IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CLAYTON McCRAY,

        Plaintiff,

v.

ALLEGHENY COUNTY, DONALD STECHSHULTE, Medical Director; NANCY PARK; JENN KELLY; NATALIE AUSTIN; LAURA WILLIAMS, Chief Deputy Warden of Healthcare Services,

        Defendants.

Civil Action No. 2:22-cv-493

**Electronically Filed**

**DEFENDANT LAURA WILLIAMS' CONCISE STATEMENT OF MATERIAL FACTS**

1. Plaintiff initiated this action by the filing of a Complaint on March 24, 2022, alleging that the Allegheny County Jail (ACJ) and various providers were deliberately indifferent to his medical care resulting in the below-the-knee amputation of his right leg. ECF Doc. 65.

2. With respect to Warden Laura Williams, Mr. McCray's Second Amended Complaint (hereinafter, the Complaint) alleges:

    a. Warden Williams was directly deliberately indifferent in refusing care to Mr. McCray; *see*, *e.g.*, *id.* at ¶¶ 123, 170–73.

    b. Or, in the alternative, that Warden Williams promulgated and acquiesced in policies that interfered with Mr. McCray's care and treatment with deliberate indifference. *Id.* at ¶ 165.

3. Throughout Mr. McCray's tenure at ACJ, Laura Williams was the Chief Deputy Warden of Healthcare. Deposition of Laura Williams, 18:24–19:19.

4. In her role, Warden Williams was an administrator of healthcare services at the prison with many administrative duties, including but not limited to:

      a.    Administrative supervision of the clinical team, with clinical supervision provided by Allegheny Health Network (AHN);

      b.    Hiring, recruitment, and discipline;

      c.    Negotiation with labor unions;

      d.    Supervision of inmate programs such as education, alternative housing, religious services and contracts for various programs and personnel; and

      e.    Working with the County leadership to secure resources for ACJ.

*Id.*, 19:24–23:19, 27:8–13.

**A.    Course of Care and Warden Williams' Involvement**

    5.    On September 23, 2019, Mr. McCray transferred to ACJ from SCI Fayette as a pre-trial detainee.

    6.    Upon admission to ACJ, Mr. McCray was assigned to general population with a lower level and lower bunk due to his disabilities. AC_CM_000881–82.[1]

    7.    On September 24, 2019, Dzenitya Turcinhodzi, PA, examined Mr. McCray. He reported a worsening wound that existed since December of 2018. Mr. McCray had been scheduled for a podiatry appointment, which had been cancelled due to his transfer to and from SCI Fayette. Mr. McCray ambulated with a cane due to his foot drop. Wound care was ordered to continue and podiatry appointment to be rescheduled. AC_CM_000495.

    8.    Per Mr. McCray, he was provided with his cane at most times during his incarceration. But recalls having his cane taken from him on one occasion while in the restricted housing unit (RHU). Deposition of Clayton McCray, 77:21–79:16.

---

[1] Where possible, this Concise Statement references the Bates Numbers as produced. Referenced excerpts attached to Appendix.

9. Mr. McCray recalls having his cane confiscated on at least one occasion because he used it in a fight. *Id.*, 161:14–17.

10. Mr. McCray's ankle-foot orthosis device (AFO) was removed from him when he was initially processed into ACJ, but was returned to him until it was lost while he was in the RHU. *Id.*, 161:18–162:18.

11. When the AFO was lost, Donald Stechschulte, M.D., entered an order for a new one. AC_CM_000514.

12. Mr. McCray received daily wound care between September 24, 2019, and January 29, 2020, with some exceptions. AC_CM_000884–001278.[2]

13. As set forth in his grievances, Mr. McCray did not receive wound care for approximately four days in October, and two-three days in December. AC_CM_002166–71.

14. In addition, Mr. McCray refused wound care, did not present for wound care, or requested dressings to complete it himself on a few occasions in that same period. AC_CM_000496, 00508, 000920, 001012, 001192, 001273. On other occasions, prison lockdown or a lack of escort interfered with the medical staff's ability to provide care. AC_CM_00499, 000501–02, 00506.

15. During this time frame, when an escort was unavailable, there were times when Mr. McCray was still able to receive wound care later in the evening. *See* AC_CM_000508.

16. Following Mr. McCray's grievances in October, Warden Williams received notice of concern with Mr. McCray's dressing changes. She noted the concern in his

---

[2] These are daily wound care records between September, 2019, and January, 2020, which represent nearly three-hundred pages. Defendant has not attached these to its Appendix, except for when a specific page is referenced. But all parties were provided these documents in discovery.

medical record and directed the Assistant Directors of Nursing (ADON's) to follow up with Mr. McCray's concerns. (AC_CM_000499, 002582).

17. On January 28, 2020, Natalie Austin, PA, examined Mr. McCray and found the wound to be improving. She also determined that Mr. McCray could do self-wound care. AC_CM_000509. PA Austin and, the following day, Nancy Park, M.D. changed Mr. McCray's wound care order to deliver supplies for daily self-wound care with weekly wound care by medical staff. AC_CM_000445.

18. On February 15 and 18, 2020, Mr. McCray filed grievances indicating that he believed he should be getting daily wound care. AC_CM_002171.

19. On February 25, 2020, Dr. Stechschulte ordered that Mr. McCray was once again to receive daily wound care. And the daily wound care regimen was renewed throughout the rest of Mr. McCray's time at ACJ. AC_CM_002171, 000446–47.

20. Mr. McCray received daily wound care between February 26, 2020, and his discharge with some exceptions. AC_CM_001293–002023.[3]

21. As set forth in his grievances, wound care was not provided for approximately four days in March and two-three days in May. AC_CM_002175-87.

22. In March, Mr. McCray filed three grievances (two on the same date) indicating that he believed his leg was worsening and outlining concerns regarding the sanitation of his cell and concerns with infection. *Id.*

23. Between February 25, 2020, and May 31, 2020, Mr. McCray was seen by a provider in ACJ (a nurse practitioner, physician assistant, or physician) who could

---

[3] These are daily wound care records between February, 2020, and October, 2020, which represent more than seven-hundred pages. Defendant has not attached these to its Appendix, except for when a specific page is referenced. But all parties were provided these documents in discovery.

prescribe medication or change Mr. McCray's wound care regimen on more than fifteen occasions, or slightly more than once a week. AC_CM_000511–21. In addition, Mr. McCray had regular appointments with physical therapists who provided recommendations to his other providers. *Id.*

24. On March 23, 2020, Warden Williams was informed, along with other staff, that Mr. McCray's March 24 outside appointment was cancelled due to COVID-19 and that it would be rescheduled. AC_CM_002421.

25. On April 14, 2020, Dr. Stechschulte noted that Mr. McCray appeared to have lost his AFO and ordered a new AFO. AC_CM_000514.

26. On May 21, 2020, Dr. Park ordered an x-ray to rule out osteomyelitis and the x-ray was reassuring. AC_CM_00519–20.

27. Nonetheless, Mr. McCray's providers remained concerned and, on May 25, 2020, ordered antibiotics as if he had osteomyelitis. AC_CM_00520.

28. On May 26 and May 27, 2020, Jennifer Kelly, RN entered orders on behalf of Dr. Park and Dr. Stechschulte, respectively to have Mr. McCray transferred to the medical housing unit (MHU). AC_CM_001508–14.

29. On May 28, 2020, Mr. McCray was suspected and found guilty of smoking synthetic marijuana in his cell on the MHU. He was sentenced to 20 days in the RHU. AC_CM_002156–57.

30. Corrections emailed Warden Williams for permission to transfer Mr. McCray to the RHU following the misconduct. Warden Williams indicated that "[u]nless he is cleared by the physicians, he needs to remain on [the MHU]." Once she was informed that he had been cleared by Dr. Stechschulte, she approved the transfer. AC_CM_002471–74.

31. Michael Warner, RN, entered the medical housing classification order permitting Mr. McCray's release to general population on behalf of Dr. Stechschulte. AC_CM_001518–19.

32. Per Mr. McCray, he was first provided a wheelchair and crutches around late May, early June. Deposition of Clayton McCray, 77:11–18; *see* AC_CM_000527 (CRNP discussing access to wheelchair on June 8, 2020); *see also* AC_CM_000446 (PA entering order for wheelchair and crutches on June 30, 2020).

33. On June 3 and 11, 2020, Dr. Park sent two emails to Warden Williams indicating that MHU housing would be preferable for Mr. McCray and on June 11, 2020, Dr. Park entered an order that Mr. McCray be transferred to the MHU upon release from the RHU. AC_CM_002483–90.

34. On June 18, 2020, Mr. McCray completed his time in the RHU. But Dr. Stechschulte indicated that he did not need to be transferred to the MHU. AC_CM_002490–92.

35. According to Mr. McCray's grievance, on June 18, 2020, Dr. Park indicated that he had been denied transfer to the MHU but, she felt, he needed to be housed in the MHU so they could keep a better eye on him. AC_CM_002185.

36. But Dr. Park entered a new Medical Housing Classification order that assigned Mr. McCray to a handicapped cell in the general population. AC_CM_001592–93.

37. Dr. Park's progress note indicated that he would be sent to a handicapped cell and provided with crutches and a wheelchair. AC_CM_000530.

38. Dr. Park testified that she was never told by Warden Williams or any corrections officers that Mr. McCray would not be transferred to the MHU despite her orders. Deposition of Dr. Park, 187:7–188:12.

39. Dr. Park testified that she felt the only time her orders were not followed was when Mr. McCray was not provided with wound care or when he was given supplies to do his own treatment. *Id.*, 188:21–189:21.

40. On June 30, 2020, Warden Williams was informed by corrections that a PA had recommended Mr. McCray go to the MHU but that placement was not possible because the MHU was full. AC_CM_002500.

41. On the same day, Dr. Park and Warden Williams discussed Mr. McCray's condition and determined that Mr. McCray was able to be transferred to the MHU. AC_CM_000533.

42. Dr. Park completed the medical housing classification order on the same day and Mr. McCray was transferred to the MHU, where he stayed for the remainder of his confinement. AC_CM_001633–34.

43. Mr. McCray's providers remained concerned about potential osteomyelitis and sought to confirm the diagnosis via tests and consultations. And the providers concluded likely osteomyelitis by July 2, 2020, via x-ray. AC_CM_000533, 536.

44. The plan was to have Mr. McCray consult with wound care and orthopedics. On July 9, 2020, the orthopedics office canceled the appointment believing that Mr. McCray should be seen by podiatry instead. AC_CM_000544–45.

45. Mr. McCray was able to go to an orthopedic consultation on July 17, 2020. The specialist ordered an MRI and vascular study. AC_CM_000551.

46.     On the same date, Warden Williams had her first documented discussion with Mr. McCray regarding his complaints while he was in the MHU.  They had a brief conversation in which they discussed his wound and his concerns.  But, no specific concerns addressed. AC_CM_000551.

47.     Mr. McCray did not specifically make Warden Williams aware of his concerns until he was placed in the MHU. *See* Deposition of McCray 206:14–18 (Mr. McCray never met Warden Williams until he was placed in the MHU); 211:22–212:22 (no grievances directed to Warden Williams until, "maybe," when Mr. McCray was already in the MHU); AC_CM_002166–2193 (no documented grievances directed to Warden Williams).

48.     Mr. McCray's providers attempted to get the MRI scheduled as soon as possible, but the next date offered was in October. AC_CM_000559–60.  So, on August 1, 2020, PA Austin noted that the MRI continued to be pushed out due to COVID-19 restrictions.  And she had Mr. McCray transferred to the emergency department for MRI and intravenous antibiotics. . AC_CM_000561–62.

49.     On August 1, 2020, Warden Williams summarized Mr. McCray's hospital visit to the ADON's and medical staff via email. AC_CM_002513.

50.     Despite PA Austin's request, the orthopedic resident told her that the MRI and vascular study was not emergent and scheduled Mr. McCray on an outpatient basis for August 17, 2020. AC_CM_000562.

51.     On August 17, 2020, Dr. Park noted that the MRIs indicated that Mr. McCray had severe osteomyelitis.  The MRI was forwarded to orthopedics for review. AC_CM_000572.

52. On August 25, 2020, orthopedics returned Drs. Stechsculte's and Park's repeated calls and recommended a right below-the-knee amputation. AC_CM_000575–76.

53. On September 4, 2020, Mr. McCray had an appointment with orthopedics at which they discussed his treatment options. The orthopedics office ultimately recommended a right below-the-knee amputation. AC_CM_000584.

54. Mr. McCray consented to the surgery which was scheduled for September 16, 2020. But, on September 8, 2020, Mr. McCray requested a second opinion. AC_CM_000586–87.

55. On September 8, 2020, Dr. Park informed Warden Williams that Mr. McCray wanted a second opinion. Warden Williams told Dr. Park to proceed with a second opinion. AC_CM_000587.

56. On September 12, 2020, following dissatisfaction with his request for a second opinion, Warden Williams and Mr. McCray had a discussion. Mr. McCray wanted a second opinion from UPMC. Warden Williams informed him that he had a right to a second opinion but not to choose the provider. Mr. McCray was frustrated with Warden Williams' responsiveness. AC_CM_000590.

57. Mr. McCray obtained a second opinion on September 15, 2020. The provider agreed that right below-the-knee amputation was appropriate. AC_CM_000591.

58. On September 16, 2020, Mr. McCray receive a right below-the-knee amputation at Allegheny General Hospital. AC_CM_000592.

59. On October 3, 2020, after his amputation, Warden Williams discussed Mr. McCray's concerns about his ability to access tablets in the MHU and his mental state following the amputation. AC_CM_000604.

B.  **ACJ Policies and Procedures**

60. Warden Williams was a part of the team that created and implemented policies and procedures, which could include numerous members of the healthcare leadership dependent on the nature of the policy. Deposition of Laura Williams, 25:5–26:4.

61. Warden Williams did not unilaterally create and implement healthcare policies at ACJ. *Id.* And ACJ policies follow, in part verbatim, the National Commission on Correctional Health Care (NCCHC) standard. Deposition of Holly Martin, 45:11–18.[4]

62. ACJ's policy for the use of medical equipment, such as canes, wheelchairs, crutches, and AFOs required a provider to prescribe the equipment. Once a prescription was obtained, corrections would be notified that the inmate could have the equipment. And corrections could not confiscate a prescribed medical device absent an immediate safety concern. Deposition of Laura Williams, 62:4–66:2, 172:9–24; Deposition of Holly Martin, 34:24–35:11; AC_CM_004378–82.

63. ACJ's wound care policy required medical personnel to follow providers' wound care orders. And wound care would be provided regardless of where the inmate was housed. Deposition of Holly Martin, 63:16–64:12, 75:1–76:3, 78:4–16.

64. ACJ's policy for assignment to the MHU required an order from a physician, with no additional sign off, until COVID. During the initial days of COVID-19, transfer of any inmate required an additional sign off to confirm whether the inmate was being transferred from quarantine—in which case additional precautions were required. But an inmate would still be transferred per the prescriber's orders. Deposition of Laura Williams, 66:4–

---

[4] Holly Martin was an ACJ corporate designee.

67:20; Deposition of Holly Martin, 112:25–115:15; AC_CM_004386–4395 (provider required to admit patient to MHU).

65. A provider medically cleared a patient prior to transfer out of the MHU to anywhere in the jail. Deposition of Laura Williams, 71:25–75:16; Deposition of Holly Martin, 112:25–115:15; AC_CM_004386–4395.

66. Corrections could offer concerns about an inmate's transfer, but the inmate would be transferred to the MHU based on the medical need as articulated by the provider. Deposition of Holly Martin, 112:25–115:15.

67. Specific to the RHU, an inmate had to be cleared by the provider through normal medical housing classification process and had to go through a medical screening process specific to RHU status. Deposition of Laura Williams, 71:25–75:16, 164:8–165:23; AC_CM_004386–4395, 000080.

68. Similarly, the provision of nutritional supplements and medications required an order from the provider, which nursing would then follow. Deposition of Laura Williams, 120:18–121:19; Deposition of Holly Martin, 34:24–35:11; AC_CM_004260–61, 004230–45.

69. To the extent that an outside specialist made a recommendation for a patient's care, the medical provider would review and determine the treatment plan. Deposition of Holly Martin, 86:5–19.

70. There is no testimony or documentary evidence of any kind indicating that Warden Williams instructed any medical provider, other medical personnel, or corrections personnel to disregard or disobey these policies.

71. There is no testimony or documentary evidence of any kind indicating that Warden Williams ever overruled a provider's prescription, medical decision or other order. Indeed, the uncontroverted testimony has been that she did not. Deposition of Dr. Stechschulte, 27:3–19; 30:11–13; Deposition of Dr. Park, 187:22–189:21; Deposition of Laura Williams, 199:24–200:6.

**C.    The Experts**

72. Plaintiff produced the expert liability report of Lee Ruotsi, M.D, dated January 5, 2025.

73. Dr. Ruotsi is a family practice and wound care specialist with significant experience in hospitals and skilled nursing facilities. Curriculum Vitae of Lee C. Ruotsi, M.D.

74. Dr. Ruotsi has no experience in correctional settings and no experience as a prison healthcare administrator. *Id.*

75. Dr. Ruotsi's report only mentions Warden Williams in two paragraphs of his twenty-page report. Expert report of Dr. Ruotsi, p. 6.

76. In those paragraphs, Dr. Ruotsi states the following with respect to Warden Williams:

   a. Warden Williams was aware of Mr. McCray's condition upon transfer to ACJ.

   b. Warden Williams "effected regulations and permitted corrections to take actions" that interfered with his specialists' order, particularly by not ensuring he received accommodations on the MHU.

   c. That Dr. Stechschulte and Dr. Park also knew that such accommodations were necessary but did not order the care requested by Mr. McCray's specialists.

   d. That Warden Williams "allowed ACJ staff" to confiscate Mr. McCray's devices and placed him into restrictive housing (without citation).

*Id.*

77. Dr. Ruotsi does not state that Warden Williams was a medical provider, nor that Warden Williams disregarded or otherwise interfered with any medical order that was actually prescribed or entered into the medical record by Mr. McCray's ACJ providers. *Id.*

78. Indeed, Dr. Ruotsi argues in those paragraphs that Dr. Stechsculte and Dr. Park knew of and failed to provide orders or otherwise act consistent with Mr. McCray's outside providers' recommendations. *Id.*

79. Defendant, Laura Williams, produced the report of Sean T. Stewart, dated January 28, 2025.

80. Mr. Stewart has decades of experience in the correctional setting, including overseeing corrections officers and medical services. Expert report of Mr. Stewart, § VII.

81. Mr. Stewart opines that Warden Williams did not dictate treatment for Mr. McCray and reasonably relied on the prescriptions, orders, and care provided by the medical providers. *Id.*, p. 6–10.

82. Mr. Stewart further opines that the ACJ policies were appropriate and consistent with national standards. *Id.*

|  |  |
|---|---|
|  | DICKIE, McCAMEY & CHILCOTE, P.C. |
| Date:  7/30/2025 | By:  */s/ Kelly B. Cullen* <br> Jeffrey J. Wetzel <br> PA I.D. #92843 <br><br> Kelly B. Cullen <br> PA I.D. #327210 <br><br> Four Gateway Center <br> 444 Liberty Ave, Suite 1000 <br> Pittsburgh, PA  15222-1225 <br><br> Attorneys for Defendant, <br> Laura Williams |

**CERTIFICATE OF SERVICE**

I, Kelly B. Cullen, Esquire, hereby certify that a true and correct copy of the foregoing Concise Statement of Material Facts has been served this 30th day of July, 2025, by ECF to all counsel of record.

DICKIE, McCAMEY & CHILCOTE, P.C.

By: _/s/ Kelly B. Cullen_
     Kelly B. Cullen

Attorneys for Defendant,
Laura Williams