**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

CLAYTON McCRAY,

          Plaintiff,

        v.

ALLEGHENY COUNTY, DONALD
STECHSHULTE, Medical Director; NANCY
PARK; NATALIE AUSTIN; LAURA
WILLIAMS, Chief Deputy Warden of
Healthcare Services,

          Defendants.

Civil Action No.  2:22-cv-493

**Electronically Filed**

**<u>DEFENDANT, LAURA WILLIAMS' APPENDIX
TO CONCISE STATEMENT OF MATERIAL FACTS</u>**

| | |
|---|---|
| Plaintiff's Second Amended Complaint | 1 |
| Allegheny County Bates-Stamped Documents | 84 |
| Deposition of Laura Williams (Excerpts) | 232 |
| Deposition of Clayton McCray (Excerpts) | 260 |
| Deposition of Holly Martin (Excerpts) | 266 |
| Deposition of Donald Stechschulte (Excerpts) | 281 |
| Deposition of Nancy Park (Excerpts) | 284 |
| Expert Report of Lee Ruotsi, M.D. | 286 |
| Curriculum Vitae of Lee Ruotsi, M.D. | 306 |
| Expert Report of Sean T. Stewart | 314 |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CLAYTON MCCRAY;** | : | |
| | : | **Case No. 2:22-cv-00493-LPL** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **ALLEGHENY COUNTY; DONALD** | : | **ELECTRONICALLY FILED** |
| **STECHSHULTE, Medical Director; NANCY** | : | |
| **PARK; JENNIFER KELLY; LAURA** | : | |
| **WILLIAMS, Chief Deputy Warden of** | : | **JURY TRIAL DEMANDED** |
| **Healthcare Services** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

## SECOND AMENDED COMPLAINT

Plaintiff files this Second Amended Complaint, to which Defendants' do not object, pursuant to Fed. R. Civ. P. 15(a)(2).

## INTRODUCTION

1.     Plaintiff Clayton McCray brings this lawsuit to defend his dignity, vindicate his rights and shine a light on the inhumane treatment endured by people incarcerated in Allegheny County. In 2020, McCray, who was 26 years old at the time, was as a pretrial detainee on a probation detainer at the Allegheny County Jail (ACJ), when he required a right below-the-knee amputation because Defendants Dr. Donald Stechshulte, Dr. Nancy Park, and Jen Kelly failed to provide McCray with adequate medical care for an infected non-healing open wound on his right heel. This wound had been treated successfully, shortly before the amputation while he was incarcerated at State Correctional Institution (SCI)-Fayette and SCI-Mercer. However, Defendants' inadequate medical care, coupled with ACJ's numerous violations of the Americans With Disabilities Act, including denying McCray his prescribed brace, orthotic shoe, cane and other assistive medical devices, and failing to accommodate him with a handicap accessible cell,

1

caused his foot wound to worsen into osteomyelitis, a serious bone infection. Within months, McCray required an amputation of his leg.

2.     At all relevant times hereto, Defendant Deputy Warden Laura Williams had actual knowledge of the severity of McCray's progressively worsening foot condition and pain. Defendant Williams promulgated and authorized policies, practices and procedures that she knew contravened orders made by McCray's outside doctors and that these contraventions would cause McCray harm. Defendant Williams also permitted ACJ staff to confiscate McCray's prescribed assistive devices, and she placed or kept McCray in solitary confinement and in housing conditions where she knew he would be denied accommodations and medical treatment he needed for his non-healing open infected wound.

3.     Defendants' misconduct and malpractice caused McCray to needlessly suffer. He seeks compensation for his injuries including the permanent loss of his right lower leg, significant pain and distress, severe mental anguish, and compensation for his future medical expenses.

## JURISDICTION AND VENUE

4.     This case is brought pursuant to the Fourteenth Amendment of the United States Constitution, 42 U.S.C.§ 1983, 28 U.S.C. §§ 2201, 2202, the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq*., and Pennsylvania state law.

5.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3)-(4), and 1367(a).

6.     This Court is the appropriate venue pursuant to 28 U.S.C. § 1391(b)(2) because the events and omissions giving rise to the claims occurred in Allegheny County, in the Western District of Pennsylvania.

**PARTIES**

7.     Plaintiff Clayton McCray had, at all relevant times, a physical disability in his right foot. In 2018, McCray developed a neuropathic ulcer or wound on his right heel, which was successfully treated at correctional facilities SCI-Fayette and SCI-Mercer where he was incarcerated.  From September 2019 to October 2020, McCray was a pretrial detainee on a probation detainer at ACJ. Defendants denied McCray standard medical care, his prescribed assistive devices, and accommodations, causing him to develop a life-threatening bone infection, and within months required him to have a right below the knee amputation.

8.     Defendant Donald Stechshulte, M.D. is and was, at all relevant times, an employee of Allegheny County, serving as the Medical Director of ACJ. Defendant Dr. Stechshulte was, at all relevant times, acting under the color of state law. He is sued in his individual capacity.

9.     Defendant Nancy Park, M.D. is and was, at all relevant times, an employee of Allegheny County, serving as a physician for ACJ. Defendant Dr. Park was, at all relevant times, acting under the color of state law. She is sued in her individual capacity.

10.     Defendant Jen Kelly is and was, at all relevant times, an employee of Allegheny County, serving as the Assistant Director of Nursing for ACJ. She was a registered nurse and responsible for overseeing the distribution of medication, the administration of wound care and debridement treatments, the distribution of nutritional supplements to malnourished patients, among other duties. Defendant Kelly was, at all relevant times, acting under the color of state law. She is sued in her individual capacity.

3

11.     Defendant Laura Williams was, at all relevant times, the Deputy Warden of Healthcare Services for ACJ. She was responsible for oversight and administration of the provision of medical healthcare at ACJ, staff training, and ensuring accommodations for incarcerated people with physical or psychiatric disabilities. Defendant Williams was, at all relevant times, acting under the color of state law. She is sued in her individual capacity.

12.     Defendant Allegheny County is a county government organized and existing under the laws of the Commonwealth of Pennsylvania. Allegheny County is in possession and control of ACJ.

## STATEMENT OF FACTS

### McCray Developed Physical Disabilities Due to Gunshot Wound

13.     In 2011, McCray developed physical disabilities after suffering a gunshot wound to his spine. He underwent surgery that resulted in the removal of one of his kidneys, which made him unable to tolerate certain types of antibiotics without becoming extremely ill.

14.     The gunshot also injured McCray's lumbar spine, causing him neuropathy and resulting in his right foot a condition known as "drop foot"—foot dragging—and numbness. McCray's foot condition made him extremely vulnerable to developing neuropathic ulcers or wounds on his right foot, which were highly likely to worsen into a severe bone infection—osteomyelitis—without standard medical care, sanitary conditions, accommodations, or assistive devices.

15.     McCray's foot condition is and was, at all relevant times, a physical disability.

16.     Following McCray's surgery in 2011, his doctor prescribed him a cane, crutches, and physical therapy for his foot disability.

17.     Before his confinement at ACJ in September 2019, McCray was able to play

4

basketball, exercise in a gym, and participate in similar recreational activities even though he had these physical disabilities.

### Neuropathic Ulcers & Osteomyelitis Are Serious Medical Conditions That Require Proper Diagnosis, Constant Monitoring and Daily Treatment

18.     Neuropathic ulcers are a type of wound. They "occur when a patient with poor neurological function of the peripheral nervous system has pressure points that cause ulceration through the epidermal and dermal tissue layers."[1]

19.     "Ulcers occur most commonly on the underside of the foot (plantar surface) and on the top of the toes or dorsal surface. They are secondary to repetitive stress. Those ulcers that present emergently and tunnel deep into the tissue are at higher risk for infection."[2]

20.     "Neuropathic ulcers with signs of cellulitis, abscess, gangrene, or deep ulceration greatly increase the risk for amputation."[3]

21.      Neuropathic ulcers are highly likely to become infected and result in osteomyelitis without sufficient medical treatment. [4]

22.     Osteomyelitis is a serious infection of the bone; it can be lethal, cause significant pain and bone loss, or require amputation of the infected body parts without sufficient medical treatment.[5]

---

[1] David M. Eastman & Mark A. Dreyer, *Neuropathic Ulcer*, StatPearls Publishing, https://www.ncbi.nlm.nih.gov/books/NBK559214/ (last updated Jan. 9, 2022).
[2] Federal Bureau of Prisons, Prevention and Management of Acute and Chronic Wounds: Federal Bureau of Prisons Clinical Practice Guidelines (2014), https://www.bop.gov/resources/pdfs/wounds.pdf.
[3] *Id.*
[4] *Id.*
[5] *Osteomyelitis*, Johns Hopkins Medicine, https://www.hopkinsmedicine.org/health/conditions-and-diseases/osteomyelitis#:~:text=Osteomyelitis%20is%20inflammation%20or%20swelling,can%2

5

23.     Upon information and belief, ACJ's medical standards for diagnosing and treating wounds of incarcerated persons is based on, in part, the Pennsylvania Department of Corrections' standards, which is in turn based on, in part, federal prison guidelines for wound care.

24.     The Federal Bureau of Prisons (BOP) Clinical Practice Guidelines for Prevention and Management of Acute and Chronic Wounds recommends guidelines for diagnosing and treating neuropathic ulcers and resulting osteomyelitis. Standard medical treatment for a neuropathic ulcerative wound includes[6] —

> i.   wound care, consisting of cleaning the wound in a sterile environment to prevent dirt or bacteria from inflaming or infecting it, applying medicated solution to the infected area, and dressing or wrapping the wound with clean, dry gauze daily or twice a day depending on the severity of the wound;
>
> ii.  debridement—the removal of necrotic, dead skin/tissue;
>
> iii. the proper dosage of antibiotics administered for the standard 14 days to eliminate the infection and adequate pain medication to lessen pain caused by the infection or wound;
>
> iv.  x-rays or MRIs to determine if the infection has spread to the bone;
>
> v.   adequate nutrition to promote healing;

---

0happen%20at%20any%20age; Ilker Uckay & Daniel Lew, *Osteomyelitis*, Infectious Disease Advisor, https://www.infectiousdiseaseadvisor.com/home/decision-support-in-medicine/infectious-diseases/osteomyelitis-4/.

[6] Federal Bureau of Prisons, Prevention and Management of Acute and Chronic Wounds: Federal Bureau of Prisons Clinical Practice Guidelines (2014), https://www.bop.gov/resources/pdfs/wounds.pdf.

6

  vi. and accommodations for the patient, including providing him with assistive

   medical devices such as a brace, orthotic shoe, cane, crutches, walker,

   wheelchair; and providing proper handicap accessible housing to allow the

   patient to move about safely and prevent exacerbating his foot wound and

   mitigate his pain and discomfort.

25. Symptoms of an infected wound include swelling, tenderness or pain around the

wound, lack of healing of the wound for 2 weeks, an odor, pus or cloudy drainage, discoloration,

fever, and pain.[7]

### Prisons Provided McCray with Standard Medical Care & Accommodations for his Neuropathic Wound on his Right Heel

26. On information and belief, McCray's physical disability and his need for

assistive devices were documented in his medical records, which were provided to every

correctional facility where he was confined.

27. Around December 2018, McCray developed a minor neuropathic ulcer on his

right heel while he was serving a sentence at SCI-Fayette, a prison in Pennsylvania.

28. On information and belief, staff at SCI-Fayette recognized McCray's foot

condition qualified as a physical disability under federal disability laws and provided him with

adequate medical care and accommodations. Medical staff members cleaned McCray's foot

wound in a sterile room daily to prevent infection. SCI-Fayette accommodated McCray by

housing him in a handicap accessible cell on the first floor. A prison doctor prescribed McCray

---

[7] *Id.*

7

an orthotic shoe,[8] AFO brace, heel cups, insoles, and a cane so he could walk around safely and protect his wound from inflammation and infection.

29.      When McCray's foot became infected three months later, SCI-Fayette immediately sent him to UPMC Presbyterian, where he received a PICC line of antibiotics to treat his infection. McCray received in-patient treatment at the hospital for two weeks and remained there until he transferred to a SCI-Mercer, another Pennsylvania state prison.

30.      In May 2019, McCray was transported from UPMC Presbyterian to SCI-Mercer. The prison permitted McCray to receive out-patient treatment for his foot wound and infection at UPMC Presbyterian.

31.      On information and belief, staff at SCI-Mercer recognized McCray's foot condition qualified as a physical disability under federal disability laws and provided him with adequate medical care and accommodations. SCI-Mercer medical staff provided McCray with proper wound care. SCI-Mercer provided McCray with a handicap accessible cell on the first floor and permitted McCray to wear his prescribed orthotic shoe and AFO brace and use his cane.

32.      In June 2019, McCray was transferred from SCI-Mercer to SCI-Fayette where he was released in September 2019. While at SCI-Fayette, staff provided McCray with accommodations and standard medical care for his foot wound. Additionally, a prison doctor prescribed McCray debridement treatments to occur every one to two months, which he received

_____

[8] McCray's orthotic shoe resembled a sneaker; it enabled him to wear and use his other medical devices such as his brace, heel cups, and insoles. At ACJ, this shoe is not available to the general population, and it could not be purchased through commissary. Incarcerated persons were completely reliant on the staff and the administration to obtain the shoe and permit them to wear it.

8

at offsite medical facilities.

## ACJ Denied McCray Standard Medical Care & Accommodations Causing His Infected Foot Wound to Worsen & Requiring Amputation of His Right Lower Leg

33.     In September 2019, McCray was admitted at ACJ because a probation detainer was lodged against him for a minor possession charge.

34.     McCray was a pretrial detainee while he was detained at ACJ up until September 30, 2020.

### ACJ Denied McCray His Prescribed Assistive Devices

35.     The BOP Clinical Practice Guidelines for Prevention and Management of Acute and Chronic Wounds state that assistive devices are critical for healing neuropathic ulcers and decreasing the risk of amputation.[9]

36.     The BOP guidelines state that patients with a neuropathic ulcer must be provided with an orthotic shoe or brace specifically designed to "offload" or relieve pressure from the ulcer and prevent shearing—pulling on tissue—and friction—blistering or removal of top layer skin—over the affected areas.[10]

37.     The BOP guidelines state patients with a neuropathic ulcer should be on their feet as little as possible. The guidelines recommend providing patients with other accommodations to limit them from standing and walking to reduce exacerbating their neuropathic ulcer.[11]

38.     The BOP guidelines also recommend providing patients "a walker, in addition to

---

[9] *Id* ("Without these two forms of intervention," assistive devices and wound debridement treatments, "the chances of meeting healing goals and preventing amputation are unlikely.").
[10] *Id.*
[11] *Id.*

9

a wheelchair, in order to transfer from one surface to another without standing on the affected foot." [12]

39.     The BOP guidelines recommend providing accommodations to reduce the patient's weightbearing while showering: "It is <u>optimal</u> to have patients with neuropathic foot ulcers shower in a handicap stall that allows them to sit. Standing in the shower should be avoided." [13]

40.     Defendants knew McCray had a non-healing neuropathic foot wound.

41.     Defendants knew outside doctors had prescribed McCray with wound care, assistive devices, and other accommodations for his foot condition.

42.     Upon admission to ACJ, McCray told the medical staff about his physical disability and the treatment and accommodations he received at SCI-Fayette and SCI-Mercer. McCray also informed the staff that his prison doctor prescribed him an orthotic shoe, AFO brace and cane, which were medically necessary to prevent the significant risk of him developing infected neuropathic ulcers on his right foot or falling. McCray attests that he was permitted to use these assistive devices at the prisons prior to his arrival at ACJ.

43.     ACJ staff received McCray's medical records from SCI-Fayette and SCI-Mercer, confirming that the prisons had provided him accommodations and permitted him to use an orthotic shoe, AFO brace and cane, which were prescribed to accommodate his disability.

---

[12] *Id.*

[13] Prevention and Management of Acute and Chronic Wounds Federal Bureau of Prisons Clinical Practice Guidelines (2014), https://www.bop.gov/resources/pdfs/wounds.pdf.

10

September 20, 2019

To whom this may concern:

RE: *McCray, Clayton # LX7447*

DOB: 7/30/1994

The above inmate will be transferring to your facility in the near future. He requires the use of the following medical devices:

- Cane
- Ankle brace
- Heel cups/lift
- AFO brace
- Insoles

Please feel free to give me a call if you should need any further information.

Sincerely,

Rachel Medlock

Health Service Administrator

WellPath

SCI – Fayette Prison

724-785-2837

*Letter from Health Services Administrator of SCI-Fayette sent to ACJ, states McCray "will be transferring to your facility in the near future. He requires the use of the following medical devices: cane, ankle brace, heel cups/lift, AFO brace, insoles."*

44.     Despite this knowledge, upon McCray's admission to ACJ, staff confiscated McCray's prescribed orthotic shoe and AFO brace without justification and did not provide McCray with an alternative assistive device to accommodate his disability.

45.     From September 2019 to June 30, 2020, ACJ staff routinely prohibited McCray from using his prescribed assistive devices on nearly every pod he was housed except for the Medical Housing Unit (MHU).

46.     From September 2019 to June 30, 2020, McCray was prevented from using his

11

assistive devices for no more than a few weeks, days, or in some instances, only a few hours at a time because ACJ staff often confiscated them without justification. Also, ACJ staff often prohibited McCray from using his medical devices such as his crane, crutches, and wheelchair inside his cell, forcing him to hop on one foot or crawl to his cell door to retrieve his meals and medications.

47.     Defendants Dr. Stechshulte, Dr. Park, and Williams were responsible for ensuring that McCray received his prescribed medical devices and was permitted to use them while he was incarcerated in ACJ from September 2019 to October 2020. From September 2019 to June 30, 2020, Defendants Williams, Dr. Stechshulte, and Dr. Park permitted ACJ staff to confiscate McCray's prescribed assistive devices, despite knowing that the devices were medically necessary for McCray, who they knew had experienced numerous falls and whose foot wound, infection, and pain worsened without them.

48.     Defendants Williams, Dr. Stechshulte, and Dr. Park also knew that unless McCray had his assistive devices, he was unable to participate in ACJ's programs, benefits, and services, including recreation, showers, meals, cell cleanings, and access to the law library kiosk, among other programs.

49.     ACJ denied McCray's requests for a shower chair or handicap accessible showering stall that would have allowed him to sit safely while showering and even though these accommodations were recommended by ACJ health providers, including Defendant Park, and required by medical standards. As a result, McCray was prevented from showering and cleaning his wound regularly because it was difficult for him to maintain balance while standing unassisted on his non-infected foot in a flimsy, plastic flip flop on a slippery wet floor.

50.     Furthermore, without his assistive devices, McCray was unable to recreate

12

because he could not maintain balance, move about safely, or protect his neuropathic foot wound with the flimsy shoe that the jail provided, which did not satisfy BOP guidelines for a specialty shoe for patients with neuropathic ulcers.

<u>ACJ Denied McCray Adequate Wound Care</u>

51.     The BOP guidelines state that wound care and especially debridement treatments are necessary for healing neuropathic ulcers and preventing amputation.[14]

52.     Defendants Dr. Stechshulte, Dr. Park, and Kelly were responsible for ensuring that McCray received his wound care as prescribed while he was incarcerated in ACJ from September 2019 to October 2020. During this time, ACJ failed to provided McCray with daily wound care and several debridement treatments as his doctors had prescribed. Initially, trained medical staff administered his wound care in a sterile setting like ACJ's infirmary on pod 5B. But by December 2019 and subsequently, ACJ medical staff routinely changed McCray's dressing in a dirty cell or refused to apply his wound care altogether. On several occasions, a staff member dropped off wound care supplies, which were sometimes missing medicated solution or gauze, and told McCray that if he wanted his wound cleaned and disinfected, then he would have to do it himself without gloves in his unsanitary cell.

53.     Additionally, ACJ corrections staff prevented McCray from receiving wound care by denying his requests to be escorted to the infirmary or treatment room where it was to occur.

54.      Several times, McCray did not receive his debridement treatments as medically prescribed.

55.     Around December 18, 2019, McCray's submitted grievance, in which he alleged

---

[14] *Id.*

13

that he was not receiving wound care as prescribed and feared that his open foot wound was at risk of being infected.

56.     ACJ's grievance coordinator spoke to McCray about his grievance, but the grievance coordinator's recommendations for medical care and accommodations were not carried out by ACJ staff or were overridden by Defendants. Those Defendants – Dr. Stechshulte, Dr. Park, and Kelly – knew McCray did not received adequate wound care while he was confined at ACJ.

57.     Defendant Kelly was the Assistant Director of Nursing for ACJ. She was responsible for overseeing and ensuring that medical staff administered wound care and debridement treatments as prescribed to patients like McCray.

58.     McCray was entirely dependent on Defendants Dr. Stechshulte and Kelly for providing or ensuring his prescribed wound care and debridement treatments.

59.     Defendant Kelly was aware from ACJ healthcare providers and through the grievance system that McCray was not receiving daily wound care and several debridement treatments as prescribed by his outside doctors. Similarly, Defendants Dr. Stechshulte and Dr. Park were aware of McCray's ongoing inadequate wound care from ACJ staff members and from their interactions with McCray from September 2019 to October 2020.

60.     On information and belief, Defendant Kelly frequently notified Defendant Williams of these significant and persistent deficiencies with McCray's wound care when they occurred.

61.      Despite Defendants Dr. Stechshulte, Dr. Park and Kelly knowing of McCray's serious medical need for his prescribed wound care and the significant, ongoing deficiencies with McCray's wound care and debridement treatments, which placed him at a substantial risk of

14

physical harm, including serious, potentially life-threatening infection, amputation, and significant pain and discomfort, Defendants Dr. Stechshulte, Dr. Park and Kelly failed to take standard measures to ensure McCray received adequate wound care and debridement treatments.

62.     On information and belief, Defendants Dr. Stechshulte, Dr. Park, Kelly and ACJ medical staff improperly documented McCray's symptoms, condition, diagnoses, or medical treatment in his ACJ medical records or made false or misleading entries to conceal their failure to provide McCray with adequate medical care.

63.     Over the following months, McCray's foot condition worsened significantly, with discoloration of his skin, swelling and redness as his sore grew larger.



*McCray's Foot Wound*

64.     In December 2019, McCray filed a motion in his probation detainer case, seeking a transfer to Renewal, an alternative housing diversion program. McCray told Judge Randal

15

Todd that ACJ's deficient medical care was causing his foot condition to worsen significantly and pleaded with the Judge to transfer him to the diversion program where he could obtain better medical treatment. Judge Todd denied McCray's motion.

65.     Defendants Dr. Stechshulte and Dr. Park were responsible for ensuring that McCray received prescribed physical therapy while he was incarcerated in ACJ from September 2019 to October 2020. Although a doctor prescribed McCray physical therapy to prevent his right leg muscles from atrophying, McCray was denied physical therapy because it was frequently cancelled or not provided by medical staff or corrections officers prevented him from attending his physical therapy appointments.

<u>ACJ Denied McCray Standard Pain Medication</u>

66.     The BOP guidelines state "[p]roper assessment and subsequent interventions to control pain is an integral part of wound care." [15] The BOP guidelines state the consequences of uncontrolled "[p]ain can significantly affect a patient's quality of life, sleep cycle, and psychosocial status. In addition, inadequately treated acute pain can lead to the development of chronic disabling neuropathic pain."[16]

67.     The BOP guidelines state that "[i]nadequate treatment of pain can also lead to poor wound healing and increased infection rates."[17]

68.     The BOP guidelines recommend that "[t]he patient's experience of pain and management strategies should be reviewed at each 2-week re-assessment, and on an as-needed basis. This review should include the patient's day-to-day experience of pain from the wound, as

---

[15] *Id.*
[16] *Id.*
[17] *Id.*

16

well as the patient's episodic pain related to treatments and any chronic neuropathic pain. Reasonable attempts should be made to minimize these different types of pain."[18]

69.     Defendants Dr. Stechshulte and Dr. Park were responsible for ensuring that McCray received adequate pain medications while he was incarcerated in ACJ from September 2019 to October 2020. During this time, Defendants Dr. Stechshulte and Dr. Park did not abide by medical standards for managing McCray's pain. Defendants Dr. Stechshulte and Dr. Park's failure to prescribe McCray adequate pain relievers put him at a significant risk of harm by delaying his wound from healing and increasing his likelihood of contracting a serious infection and amputation.

70.     The denial of McCray's assistive devices forced him to walk on his inflamed or infected non-healing open wound causing him significant pain.

71.     McCray was diagnosed with chronic pain, which was documented in his ACJ medical records.

72.     In January 2020, McCray repeatedly told ACJ staff that his pain and infection in his foot were getting worse. He also told Defendants Dr. Stechshulte and Dr. Park that his pain management needs were not being met.

73.     On information and belief, Defendants Dr. Stechshulte and Dr. Park knew McCray's pain medications and dosages defied medical standards and were inadequate to alleviate his pain, but they deliberately chose not to prescribe him standard pain medications that were available.

74.     As a result, McCray suffered excruciating pain that it caused him to fall or lose

---

[18] *Id.*

17

control of his bladder and urinate on himself. Additionally, McCray's pain often prevented or limited him from retrieving meal trays, cleaning his cell, showering, and recreating, caused loss of appetite, and substantially increased the risk of delaying his wound from healing and increasing his risk of amputation.

<u>ACJ Failed to Provide McCray Adequate Nutrition</u>

75.     The BOP guidelines state "that nutrition is an important aspect of a comprehensive care plan for treatment of wounds" because "[a]dequate calories, protein, fluids, vitamins, and minerals are required by the body to maintain tissue integrity, to prevent breakdown, and to support the body's natural healing processes."[19]

76.     The BOP guidelines state "[n]utrition deficiencies may contribute to delayed wound healing, and assessment of nutrition status should be performed in all chronic wound patients who are not meeting healing goals after four weeks of basic wound care interventions."[20]

77.     The BOP guidelines recommend providers have a registered dietician assess the patient's nutritional needs and ensure that the patient is provided with additional food or nutritional supplements as recommended.

78.     Defendants Dr. Stechshulte, Dr. Park and Kelly were responsible for ensuring that McCray received adequate nutrition while he was incarcerated in ACJ from September 2019 to October 2020, but they failed to do so.

79.     On information and belief, from September 2019 to October 2020, Defendants Dr. Stechshulte and Dr. Park did not do a basic or comprehensive assessment of McCray's

---

[19] *Id.*
[20] *Id.*

18

nutritional needs, contravening medical standards, and Defendants Dr. Stechshulte and Dr. Park knew their contraventions were substantially likely to delay healing of McCray's open wound and put him at a substantial risk of harm.

80.     On information and belief, Defendants Dr. Stechshulte and Dr. Park knew McCray failed to receive nutritional supplements they prescribed him, yet they failed to take corrective action.

81.     On information and belief, Defendant Kelly knew that McCray was not receiving his boost nutritional supplement as prescribed, but she failed to take corrective action.

82.     As a result of Defendants' failure to provide McCray adequate medical care and nutrition, McCray lost over 20lbs in less than 6 months.

83.     Defendants Dr. Stechshulte and Dr. Park knew that McCray's malnutrition was in part due to his pain and from being unable to retrieve his meal trays. Despite this knowledge, Defendants did not accommodate McCray such as bring him a meal tray when he could not retrieve it himself.

<u>ACJ Denied McCray Housing Accommodations</u>

84.     ACJ's MHU, at all relevant times, provided housing for patients with serious medical needs. The MHU was specifically designed for treating patients with frequent wound care needs. Because the MHU had healthcare staff on duty 24/7 and physicians conducted daily rounds, ACJ was able to ensure that infirmed or disabled patients were closely monitored, their medical conditions were assessed daily, and they received immediate medical treatment if their medical condition worsened. Patients were kept in large handicap accessible rooms and were permitted to use their assistive devices. Patients prescribed physical therapy could have it in their rooms.

19

85.     In September 2019, Defendant Williams helped establish criteria for individuals who should be housed on MHU: (1) anyone with an assistive/ambulatory device (crutches, walker, cane, wheelchair); (2) someone with frequent wound care orders; and (3) diabetic patients. At all relevant times, McCray's serious medical needs for assistive devices and daily wound care treatment satisfied two out of the three criteria for housing a patient on the MHU.

86.     On information and belief, the MHU had several unoccupied rooms available every month from September 2019 to July 2020.

87.     The MHU, at all relevant times, was the only housing unit in ACJ that permitted patients to be 100% non-weight bearing, use their assistive devices, and provided constant monitoring and daily treatment of wounds with immediate access to medical staff, supplies, and sterile treatment rooms for applying wound care dressings.

88.     Defendants Dr. Stechshulte and Dr. Park were responsible for ensuring that McCray received housing that accommodated his medical conditions and disabilities, including housing on a lower tier or in MHU, while he was incarcerated in ACJ from September 2019 to October 2020.

89.     Around September 2019, October to November 2019, and February to March 2020, Defendants Dr. Stechshulte and Dr. Park failed to ensure McCray was housed on a lower tier and given a lower bunk bed, which was recommended by prison doctors and necessary to prevent McCray's foot wound from being exacerbated and reduce the risk of him falling.

90.     From September 2019 to October 2020, Defendants Stechshulte and Park were responsible for ensuring McCray was housed in a location, such as MHU, where he would be permitted to use his medical devices, receive wound care, and have access to medical services.

91.     Although ACJ healthcare providers were authorized to house patients in the

20

MHU, from September 2019 to June 30, 2020, Defendants Williams repeatedly overrode ACJ doctors', including those by Defendants Dr. Stechshulte and Dr. Park, and outside doctors' recommendations to house McCray in the MHU where he would be non-weight bearing as doctors had prescribed.

92.     On March 24, 2020, McCray was transferred to pod 8E, a segregated housing pod, placed on RHU/DHU status, and subjected to conditions of solitary confinement after Internal Affairs officers confiscated a note by McCray, which they confirmed was innocuous and did not concern illicit activity.

93.     Although there were no criminal or disciplinary charges filed against McCray, Defendant Williams kept McCray in solitary confinement on 8E for 15 days. During that time, ACJ staff refused McCray's requests to be kept in a handicap cell, which was available. ACJ staff confiscated McCray's orthotic shoe and AFO brace, preventing him from showering or recreating regularly. McCray did not receive daily wound care as prescribed by his outside doctor. The denial of his assistive devices and medical care caused his foot condition to deteriorate, hastened his infection, and caused him to experience severe pain and discomfort.

94.     Defendant Williams had the authority to permit McCray to be on disciplinary confinement status in the MHU, but she chose not to exercise her authority despite McCray's requests to be moved there and in contravention of McCray's outside doctor's orders. Similarly, Defendants Dr. Stechshulte and Dr. Park failed to ensure McCray received sufficient medical care and accommodations when he was on 8E or RHU/DHU status.

95.     Defendants Williams, Dr. Stechshulte, and Dr. Park were aware that McCray would not have readily available access to medical staff or treatment on 8E, and his foot condition would not be monitored by medical professionals daily, and that McCray would be

21

denied his prescribed assistive devices in segregated housing and in his cell resulting in physical injuries and preventing McCray from participating in the jail's programs and services. These substantial risks of harm to McCray were foreseeable and preventable and unfortunately came to fruition. For example, on April 2, 2020, after his cane became caught on a cord, McCray lost his balance and fell because ACJ had confiscated his orthotic shoe and AFO brace.

96.     On April 9, 2020, McCray was moved to pod 3E but was denied a handicap accessible cell that was available. McCray's housing on 3E lacked access to sufficient medical care and denied him accommodations. ACJ staff denied or severely restricted McCray's use of his prescribed assistive devices such as his orthotic shoe, AFO brace, cane, which prevented him from participating in ACJ programs and services such as recreation, showers, cell cleaning, and exacerbated his foot wound and pain.

97.     On April 10, 2020, McCray was washing his hands in his sink when he fell because he was unable to maintain his balance without his brace and orthotic shoe, which had been confiscated by ACJ staff.

98.     McCray had to resort to hitting the emergency button to get medical treatment because ACJ officers routinely denied his requests for medical treatment, wound care, or pain medications.

99.     In May 2020, Sara McClung, a medical assistant, administered McCray's wound care in his cell several times. While McClung was changing McCray's dressings, she noticed McCray's leg was swollen and his wound was severely infected and emitted a putrid odor. On information and belief, McClung described McCray's symptoms to Defendants Dr. Stechshulte and Dr. Park and told them that McCray's foot appeared infected and his pain was getting worse.

100.    Despite apparent signs of an infection, Defendants Dr. Stechshulte and Dr. Park

22

did not prescribe McCray any antibiotics at this time.

101.    On May 22, 2020, x-rays of McCray's right foot confirmed that he had

osteomyelitis in his calcaneus heel bone.

102.    On May 25, 2020, an ACJ healthcare provider confirmed McCray's heel had an

ulcerous open wound consistent with osteomyelitis.

103.    On May 26, 2020, ACJ diagnosed McCray with "Chronic osteomyelitis w

draining sinus, right ankle and foot" and an "open wound of [right] foot", according to McCray's

medical records. McCray's osteomyelitis diagnosis was also confirmed by an outside doctor.

However, Defendants Dr. Stechshulte and Dr. Park did not inform McCray of his osteomyelitis

diagnosis until weeks later.

ACJ Denied McCray Standard Antibiotic Treatment

104.    The BOP guidelines recommend prescribing antibiotics in conjunction with other

measures to treat osteomyelitis and are especially warranted when the patient also has cellulitis.[21]

Antibiotics must be administered at the proper dosage and for the standard full course of 14 days

to be effective.

105.    Defendants Dr. Stechshulte and Dr. Park were responsible for ensuring that

McCray received appropriate antibiotics while he was incarcerated in ACJ from September 2019

to October 2020. Defendants Dr. Stechshulte and Dr. Park prescribed McCray antibiotics

directly or by approving or overseeing his antibiotic treatments administered by ACJ healthcare

staff, who they supervised. Defendants Dr. Stechshulte and Dr. Park knowingly disregarded

medical standards by prescribing McCray antibiotics for a dosage and duration that were too

---

[21] Prevention and Management of Acute and Chronic Wounds Federal Bureau of Prisons Clinical
Practice Guidelines (2014), https://www.bop.gov/resources/pdfs/wounds.pdf.

23

short to be effective, often not longer than 2-4 days. They also failed to promptly administer appropriate antibiotics to McCray despite outside doctors diagnosing him with cellulitis.

106.    Defendants Dr. Stechshulte and Dr. Park prescribed McCray directly or through subordinate ACJ healthcare staff, antibiotics that they knew he could not tolerate due to him having only one kidney.

107.    On May 28, 2020, McCray was transferred to the MHU by Defendant Dr. Stechshulte in order for McCray "to be more aggressively treated for his foot wound and we could insure [sic] that medications were being given appropriately." However, McCray was in the MHU for only one day.

108.    On May 29, 2020, a culture result of McCray's foot found he was infected with staphylococcus aureus, a dangerous and potentially lethal bacteria.

109.    That same day, McCray was accused of a non-violent rule violation. He was transferred to pod 8E, put on RHU/DHU status and kept in solitary confinement for 20 days, despite the severity of his rapidly worsening foot condition, his staph infection, and that housing on 8E lacked the necessary accommodations that Defendants Dr. Stechshulte and Dr. Park and his outside doctor had prescribed.

110.    At the time of McCray's transfer to 8E, there was an incarcerated person housed in MHU who was permitted to stay there even though he was on RHU/DHU status, had a disciplinary disposition rendered against, and he was serving out his disciplinary sentence.

111.    At the time, there was sufficient bed capacity to house McCray on the MHU.

112.    Defendant Williams overrode Defendants Dr. Stechshulte's and Dr. Park's and an outside specialist's recommendations to house McCray in the MHU where he would have

24

received immediate medical care for his deteriorating foot condition.

113.     On information and belief, McCray did not receive antibiotics until he was transferred to 8E, on May 29, which was nearly a week after healthcare staff diagnosed him with osteomyelitis.

114.     Around May 29, 2020, Defendants Dr. Stechshulte and Dr. Park prescribed McCray Moxifloxacin HCl, an antibiotic, for only four days instead of the standard 14 days. McCray had a severe adverse reaction to the medication, including excessive vomiting.

115.     McCray did not receive wound care for the first two days on 8E. A nurse brought supplies for McCray to do wound care on himself. McCray told healthcare providers that he was unable to do his wound care in his dirty cell without risking infecting his open nonhealing wound. McCray also told healthcare providers that he was in too much pain to change his dressing and apply medicated solution. Defendant Kelly was notified the McCray was not receiving his prescribed daily wound care.

116.     On May 29-30, 2020, Defendants Dr. Stechshulte and Dr. Park prescribed McCray Clindamycin HCl, an antibiotic, for only two days, instead of the standard 14 days, which was too short a course to be effective.

117.     Between May 31 and Jun 2, 2020, Defendants Dr. Stechshulte and Dr. Park prescribed McCray Vancomycin HCl, a medicine used to treat stomach issues, not foot infections. This 3-day course of antibiotics was not administered for the standard 14 days, and thus was too short to be effective.

<u>ACJ Delayed Specialists from Timely Diagnosing & Treating McCray</u>

118.     From September 2019 to October 2020, Defendant Williams, Dr. Stechshulte, and Dr. Park were responsible for ensuring McCray received prompt diagnosis and treatment by

25

specialists and approved of standard diagnostic imaging used to detect bone infections for McCray.

119.    During this time, Defendants Williams, Dr. Stechshulte, and Dr. Park delayed McCray's diagnosis and treatment of osteomyelitis by specialists and critical diagnostic imaging, resulting in McCray's bone infection spreading and causing significant physical injuries, which were preventable.

120.    Defendant Williams, Dr. Stechshulte, and Dr. Park denied or delayed outside specialists/doctors from examining, monitoring, or treating McCray onsite at ACJ, and on several occasions, delayed McCray's timely examination by specialists/doctors offsite

121.    On February 24, 2020, McCray's podiatry specialist, referred McCray to Allegheny General Hospital (AGH) Wound Care Center for "evaluation and treatment of chronic right heel ulcer." Defendant Williams, Dr. Stechshulte, and Dr. Park prevented timely diagnosis and treatment of McCray's open non-healing foot wound by delaying his examination by a wound care specialist until June 2020.

122.    Dr. Elisa Taffe, at all relevant times, was the medical director of the Advanced Wound Healing and Lymphedema Center at AHN Allegheny General Hospital. McCray was referred to Dr. Taffe for wound care treatment.

123.    Defendant Williams denied Dr. Taffe from examining McCray onsite at ACJ around June 3, 2020, thereby delaying his diagnoses and treatment. From June 2020 to August 2020, Defendant Williams further delayed and denied treatment of McCray's wound by denying Dr. Taffe from monitoring McCray's foot wound at the jail or at AGH.

124.    Based on McCray's medical records and reports from specialists and doctors, Dr. Taffe ordered McCray "to be 100% NON WEIGHT BEARING" due to the severity of his foot

26

wound and ordered that ACJ provide McCray with accommodations to effectuate the medical order.

125.    Around June 3 and 4, 2020, Defendant Dr. Park documented that ACJ medical and correctional staff were failing to comply with Dr. Taffe's orders. Dr. Park wrote that "Housing on 8E is not recommended with regard to [McCray's] wound care" because McCray was not being provided with medical devices and housing accommodations, which were necessary for him to be non-weight bearing per Dr. Taffe's orders.

126.    Upon information and belief, Dr. Taffe instructed Defendant Dr. Park to prescribe McCray a full course of antibiotics if he showed signs on an infection. Defendants Dr. Stechshulte and Dr. Park did not comply with Dr. Taffe's order.

127.    On June 8-10, 2020, Defendants prescribed McCray Clindamycin HCl, an antibiotic, for only two days instead of the 14 days, which was too short a course to be effective.

128.    On June 16, 2020, Dr. Taffe attempted to examine McCray remotely using a video conferencing feature on Defendant Dr. Park's cell phone. Dr. Taffe's examination, which lasted no more than 5 minutes, was impeded because Defendant Dr. Park had difficulty operating the video camera on her phone; at times the video was blurry or not focused on McCray's foot wound. Dr. Taffe found it "very difficult to assess" McCray's mobility and needs for assistive device footwear.

129.     Dr. Taffe ordered that McCray "be evaluated for appropriate footwear to deal with his limited ankle mobility and foot drop."

130.    Dr. Taffe informed Defendant Dr. Park that McCray was "at a high risk of further complications and developing osteomyelitis" if he was not permitted to use proper assistive devices.

27

131.   On June 16, 2020, McCray was released from RHU/DHU on 8E. Defendant Williams denied McCray's request to be housed on MHU, even though it was the only housing unit that was equipped to comply with Dr. Taffe's non-weight bearing medical order for McCray and had several unoccupied rooms available. Defendant Williams overrode Dr. Stechsulte's and Dr. Park's recommendations to house McCray in the MHU. Instead, Defendant Williams housed McCray on pod 3B, a general population housing pod, which lacked access to sufficient medical care and where he was denied accommodations.

132.   Although McCray was housed in a handicap accessible cell, ACJ continued to deny or severely limit McCray's use of his assistive devices. Often, ACJ staff prohibited McCray from using his wheelchair or crutches in his cell, forcing him to hop on one foot or crawl to move about his cell. On June 29, 2020, ACJ staff confiscated McCray's crutches.

133.   ACJ staff frequently failed to provide McCray wound care while he was housed on 3B.

134.   In June, McCray was denied showers for several days at a time, causing the bacteria in his infected foot to fester, and preventing him from completing daily wound care. He was denied access to a handicap accessible shower, forcing him to stand on his infected foot, causing him pain and discomfort, making it difficult to maintain balance, and placing him at substantial risk of falling.

135.   Despite knowing that McCray was being denied his medical devices and critical medical services and accommodations he needed and as recommended by Dr. Taffe, Dr. Stechsulte and Dr. Park failed to take corrective action.

136.   In June, McCray told Defendant Williams and a healthcare provider that he was not receiving daily wound care, showers, or recreation in general population.

28

137.    On June 11, 2020, McCray's right toenail fell off—a clear indicator that McCray's foot condition was deteriorating.

138.    In June 2020, McCray fell due to debilitating pain from his severely infected foot wound.

139.    Maria, a physician's assistant, examined McCray's foot and noticed his heel's skin appeared dark black-green and reeked of a foul odor, which were symptoms consistent with an infection.

140.    Maria recommended Defendant Dr. Park prescribe McCray a different course of antibiotics because his current antibiotic regiment was not treating his foot infection.

141.    In June, McCray was in agony from his foot wound. ACJ correctional staff denied McCray's requests for medical care, so he hit the medical emergency button in his cell. Minutes later, several members of SERT, ACJ's tactical corrections squad, armed with weapons, responded to McCray's request for medical care. ACJ did not dispatch a healthcare provider to assess McCray's medical emergency.

142.    On June 23, 2020, McCray was in such dire need of medical care, he told a staff member that he was suicidal and was going to kill himself in order to be moved to pod 5C, housing for acutely suicidal individuals. On 5C, Thomas Patts, a psychiatric assistant, spoke to McCray and examined his wound. Patts practiced in orthopedics for 14 years. He told McCray that his foot was extremely infected and that it would likely need to be amputated.

143.    Later that day, McCray was moved to the MHU where he resided until October 10, 2020.

144.    On July 4, 2020, a wound culture of McCray's foot found he was septic and infected with extremely harmful streptococcus.

29

145.     Defendants Dr. Stechshulte and Dr. Park prescribed McCray Augmentin even though the medication was contraindicated for him due to his kidney condition and his blood test results, which indicated that he was experiencing problems with his kidneys and/or pancreas. McCray suffered an adverse reaction to the Augmentin.

<u>McCray's Spreading, Life-threatening Osteomyelitis<br>Necessitated Amputating His Right Leg</u>

146.     By July 6, 2020, x-rays clearly showed early osteomyelitis on right calcaneus, which a specialist confirmed.



*X-ray of osteomyelitis in McCray's right foot*

147.     On July 17, 2020, an orthopedic surgeon examined McCray's foot wound. He told McCray that he would likely need surgery to remove parts of his infected foot. He ordered McCray get an MRI and an ultrasound immediately, so that the surgeon could determine the extent of his osteomyelitis and prevent further destruction of the bone and afflicted parts. McCray told Defendant Williams about the orthopedic surgeon's assessment and medical order.

30

148.     Disregarding the urgency of McCray's foot condition and spreading osteomyelitis, Defendants Williams, Dr. Stechshulte and Dr. Park, on information and belief, failed to timely approve or schedule McCray's consultations and follow-up exams with outside experts and obtain his MRI, despite knowing they were needed to properly treat McCray and prevent further damage from the osteomyelitis.

149.     On July 5-14 and 17-18, 2020, Defendants Dr. Stechshulte and Dr. Park prescribed McCray antibiotics, but his treatment course was too short, and the prescription dosage was too weak to treat his osteomyelitis, and both doctors were aware of this because the standard duration for a course of antibiotics is common medical knowledge and therefore obvious.

150.     On August 1, 2020, McCray was hospitalized at AGH for excruciating pain in his right foot up to his knee and he was experiencing chills. Dr. Tarrell Coley diagnosed McCray with acute osteomyelitis of right calcaneus.

151.     In August 2020, Defendants Dr. Stechshulte and Dr. Park discontinued or failed to prescribe McCray antibiotics despite knowing that the medical standard recommended antibiotics for individuals like McCray who had been diagnosed with osteomyelitis and had cellulitis.[22]  Upon information and belief, McCray's outside doctors did not order his antibiotics be discontinued.

152.     Defendants Dr. Stechshulte and Dr. Park told McCray he did not need antibiotics because he was eventually going to have surgery to remove part or all of his calcaneus.

---

[22] Prevention and Management of Acute and Chronic Wounds Federal Bureau of Prisons Clinical Practice Guidelines (2014), available at https://www.bop.gov/resources/pdfs/wounds.pdf.

31

153.    On August 17, 2020, an MRI of McCray's right leg and foot showed he had suffered significant harm, including osteomyelitis that had infected most of his calcaneus and possibly part of his talis; McCray also had severe posttraumatic osteoarthrosis at the tibiotalar joint with muscular signal changes consistent with denervation.

154.    The MRI confirmed that surgery was necessary to stop the spreading osteomyelitis. McCray asked for a second opinion. Defendant Williams told McCray that if he wanted one, then he would have to pay for the appointment out-of-pocket. Eventually, ACJ referred McCray to another doctor, who recommended he have the surgery.

155.    Defendants Dr. Stechshulte and Dr. Park told McCray that it would be easier for him to walk if he got an amputation.

156.    On September 4, 2020, an orthopedic surgeon stated that a "right BKA [below knee amputation] is recommended for multiple reasons including nonhealing wound right heel with osteomyelitis of calcaneus" along with osteoarthosis [sic] and ligament issues." A specialist confirmed McCray's bone infection was dire and recommended that he "have a below-the-knee amputation, to prevent <u>continued spread of osteomyelitis, sepsis, and death."</u>

157.    An orthopedic surgeon determined that McCray's infected nonhealing foot wound caused the osteomyelitis and other physical injuries that required amputation of McCray's right leg.

158.    On September 10, 2020, McCray had a right below the knee amputation at AGH.

32



*McCray after his right below the knee amputation*

159.     On September 16, 2020, McCray was discharged from AGH and returned to ACJ.

160.     McCray was confined at ACJ until October 2020. During that time, Defendants Stechshulte and Park did not provide McCray with adequate pain management.

161.     McCray was prescribed physical therapy but did not receive it regularly.

162.     In September 2020, McCray pled to a misdemeanor charge so he could be released from ACJ and receive adequate medical treatment.

163.     Since September 24, 2020, McCray has experienced ongoing knee pain, phantom pain, discomfort, and infections due to the amputation.

### Defendant Williams Interfered with McCray's Medical Care & Subjected Him to Inhumane Conditions

164.     Defendant Laura Williams, at all relevant times, was the Chief Deputy Warden of Healthcare Services for ACJ. Prior to her serving as Chief Deputy Warden, Defendant Williams served as a drug and alcohol counselor before being promoted to Deputy Health Services

33

Administrator. She had no training, experience or qualifications for prescribing medications or making medical diagnoses, administering wound care, and had no experience in the medical care field. Nor did she have the training, experience or qualifications for overseeing the operations of the health care department.

165.    Defendant Williams, at all relevant times, was responsible for authorizing, promulgating, condoning, acquiescing in, and implementing policies and practices affecting the provision of medical services at ACJ including but not limited to permitting or authorizing correctional staff to confiscate assistive devices, which were prescribed and deemed medically necessary; delaying diagnosis or treatment by denying outside doctors from examining persons with serious infectious wounds onsite at ACJ or offsite at the doctor's medical facility; failing to approve timely consultations and follow-up exams with outside doctors; and failing to advocate and take steps to remove individuals from solitary confinement or housing conditions that lacked access to sufficient medical care or denied his accommodations.

166.    Defendant Williams knew these policies were injurious to McCray by denying him medical treatment or accommodations for his serious medical needs and by subjecting him to inhumane conditions of confinement.

167.    Defendant Williams knew outside doctors had prescribed McCray assistive devices and they were medically necessary to accommodate his physical disability and protect the infected or inflamed open foot wound.

168.    Defendant Williams knew McCray fell more than half a dozen times due to ACJ staff denying or severely limiting McCray's use of his prescribed assistive devices. Defendant also knew that denying McCray's assistive devices caused him pain, hastened his infection,

34

exacerbated his wound, and prevented him from participating in ACJ's programs, benefits, and services.

169.    Despite knowing that denying McCray's assistive devices would put him at a substantial risk of harm, endangering his health and safety, Defendant Williams did not instruct or train ACJ correctional staff to allow McCray to use his assistive devices as prescribed.

170.    At all relevant times, the decision to house an individual on the MHU was a medical decision. Defendant Dr. Stechshulte told McCray that Defendant Williams overrode recommendations by him and outside doctors to house McCray on the MHU where he would be 100% non-weightbearing, permitted to use his assistive devices, and receive daily wound care as his outside doctor prescribed, and monitoring of his open non-healing foot wound.

171.    Defendant Dr. Stechshulte told McCray that Defendant Williams denied outside doctors from examining McCray onsite at ACJ or at the doctor's medical facility.

172.    Defendant Williams had actual knowledge of the severity of McCray's progressively worsening foot condition, his need for assistive devices and medical care and other accommodations from ACJ staff, outside doctors, and McCray. McCray informed Defendant Williams frequently from speaking with her directly and through grievances and inmate request forms, to which Defendant responded.

173.    Despite her actual knowledge of McCray's medical issues, Defendant Williams either assigned McCray to a segregated housing or housing in general population, where his assistive devices and other accommodations were denied or she refused to change that assignment once she became aware of McCray's medical condition, the denial of his assistive devices, and conditions exposing him to a substantial risk of harm.

35

174.    As a result of being assigned to the segregated housing unit and housing in general population that lacked access to sufficient medical care and denied his accommodations, McCray suffered agonizing pain every time he had to walk in his cell or on the pod for medical treatment, for showers, for recreation, or for any purpose which required him to walk and put pressure on his open non-healing wound. The lack of assistive devices exacerbated McCray's wound and hastened his infection.

**Causes of Action**

**COUNT I: Americans with Disabilities Act, 42 U.S.C. §12132-
Against Defendant Allegheny County**

175.    Plaintiff hereby incorporates by reference the allegations contained in the above paragraphs 1 through 169 of this Complaint as if fully set forth herein.

176.    Defendant Allegheny County is a public entity within the meaning of 42 U.S.C. §12131.

177.    Plaintiff is a qualified individual with disabilities within the meaning of Title II of the Americans with Disabilities Act ("ADA").

178.    Defendant Allegheny County, and its employees, knew that Plaintiff was an individual with disabilities covered by the protections of the ADA.

179.    Despite this knowledge, Allegheny County and its employees failed to provide Plaintiff with necessary reasonable accommodations for his disabilities.

180.    Such reasonable accommodations for Plaintiff's physical disabilities include but are not limited to: the provision of assistive devices; provision of a handicap accessible cell; provision of housing allowing Plaintiff to be 100% non-weight bearing; housing in the MHU, including when on RHU/DHU status; provision of a shower chair; and training for ACJ staff on recognizing when a person has a physical disability and instructing staff to not confiscate or limit

36

individual's ability to use their assistive devices.

181.    Allegheny County acted with deliberate indifference to the risk of violating Plaintiff's federally protected rights under the Americans With Disabilities Act by permitting, authorizing, acquiescing in, and otherwise enabling staff to confiscate or limit McCray's access to his prescribed assistive devices.

182.    Defendant Allegheny County further discriminated against Plaintiff by failing to provide him a handicap shower stall or shower seat.

183.    Allegheny County and its employees further discriminated against Plaintiff by failing to provide him meals and medication when his pain or discomfort prevented him from retrieving them unassisted.

184.    As a direct and proximate result of the aforementioned acts, including but not limited to Defendant Allegheny County's deliberate indifference to the violations of Plaintiff's federally protected rights, Plaintiff has suffered loss of his right leg and continues to suffer great pain, and mental and emotional distress.

**COUNT II: Defendants' Deliberate Indifference to Plaintiff's Serious Need for Medical Care Violates the Fourteenth Amendment to the U.S. Constitution – Against Allegheny County and Against Defendants Williams, Dr. Stechshulte, Dr. Park and Kelly in their Individual Capacities**

185.    Plaintiff hereby incorporates by reference the allegations contained in the above paragraphs 1 through 169 of this Complaint as if fully set forth herein.

186.    At all relevant times, Defendant Williams was responsible for authorizing, promulgating, condoning, acquiescing in, and implementing policies and practices affecting the provision of medical services at ACJ including but not limited to permitting or authorizing correctional staff to confiscate assistive devices, which were prescribed and deemed medically

37

necessary; delaying diagnosis or treatment by denying outside doctors from examining persons with serious infectious wounds onsite at ACJ or offsite at the doctor's clinic; failing to approve timely consultations and follow-up exams with outside doctors; failing to advocate and take steps to remove individuals from solitary confinement or housing conditions that lacked sufficient access to medical care or denied accommodations. Defendant Williams knew these policies were injurious to McCray by denying him medical treatment or accommodations for his serious medical needs.

187.    Defendant Williams knew outside doctors had prescribed McCray assistive devices and they were medically necessary to accommodate his physical disability and protect his nonhealing open neuropathic wound on his foot. Defendant Williams knew McCray fell more than half a dozen times because ACJ staff denied or severely limited McCray's use of his prescribed assistive devices. Defendant also knew that denying McCray's assistive devices caused him pain, hastened his infection, worsened his wound, and prevented him from participating in ACJ's programs, benefits, and services. Despite knowing that denying McCray's assistive devices would deny him a serious medical need and put him at a substantial risk of harm, endangering his health and safety, Defendant Williams did not instruct or train ACJ correctional staff to permit McCray to use his assistive devices as prescribed.

188.    Defendant Williams had actual knowledge of McCray's worsening foot condition and treatment issues, and the harm caused to McCray by deficient medical care and denial of accommodations, as a result of personal conversations with McCray, as well as from his healthcare providers at ACJ and outside doctors, and through the grievance process and his internal complaints.

38

189.    Defendant Williams was deliberately indifferent to, and her acts and omissions were objectively unreasonable to, McCray's serious medical needs, which caused him unnecessary pain and suffering and physical injuries.

190.    Defendants Dr. Stechshulte and Dr. Park had personal knowledge of the infection in McCray's foot wound and his excruciating pain, but they did not take the required steps to treat his serious medical condition by, among other acts and omissions:

1.      failing to prescribe or provide him with medically necessary assistive devices;

2.      failing to ensure or administer his daily wound care as medically indicated;

3.      failing to prescribe a medically appropriate course of antibiotics to control the infection in knowing and gross deviation from the applicable standard of care;

4.      failing to administer sufficient pain medication;

5.      failing to ensure or administer adequate nutrition;

6.      failing to ensure McCray was housed where he could be 100% non-weightbearing as prescribed by outside doctors.

191.    Dr. Stechshulte and Dr. Park's acts and omissions were objectively unreasonable and constituted deliberate indifference to McCray's serious medical needs, which caused him unnecessary pain and suffering and physical injuries.

192.    Defendant Kelly was responsible at all relevant times for ensuring McCray received daily wound care, debridement treatments, and nutritional supplements as prescribed.

193.    Defendant Kelly knew McCray had a serious medical need for his prescribed wound care, debridement treatments, and nutritional supplements and were critical to prevent inflammation, infection, and unnecessary pain from his non-healing open foot wound, and promote healing, and Defendant Kelly knew that the failure to ensure McCray received his

39

prescribed wound care, debridement treatments, and nutritional supplements placed McCray at a substantial risk of harm to his health.

194.    Defendant Kelly knew from ACJ staff members, including healthcare providers, and from McCray that he did not receive his prescribed wound care, debridement treatments, or nutritional supplements numerous times during his confinement at ACJ from 2019 to 2020.

195.    Defendant Kelly's acts and omissions were objectively unreasonable and constituted deliberate indifference to McCray's serious medical needs, which caused him unnecessary pain and suffering and physical injuries.

### COUNT III: Malpractice-Against Defendants Dr. Stechshulte and Dr. Park

196.    Plaintiff hereby incorporates by reference the allegations contained in the above paragraphs 1 through 169 of this Complaint as if fully set forth herein.

197.    At all relevant times, Defendants Dr. Stechshulte and Dr. Park were doctors and had a duty to provide standard medical care to McCray, their patient, while he was incarcerated in ACJ.

198.    Defendants Dr. Stechshulte and Dr. Park breached their duty to McCray by failing to prescribe him antibiotics at the proper dosage, for the standard full course treatment of days, and an antibiotic that McCray could tolerate with his kidney condition; failing to prescribe McCray with standard pain medication while he was suffering from excruciating pain from his foot wound and infections and after McCray's amputation; failing to ensure or provide McCray with daily wound care in a sterile environment, as prescribed by an outside doctor; failing to ensure that he received adequate nutrition; delaying or impeding diagnosis and treatment by outside specialist; failing to provide McCray with accommodations such as housing in MHU and

40

assistive devices to ensure McCray was 100% non-weightbearing as ordered by a specialist, among other negligent acts or omissions

199. Defendants Dr. Stechshulte and Dr. Park' breach increased McCray's risk of harm or caused him damages, including significant and preventable pain, suffering, and discomfort; and preventable physical injuries including eroded bones, sepsis, osteomyelitis and right below the knee amputation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court grant the following relief:

A.     Award Plaintiff compensatory, special, and punitive damages on all claims;

B.     Grant attorneys' fees and costs;

C.     Such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff requests a trial by jury with respect to all matters and issues properly triable by a jury.

Respectfully submitted,

/s/Jaclyn Kurin*
Staff Attorney
D.C. I.D. No. 1600719
jkurin@alcenter.org
/s/ Bret Grote
Legal Director
PA I.D. No. 317273
bretgrote@abolitionistlawcenter.org
Abolitionist Law Center
PO Box 8654
Pittsburgh, PA 15221
412-654-9070

*pro hac vice

41

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CLAYTON MCCRAY;

Plaintiff,

v.

ALLEGHENY COUNTY; DONALD
STECHSHULTE, Medical Director; NANCY
PARK; JENNIFER KELLY; LAURA
WILLIAMS, Chief Deputy Warden of
Healthcare Services

Defendants.

Case No. 2:22-cv-00493-LPL

ELECTRONICALLY FILED

JURY TRIAL DEMANDED

### SECOND AMENDED COMPLAINT

Plaintiff files this Second Amended Complaint, to which Defendants' do not object, pursuant to Fed. R. Civ. P. 15(a)(2).

> Deleted: .
> Formatted: Indent: Left:  0"
> Formatted: Line spacing:  double
> Formatted: Font:Not Bold

### INTRODUCTION

1.      Plaintiff Clayton McCray brings this lawsuit to defend his dignity, vindicate his rights and shine a light on the inhumane treatment endured by people incarcerated in Allegheny County. In 2020, McCray, who was 26 years old at the time, was as a pretrial detainee on a probation detainer at the Allegheny County Jail (ACJ), when he required a right below-the-knee amputation because Defendants Dr. Donald Stechshulte, Dr. Nancy Park, and Jen Kelly failed to provide McCray with adequate medical care for an infected non-healing open wound on his right heel. This wound had been treated successfully, shortly before the amputation while he was incarcerated at State Correctional Institution (SCI)-Fayette and SCI-Mercer. However, Defendants' inadequate medical care, coupled with ACJ's numerous violations of the Americans With Disabilities Act, including denying McCray his prescribed brace, orthotic shoe, cane and other assistive medical devices, and failing to accommodate him with a handicap accessible cell,

1

caused his foot wound to worsen into osteomyelitis, a serious bone infection. Within months, McCray required an amputation of his leg.

2.      At all relevant times hereto, Defendant Deputy Warden Laura Williams had actual knowledge of the severity of McCray's progressively worsening foot condition and pain. Defendant Williams promulgated and authorized policies, practices and procedures that she knew contravened orders made by McCray's outside doctors and that these contraventions would cause McCray harm. Defendant Williams also permitted ACJ staff to confiscate McCray's prescribed assistive devices, and she placed or kept McCray in solitary confinement and in housing conditions where she knew he would be denied accommodations and medical treatment he needed for his non-healing open infected wound.

3.      Defendants' misconduct and malpractice caused McCray to needlessly suffer. He seeks compensation for his injuries including the permanent loss of his right lower leg, significant pain and distress, severe mental anguish, and compensation for his future medical expenses.

## JURISDICTION AND VENUE

4.      This case is brought pursuant to the Fourteenth Amendment of the United States Constitution, 42 U.S.C. § 1983, 28 U.S.C. §§ 2201, 2202, the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.*, and Pennsylvania state law.

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3)-(4), and 1367(a).

6.      This Court is the appropriate venue pursuant to 28 U.S.C. § 1391(b)(2) because the events and omissions giving rise to the claims occurred in Allegheny County, in the Western District of Pennsylvania.

2

## PARTIES

7.     Plaintiff Clayton McCray had, at all relevant times, a physical disability in his right foot. In 2018, McCray developed a neuropathic ulcer or wound on his right heel, which was successfully treated at correctional facilities SCI-Fayette and SCI-Mercer where he was incarcerated.  From September 2019 to October 2020, McCray was a pretrial detainee on a probation detainer at ACJ. Defendants denied McCray standard medical care, his prescribed assistive devices, and accommodations, causing him to develop a life-threatening bone infection, and within months required him to have a right below the knee amputation.

8.     Defendant Donald Stechshulte, M.D. is and was, at all relevant times, an employee of Allegheny County, serving as the Medical Director of ACJ. Defendant Dr. Stechshulte was, at all relevant times, acting under the color of state law. He is sued in his individual capacity.

9.     Defendant Nancy Park, M.D. is and was, at all relevant times, an employee of Allegheny County, serving as a physician for ACJ. Defendant Dr. Park was, at all relevant times, acting under the color of state law. She is sued in her individual capacity.

10.     Defendant Jen Kelly is and was, at all relevant times, an employee of Allegheny County, serving as the Assistant Director of Nursing for ACJ. She was a registered nurse and responsible for overseeing the distribution of medication, the administration of wound care and debridement treatments, the distribution of nutritional supplements to malnourished patients, among other duties. Defendant Kelly was, at all relevant times, acting under the color of state law. She is sued in her individual capacity.

3

11.     Defendant Laura Williams was, at all relevant times, the Deputy Warden of Healthcare Services for ACJ. She was responsible for oversight and administration of the provision of medical healthcare at ACJ, staff training, and ensuring accommodations for incarcerated people with physical or psychiatric disabilities. Defendant Williams was, at all relevant times, acting under the color of state law. She is sued in her individual capacity.

12.     Defendant Allegheny County is a county government organized and existing under the laws of the Commonwealth of Pennsylvania. Allegheny County is in possession and control of ACJ.

## STATEMENT OF FACTS

### McCray Developed Physical Disabilities Due to Gunshot Wound

13.     In 2011, McCray developed physical disabilities after suffering a gunshot wound to his spine. He underwent surgery that resulted in the removal of one of his kidneys, which made him unable to tolerate certain types of antibiotics without becoming extremely ill.

14.     The gunshot also injured McCray's lumbar spine, causing him neuropathy and resulting in his right foot a condition known as "drop foot"—foot dragging—and numbness. McCray's foot condition made him extremely vulnerable to developing neuropathic ulcers or wounds on his right foot, which were highly likely to worsen into a severe bone infection—osteomyelitis—without standard medical care, sanitary conditions, accommodations, or assistive devices.

15.     McCray's foot condition is and was, at all relevant times, a physical disability.

16.     Following McCray's surgery in 2011, his doctor prescribed him a cane, crutches, and physical therapy for his foot disability.

17.     Before his confinement at ACJ in September 2019, McCray was able to play

4

basketball, exercise in a gym, and participate in similar recreational activities even though he had these physical disabilities.

### Neuropathic Ulcers & Osteomyelitis Are Serious Medical Conditions That Require Proper Diagnosis, Constant Monitoring and Daily Treatment

18.     Neuropathic ulcers are a type of wound. They "occur when a patient with poor neurological function of the peripheral nervous system has pressure points that cause ulceration through the epidermal and dermal tissue layers."[1]

19.     "Ulcers occur most commonly on the underside of the foot (plantar surface) and on the top of the toes or dorsal surface. They are secondary to repetitive stress. Those ulcers that present emergently and tunnel deep into the tissue are at higher risk for infection."[2]

20.     "Neuropathic ulcers with signs of cellulitis, abscess, gangrene, or deep ulceration greatly increase the risk for amputation."[3]

21.     Neuropathic ulcers are highly likely to become infected and result in osteomyelitis without sufficient medical treatment. [4]

22.     Osteomyelitis is a serious infection of the bone; it can be lethal, cause significant pain and bone loss, or require amputation of the infected body parts without sufficient medical treatment.[5]

---

[1] David M. Eastman & Mark A. Dreyer, *Neuropathic Ulcer*, StatPearls Publishing, https://www.ncbi.nlm.nih.gov/books/NBK559214/ (last updated Jan. 9, 2022).
[2] Federal Bureau of Prisons, Prevention and Management of Acute and Chronic Wounds: Federal Bureau of Prisons Clinical Practice Guidelines (2014), https://www.bop.gov/resources/pdfs/wounds.pdf.
[3] *Id.*
[4] *Id.*
[5] *Osteomyelitis*, Johns Hopkins Medicine, https://www.hopkinsmedicine.org/health/conditions-and-diseases/osteomyelitis#:~:text=Osteomyelitis%20is%20inflammation%20or%20swelling,can%2

5

23.     Upon information and belief, ACJ's medical standards for diagnosing and treating wounds of incarcerated persons is based on, in part, the Pennsylvania Department of Corrections' standards, which is in turn based on, in part, federal prison guidelines for wound care.

24.     The Federal Bureau of Prisons (BOP) Clinical Practice Guidelines for Prevention and Management of Acute and Chronic Wounds recommends guidelines for diagnosing and treating neuropathic ulcers and resulting osteomyelitis. Standard medical treatment for a neuropathic ulcerative wound includes[6] —

     i.     wound care, consisting of cleaning the wound in a sterile environment to prevent dirt or bacteria from inflaming or infecting it, applying medicated solution to the infected area, and dressing or wrapping the wound with clean, dry gauze daily or twice a day depending on the severity of the wound;

     ii.    debridement—the removal of necrotic, dead skin/tissue;

     iii.   the proper dosage of antibiotics administered for the standard 14 days to eliminate the infection and adequate pain medication to lessen pain caused by the infection or wound;

     iv.    x-rays or MRIs to determine if the infection has spread to the bone;

     v.     adequate nutrition to promote healing;

---

0happen%20at%20any%20age; Ilker Uckay & Daniel Lew, *Osteomyelitis*, Infectious Disease Advisor, https://www.infectiousdiseaseadvisor.com/home/decision-support-in-medicine/infectious-diseases/osteomyelitis-4/.

[6] Federal Bureau of Prisons, Prevention and Management of Acute and Chronic Wounds: Federal Bureau of Prisons Clinical Practice Guidelines (2014), https://www.bop.gov/resources/pdfs/wounds.pdf.

6

vi. and accommodations for the patient, including providing him with assistive medical devices such as a brace, orthotic shoe, cane, crutches, walker, wheelchair; and providing proper handicap accessible housing to allow the patient to move about safely and prevent exacerbating his foot wound and mitigate his pain and discomfort.

25.     Symptoms of an infected wound include swelling, tenderness or pain around the wound, lack of healing of the wound for 2 weeks, an odor, pus or cloudy drainage, discoloration, fever, and pain.[7]

**Prisons Provided McCray with Standard Medical Care & Accommodations for his Neuropathic Wound on his Right Heel**

26.     On information and belief, McCray's physical disability and his need for assistive devices were documented in his medical records, which were provided to every correctional facility where he was confined.

27.     Around December 2018, McCray developed a minor neuropathic ulcer on his right heel while he was serving a sentence at SCI-Fayette, a prison in Pennsylvania.

28.     On information and belief, staff at SCI-Fayette recognized McCray's foot condition qualified as a physical disability under federal disability laws and provided him with adequate medical care and accommodations. Medical staff members cleaned McCray's foot wound in a sterile room daily to prevent infection. SCI-Fayette accommodated McCray by housing him in a handicap accessible cell on the first floor. A prison doctor prescribed McCray

---

[7] *Id.*

7

an orthotic shoe,[8] AFO brace, heel cups, insoles, and a cane so he could walk around safely and protect his wound from inflammation and infection.

29.     When McCray's foot became infected three months later, SCI-Fayette immediately sent him to UPMC Presbyterian, where he received a PICC line of antibiotics to treat his infection. McCray received in-patient treatment at the hospital for two weeks and remained there until he transferred to a SCI-Mercer, another Pennsylvania state prison.

30.     In May 2019, McCray was transported from UPMC Presbyterian to SCI-Mercer. The prison permitted McCray to receive out-patient treatment for his foot wound and infection at UPMC Presbyterian.

31.     On information and belief, staff at SCI-Mercer recognized McCray's foot condition qualified as a physical disability under federal disability laws and provided him with adequate medical care and accommodations. SCI-Mercer medical staff provided McCray with proper wound care. SCI-Mercer provided McCray with a handicap accessible cell on the first floor and permitted McCray to wear his prescribed orthotic shoe and AFO brace and use his cane.

32.     In June 2019, McCray was transferred from SCI-Mercer to SCI-Fayette where he was released in September 2019. While at SCI-Fayette, staff provided McCray with accommodations and standard medical care for his foot wound. Additionally, a prison doctor prescribed McCray debridement treatments to occur every one to two months, which he received

---

[8] McCray's orthotic shoe resembled a sneaker; it enabled him to wear and use his other medical devices such as his brace, heel cups, and insoles. At ACJ, this shoe is not available to the general population, and it could not be purchased through commissary. Incarcerated persons were completely reliant on the staff and the administration to obtain the shoe and permit them to wear it.

8

at offsite medical facilities.

**ACJ Denied McCray Standard Medical Care & Accommodations**
**Causing His Infected Foot Wound to Worsen & Requiring Amputation of**
**His Right Lower Leg**

33.    In September 2019, McCray was admitted at ACJ because a probation detainer was lodged against him for a minor possession charge.

34.    McCray was a pretrial detainee while he was detained at ACJ up until September 30, 2020.

<u>ACJ Denied McCray His Prescribed Assistive Devices</u>

35.    The BOP Clinical Practice Guidelines for Prevention and Management of Acute and Chronic Wounds state that assistive devices are critical for healing neuropathic ulcers and decreasing the risk of amputation.[9]

36.    The BOP guidelines state that patients with a neuropathic ulcer must be provided with an orthotic shoe or brace specifically designed to "offload" or relieve pressure from the ulcer and prevent shearing—pulling on tissue—and friction—blistering or removal of top layer skin—over the affected areas.[10]

37.    The BOP guidelines state patients with a neuropathic ulcer should be on their feet as little as possible. The guidelines recommend providing patients with other accommodations to limit them from standing and walking to reduce exacerbating their neuropathic ulcer.[11]

38.    The BOP guidelines also recommend providing patients "a walker, in addition to

---

[9] *Id* ("Without these two forms of intervention," assistive devices and wound debridement treatments, "the chances of meeting healing goals and preventing amputation are unlikely.").
[10] *Id.*
[11] *Id.*

9

a wheelchair, in order to transfer from one surface to another without standing on the affected foot." [12]

39.     The BOP guidelines recommend providing accommodations to reduce the patient's weightbearing while showering: "It is <u>optimal</u> to have patients with neuropathic foot ulcers shower in a handicap stall that allows them to sit. Standing in the shower should be avoided." [13]

40.     Defendants knew McCray had a non-healing neuropathic foot wound.

41.     Defendants knew outside doctors had prescribed McCray with wound care, assistive devices, and other accommodations for his foot condition.

42.     Upon admission to ACJ, McCray told the medical staff about his physical disability and the treatment and accommodations he received at SCI-Fayette and SCI-Mercer. McCray also informed the staff that his prison doctor prescribed him an orthotic shoe, AFO brace and cane, which were medically necessary to prevent the significant risk of him developing infected neuropathic ulcers on his right foot or falling. McCray attests that he was permitted to use these assistive devices at the prisons prior to his arrival at ACJ.

43.     ACJ staff received McCray's medical records from SCI-Fayette and SCI-Mercer, confirming that the prisons had provided him accommodations and permitted him to use an orthotic shoe, AFO brace and cane, which were prescribed to accommodate his disability.

---

[12] *Id.*

[13] Prevention and Management of Acute and Chronic Wounds Federal Bureau of Prisons Clinical Practice Guidelines (2014), https://www.bop.gov/resources/pdfs/wounds.pdf.

10

September 20, 2019

To whom this may concern:

RE: *McCray, Clayton # LX7447*

DOB: 7/30/1994

The above inmate will be transferring to your facility in the near future. He requires the use of the following medical devices:

- Cane
- Ankle brace
- Heel cups/lift
- AFO brace
- Insoles

Please feel free to give me a call if you should need any further information.

Sincerely,

*Rachel Medlock*

Rachel Medlock

Health Service Administrator

WellPath

SCI – Fayette Prison

724-785-2837

*Letter from Health Services Administrator of SCI-Fayette sent to ACJ, states McCray "will be transferring to your facility in the near future. He requires the use of the following medical devices: cane, ankle brace, heel cups/lift, AFO brace, insoles."*

44.      Despite this knowledge, upon McCray's admission to ACJ, staff confiscated McCray's prescribed orthotic shoe and AFO brace without justification and did not provide McCray with an alternative assistive device to accommodate his disability.

45.      From September 2019 to June 30, 2020, ACJ staff routinely prohibited McCray from using his prescribed assistive devices on nearly every pod he was housed except for the Medical Housing Unit (MHU).

46.      From September 2019 to June 30, 2020, McCray was prevented from using his

11

assistive devices for no more than a few weeks, days, or in some instances, only a few hours at a time because ACJ staff often confiscated them without justification. Also, ACJ staff often prohibited McCray from using his medical devices such as his crane, crutches, and wheelchair inside his cell, forcing him to hop on one foot or crawl to his cell door to retrieve his meals and medications.

47.     Defendants Dr. Stechshulte, Dr. Park, and Williams were responsible for ensuring that McCray received his prescribed medical devices and was permitted to use them while he was incarcerated in ACJ from September 2019 to October 2020. From September 2019 to June 30, 2020, Defendants Williams, Dr. Stechshulte, and Dr. Park permitted ACJ staff to confiscate McCray's prescribed assistive devices, despite knowing that the devices were medically necessary for McCray, who they knew had experienced numerous falls and whose foot wound, infection, and pain worsened without them.

48.     Defendants Williams, Dr. Stechshulte, and Dr. Park also knew that unless McCray had his assistive devices, he was unable to participate in ACJ's programs, benefits, and services, including recreation, showers, meals, cell cleanings, and access to the law library kiosk, among other programs.

49.     ACJ denied McCray's requests for a shower chair or handicap accessible showering stall that would have allowed him to sit safely while showering and even though these accommodations were recommended by ACJ health providers, including Defendant Park, and required by medical standards. As a result, McCray was prevented from showering and cleaning his wound regularly because it was difficult for him to maintain balance while standing unassisted on his non-infected foot in a flimsy, plastic flip flop on a slippery wet floor.

50.     Furthermore, without his assistive devices, McCray was unable to recreate

12

because he could not maintain balance, move about safely, or protect his neuropathic foot wound with the flimsy shoe that the jail provided, which did not satisfy BOP guidelines for a specialty shoe for patients with neuropathic ulcers.

### ACJ Denied McCray Adequate Wound Care

51.     The BOP guidelines state that wound care and especially debridement treatments are necessary for healing neuropathic ulcers and preventing amputation.[14]

52.     Defendants Dr. Stechsulte, Dr. Park, and Kelly were responsible for ensuring that McCray received his wound care as prescribed while he was incarcerated in ACJ from September 2019 to October 2020. During this time, ACJ failed to provided McCray with daily wound care and several debridement treatments as his doctors had prescribed. Initially, trained medical staff administered his wound care in a sterile setting like ACJ's infirmary on pod 5B. But by December 2019 and subsequently, ACJ medical staff routinely changed McCray's dressing in a dirty cell or refused to apply his wound care altogether. On several occasions, a staff member dropped off wound care supplies, which were sometimes missing medicated solution or gauze, and told McCray that if he wanted his wound cleaned and disinfected, then he would have to do it himself without gloves in his unsanitary cell.

53.     Additionally, ACJ corrections staff prevented McCray from receiving wound care by denying his requests to be escorted to the infirmary or treatment room where it was to occur.

54.      Several times, McCray did not receive his debridement treatments as medically prescribed.

55.     Around December 18, 2019, McCray's submitted grievance, in which he alleged

---

[14] *Id.*

13

that he was not receiving wound care as prescribed and feared that his open foot wound was at risk of being infected.

56.     ACJ's grievance coordinator spoke to McCray about his grievance, but the grievance coordinator's recommendations for medical care and accommodations were not carried out by ACJ staff or were overridden by Defendants. Those Defendants – Dr. Stechshulte, Dr. Park, and Kelly – knew McCray did not received adequate wound care while he was confined at ACJ.

57.     Defendant Kelly was the Assistant Director of Nursing for ACJ. She was responsible for overseeing and ensuring that medical staff administered wound care and debridement treatments as prescribed to patients like McCray.

58.     McCray was entirely dependent on Defendants Dr. Stechshulte and Kelly for providing or ensuring his prescribed wound care and debridement treatments.

59.     Defendant Kelly was aware from ACJ healthcare providers and through the grievance system that McCray was not receiving daily wound care and several debridement treatments as prescribed by his outside doctors. Similarly, Defendants Dr. Stechshulte and Dr. Park were aware of McCray's ongoing inadequate wound care from ACJ staff members and from their interactions with McCray from September 2019 to October 2020.

60.     On information and belief, Defendant Kelly frequently notified Defendant Williams of these significant and persistent deficiencies with McCray's wound care when they occurred.

61.      Despite Defendants Dr. Stechshulte, Dr. Park and Kelly knowing of McCray's serious medical need for his prescribed wound care and the significant, ongoing deficiencies with McCray's wound care and debridement treatments, which placed him at a substantial risk of

14

physical harm, including serious, potentially life-threatening infection, amputation, and significant pain and discomfort, Defendants Dr. Stechshulte, Dr. Park and Kelly failed to take standard measures to ensure McCray received adequate wound care and debridement treatments.

62.    On information and belief, Defendants Dr. Stechshulte, Dr. Park, Kelly and ACJ medical staff improperly documented McCray's symptoms, condition, diagnoses, or medical treatment in his ACJ medical records or made false or misleading entries to conceal their failure to provide McCray with adequate medical care.

63.    Over the following months, McCray's foot condition worsened significantly, with discoloration of his skin, swelling and redness as his sore grew larger.



*McCray's Foot Wound*

64.    In December 2019, McCray filed a motion in his probation detainer case, seeking a transfer to Renewal, an alternative housing diversion program. McCray told Judge Randal

15

Todd that ACJ's deficient medical care was causing his foot condition to worsen significantly and pleaded with the Judge to transfer him to the diversion program where he could obtain better medical treatment. Judge Todd denied McCray's motion.

65.     Defendants Dr. Stechshulte and Dr. Park were responsible for ensuring that McCray received prescribed physical therapy while he was incarcerated in ACJ from September 2019 to October 2020. Although a doctor prescribed McCray physical therapy to prevent his right leg muscles from atrophying, McCray was denied physical therapy because it was frequently cancelled or not provided by medical staff or corrections officers prevented him from attending his physical therapy appointments.

<u>ACJ Denied McCray Standard Pain Medication</u>

66.     The BOP guidelines state "[p]roper assessment and subsequent interventions to control pain is an integral part of wound care." [15] The BOP guidelines state the consequences of uncontrolled "[p]ain can significantly affect a patient's quality of life, sleep cycle, and psychosocial status. In addition, inadequately treated acute pain can lead to the development of chronic disabling neuropathic pain."[16]

67.     The BOP guidelines state that "[i]nadequate treatment of pain can also lead to poor wound healing and increased infection rates."[17]

68.     The BOP guidelines recommend that "[t]he patient's experience of pain and management strategies should be reviewed at each 2-week re-assessment, and on an as-needed basis. This review should include the patient's day-to-day experience of pain from the wound, as

---

[15] *Id.*
[16] *Id.*
[17] *Id.*

16

well as the patient's episodic pain related to treatments and any chronic neuropathic pain. Reasonable attempts should be made to minimize these different types of pain."[18]

69.     Defendants Dr. Stechshulte and Dr. Park were responsible for ensuring that McCray received adequate pain medications while he was incarcerated in ACJ from September 2019 to October 2020. During this time, Defendants Dr. Stechshulte and Dr. Park did not abide by medical standards for managing McCray's pain. Defendants Dr. Stechshulte and Dr. Park's failure to prescribe McCray adequate pain relievers put him at a significant risk of harm by delaying his wound from healing and increasing his likelihood of contracting a serious infection and amputation.

70.     The denial of McCray's assistive devices forced him to walk on his inflamed or infected non-healing open wound causing him significant pain.

71.     McCray was diagnosed with chronic pain, which was documented in his ACJ medical records.

72.     In January 2020, McCray repeatedly told ACJ staff that his pain and infection in his foot were getting worse. He also told Defendants Dr. Stechshulte and Dr. Park that his pain management needs were not being met.

73.     On information and belief, Defendants Dr. Stechshulte and Dr. Park knew McCray's pain medications and dosages defied medical standards and were inadequate to alleviate his pain, but they deliberately chose not to prescribe him standard pain medications that were available.

74.     As a result, McCray suffered excruciating pain that it caused him to fall or lose

---

[18] *Id.*

17

control of his bladder and urinate on himself. Additionally, McCray's pain often prevented or limited him from retrieving meal trays, cleaning his cell, showering, and recreating, caused loss of appetite, and substantially increased the risk of delaying his wound from healing and increasing his risk of amputation.

ACJ Failed to Provide McCray Adequate Nutrition

75.     The BOP guidelines state "that nutrition is an important aspect of a comprehensive care plan for treatment of wounds" because "[a]dequate calories, protein, fluids, vitamins, and minerals are required by the body to maintain tissue integrity, to prevent breakdown, and to support the body's natural healing processes."[19]

76.     The BOP guidelines state "[n]utrition deficiencies may contribute to delayed wound healing, and assessment of nutrition status should be performed in all chronic wound patients who are not meeting healing goals after four weeks of basic wound care interventions."[20]

77.     The BOP guidelines recommend providers have a registered dietician assess the patient's nutritional needs and ensure that the patient is provided with additional food or nutritional supplements as recommended.

78.     Defendants Dr. Stechshulte, Dr. Park and Kelly were responsible for ensuring that McCray received adequate nutrition while he was incarcerated in ACJ from September 2019 to October 2020, but they failed to do so.

79.     On information and belief, from September 2019 to October 2020, Defendants Dr. Stechshulte and Dr. Park did not do a basic or comprehensive assessment of McCray's

---

[19] *Id.*
[20] *Id.*

18

nutritional needs, contravening medical standards, and Defendants Dr. Stechshulte and Dr. Park knew their contraventions were substantially likely to delay healing of McCray's open wound and put him at a substantial risk of harm.

80.    On information and belief, Defendants Dr. Stechshulte and Dr. Park knew McCray failed to receive nutritional supplements they prescribed him, yet they failed to take corrective action.

81.    On information and belief, Defendant Kelly knew that McCray was not receiving his boost nutritional supplement as prescribed, but she failed to take corrective action.

82.    As a result of Defendants' failure to provide McCray adequate medical care and nutrition, McCray lost over 20lbs in less than 6 months.

83.    Defendants Dr. Stechshulte and Dr. Park knew that McCray's malnutrition was in part due to his pain and from being unable to retrieve his meal trays. Despite this knowledge, Defendants did not accommodate McCray such as bring him a meal tray when he could not retrieve it himself.

<u>ACJ Denied McCray Housing Accommodations</u>

84.    ACJ's MHU, at all relevant times, provided housing for patients with serious medical needs. The MHU was specifically designed for treating patients with frequent wound care needs. Because the MHU had healthcare staff on duty 24/7 and physicians conducted daily rounds, ACJ was able to ensure that infirmed or disabled patients were closely monitored, their medical conditions were assessed daily, and they received immediate medical treatment if their medical condition worsened. Patients were kept in large handicap accessible rooms and were permitted to use their assistive devices. Patients prescribed physical therapy could have it in their rooms.

19

85.     In September 2019, Defendant Williams helped establish criteria for individuals who should be housed on MHU: (1) anyone with an assistive/ambulatory device (crutches, walker, cane, wheelchair); (2) someone with frequent wound care orders; and (3) diabetic patients. At all relevant times, McCray's serious medical needs for assistive devices and daily wound care treatment satisfied two out of the three criteria for housing a patient on the MHU.

86.     On information and belief, the MHU had several unoccupied rooms available every month from September 2019 to July 2020.

87.     The MHU, at all relevant times, was the only housing unit in ACJ that permitted patients to be 100% non-weight bearing, use their assistive devices, and provided constant monitoring and daily treatment of wounds with immediate access to medical staff, supplies, and sterile treatment rooms for applying wound care dressings.

88.     Defendants Dr. Stechshulte and Dr. Park were responsible for ensuring that McCray received housing that accommodated his medical conditions and disabilities, including housing on a lower tier or in MHU, while he was incarcerated in ACJ from September 2019 to October 2020.

89.     Around September 2019, October to November 2019, and February to March 2020, Defendants Dr. Stechshulte and Dr. Park failed to ensure McCray was housed on a lower tier and given a lower bunk bed, which was recommended by prison doctors and necessary to prevent McCray's foot wound from being exacerbated and reduce the risk of him falling.

90.     From September 2019 to October 2020, Defendants Stechshulte and Park were responsible for ensuring McCray was housed in a location, such as MHU, where he would be permitted to use his medical devices, receive wound care, and have access to medical services.

91.     Although ACJ healthcare providers were authorized to house patients in the

20

MHU, from September 2019 to June 30, 2020, Defendants Williams repeatedly overrode ACJ doctors', including those by Defendants Dr. Stechshulte and Dr. Park, and outside doctors' recommendations to house McCray in the MHU where he would be non-weight bearing as doctors had prescribed.

92.     On March 24, 2020, McCray was transferred to pod 8E, a segregated housing pod, placed on RHU/DHU status, and subjected to conditions of solitary confinement after Internal Affairs officers confiscated a note by McCray, which they confirmed was innocuous and did not concern illicit activity.

93.     Although there were no criminal or disciplinary charges filed against McCray, Defendant Williams kept McCray in solitary confinement on 8E for 15 days. During that time, ACJ staff refused McCray's requests to be kept in a handicap cell, which was available. ACJ staff confiscated McCray's orthotic shoe and AFO brace, preventing him from showering or recreating regularly. McCray did not receive daily wound care as prescribed by his outside doctor. The denial of his assistive devices and medical care caused his foot condition to deteriorate, hastened his infection, and caused him to experience severe pain and discomfort.

94.     Defendant Williams had the authority to permit McCray to be on disciplinary confinement status in the MHU, but she chose not to exercise her authority despite McCray's requests to be moved there and in contravention of McCray's outside doctor's orders. Similarly, Defendants Dr. Stechshulte and Dr. Park failed to ensure McCray received sufficient medical care and accommodations when he was on 8E or RHU/DHU status.

95.     Defendants Williams, Dr. Stechshulte, and Dr. Park were aware that McCray would not have readily available access to medical staff or treatment on 8E, and his foot condition would not be monitored by medical professionals daily, and that McCray would be

21

denied his prescribed assistive devices in segregated housing and in his cell resulting in physical injuries and preventing McCray from participating in the jail's programs and services. These substantial risks of harm to McCray were foreseeable and preventable and unfortunately came to fruition. For example, on April 2, 2020, after his cane became caught on a cord, McCray lost his balance and fell because ACJ had confiscated his orthotic shoe and AFO brace.

96.      On April 9, 2020, McCray was moved to pod 3E but was denied a handicap accessible cell that was available. McCray's housing on 3E lacked access to sufficient medical care and denied him accommodations. ACJ staff denied or severely restricted McCray's use of his prescribed assistive devices such as his orthotic shoe, AFO brace, cane, which prevented him from participating in ACJ programs and services such as recreation, showers, cell cleaning, and exacerbated his foot wound and pain.

97.      On April 10, 2020, McCray was washing his hands in his sink when he fell because he was unable to maintain his balance without his brace and orthotic shoe, which had been confiscated by ACJ staff.

98.      McCray had to resort to hitting the emergency button to get medical treatment because ACJ officers routinely denied his requests for medical treatment, wound care, or pain medications.

99.      In May 2020, Sara McClung, a medical assistant, administered McCray's wound care in his cell several times. While McClung was changing McCray's dressings, she noticed McCray's leg was swollen and his wound was severely infected and emitted a putrid odor. On information and belief, McClung described McCray's symptoms to Defendants Dr. Stechshulte and Dr. Park and told them that McCray's foot appeared infected and his pain was getting worse.

100.      Despite apparent signs of an infection, Defendants Dr. Stechshulte and Dr. Park

22

did not prescribe McCray any antibiotics at this time.

101.    On May 22, 2020, x-rays of McCray's right foot confirmed that he had osteomyelitis in his calcaneus heel bone.

102.    On May 25, 2020, an ACJ healthcare provider confirmed McCray's heel had an ulcerous open wound consistent with osteomyelitis.

103.    On May 26, 2020, ACJ diagnosed McCray with "Chronic osteomyelitis w draining sinus, right ankle and foot" and an "open wound of [right] foot", according to McCray's medical records. McCray's osteomyelitis diagnosis was also confirmed by an outside doctor. However, Defendants Dr. Stechshulte and Dr. Park did not inform McCray of his osteomyelitis diagnosis until weeks later.

<u>ACJ Denied McCray Standard Antibiotic Treatment</u>

104.    The BOP guidelines recommend prescribing antibiotics in conjunction with other measures to treat osteomyelitis and are especially warranted when the patient also has cellulitis.[21] Antibiotics must be administered at the proper dosage and for the standard full course of 14 days to be effective.

105.    Defendants Dr. Stechshulte and Dr. Park were responsible for ensuring that McCray received appropriate antibiotics while he was incarcerated in ACJ from September 2019 to October 2020.  Defendants Dr. Stechshulte and Dr. Park prescribed McCray antibiotics directly or by approving or overseeing his antibiotic treatments administered by ACJ healthcare staff, who they supervised.  Defendants Dr. Stechshulte and Dr. Park knowingly disregarded medical standards by prescribing McCray antibiotics for a dosage and duration that were too

---

[21] Prevention and Management of Acute and Chronic Wounds Federal Bureau of Prisons Clinical Practice Guidelines (2014), https://www.bop.gov/resources/pdfs/wounds.pdf.

23

short to be effective, often not longer than 2-4 days. They also failed to promptly administer appropriate antibiotics to McCray despite outside doctors diagnosing him with cellulitis.

106.    Defendants Dr. Stechshulte and Dr. Park prescribed McCray directly or through subordinate ACJ healthcare staff, antibiotics that they knew he could not tolerate due to him having only one kidney.

107.    On May 28, 2020, McCray was transferred to the MHU by Defendant Dr. Stechshulte in order for McCray "to be more aggressively treated for his foot wound and we could insure [sic] that medications were being given appropriately." However, McCray was in the MHU for only one day.

108.    On May 29, 2020, a culture result of McCray's foot found he was infected with staphylococcus aureus, a dangerous and potentially lethal bacteria.

109.    That same day, McCray was accused of a non-violent rule violation. He was transferred to pod 8E, put on RHU/DHU status and kept in solitary confinement for 20 days, despite the severity of his rapidly worsening foot condition, his staph infection, and that housing on 8E lacked the necessary accommodations that Defendants Dr. Stechshulte and Dr. Park and his outside doctor had prescribed.

110.    At the time of McCray's transfer to 8E, there was an incarcerated person housed in MHU who was permitted to stay there even though he was on RHU/DHU status, had a disciplinary disposition rendered against, and he was serving out his disciplinary sentence.

111.    At the time, there was sufficient bed capacity to house McCray on the MHU.

112.    Defendant Williams overrode Defendants Dr. Stechshulte's and Dr. Park's and an outside specialist's recommendations to house McCray in the MHU where he would have

24

received immediate medical care for his deteriorating foot condition.

113.    On information and belief, McCray did not receive antibiotics until he was transferred to 8E, on May 29, which was nearly a week after healthcare staff diagnosed him with osteomyelitis.

114.    Around May 29, 2020, Defendants Dr. Stechshulte and Dr. Park prescribed McCray Moxifloxacin HCl, an antibiotic, for only four days instead of the standard 14 days. McCray had a severe adverse reaction to the medication, including excessive vomiting.

115.    McCray did not receive wound care for the first two days on 8E. A nurse brought supplies for McCray to do wound care on himself. McCray told healthcare providers that he was unable to do his wound care in his dirty cell without risking infecting his open nonhealing wound. McCray also told healthcare providers that he was in too much pain to change his dressing and apply medicated solution. Defendant Kelly was notified the McCray was not receiving his prescribed daily wound care.

116.    On May 29-30, 2020, Defendants Dr. Stechshulte and Dr. Park prescribed McCray Clindamycin HCl, an antibiotic, for only two days, instead of the standard 14 days, which was too short a course to be effective.

117.    Between May 31 and Jun 2, 2020, Defendants Dr. Stechshulte and Dr. Park prescribed McCray Vancomycin HCl, a medicine used to treat stomach issues, not foot infections. This 3-day course of antibiotics was not administered for the standard 14 days, and thus was too short to be effective.

<u>ACJ Delayed Specialists from Timely Diagnosing & Treating McCray</u>

118.    From September 2019 to October 2020, Defendant Williams, Dr. Stechshulte, and Dr. Park were responsible for ensuring McCray received prompt diagnosis and treatment by

25

specialists and approved of standard diagnostic imaging used to detect bone infections for McCray.

119.    During this time, Defendants Williams, Dr. Stechshulte, and Dr. Park delayed McCray's diagnosis and treatment of osteomyelitis by specialists and critical diagnostic imaging, resulting in McCray's bone infection spreading and causing significant physical injuries, which were preventable.

120.    Defendant Williams, Dr. Stechshulte, and Dr. Park denied or delayed outside specialists/doctors from examining, monitoring, or treating McCray onsite at ACJ, and on several occasions, delayed McCray's timely examination by specialists/doctors offsite

121.    On February 24, 2020, McCray's podiatry specialist, referred McCray to Allegheny General Hospital (AGH) Wound Care Center for "evaluation and treatment of chronic right heel ulcer." Defendant Williams, Dr. Stechshulte, and Dr. Park prevented timely diagnosis and treatment of McCray's open non-healing foot wound by delaying his examination by a wound care specialist until June 2020.

122.    Dr. Elisa Taffe, at all relevant times, was the medical director of the Advanced Wound Healing and Lymphedema Center at AHN Allegheny General Hospital. McCray was referred to Dr. Taffe for wound care treatment.

123.    Defendant Williams denied Dr. Taffe from examining McCray onsite at ACJ around June 3, 2020, thereby delaying his diagnoses and treatment. From June 2020 to August 2020, Defendant Williams further delayed and denied treatment of McCray's wound by denying Dr. Taffe from monitoring McCray's foot wound at the jail or at AGH.

124.    Based on McCray's medical records and reports from specialists and doctors, Dr. Taffe ordered McCray "to be 100% NON WEIGHT BEARING" due to the severity of his foot

26

wound and ordered that ACJ provide McCray with accommodations to effectuate the medical order.

125. Around June 3 and 4, 2020, Defendant Dr. Park documented that ACJ medical and correctional staff were failing to comply with Dr. Taffe's orders. Dr. Park wrote that "Housing on 8E is not recommended with regard to [McCray's] wound care" because McCray was not being provided with medical devices and housing accommodations, which were necessary for him to be non-weight bearing per Dr. Taffe's orders.

126. Upon information and belief, Dr. Taffe instructed Defendant Dr. Park to prescribe McCray a full course of antibiotics if he showed signs on an infection. Defendants Dr. Stechshulte and Dr. Park did not comply with Dr. Taffe's order.

127. On June 8-10, 2020, Defendants prescribed McCray Clindamycin HCl, an antibiotic, for only two days instead of the 14 days, which was too short a course to be effective.

128. On June 16, 2020, Dr. Taffe attempted to examine McCray remotely using a video conferencing feature on Defendant Dr. Park's cell phone. Dr. Taffe's examination, which lasted no more than 5 minutes, was impeded because Defendant Dr. Park had difficulty operating the video camera on her phone; at times the video was blurry or not focused on McCray's foot wound. Dr. Taffe found it "very difficult to assess" McCray's mobility and needs for assistive device footwear.

129. Dr. Taffe ordered that McCray "be evaluated for appropriate footwear to deal with his limited ankle mobility and foot drop."

130. Dr. Taffe informed Defendant Dr. Park that McCray was "at a high risk of further complications and developing osteomyelitis" if he was not permitted to use proper assistive devices.

27

131.    On June 16, 2020, McCray was released from RHU/DHU on 8E. Defendant Williams denied McCray's request to be housed on MHU, even though it was the only housing unit that was equipped to comply with Dr. Taffe's non-weight bearing medical order for McCray and had several unoccupied rooms available. Defendant Williams overrode Dr. Stechshulte's and Dr. Park's recommendations to house McCray in the MHU. Instead, Defendant Williams housed McCray on pod 3B, a general population housing pod, which lacked access to sufficient medical care and where he was denied accommodations.

132.    Although McCray was housed in a handicap accessible cell, ACJ continued to deny or severely limit McCray's use of his assistive devices. Often, ACJ staff prohibited McCray from using his wheelchair or crutches in his cell, forcing him to hop on one foot or crawl to move about his cell. On June 29, 2020, ACJ staff confiscated McCray's crutches.

133.    ACJ staff frequently failed to provide McCray wound care while he was housed on 3B.

134.    In June, McCray was denied showers for several days at a time, causing the bacteria in his infected foot to fester, and preventing him from completing daily wound care. He was denied access to a handicap accessible shower, forcing him to stand on his infected foot, causing him pain and discomfort, making it difficult to maintain balance, and placing him at substantial risk of falling.

135.    Despite knowing that McCray was being denied his medical devices and critical medical services and accommodations he needed and as recommended by Dr. Taffe, Dr. Stechshulte and Dr. Park failed to take corrective action.

136.    In June, McCray told Defendant Williams and a healthcare provider that he was not receiving daily wound care, showers, or recreation in general population.

28

137.    On June 11, 2020, McCray's right toenail fell off—a clear indicator that McCray's foot condition was deteriorating.

138.    In June 2020, McCray fell due to debilitating pain from his severely infected foot wound.

139.    Maria, a physician's assistant, examined McCray's foot and noticed his heel's skin appeared dark black-green and reeked of a foul odor, which were symptoms consistent with an infection.

140.    Maria recommended Defendant Dr. Park prescribe McCray a different course of antibiotics because his current antibiotic regiment was not treating his foot infection.

141.    In June, McCray was in agony from his foot wound. ACJ correctional staff denied McCray's requests for medical care, so he hit the medical emergency button in his cell. Minutes later, several members of SERT, ACJ's tactical corrections squad, armed with weapons, responded to McCray's request for medical care. ACJ did not dispatch a healthcare provider to assess McCray's medical emergency.

142.    On June 23, 2020, McCray was in such dire need of medical care, he told a staff member that he was suicidal and was going to kill himself in order to be moved to pod 5C, housing for acutely suicidal individuals. On 5C, Thomas Patts, a psychiatric assistant, spoke to McCray and examined his wound. Patts practiced in orthopedics for 14 years. He told McCray that his foot was extremely infected and that it would likely need to be amputated.

143.    Later that day, McCray was moved to the MHU where he resided until October 10, 2020.

144.    On July 4, 2020, a wound culture of McCray's foot found he was septic and infected with extremely harmful streptococcus.

29

145.    Defendants Dr. Stechshulte and Dr. Park prescribed McCray Augmentin even though the medication was contraindicated for him due to his kidney condition and his blood test results, which indicated that he was experiencing problems with his kidneys and/or pancreas. McCray suffered an adverse reaction to the Augmentin.

<u>McCray's Spreading, Life-threatening Osteomyelitis</u>
<u>Necessitated Amputating His Right Leg</u>

146.    By July 6, 2020, x-rays clearly showed early osteomyelitis on right calcaneus, which a specialist confirmed.



*X-ray of osteomyelitis in McCray's right foot*

147.    On July 17, 2020, an orthopedic surgeon examined McCray's foot wound. He told McCray that he would likely need surgery to remove parts of his infected foot. He ordered McCray get an MRI and an ultrasound immediately, so that the surgeon could determine the extent of his osteomyelitis and prevent further destruction of the bone and afflicted parts. McCray told Defendant Williams about the orthopedic surgeon's assessment and medical order.

30

148.     Disregarding the urgency of McCray's foot condition and spreading osteomyelitis, Defendants Williams, Dr. Stechshults and Dr. Park, on information and belief, failed to timely approve or schedule McCray's consultations and follow-up exams with outside experts and obtain his MRI, despite knowing they were needed to properly treat McCray and prevent further damage from the osteomyelitis.

149.     On July 5-14 and 17-18, 2020, Defendants Dr. Stechshulte and Dr. Park prescribed McCray antibiotics, but his treatment course was too short, and the prescription dosage was too weak to treat his osteomyelitis, and both doctors were aware of this because the standard duration for a course of antibiotics is common medical knowledge and therefore obvious.

150.     On August 1, 2020, McCray was hospitalized at AGH for excruciating pain in his right foot up to his knee and he was experiencing chills. Dr. Tarrell Coley diagnosed McCray with acute osteomyelitis of right calcaneus.

151.     In August 2020, Defendants Dr. Stechshulte and Dr. Park discontinued or failed to prescribe McCray antibiotics despite knowing that the medical standard recommended antibiotics for individuals like McCray who had been diagnosed with osteomyelitis and had cellulitis.[22] Upon information and belief, McCray's outside doctors did not order his antibiotics be discontinued.

152.     Defendants Dr. Stechshulte and Dr. Park told McCray he did not need antibiotics because he was eventually going to have surgery to remove part or all of his calcaneus.

---

[22] Prevention and Management of Acute and Chronic Wounds Federal Bureau of Prisons Clinical Practice Guidelines (2014), available at https://www.bop.gov/resources/pdfs/wounds.pdf.

31

153. On August 17, 2020, an MRI of McCray's right leg and foot showed he had suffered significant harm, including osteomyelitis that had infected most of his calcaneus and possibly part of his talis; McCray also had severe posttraumatic osteoarthrosis at the tibiotalar joint with muscular signal changes consistent with denervation.

154. The MRI confirmed that surgery was necessary to stop the spreading osteomyelitis. McCray asked for a second opinion. Defendant Williams told McCray that if he wanted one, then he would have to pay for the appointment out-of-pocket. Eventually, ACJ referred McCray to another doctor, who recommended he have the surgery.

155. Defendants Dr. Stechshulte and Dr. Park told McCray that it would be easier for him to walk if he got an amputation.

156. On September 4, 2020, an orthopedic surgeon stated that a "right BKA [below knee amputation] is recommended for multiple reasons including nonhealing wound right heel with osteomyelitis of calcaneus" along with osteoarthosis [sic] and ligament issues." A specialist confirmed McCray's bone infection was dire and recommended that he "have a below-the-knee amputation, to prevent <u>"continued spread of osteomyelitis, sepsis, and death."</u>

157. An orthopedic surgeon determined that McCray's infected nonhealing foot wound caused the osteomyelitis and other physical injuries that required amputation of McCray's right leg.

158. On September 10, 2020, McCray had a right below the knee amputation at AGH.

32



*McCray after his right below the knee amputation*

159. On September 16, 2020, McCray was discharged from AGH and returned to ACJ.

160. McCray was confined at ACJ until October 2020. During that time, Defendants Stechshulte and Park did not provide McCray with adequate pain management.

161. McCray was prescribed physical therapy but did not receive it regularly.

162. In September 2020, McCray pled to a misdemeanor charge so he could be released from ACJ and receive adequate medical treatment.

163. Since September 24, 2020, McCray has experienced ongoing knee pain, phantom pain, discomfort, and infections due to the amputation.

**Defendant Williams Interfered with McCray's Medical Care & Subjected Him to Inhumane Conditions**

164. Defendant Laura Williams, at all relevant times, was the Chief Deputy Warden of Healthcare Services for ACJ. Prior to her serving as Chief Deputy Warden, Defendant Williams served as a drug and alcohol counselor before being promoted to Deputy Health Services

33

Administrator. She had no training, experience or qualifications for prescribing medications or making medical diagnoses, administering wound care, and had no experience in the medical care field. Nor did she have the training, experience or qualifications for overseeing the operations of the health care department.

165. Defendant Williams, at all relevant times, was responsible for authorizing, promulgating, condoning, acquiescing in, and implementing policies and practices affecting the provision of medical services at ACJ including but not limited to permitting or authorizing correctional staff to confiscate assistive devices, which were prescribed and deemed medically necessary; delaying diagnosis or treatment by denying outside doctors from examining persons with serious infectious wounds onsite at ACJ or offsite at the doctor's medical facility; failing to approve timely consultations and follow-up exams with outside doctors; and failing to advocate and take steps to remove individuals from solitary confinement or housing conditions that lacked access to sufficient medical care or denied his accommodations.

166. Defendant Williams knew these policies were injurious to McCray by denying him medical treatment or accommodations for his serious medical needs and by subjecting him to inhumane conditions of confinement.

167. Defendant Williams knew outside doctors had prescribed McCray assistive devices and they were medically necessary to accommodate his physical disability and protect the infected or inflamed open foot wound.

168. Defendant Williams knew McCray fell more than half a dozen times due to ACJ staff denying or severely limiting McCray's use of his prescribed assistive devices. Defendant also knew that denying McCray's assistive devices caused him pain, hastened his infection,

34

exacerbated his wound, and prevented him from participating in ACJ's programs, benefits, and services.

169.     Despite knowing that denying McCray's assistive devices would put him at a substantial risk of harm, endangering his health and safety, Defendant Williams did not instruct or train ACJ correctional staff to allow McCray to use his assistive devices as prescribed.

170.     At all relevant times, the decision to house an individual on the MHU was a medical decision. Defendant Dr. Stechshulte told McCray that Defendant Williams overrode recommendations by him and outside doctors to house McCray on the MHU where he would be 100% non-weightbearing, permitted to use his assistive devices, and receive daily wound care as his outside doctor prescribed, and monitoring of his open non-healing foot wound.

171.     Defendant Dr. Stechshulte told McCray that Defendant Williams denied outside doctors from examining McCray onsite at ACJ or at the doctor's medical facility.

172.     Defendant Williams had actual knowledge of the severity of McCray's progressively worsening foot condition, his need for assistive devices and medical care and other accommodations from ACJ staff, outside doctors, and McCray. McCray informed Defendant Williams frequently from speaking with her directly and through grievances and inmate request forms, to which Defendant responded.

173.     Despite her actual knowledge of McCray's medical issues, Defendant Williams either assigned McCray to a segregated housing or housing in general population, where his assistive devices and other accommodations were denied or she refused to change that assignment once she became aware of McCray's medical condition, the denial of his assistive devices, and conditions exposing him to a substantial risk of harm.

35

174.    As a result of being assigned to the segregated housing unit and housing in general population that lacked access to sufficient medical care and denied his accommodations, McCray suffered agonizing pain every time he had to walk in his cell or on the pod for medical treatment, for showers, for recreation, or for any purpose which required him to walk and put pressure on his open non-healing wound. The lack of assistive devices exacerbated McCray's wound and hastened his infection.

### Causes of Action

### COUNT I: Americans with Disabilities Act, 42 U.S.C. §12132-
### Against Defendant Allegheny County

175.    Plaintiff hereby incorporates by reference the allegations contained in the above paragraphs 1 through 169 of this Complaint as if fully set forth herein.

176.    Defendant Allegheny County is a public entity within the meaning of 42 U.S.C. §12131.

177.    Plaintiff is a qualified individual with disabilities within the meaning of Title II of the Americans with Disabilities Act ("ADA").

178.    Defendant Allegheny County, and its employees, knew that Plaintiff was an individual with disabilities covered by the protections of the ADA.

179.    Despite this knowledge, Allegheny County and its employees failed to provide Plaintiff with necessary reasonable accommodations for his disabilities.

180.    Such reasonable accommodations for Plaintiff's physical disabilities include but are not limited to: the provision of assistive devices; provision of a handicap accessible cell; provision of housing allowing Plaintiff to be 100% non-weight bearing; housing in the MHU, including when on RHU/DHU status; provision of a shower chair; and training for ACJ staff on recognizing when a person has a physical disability and instructing staff to not confiscate or limit

36

individual's ability to use their assistive devices.

181.    Allegheny County acted with deliberate indifference to the risk of violating Plaintiff's federally protected rights under the Americans With Disabilities Act by permitting, authorizing, acquiescing in, and otherwise enabling staff to confiscate or limit McCray's access to his prescribed assistive devices.

182.    Defendant Allegheny County further discriminated against Plaintiff by failing to provide him a handicap shower stall or shower seat.

183.    Allegheny County and its employees further discriminated against Plaintiff by failing to provide him meals and medication when his pain or discomfort prevented him from retrieving them unassisted.

184.    As a direct and proximate result of the aforementioned acts, including but not limited to Defendant Allegheny County's deliberate indifference to the violations of Plaintiff's federally protected rights, Plaintiff has suffered loss of his right leg and continues to suffer great pain, and mental and emotional distress.

**COUNT II: Defendants' Deliberate Indifference to Plaintiff's Serious Need for Medical Care Violates the Fourteenth Amendment to the U.S. Constitution – Against Allegheny County and Against Defendants Williams, Dr. Stechshulte, Dr. Park and Kelly in their Individual Capacities**

185.    Plaintiff hereby incorporates by reference the allegations contained in the above paragraphs 1 through 169 of this Complaint as if fully set forth herein.

186.    At all relevant times, Defendant Williams was responsible for authorizing, promulgating, condoning, acquiescing in, and implementing policies and practices affecting the provision of medical services at ACJ including but not limited to permitting or authorizing correctional staff to confiscate assistive devices, which were prescribed and deemed medically

37

necessary; delaying diagnosis or treatment by denying outside doctors from examining persons with serious infectious wounds onsite at ACJ or offsite at the doctor's clinic; failing to approve timely consultations and follow-up exams with outside doctors; failing to advocate and take steps to remove individuals from solitary confinement or housing conditions that lacked sufficient access to medical care or denied accommodations. Defendant Williams knew these policies were injurious to McCray by denying him medical treatment or accommodations for his serious medical needs.

187.    Defendant Williams knew outside doctors had prescribed McCray assistive devices and they were medically necessary to accommodate his physical disability and protect his nonhealing open neuropathic wound on his foot. Defendant Williams knew McCray fell more than half a dozen times because ACJ staff denied or severely limited McCray's use of his prescribed assistive devices. Defendant also knew that denying McCray's assistive devices caused him pain, hastened his infection, worsened his wound, and prevented him from participating in ACJ's programs, benefits, and services. Despite knowing that denying McCray's assistive devices would deny him a serious medical need and put him at a substantial risk of harm, endangering his health and safety, Defendant Williams did not instruct or train ACJ correctional staff to permit McCray to use his assistive devices as prescribed.

188.    Defendant Williams had actual knowledge of McCray's worsening foot condition and treatment issues, and the harm caused to McCray by deficient medical care and denial of accommodations, as a result of personal conversations with McCray, as well as from his healthcare providers at ACJ and outside doctors, and through the grievance process and his internal complaints.

38

189.    Defendant Williams was deliberately indifferent to, and her acts and omissions were objectively unreasonable to, McCray's serious medical needs, which caused him unnecessary pain and suffering and physical injuries.

190.    Defendants Dr. Stechshulte and Dr. Park had personal knowledge of the infection in McCray's foot wound and his excruciating pain, but they did not take the required steps to treat his serious medical condition by, among other acts and omissions:

1.    failing to prescribe or provide him with medically necessary assistive devices;

2.    failing to ensure or administer his daily wound care as medically indicated;

3.    failing to prescribe a medically appropriate course of antibiotics to control the infection in knowing and gross deviation from the applicable standard of care;

4.    failing to administer sufficient pain medication;

5.    failing to ensure or administer adequate nutrition;

6.    failing to ensure McCray was housed where he could be 100% non-weightbearing as prescribed by outside doctors.

191.    Dr. Stechshulte and Dr. Park's acts and omissions were objectively unreasonable and constituted deliberate indifference to McCray's serious medical needs, which caused him unnecessary pain and suffering and physical injuries.

192.    Defendant Kelly was responsible at all relevant times for ensuring McCray received daily wound care, debridement treatments, and nutritional supplements as prescribed.

193.    Defendant Kelly knew McCray had a serious medical need for his prescribed wound care, debridement treatments, and nutritional supplements and were critical to prevent inflammation, infection, and unnecessary pain from his non-healing open foot wound, and promote healing, and Defendant Kelly knew that the failure to ensure McCray received his

39

prescribed wound care, debridement treatments, and nutritional supplements placed McCray at a substantial risk of harm to his health.

194.    Defendant Kelly knew from ACJ staff members, including healthcare providers, and from McCray that he did not receive his prescribed wound care, debridement treatments, or nutritional supplements numerous times during his confinement at ACJ from 2019 to 2020.

195.    Defendant Kelly's acts and omissions were objectively unreasonable and constituted deliberate indifference to McCray's serious medical needs, which caused him unnecessary pain and suffering and physical injuries.

**COUNT III: Malpractice-Against Defendants Dr. Stechshulte and Dr. Park**

196.    Plaintiff hereby incorporates by reference the allegations contained in the above paragraphs 1 through 169 of this Complaint as if fully set forth herein.

197.    At all relevant times, Defendants Dr. Stechshulte and Dr. Park were doctors and had a duty to provide standard medical care to McCray, their patient, while he was incarcerated in ACJ.

198.    Defendants Dr. Stechshulte and Dr. Park breached their duty to McCray by failing to prescribe him antibiotics at the proper dosage, for the standard full course treatment of days, and an antibiotic that McCray could tolerate with his kidney condition; failing to prescribe McCray with standard pain medication while he was suffering from excruciating pain from his foot wound and infections and after McCray's amputation; failing to ensure or provide McCray with daily wound care in a sterile environment, as prescribed by an outside doctor; failing to ensure that he received adequate nutrition; delaying or impeding diagnosis and treatment by outside specialist; failing to provide McCray with accommodations such as housing in MHU and

40

assistive devices to ensure McCray was 100% non-weightbearing as ordered by a specialist, among other negligent acts or omissions

     199.    Defendants Dr. Stechshulte and Dr. Park' breach increased McCray's risk of harm or caused him damages, including significant and preventable pain, suffering, and discomfort; and preventable physical injuries including eroded bones, sepsis, osteomyelitis and right below the knee amputation.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court grant the following relief:

A.    Award Plaintiff compensatory, special, and punitive damages on all claims;

B.    Grant attorneys' fees and costs;

C.    Such other relief as the Court deems just and proper.

### JURY DEMAND

Plaintiff requests a trial by jury with respect to all matters and issues properly triable by a jury.

Respectfully submitted,

/s/Jaclyn Kurin*
Staff Attorney
D.C. I.D. No. 1600719
jkurin@alcenter.org
/s/ Bret Grote
Legal Director
PA I.D. No. 317273
bretgrote@abolitionistlawcenter.org
Abolitionist Law Center
PO Box 8654
Pittsburgh, PA 15221
412-654-9070

*pro hac vice

41

| Page 1: [1] Deleted | bretgrote@yahoo.com | 1/13/25 1:39:00 PM |

**FIRST**

Allegheny County Jail
950 2nd Ave
Pittsburgh, PA 15219

### Treatments - MCCRAY, CLAYTON 2019-11068

| Name | SIG | Ordered By | Start | Stop |
|---|---|---|---|---|
| Soak foot in warm water with 60cc of Dakins solution mixed in with a foot basin full of water | as directed | Donald Stechschulte MD | 5/31/2019 | 6/14/2019 |
| WOUND CARE | daily pm | Donald Stechschulte MD | 5/31/2019 | 6/14/2019 |
| WOUND CARE | daily am | Maria Ivona Chrzastowska PA | 8/29/2019 | 9/27/2019 |
| WOUND CARE | daily am | Sarah Kielek NP | 9/6/2019 | 9/20/2019 |
| WOUND CARE | daily am | Sarah Kielek NP | 9/6/2019 | 9/20/2019 |
| WOUND CARE | daily am | Sarah Kielek NP | 9/23/2019 | 10/6/2019 |
| WOUND CARE | daily am | Charles Timbers NP | 10/7/2019 | 10/16/2019 |
| WOUND CARE | daily am | Nancy Park MD | 10/16/2019 | 11/5/2019 |
| WOUND CARE | daily pm | Jodi Lynch NP | 10/19/2019 | 10/25/2019 |
| WOUND CARE | daily pm | Maria Ivona Chrzastowska PA | 11/1/2019 | 11/7/2019 |
| therahoney gel | daily pm | Maria Ivona Chrzastowska PA | 11/1/2019 | 11/10/2019 |
| foam wedge | daily pm | Maria Ivona Chrzastowska PA | 11/2/2019 | 11/2/2019 |
| WOUND CARE | daily am | Nancy Park MD | 11/8/2019 | 12/7/2019 |
| WOUND CARE | daily am | Nancy Park MD | 11/25/2019 | 2/22/2020 |
| HOT PACK | daily pm | Natalie Austin PA | 1/7/2020 | 1/13/2020 |
| WOUND CARE | daily pm | Natalie Austin PA | 1/8/2020 | 4/6/2020 |
| WOUND CARE | daily am | Donald Stechschulte MD | 1/8/2020 | 2/6/2020 |
| medihoney/kerlex/4x4s to pt prn for self wound care | weekly | Natalie Austin PA | 1/28/2020 | 3/27/2020 |
| WOUND CARE | weekly | Nancy Park MD | 1/29/2020 | 2/27/2020 |
| WOUND CARE | daily pm | Donald Stechschulte MD | 2/25/2020 | 3/25/2020 |
| WOUND CARE | daily am | Sarah Kielek NP | 3/26/2020 | 6/23/2020 |
| COOL COMPRESS | twice per day | Sarah Kielek NP | 4/2/2020 | 4/4/2020 |
| Patient needs an AFO for right foot drop | as directed | Donald Stechschulte MD | 4/14/2020 | 10/10/2020 |
| WOUND CARE | daily am | Nancy Park MD | 4/23/2020 | 7/21/2020 |
| WOUND CARE | daily am | Nancy Park MD | 5/14/2020 | 7/12/2020 |

| Name | SIG | Ordered By | Start | Stop |
|---|---|---|---|---|
| WOUND CARE | daily am | Nancy Park MD | 5/20/2020 | 11/15/2020 |
| WOUND CARE | daily pm | Natalie Austin PA | 5/25/2020 | 11/20/2020 |
| WOUND CARE | daily am | Natalie Austin PA | 5/27/2020 | 8/24/2020 |
| WOUND CARE | daily am | Nancy Park MD | 6/18/2020 | 8/16/2020 |
| WOUND CARE | daily am | Nancy Park MD | 6/18/2020 | 8/16/2020 |
| WOUND CARE | daily am | Nancy Park MD | 6/24/2020 | 8/22/2020 |
| post op shoe size 10 | as directed | Nancy Park MD | 6/29/2020 | 9/26/2020 |
| CLEARED FROM MENTAL HEALTH | now | Thomas Patts PA | 6/30/2020 | 6/30/2020 |
| wheelchair & crutches for ambulation on pod | daily am | Natalie Austin PA | 6/30/2020 | 12/26/2020 |
| antiembolic knee-high | now | Maria Ivona Chrzastowska PA | 7/11/2020 | 7/11/2020 |
| WOUND CARE | twice per day | Donald Stechschulte MD | 7/17/2020 | 8/15/2020 |
| WEIGHT CHECK | every 2 weeks | Nancy Park MD | 7/27/2020 | 9/24/2020 |
| ICE PACK | now | Natalie Austin PA | 7/31/2020 | 7/31/2020 |
| HOT PACK | twice per day | Natalie Austin PA | 8/1/2020 | 8/4/2020 |
| HOT PACK | now | Natalie Austin PA | 8/8/2020 | 8/8/2020 |
| HOT PACK | now | Natalie Austin PA | 8/10/2020 | 8/10/2020 |
| HOT PACK | now | Natalie Austin PA | 8/21/2020 | 8/21/2020 |
| WOUND CARE | twice per day | Nancy Park MD | 8/24/2020 | 10/22/2020 |
| WOUND CARE | daily am | Nancy Park MD | 9/8/2020 | 10/7/2020 |
| NPO after midnight | as directed | Nancy Park MD | 9/15/2020 | 9/15/2020 |
| wheelchair | now | Natalie Austin PA | 9/16/2020 | 3/14/2021 |
| NWB to right BKA | as directed | Sandra Simms NP | 9/18/2020 | 10/17/2020 |
| WOUND CARE | daily am | Donald Stechschulte MD | 9/18/2020 | 10/17/2020 |
| wound dressing change with bacitracin and telfa over suture line and then kurlix and then coban | daily pm | Slava Winters MD | 9/18/2020 | 9/24/2020 |
| VITAL SIGNS | daily am | Sandra Simms NP | 9/19/2020 | 9/28/2020 |
| Incentive spirometer | as directed | Sandra Simms NP | 9/19/2020 | 9/23/2020 |
| Right Knee Immobilizer to remain in place at ALL TIMES- to prevent flexion contracture right knee | as directed | Nancy Park MD | 9/21/2020 | 10/20/2020 |
| ROUTINE OBSERVATION | now | Willis Leavitt MD | 9/23/2020 | 9/29/2020 |

MCCRAY, CLAYTON LAMONT JR 169149 (2019-11068)

| Name | SIG | Ordered By | Start | Stop |
|---|---|---|---|---|
| WOUND CARE | daily am | Donald Stechschulte MD | 9/25/2020 | 11/23/2020 |
| WOUND CARE | daily am | Nancy Park MD | 10/6/2020 | 11/4/2020 |

Maria Ivona Chrzastowska PA POSTED ON 9/14/2019 10:04:20 PM EDT                    Type: PA NOTE

Inm requested to be see while at Sallyport for wound care.

Reports progressive wound debris that do not get cleaned with soaks.

chronic complex  R heel wound w/o infection sxs

A/P:

- R heel neuropathic ulcer 2/2 GSW to spine w/associated R-sided weakness and numbness

 tylenol bid/baclofen

 wound care

 podiatry consult for debridement

---

Maria Ivona Chrzastowska PA POSTED ON 9/14/2019 10:07:06 PM EDT                    Type: PA NOTE

Ordered labs: cbc, cmp.

---

Reneelyn Corley RN POSTED ON 9/21/2019 4:31:02 AM EDT                    Type: NURSE

inmate released longer than 72 hrs, per policy personal meds destroyed

---

Alexandra Bieselt MA POSTED ON 9/24/2019 9:40:51 PM EDT                    Type: MEDICAL ASSISTANT

writer called pod 2x. inmate was a no show for treatment

---

Dzenita Turcinhodzic Physician Assistant POSTED ON 9/24/2019 11:24:48 PM EDT                    Type: PA NOTE

Patient on 5B for wound care. He requested to see provider even though Sarah Kielek CRNP spoke with him already this evening. He reports that his wound to right heel is getting worse and "smells." Patient reports having wound since December 2018. Patient has foot drop to right foot and ambulates with cane 2* to GSW to spine.

Requesting boost and for his podiatry appointment to be rescheduled. Apparently he left last Monday for SCI Fayette and returned yesterday and therefore his offsite appointment was cancelled. States at Fayette they did not soak his foot, just dry dressing changes with Medihoney.

On exam, right heel with thickened skin that is cracked with areas of hyperpigmentation, there is a dime sized opening to heel with no drainage, infection or odor noted. This is the first time I'm seeing this wound and unsure of what it looked like before. Reading previous notes by providers, it appears to be the same upon my exam.

Will continue wound care as ordered and reschedule podiatry appointment ASAP.

---

Esther Stanton PA POSTED ON 9/25/2019 9:36:39 PM EDT                    Type: PA NOTE

S: Inmate to sallyport due to wound in his left heel. He states the wound is worse and it is tender. He has had this wound for a while and most recently was treated with medihoney. He has been approved to see podiatry but this is not yet scheduled.

O: Wound to left heel with copious amounts of calloused skin and a large open area with a dime sized hole as described by the PA on 9/24/19

A/p Severe nonhealing wound with tenderness- rx Keflex and he will see podiatry.

Elon Mwaura PA POSTED ON 9/29/2019 1:45:47 PM EDT                                      Type: PHYSICAL THERAPIST

Tenia pedis

clotrimazole ordered

follow-up p.r.n.

---

Patricia Brewer LPN POSTED ON 9/30/2019 10:28:17 PM EDT                                      Type: NURSE

Wound care completed by MA from previous shift.

---

Donald Stechschulte MD POSTED ON 10/1/2019 10:14:13 AM EDT                                      Type: MEDICAL MD/DO

Patient was seen in the Sally port while he was having a dressing change, he has a large neuropathic ulcer of his right heel area being treated conservatively with the Medihoney dressing changes and p.o. Clindamycin. He is in line for a podiatry appointment for possible debridement and this has not been scheduled.

Now he is complaining of pain and discomfort we will alter his pain medicine and see if we can initiate a quicker appointment with Podiatry

---

Brandon Woodson MA POSTED ON 10/7/2019 4:28:16 PM EDT                                      Type: MEDICAL ASSISTANT

Called inmate for his dressing change. Inmate was never sent. Called back at 420pm to see if the inmate was being sent. Spoke with officer Cornell,; she stated "she would send him". CO Cornell called back and spoke with RN Laidley and stated" McCray is refusing his dressing change"

---

Donald Stechschulte MD POSTED ON 10/10/2019 9:29:31 AM EDT                                      Type: MEDICAL MD/DO

Patient was seen in the Sally port on 5B with a chief complaint of his foot and leg continue with significant pain. T4 is have not helped amitriptyline has not helped Cymbalta has not helped the only thing that gives him partial relief his gabapentin.

An ad Hoc committee was called together with Dr. Park and myself with the patient's history of a gunshot wound with footdrop and pressure ulcers of his calcaneus with a history of failing various medications it seems reasonable to restart his Neurontin

---

Curtis Wilson Med Tech POSTED ON 10/14/2019 5:06:28 PM EDT                                      Type: MED TECH

right testicle is hurting and in both legs

---

SOAP NOTE BY: Nancy Park MD POSTED ON 10/16/2019 2:39:56 PM EDT                                      Type: MEDICAL MD/DO

**Subjective**

sally port

25M who is in the treatment room for wound care to right calcaneous ulcer

he asked that a provider also see him for pain right testicle area- present for about 6 months, waxes and wanes, possible lump in the area, perhaps more painful recently, NO discharge/dysuria/abd pain; no definite STD risk but he agrees to be screened

Briana Bujanowski MA POSTED ON 10/30/2019 11:58:50 AM EDT                    Type: MEDICAL ASSISTANT

Called pod for patient to come for dressing change. Patient is at court.

Diane Hopkins MA POSTED ON 10/30/2019 9:14:16 PM EDT                    Type: MEDICAL ASSISTANT

Could not do dressing change due to IM being at court, as well as females in 5B Sally Port, after 8pm.

Christina Grunwald RN POSTED ON 10/31/2019 12:34:50 PM EDT                    Type: NURSE

No AM card for gabapentin. Order was re-newed on 10/20/19. ACJ pharmacy notifed of missing card and will contact Kane.

Diane Hopkins MA POSTED ON 10/31/2019 8:56:05 PM EDT                    Type: MEDICAL ASSISTANT

Not able to conduct wound care due to females in Sallyport, No Escort until after 8pm, and then an Institutional Lock Down.
Tried to get IM up for wound care at 4:30, count was not clear.

Laura Williams Chief Deputy Warden of Healthcare Services POSTED ON 11/1/2019 2:22:35 PM EDT                    Type: HSA/DHSA

Received notification from Chief Zetwo that Mr. McCray was inquiring about his dressing changes. It appears that he was given some supplies on 10/28/19, but was not seen since then. Notified the ADON's for follow up.

Diane Hopkins MA POSTED ON 11/1/2019 9:49:29 PM EDT                    Type: MEDICAL ASSISTANT

IM was to be seen by provider, and receive wound care.
Called POD twice for IM to come to 5B, no escort.
CO called up at 9:00 pm, to transport IM to 5B.
Sallyport had female IM's at this time.
Will pass along to Night Shift, for available provider.

Diane Hopkins MA POSTED ON 11/1/2019 10:39:43 PM EDT                    Type: MEDICAL ASSISTANT

IM seen in 5B by provider and was treated for wound care.
Cleansed foot area with soap and water.
Applied Bacitracin and Sentanyl.
Wrapped with Gauze.

Maria Ivona Chrzastowska PA POSTED ON 11/1/2019 10:57:09 PM EDT                    Type: PA NOTE

Seen at Sallyport to eval. R foot wound.
PMH/o R chronic plantar ulcer x 8 mo, R foot drop s/p GSW to spinal area, b/l LE neuropathy.
S/p debridement 10/719 by podiatry, picture of the R plantar heel ulcer included in the note/Epic.

O

GU exam performed in presence of CO

testicles normal in size and shape, no mass or TTP

Abd- NT

Extr- no swelling or erythema, no inguinal adenopathy

right heel ulcer not evaluated as wound care had just been done and dressing in place

Plan

await scrotal US which was ordered today

---

Nancy Park MD POSTED ON 11/13/2019 7:31:35 AM EST                    Type: MEDICAL MD/DO

Right LE venous doppler  11/8/19

Negative for DVT

---

Nancy Park MD POSTED ON 11/13/2019 7:34:33 AM EST                    Type: MEDICAL MD/DO

US scrotum  11/11/19

1 cm right epidydimal cyst otherwise negative scrotal US

Normal appearing testicles

---

Natalie Austin PA POSTED ON 11/20/2019 3:11:26 PM EST                    Type: PA NOTE

Procedure note- Left heel debrided with 11 blade. Removed lg amount of callous and black eschar.  Wound was prematuring closing, so it debrided around the opening of the wound.  Pt tolerated procure well. No complications.

---

Curtis Wilson Med Tech POSTED ON 11/22/2019 6:45:29 PM EST                    Type: MED TECH

wants to be check for an UTI

---

Nancy Park MD POSTED ON 11/25/2019 3:27:05 PM EST                    Type: MEDICAL MD/DO

PODIATRY CONSULT REVIEW:

Advised start Augmentin bid x 5 days, discontinue Medihoney, use Santyl with wound care instead

Orders placed.

---

Nancy Park MD POSTED ON 11/25/2019 3:28:26 PM EST                    Type: MEDICAL MD/DO

UA with reflex to culture ordered per previous note.

---

Diane Hopkins MA POSTED ON 12/3/2019 10:15:24 PM EST                    Type: MEDICAL ASSISTANT

Unable to conduct wound care due to Many harms in Sally Port as well as no escort at the time

---

Sarah Kielek CRNP POSTED ON 12/12/2019 7:59:14 PM EST                    Type: NURSE

SCS wants checked for UTI. UA dip ordered.

---

Briana Bujanowski MA POSTED ON 12/17/2019 1:08:40 PM EST                    Type: NURSE

Abnormal Vital Signs/Readings: Dr. Park is aware

Blood Pressure Systolic: 161

---

Michael Warner RN POSTED ON 12/19/2019 5:32:25 PM EST                    Type: NURSE

Abnormal Vital Signs/Readings: Sarah K. CRNP aware

Blood Sugar: 65

---

Diane Hopkins MA POSTED ON 12/19/2019 10:14:08 PM EST                    Type: MEDICAL ASSISTANT

Cleansed wound with soap and water, applied Santyl to open area and covered with non stick dressing. Wrapped with ace bandage.
Wound has an odor, notified Sarah (CRNP) who will order antibiotic medication.

---

Sarah Kielek CRNP POSTED ON 12/20/2019 11:41:47 AM EST                    Type: NP NOTE

late entry from 12/19/2019 - medical emergency.
s:IM found alert, laying face down and cuffed in cell.
Room had a strong smell of a burned substance; IM denied any illicit drug use.
Stated he was sitting on toilet and had been straining and became dizzy and fell to the floor.
- bowel movements have been less frequent than normal and endorses some constipation/nausea x3 days. today has only eaten a pear due to nausea
Denies hitting head, having improved however persistent nausea
o:aox3 appears fatigued but well - VS, mildly htn
eomi
ra ctabl
rrr no m/r/g
+bs - multiple well healed scars over abd from previous sx.
a/p: vasovagal response, constipation, nausea, htn
zofran OD now, add x3 days to emar
clonidine 0.1mg po now
add bowel regime
f/u clinic

---

MCCRAY, CLAYTON LAMONT JR 169149 (2019-11068)

Today I was referred a grievance for this prior to DON and admin assistant and instructed to help address this regarding wound care access. Instructed to educate on how to appropriately clean wound in the event he is unable to be brought to 5B to obtain wound care dressing change and inform pt on how to access cleaning supplies for his room to address his cell condition. Review of wound care received, dates missed/not documented, progress notes of care received, progress notes of escort/sally port considerations affecting ability to receive wound care at that time, etc. Per nurse feedback, patient is able to wash heal with soap and water. Since he was recently noticed to have fungal infection inbetween toes, he was ordered tolnaftate and is advised to keep that section of his foot uncovered when possible. Ensuring his foot is adequately dried after washing/showering to ensure a reduction in a moist environment. Corrections feedback indicated that M, W, and F are mandatory cell cleaning days and that inmates can ask an officer at any time for chemical supplies to help clean their cells. These cleansers are given to the pods daily by the Supply Department. The patient's housing location required an escort to bring patient to 5B, there are notes of lack of escort being reason for missed wound care appts, as well as females in sallyport and the inability to bring patient down. Due to the location of where wound care is performed as well, a high volume of patients or medical emergencies and/or staff volume may play a role in scheduling conflicts. Patient was relayed this information, and the DON was provided with this feedback and any notes taken/reviewed.

---

Lauren Bach Infectious Disease Coordinator POSTED ON 1/2/2020 3:02:05 PM EST                    Type: NURSE

Per request, Dr. Park and Dr. S consulted regarding recent note of antibiotic consideration. None needed at this time.

Per patient request, asked if provider Natalie or another individual would be performing a debridement soon. Per 5B MD request, patient should be scheduled for debridement appointments in clinic due to the time-requirement needed to help ensure patient flow within the sallyport section. Patient will continue to have daily wound care appts scheduled for that 5B sallyport location though.

Clinic coordinator notified about the debridement appointment needs for this patient. Email sent.

Review closed.

---

Donald Stechschulte MD POSTED ON 1/3/2020 9:31:20 AM EST                    Type: MEDICAL MD/DO

Patient was seen on the Sally port on 5B as he was getting his dressing changed on his foot.  The wound appeared much better and less deep than the last time I saw it; the patient was requesting it be debrided and honestly the tissue surrounding the area looked to be non-necrotic and intake at this time it was appropriate to debride the area.  Because of the concern for MRSA we will take a nasal swab to see if this patient is a carrier; if he is a carrier we will initiate Bactroban nasal swabs

---

Brandon Woodson MA POSTED ON 1/5/2020 9:47:17 AM EST                    Type: MEDICAL ASSISTANT

Inmate stated he was gonna do self wound care

---

Brandon Woodson MA POSTED ON 1/6/2020 5:15:52 PM EST                    Type: MEDICAL ASSISTANT

No level escort

---

Donald Stechschulte MD POSTED ON 1/7/2020 5:45:20 AM EST                    Type: MEDICAL MD/DO

Nasal swab taken to address possible carrier state of MRSA was negative; he does not appear to be a carrier

---

Dennis Larkin Physical Therapist POSTED ON 1/7/2020 11:08:20 AM EST                    Type: PHYSICAL THERAPIST

Diane Hopkins MA POSTED ON 1/9/2020 5:02:31 PM EST                                    Type: MEDICAL ASSISTANT

Called for woud care at 4:30pm.
IM no show in 5B.

Ntezimana Clementine MA POSTED ON 1/11/2020 10:11:45 PM EST                           Type: MEDICAL ASSISTANT

Called to 5B for wound care at 9:30pm. IM no show to 5B.

Ryan Watson Physical Therapist POSTED ON 1/14/2020 11:28:09 AM EST                      Type: PHYSICAL THERAPIST

S: pt reports no new complaints
O: BLE seated with blue theraband LAQ, hip abd, HS curls 3x10. standing TKE with blue theraband 2x10. Standing mini squats, hip abd, ext and flex 2x10.
A: pt tolerates tx well
P:  PT 1-2w4 ther ex, core ex, ROM, PRE BLE

Dennis Larkin Physical Therapist POSTED ON 1/16/2020 10:20:50 AM EST                     Type: PHYSICAL THERAPIST

S: pt reports mod L knee pain R knee feeling ok
O: BLE seated with blue theraband LAQ, hip abd, HS curls 3x10. standing TKE with blue theraband 2x10. Standing mini squats, hip abd, ext and flex 2x10.
A: pt tolerates tx well pt reported he is doing HEP
P:  PT 1-2w4 ther ex, core ex, ROM, PRE BLE

Diane Hopkins MA POSTED ON 1/16/2020 10:08:27 PM EST                                   Type: MEDICAL ASSISTANT

Wound care completed as directed.

Dennis Larkin Physical Therapist POSTED ON 1/21/2020 9:51:32 AM EST                      Type: PHYSICAL THERAPIST

S: pt denies pain today
O: RLE seated with gray theraband TKE, LAQ, hip abd, green T band for HS curls 3x10. standing TKE with blue theraband 2x10. Standing mini squats, hip abd, ext and flex 2x10.
A: pt tolerates tx well pt reported he is doing HEP
P:  PT 1-2w4 ther ex, core ex, ROM, PRE BLE

Diane Hopkins MA POSTED ON 1/22/2020 5:00:12 PM EST                                    Type: MEDICAL ASSISTANT

IM given supplies, 4x4's and Santyl in a cup.

Ellen Crosby MA POSTED ON 1/24/2020 6:11:11 PM EST          Type: MEDICAL MD/DO

Imate was called there was no escort at this timne was told to call after 800 will call

Diane Hopkins MA POSTED ON 1/24/2020 9:46:39 PM EST          Type: MEDICAL ASSISTANT

Cleansed wound on left heel with Soap/Water, applied Santyl.

Applied non-stick tefla and gauze.

Wrapped with kerlix.

Jodi Lynch CRNP POSTED ON 1/25/2020 11:09:44 AM EST          Type: NP NOTE

Patient seen in exam room of 5B while having wound care completed. Wound on R heel is void of exudate, swelling, and warmth. Wound bed comprised of granulation tissue. Outer heel around wound comprised of thick yellow callous area, #10 scalpel used to thin callous down. While patient in exam room, reports a pain that occurred last evening in his right testicle, states that pain was a sharp, shooting pain in nature, and with short duration, today he has an ache when touched. Denies any urinary symptoms, denies erectile symptoms and no pain with ejaculation, examined bilateral testicles and no swelling or lumps are noted. Patient can have ibuprofen for discomfort, advised patient that he will be scheduled for f/u in clinic, but if pain continues or gets worse he is to alert medical. Patient had US of area in Nov. revealed no torsion, but a cyst on R testicle was found, L testicle wnl. Today on exam cyst could not be felt, R testicle was smooth without deviation of shape. Patient is afebrile and without pain now, no swelling or firmness of scrotal area noted. Will continue to monitor as needed. Patient released back to pod in stable condition.

Donald Wilt Physical Therapist POSTED ON 1/28/2020 9:40:47 AM EST          Type: PHYSICAL THERAPIST

S: Issues with AFO- velcro on strap- unable to use shell AFO due to wound on R heel

O:  MMT trunk flex 4+/5 R hip flex 4+ /5 abd/add 4/5 quad 5/5 ham 4/5 DF NT  Patient amb  with spc and AFO I.  AROM BLE WNL except R ankle.  RLE press man resist 2x10 Seated R hip flex/abd, LAQ silver hamstring curl blue theraband 2x10 Upward diagonal SLR with man resist 2x10

A:  Demo increase RLE strength

P:  consult with DR. S on to cont with theraband PREs or DC to HEP

Natalie Austin PA POSTED ON 1/28/2020 5:21:08 PM EST          Type: PA NOTE

Wound care supplies given to pt today; he can do self wound care.

Natalie Austin PA POSTED ON 1/28/2020 10:29:09 PM EST          Type: PA NOTE

Wound debrided in clinic today; scalpel used; tolerated well.

wound improving- getting smaller/filling in.

f/u prn

Donald Wilt Physical Therapist POSTED ON 2/3/2020 9:37:56 AM EST          Type: PHYSICAL THERAPIST

Notified Ivonna about inmate requesting daily dressing changes. Wound care order states inmate to be done weekly per Dr Parks, Ivonna went to assess and give inmate supplies.

---

Donald Stechschulte MD POSTED ON 2/25/2020 6:20:17 AM EST                    Type: MEDICAL MD/DO

Patient was seen by Podiatry on February 24, 2020 and it was recommended that he have daily dressing changes consisting of cleaning the area with antibiotic soap than adding Santyl covered with a dry dressing. They also recommended follow-up with the AGH Wound Clinic. We will make those arrangements

---

Akeyla Wall MA POSTED ON 3/1/2020 2:12:24 PM EST                    Type: MEDICAL ASSISTANT

attempted to have inamate sent to medical for wound care. Per officer inmate was on a visit. I will give information to next MA on schedule.

---

Nancy Park MD POSTED ON 3/5/2020 11:10:45 AM EST                    Type: MEDICAL MD/DO

wound care

evaluated during his wound care session

17 mm open wound right plantar heel with approx 5 mm depth

health granulation at base with no visible drainage

no surrounding cellulitis

very thick callous surrounding the area

Proc: #15 blade use to debride the surrounding callous from the margin of wound to 1 cm of surrounding area

Plan

CC wound care with daily cleaning and application of Santyl and dressings

Tylenol ordered

Boost reordered as daily x 30 days for wound healing

---

Brandon Woodson MA POSTED ON 3/8/2020 6:35:37 PM EDT                    Type: MEDICAL ASSISTANT

Called for inmate to come to 5B; no movement currently; modified lock-down

---

Robyn Smith Staff Educator POSTED ON 3/13/2020 2:01:35 PM EDT                    Type: NURSE

3B pod CO called 5B. Pt was concerned that he was called to 5B for a dressing change and was not notified because he just moved off level 2 to pod 3B.

I informed 3B pod CO that pt is ordered nightly dressing changes (although it appears he does occassionaly get dressing changes in am). I informed pod CO that we could not call pt up at this time currently due to the triage room occupied. Pod CO stated he'd relay this to the patient.

---

Monica Philippone Substance Abuse Counselor POSTED ON 3/18/2020 5:23:10 PM EDT                    Type: SUBSTANCE ABUSE COUNSELOR

Individual seen during scr-medical. Individual stated that he has an open sore on his right heel. Alert set for medical nurse.

MCCRAY, CLAYTON LAMONT JR 169149 (2019-11068)

---

Maria Long RN POSTED ON 3/20/2020 1:05:26 PM EDT                   Type: NURSE

ns for sc / wouldnt come to see m  fu pm

---

Akeyla Wall MA POSTED ON 3/21/2020 5:53:34 PM EDT             Type: MEDICAL ASSISTANT

called to have inmate brought up to 5b for wound care informed by officer noone could escort him at this time

---

JmsControllerSegregationRounds POSTED ON 3/24/2020 2:37:43 PM EDT        Type: GROUP NOTE

The patient was Admited to Segregation Rounds when moved to LEV8 PODE 120 L.

---

Sarah Kielek CRNP POSTED ON 3/26/2020 11:23:56 AM EDT           Type: NP NOTE

seg rounds- reports he has not had his R heel drsg changed for 2 days. currently has gauze drsg to R foot/heel. Appears wound care orders expired.  Re-ordered and will contact 5b to inform in need of drsg change.

---

Sarah Kielek CRNP POSTED ON 3/26/2020 5:44:14 PM EDT            Type: NP NOTE

alert - patient requesting t#3's ro, request denied. has prn tyl ordered.

---

Elon Mwaura PA POSTED ON 3/28/2020 5:33:08 PM EDT            Type: PA NOTE

Asking for wound care, these is already ordered

---

Elon Mwaura PA POSTED ON 3/31/2020 11:45:30 AM EDT          Type: PA NOTE

Still requesting a dressing change
5B contacted and an MA will go up to 8E to do the dressing change
No other concern

---

Siix Larry RN POSTED ON 3/31/2020 1:32:22 PM EDT            Type: NP NOTE

according to inmates chart inmate was seen by provider today on 8E and is requesting dressing change . 5B was called and reported an MA would go up to 8E to do dressing change. SCR Medical Nurse closed.

---

Sarah Kielek CRNP POSTED ON 4/2/2020 1:52:52 PM EDT            Type: NP NOTE

seg rounds- patient c/o about wound care. Advised wound care is ordered to be completed. Contacted 5b, spoke with Kristen RN, to confirm someone

will be going up constant his wound care today

---

Sarah Kielek CRNP POSTED ON 4/2/2020 8:21:34 PM EDT                                    Type: NP NOTE

late entry s/p medical emergency. found lying down on L side shackled. reports cane got cauugh on a plug/cord and lost balance. Denies LOC or hitting his head. Patient prompted to lay supine on back - initially resistant stating he could not move however than he did.

aox3 nad

L ankle w/o edema, ecchymosis

achilles tendon intact

skin warm dry and intact

TTP over general malleolous

ROM intact w/pain

assisted to stand up on feet, painful however tolerated

a/p: L ankle sprain

assisted vaia stretcher to cell

has prn pain meds already

add cold packs for comfort

RICE

---

Sara McClung MA POSTED ON 4/3/2020 7:34:16 PM EDT                                   Type: MEDICAL ASSISTANT

Went to 8E for wound care. Inmate has a quarter size hole on RIght heel. Since this writer had done inmtes wound care, It has gotten worse. WIll notify provider. Inmate states his wound has gotten worse due to sporatic wound dressing.

---

Aeriel Garner CMA POSTED ON 4/7/2020 2:45:12 PM EDT                                   Type: MEDICAL ASSISTANT

SARA MCCLUNG COMPLETED INMATES WOUND CARE I AM JUST DOCUMENTING TO KEEP TRACK OF INMATES CARE. CO VERIFIED THAT SHE WAS UP THERE AS WELL.

---

Sarah Kielek CRNP POSTED ON 4/7/2020 4:34:46 PM EDT                                    Type: NP NOTE

s:seg rounds- Patient states he wants T#3's reordered for his chronic foot pain. He is currently on gabapentin 800mg po BID for pain mngt.

o: aox3 nad no facial grimacing

observed patient get himself up from his cell bed and ambulate fluidly to cell door.

a/p: chronic pain

at this time T#3 's for pain mngt is not warrented which angered the patient with me

offered short course prn tyl, patient than became calmer and agreeable

-suspicious for malingering

---

JmsControllerSegregationRounds POSTED ON 4/9/2020 2:17:10 PM EDT                          Type: REMOVE FROM QUEUE

The patient was discharged from Segregation Rounds when moved out of LEV8 PODE 120 L.

Sarah Kielek CRNP POSTED ON 4/10/2020 10:00:56 PM EDT                                    Type: NP NOTE

s:s/p medical emergency.  Patient was washing hands at sink and 'my L leg fell out'. Upon arrival patient laying on R side on ground. Denies LOC, trauma or hitting head, any illicit drug use. Holding ontp LLE, general nonspecific pain through his entire leg. denies trauma to legs, did attempt to extand arms and break fall.

c/o shooting pains in BLE that are intermittent and rotate shooting pain from LLE to RLE.  BLE pain both start from bottom of feet and shoots up his legs.

o: aox3 nad mildly elevated BP however I believe this is likely due to the recent events he has incurred.

ra easy respirations

no obvious gross deformity to RLU, TTP throughout

+d/p flexion and rotation to ankle

+rom L knee

skin intact

no joint effusion appreciated

a/p: s/p fall, chronic nerve pain

patient did not want assistance getting back to bunk

did assist patient with lifting legs to bed - oh note I barely utilized asistance,  patient lifted both legs jointly up into the air and pulled legs to bed from core

addt'l ibu pm 800mg; recently rcv'd tyl from evening med pass

physical therapy referal

increase gabapentin for his chronic nerve pain

Tim Kubistek Physical Therapist POSTED ON 4/13/2020 11:34:38 AM EDT                    Type: PHYSICAL THERAPIST

PT Assessment to be scheduled/completed.

Donald Wilt Physical Therapist POSTED ON 4/14/2020 8:53:35 AM EDT                       Type: PHYSICAL THERAPIST

S: gunshot spine 2011 affecting RLE, received therapy in which he request dc as progressed well.  howevfer several days states RLE ave out and fell to floor

O:  MMT trunk flex 4/5 R hip flex 4/5 abd/add 4/5 quad 5/5 ham 4/5 DF NT(ankle fused)  L hip flex/abd 5/5 quad and ham 5/5, DF 4+/5 PF 4-/5.  Patient amb  with spc landing foot flat with increase hip flex to clear on swing secondary to no AFO at this time..  AROM BLE WNL except R ankle.  RLE press man resist 2x10. Patient instructed SLR flex and hip abd- stand hip abd isometrics

A:  decrease RLE strength secondary spinal injury

P:  Patient edu on HEP.  Patient benefit from AFO how ever has heel wound-plan 1-2w4 as able/allowed due to covid-19 and proceed with PREs, isometrics

Donald Stechschulte MD POSTED ON 4/14/2020 10:00:15 AM EDT                             Type: MEDICAL MD/DO

Spoke with physical therapist and apparently since the patient was transferred to eight he he has lost his AFO for his foot drop and need another one We will attempt to find his original but in the meantime I will order a nnew AFO for right foot drop

Christina Grunwald RN POSTED ON 4/17/2020 9:26:19 AM EDT                    Type: NURSE

Inmate requesting wound care with debridment. Will make practioner appt to eval need for further wound care.

---

Fern Hast-Murphy LPN POSTED ON 4/17/2020 2:44:35 PM EDT                    Type: NURSE

Inmate wants a stronger dose of Gabapentin for his chronic pain. Alert sent.

---

Sara McClung MA POSTED ON 4/18/2020 5:27:51 PM EDT                    Type: MEDICAL ASSISTANT

Went to do wound care for inmate. I was informed that woundcare was to be done in Sally port on 3E. 3 CO's were sitting in the hallway at floor control. I performed my wound care with out supervison. Laura Williams was made aware.

---

Maria Ivona Chrzastowska PA POSTED ON 4/19/2020 8:47:07 PM EDT                    Type: PA NOTE

Reviewed med alert re: increase gabapentin dose-it was increased 4/10/see note below.

---

Dennis Larkin Physical Therapist POSTED ON 4/21/2020 9:47:50 AM EDT                    Type: PHYSICAL THERAPIST

S: Pt seen today pt denies pain but has some difficulty amb due to foot drop

O:  Patient review HEP to R LE SLR  hip flex and hip abd- stand hip abd isometrics

A:  decrease RLE strength secondary spinal injury pt has good understanding of HEP

P:  Patient edu on HEP.  Patient benefit from AFO how ever has heel wound-plan 1-2w4 as able/allowed due to covid-19 and proceed with PREs, isometrics

---

Aeriel Garner CMA POSTED ON 4/22/2020 5:29:54 PM EDT                    Type: MEDICAL ASSISTANT

notified Dr. S and Dr. Parks about inmates foot

---

Nancy Park MD POSTED ON 4/23/2020 1:44:32 PM EDT                    Type: MEDICAL MD/DO

I evaluated inmate's right heel ulcerative wound with the MA during wound care

15 mm open wound plantar surface of right heel of approx 5 mm depth visually

there is some overgrowth of skin at the margins

base appears well granulated with some scant serous drainage

A/P  chronic right plantar heel wound

I will make every attempt to debride the wound next week, it is in need of debridement.

Continue wound care sessions daily as directed

Santyl changed to Therafoam Honey Pads

He asked for T4 for pain which I declined.

I have increased his Tylenol dose.

MCCRAY, CLAYTON LAMONT JR 169149 (2019-11068)

Maria Ivona Chrzastowska PA POSTED ON 4/26/2020 9:46:05 PM EDT                                    Type: PA NOTE

S/p med emergency for lying on the floor w/bloody sock on R foot, coffee spilled on the ground when med team arrived.

Known chronic R plantar ulcer s/p multiple debridements per podiatry and onsite.

Reports R foot pain, off narcotic analgesia, his tylenol was increased recently.

Last wound care 4/25, does it himself too, keeps santyl in cell.

VS 136/90, 16, 107, 98.7, 95%

NAD awake and alert

R plantar heel open fat level ~2 cm x ~2 cm well granulated chronic wound surrounded by overgrowth tissue w/o sxs/o infection.

A/P:

- R foot pain-chronic plantar ulceration/neuropathy

  s/p increased gabapentin Rx as of 4/10

  off narcotic analgesia as of 4/23, tylenol was increased, ibuprofen 600 mg now

  wound care-changed dressing in cell w/santyl/gauze/kerlix

  pending debridement this wk

---

Siix Larry RN POSTED ON 4/30/2020 1:34:22 PM EDT                                                  Type: NP NOTE

RN on pod for med pass/sick call. inamte is requesting boost to be reordered. boost order expired 4/29. will send alert to providers que.

---

Siix Larry RN POSTED ON 4/30/2020 7:59:59 PM EDT                                                  Type: NP NOTE

Pod officer from 3E called 5B and reported inmate is requesting dressing change. pod officer informed inmates can come to 5B for dressing changes. pod officer reported he would have to find escort to get inmates to 5B.

---

Siix Larry RN POSTED ON 5/3/2020 3:44:17 PM EDT                                                   Type: NP NOTE

Pod officer called reporting inmate is requesting a dressing change. RN informed Pod officer that supplies could be taken to inmate to do wound care. Pod officer reported that inmate was okay with this. supplies taken to 3E.

---

Zooey Carter RN POSTED ON 5/3/2020 4:08:25 PM EDT                                                 Type: NURSE

Wound supplies given to inmate on 3E for wound self-care, inmate stated  "last time I did it, sore got worse", inmate refused to apply own wound care, insisted wound care be done by someone else, offered to leave supplies w inmate to be done later, inmate refused, said took old bandage off yest for shower

---

SOAP NOTE BY: Nancy Park MD POSTED ON 5/4/2020 10:53:35 AM EDT                                    Type: MEDICAL MD/DO

**Subjective**

WOUND CARE 5B

presents for wound care of chronic ulcerative area right heel

he has had podiatry evaluations in past and in 3/2020 they recommended AGH Wound Care referral

He asks for Boost renewal

He has had one caput of the lesion which is surrounded at the slightly raised epidermal edge

His RLE AFO brace was lost when he changed pods.

## Objective

| BP: / | Temp: | Pulse: | Resp: | Wt: | Sa02: | BS: | Pain: |
|-------|-------|--------|-------|-----|-------|-----|-------|

alert NAD

Skin: 2 cm deep ulcerative lesion right heel with granulation and muscle at the base

NO necrosis, drainage

GU- 3 mm smooth, mobile cystic lesion of the right hemiscrotum adjacent to the right testicle, minimal TTP

Testicles normal in size, consistency, no mass

Penis normal- no rash or lesion

Wound Care: wound cleaned with saline, right heel ulcer debrided at margins with a #15 blade, Theraderm Honey applied to wound and padded dressing applied

## Assessment

Chronic nonhealing ulcer right heel

right foot drop- lost AFO brace

pain right hemiscrotum- right epidydimal cyst

## Plan

Boost reordered- 1 daily x 30 days

Allstar PT reconsulted re AFO brace

Urology consult ordered re chronic right scrotal pain, known epidydimal cyst

UA c reflex to culture ordered

Consider use of Biataine Alginate dressing to pack wound at next wound care session.

AGH Wound Care consult resubmitted.

---

Michael Warner RN POSTED ON 5/4/2020 4:28:46 PM EDT                                    Type: NURSE

This writer called Inmate to have daily changed.

Inmate stated that he came to 5B already today and wound I&D by Dr Park

---

Donald Wilt Physical Therapist POSTED ON 5/5/2020 9:46:37 AM EDT                       Type: PHYSICAL THERAPIST

Therapist met with Dr. Parks to update that therapy is working with medical to replace AFO

---

Lynda Balint RN POSTED ON 5/10/2020 12:54:16 PM EDT                                    Type: NURSE

During med pass inmate c/o increased pain to right foot. He states he doesnt want anything more for pain but wants to see a doctor because he thinks it's infected. Priority alert sent to provider.

**Donald Wilt Physical Therapist POSTED ON 5/14/2020 8:34:34 AM EDT**                    Type: PHYSICAL THERAPIST

S: patient states pain so/so.

O: hip abd 4/5 flex 4+/5 quad 5/5. Patient tender along R ITB. RLE press with man resist, seated r hip flex/abd, add man resist 2x10 terminal knee ext man resist x5. Patient to cont with seated hip isometrics

A: patient I with isometrics

P: awaiting price for AFO. Also plan to proceed with theraband PRE but cont with HEP at this time

---

**Sara McClung MA POSTED ON 5/14/2020 9:27:40 AM EDT**                    Type: MEDICAL ASSISTANT

Went to pod to do wound care. Upon inmate removing his shoe, this writer smelled a foul smell, which I haven't noticed before. INmate states he told med nurse he thinks his foot is infected. Alterted Dr. Park was issue. Also on 5/12/20, I called pod to ask if inmate wanted wound care done. CO on pod stated he refused. Doing the wound care today, inmate stated he did not refuse the wound care on 5/12/20, which he never does.

---

**Kristen Wilson-Hall RN POSTED ON 5/14/2020 11:06:23 AM EDT**                    Type: NURSE

Periperal lab draws taken from R arm using sterile precautions. He tolerated the procdure. Educated on PMH of GSW to spine and the long lasting effects and complications, he was in understanding of this information. He was seen by the provider for R foot I&D. Safety maintained.

---

**Nancy Park MD POSTED ON 5/14/2020 11:15:30 AM EDT**                    Type: MEDICAL MD/DO

5B wound care session

2 cm wound cavity plantar suface of right heel

margins of wound debrided with #15 blade

piece of Biatane Alginate AG cut to size of wound and laid inside the cavity

absorbant dressing applied over the site

Monitor closely with this new treatment plan

---

**Nancy Park MD POSTED ON 5/14/2020 11:17:42 AM EDT**                    Type: MEDICAL MD/DO

addendum

tinea pedis noted between several toes of right foot and ketoconazole cream ordered as KOP

---

**Maria Ivona Chrzastowska PA POSTED ON 5/15/2020 9:48:30 AM EDT**                    Type: PA NOTE

Labs reviewed and unremarkable.

---

**Charles Timbers CRNP POSTED ON 5/16/2020 4:55:29 PM EDT**                    Type: NP NOTE

Patient has been seen and evaluated concerning his right foot area. Please refer to the providers note

---

**MCCRAY, CLAYTON LAMONT JR 169149 (2019-11068)**

Michael Warner RN POSTED ON 5/19/2020 4:57:20 PM EDT                                    Type: NURSE

This writer call for this Inmate for daily dressing change
CO stated that Inmate had dressing changed already today

Nancy Park MD POSTED ON 5/20/2020 11:32:52 AM EDT                                    Type: MEDICAL MD/DO

Wound Care 5B
right plantar heel ulcer
2 cm diameter, approx 1 cm depth
malodorous, minimal serous drainage present, granulated tissue at the base
No debridement performed today.
wound cleaned with saline and a piece of Biatin Alginate AG applied into the wound cavity
area covered with a dressing
Right lower leg:
swollen from foot to thigh, peripheral pulses full and normal perfusion toes
no erythema/induration, no localizing areas of TTP
Plan:
Wound care discussed with ADON
Recommended that Medihoney layer be applied to the wound and then covered with the Biatin Alginate and the orders will be changed to reflect this.
AGH Wound Care appointment upcoming on 6/9/20
RLE venous doppler ordered re RLE swelling
Recent bloodwork results reviewd with him, stable
T3 q PM ordered for pain RLE
VSs today all WNL

Nancy Park MD POSTED ON 5/21/2020 9:57:53 AM EDT                                    Type: MEDICAL MD/DO

Preliminary RLE venous doppler result 5/21/20- Negative

VSs 5/20/20 were all WNL
Right Foot/calcaneous xrays ordered- r/o osteomyelitis
Bloodwork ordered, not done yet.

Nancy Park MD POSTED ON 5/21/2020 10:00:03 AM EDT                                    Type: MEDICAL MD/DO

Bloodwork 5/14/20- CMP, CBC, TSH WNL

Esther Stanton PA POSTED ON 5/22/2020 1:11:31 PM EDT                                    Type: PA NOTE

S: Inmate seen on pod for followup wound evaluation. He is scheduled to see wound care at AGH next month. He denies fever or chills. Lower extremity doppler negative for DVT. Hx GSW to spine and leg
O: Right heel wtih plantar ulcer with dimensions charted 1 day ago. Wound is surrounded by some macerated tissue. The wound is foul smelling with

serosanguineous drainage, gradually resolving with good perfusion. Site/eval wound 1 continuous and cleaned. L log swelling from ankle to thigh.

A/p Nonhealing wound- continue medihoney and biatin alginate daily

He is to notify medical if he develops fever or chills or notes any changes to his wound.

He will follow up with AGH

---

Natalie Austin PA POSTED ON 5/25/2020 9:28:31 PM EDT                                                Type: PA NOTE

I called pod to see pt on 5B to eval foot wound due to recent decline and +malodorous slough present.

Pt declined.

Foot xray reviewed, showed no acute osteo.

Will obtain wound culture tomorrow.

Dakins cleanse/packing ordered for plantar foot wound, which will kill the bacteria.

Oral antbx started as if he had osteomyelitis, since the sx are very telling of osteo. These won't start until tomorrow PM, after cx is taken.

---

Michael Warner RN POSTED ON 5/26/2020 9:11:57 PM EDT                                                Type: NURSE

Inmate brought to 5B for dressing change and eval by Provider Natallie (PA)

---

Natalie Austin PA POSTED ON 5/26/2020 9:20:24 PM EDT                                                Type: PA NOTE

Saw pt on 5B for right heel wound care. He said he didn't really want to be housed here.

O- vss, NAD

R heel- 3cm open wound, viable red/purple wound base, +UM @ 2:00, no tunneling no palpable bone, +malodorous, sm amt of tan slough washed about with dakins scrub/rinse. periwound calloused

A- non healing R heel wound

P- cx taken, added dakins rinse to wound care regimen; packed with dakins; hold off on medihoney for now, rec heel cup for offloading assistance.

Pt is putting too much pressure on the wound, and it is not going to heal. Pt went back to pod.

---

Colette Jones RN POSTED ON 5/28/2020 6:14:03 AM EDT                                                Type: NURSE

Zofran 4mg x1 for c/o n/v related to new medication Moxifoxacin 400mg

---

SOAP NOTE BY: Donald Stechschulte MD POSTED ON 5/28/2020 10:00:00 AM EDT                        Type: MEDICAL ASSISTANT

### Subjective

Patient was brought to 5B to be more aggressively treated for his foot wound and we could insure that medications were being given appropriately.

He has an upcoming wound evaluation at Allegheny General

He was started on Mobic for discomfort and this really upset his stomach and made him nauseated we will discontinue this medication

### Objective

| BP: | Temp: | Pulse: 69 | Resp: 14 | Wt: | SaO2: | BS: | Pain: |
|-----|-------|-----------|----------|-----|-------|-----|-------|
| 120/68 | 98.3 | | | | 100 | | |

Vitals are stable

Chest is clear

Heart is regularly regular

Wound was not inspected will try to do so later

## Assessment

Deep right heel wound secondary to gunshot wound that left him with a footdrop and an apparent ill fitting brace that started this ulcer on his right heel

## Plan

Will DC the Mobic

He stated that he had good pain relief with a combination of gabapentin and baclofen in the past

| Drug Name | Drug Strength | Quantity | Start | Stop | Complete Sig |
|-----------|---------------|----------|-------|------|--------------|
| Baclofen Oral | 20 MG | 1 | 5/28/2020 8:00:00 AM | 6/26/2020 11:59:59 PM | Take 20 mg by mouth twice per day for 30 day(s). Dispense 60 tablet. 2 Refill(s) |

---

Donald Stechschulte MD POSTED ON 5/28/2020 10:07:59 AM EDT                    Type: MEDICAL ASSISTANT

I made a mistake the patient is not on Mobic he was on Moxifloxicin; he was unable to tolerate that secondary to GI discomfort; the wound culture showed many g positive cocci a positive rods and negative rods; the sensitivities not available yet will start an antibiotic possibly based on those culture results

---

Dennis Larkin Physical Therapist POSTED ON 5/28/2020 11:03:22 AM EDT                    Type: PHYSICAL THERAPIST

S: Pt seen toay pt reported pt had 10/10 pain to R LE last night but feeling better today due to pt had his pain meds.

O: Pt instructed in isometric ex with QS, GS, hip flex, hip abd/ add, active AP x 10 reps each

A:  patient I with isometrics

P:  awaiting price for AFO. Also plan to proceed with theraband PRE but cont with HEP at this time

---

Michael Warner RN POSTED ON 5/28/2020 3:36:34 PM EDT                    Type: NURSE

Inmate was suspected smoking and also there was found contraband in his cell

Dr S was notified and Inmate is Medical cleared to leave this POD.

---

Sarah Kielek CRNP POSTED ON 5/28/2020 9:00:31 PM EDT                    Type: NP NOTE

IM saw me walking through the MHU from his cell and requested to speak with me. He was inquiring about a brace and when he would be receiving it. Endorses that he does have a yellow carter pillow in his room to offload heal pressure.

Reviewed PT notes, AFO brace is still in the process of being obtained and that the plan includes a theraband pre cut resistence band for strengthening.

## MCCRAY, CLAYTON LAMONT JR 169149 (2019-11068)

Aeriel Garner CMA POSTED ON 6/5/2020 3:07:35 PM EDT                                    Type: MEDICAL ASSISTANT

Inmate was given a hat for possible c-diff. Once the sample was obtained I notified the inmate that we could not use it because his stool was fully formed (looked like pebbles). He was given a pack of medium diapers and told to inform medical if he starts having any other issues. Inmate also reports having chills and body aches along with the diarrhea. Please become aware of why the inmate was moved to 8E to gain insight on why he might be experiencing these symptoms.

Maria Ivona Chrzastowska PA POSTED ON 6/6/2020 11:24:49 AM EDT                          Type: PA NOTE

Seg rounds: changed dressing R foot: 3 cm x 3 cmx 1 cm depthchonic plantar wound w/o signs/o infection.
Unnaboot applied up to the knee hight for support.
PMH/o GSW 2011, foot drop/neuropathy/wound RLE.

Natalie Austin PA POSTED ON 6/6/2020 8:41:24 PM EDT                                     Type: PA NOTE

Wound care was completed 6/5 by Aeriel- wound is filling in nicely.
No need for debridement at this time.

Jodi Lynch CRNP POSTED ON 6/8/2020 10:55:53 PM EDT                                      Type: NP NOTE

Patient seen on pod for wound care, wound bed is beefy red, no exudate. Ankle is swollen, warm and pink. Patient has order to elevate during day and use wheelchair. Patient cannot have wheelchair on 8E. Patient needs to be DHU. Will discuss with Dr. S regarding housing.

Nancy Park MD POSTED ON 6/9/2020 7:51:07 AM EDT                                         Type: MEDICAL MD/DO

Wound Care 8E treatment room:

No new complaints today.
Querried re depression/sadness/SI/HI and he denies- PHQ2 form completed.

Dressings and leg wrap removed.
Wound right heel is filling in with reduction of depth and granulation forming.  No odor or visible drainage.
Right leg is only swollen at level of ankle.  Distal perfusion adequate.
Wound cleaned with saline and Dakins soaked 2x2 cotton pad applied to site.
Wound area dressed with rolled gauze and then the Coban was applied over the dressing from foot to proximal tibial.

Inmate was sized for crutches, due to RHU status he is not able to keep them in cell and cannot use them out of cell due to handcuffs.  The crutches are taken to 5B nurse's station to store until he is released from RHU.
In the meantime he is strongly advised to use the wheelchair when out of his cell for rec or anything else.
100% nonWB status is encouraged to him and he will do the best he can in the present circumstance.

Nancy Park MD POSTED ON 6/9/2020 7:52:20 AM EDT                                         Type: MEDICAL MD/DO

Esther Stanton PA POSTED ON 6/18/2020 9:43:51 AM EDT                    Type: PA NOTE

Seg rounds: inmate seen on seg rounds complaining that he is supposed to be nonweight bearing and does not have a wheel chair and that his wound dressing was supposed to be changed to silver alginate which was not yet done. I verified in his video consult with wound care that he is non-weight bearing and is supposed to start the silver alginate. I conferred with Dr. Park, who is in the vidio visit, that he will start the silver alginate today. Inmate does have a wheel chair for use out of his cell but is not allowed to have crutches on 8E. He will be moved in the near future from 8E where he will be allowed crutches and the wheel chair to maintain full non weight bearing status, per Dr. Park.

Nancy Park MD POSTED ON 6/18/2020 1:41:18 PM EDT                    Type: MEDICAL MD/DO

Wound Care 8E:

Wound care orders changed today to reflect the change to Biatain Alginate.

Right heel wound appears similar with some slight increase of darkened tissue adjacent to the healthy tissue which is filling in, thickened callous present at the wound margins, some odor today, no visible drainage, RLE NT, no pitting edema, right ankle swollen but improved
Wound cleaned with Dakin's solution, patch of Biatain Alginate Ag applied to the wound and dressing applied over the area.
Coban applied from the midfoot to the infrapatellar area.

Anticipate probable transfer off of DHU to a regular pod; HC cell has been requested to insure NWB status.
When he moves out of 8E he will get his crutches which are being held on 5B. He states he prefers no WC but advised to consider until we see how he does.

Will call him to 5B treatment room when off of 8E so that debridement of wound can be performed.

JmsControllerSegregationRounds POSTED ON 6/19/2020 9:44:03 PM EDT                    Type: REMOVE FROM QUEUE

The patient was discharged from Segregation Rounds when moved out of LEV8 PODE 103 L.

Colette Jones RN POSTED ON 6/20/2020 2:43:39 AM EDT                    Type: NURSE

Inmate was upset his dressing was not change son RN went to 3B to do his dressing. The base of right innner heel wound was dark pink with margins of wound filling in with layered thickened callous skin around wound, bloody drainage on floor as if inmate had walk on floor, right ankle swollen, wound was cleaned with Dakin's solution, patch of Biatain Alginate Ag applied to the wound and dressing applied over the area with Coban from the midfoot to the ankle area. Inmate tolerted procedure well.

Esther Stanton PA POSTED ON 6/23/2020 11:38:38 AM EDT                    Type: PA NOTE

S: Patient stated he was not worried about his pain management today but worried about his wound. He has chronic non-healing wound to right heel. He is followed closely in wound care and had phone consult with wound care very recently. Wound care recommendations are being completed as recommended by Dr. Taffe in a wound care virtual consult 7 days ago
O: AAOx3 NAD
   Right heal wound with drainage through the sock
A/p Chronic wound- continue care as directed in recent orders by Dr. Taffe. Inmate will contiue on T3 and baclofen.

cystic lesion- right epididymal head US 6/29 encounter

small right testicular hydrocoele

small left epididymal head cyst 0.64 cm

Pain penile shaft per inmate

## Plan

Debride the wound once again in 1-2 days

Do a wound culture at the debridement session

repeat right foot and ankle xray due to increased pain

trial of a post op shoe for the right foot when he comes for debridement- size 9.5-10

I have increase the gabapentin to 1200 mg bid

I gave him zofran 8 mg on the pod for nausea and ordered 4 mg bid x 3 days

Increase T4 to 1.5 q PM

Benadryl hs x 7 days for sleep

Fax scrotal US report to urology tomorrow

Do a GU/penis exam next encounter for wound care, will likely require that urology address this issue

| Drug Name | Drug Strength | Quantity | Start | Stop | Complete Sig |
|---|---|---|---|---|---|
| Baclofen Oral | 20 MG | 1 | 5/28/2020 8:00:00 AM | 6/26/2020 11:59:59 PM | Take 20 mg by mouth twice per day for 30 day(s). Dispense 60 tablet. 2 Refill(s) |

---

Vincent O'Reilly RN POSTED ON 6/29/2020 8:52:12 PM EDT                    Type: NURSE

Admit to 5C. Close observation. Gown only for safety. VO S. Mundy PA-C/V O'Reilly RN

---

Vincent O'Reilly RN POSTED ON 6/29/2020 9:12:43 PM EDT                    Type: NURSE

Per Dr. Park, Inmate given 1.5 tabs of tylenol #3, and 1200mg of gabapentin.

---

Nancy Park MD POSTED ON 6/30/2020 12:16:11 PM EDT                    Type: MEDICAL MD/DO

Phone call with MH- Tom Patts

Concern that gabapentin is exacerbating depressive sxs.

I have decreased the dose to 600 mg bid at this time.

---

Nancy Park MD POSTED ON 6/30/2020 3:18:27 PM EDT                    Type: MEDICAL MD/DO

I spoke with Chief Laura Williams and we will transfer inmate to MHU, form completed.

---

Natalie Austin PA POSTED ON 6/30/2020 4:12:07 PM EDT                    Type: PA NOTE

LATE entry- pt was seen on 5C for foot debridement. Pt denied NVFC. NAD.

MCCRAY, CLAYTON LAMONT JR 169149 (2019-11068)

SOAP NOTE BY: Nancy Park MD POSTED ON 7/2/2020 12:03:14 PM EDT                    Type: MEDICAL MD/DO

**Subjective**

PT note appreciated.

He states that his right leg is painful, he would like a consideration for increasing the T3, he adds that he thinks the supplements that were added to his meds- zinc and vit C- may have caused his nausea.

**Objective**

BP: /        Temp:        Pulse:        Resp:        Wt:        Sa02:        BS:        Pain:

AVSS as per record

alert NAD

Lungs CTAB

COR RRR

MSK- evaluate right foot in wound care after his shower

**Assessment**

chronic wound right heel

GSW- right foot drop and hx of right ankle fusion

hx of nephrectomy

**Plan**

CC wound care regimen, he is making slow progress

AGH wound care appt 7/9/20

100% NWB reminded/urged- WC/crutches available to him

Post op shoe to keep the right foot clean and protected

Daily showers

CC meds

I will increase the T3 to 0.5 in AM and 1 in PM- as wound heals further I will reduce the dose again

| Drug Name | Drug Strength | Quantity | Start | Stop | Complete Sig |
|---|---|---|---|---|---|
| Baclofen Oral | 20 MG | 1 | 5/28/2020 8:00:00 AM | 6/26/2020 11:59:59 PM | Take 20 mg by mouth twice per day for 30 day(s). Dispense 60 tablet. 2 Refill(s) |

Nancy Park MD POSTED ON 7/2/2020 1:26:23 PM EDT                    Type: MEDICAL MD/DO

Right foot and ankle xrays from 7/2/20 reviewed with Dr Stechschulte.

Per radiology report and our review of xrays there has been interval change of the calcaneous showing probable osteomyelitis. Ankle views unchanged.

Voice message left at AGH Wound Care for Dr Taffe to call back to discuss next steps. Inmate does have appt with Dr Taffe on 7/9/20.

He has surgical hardware in his right ankle which could be a consideration for doing an MRI.

Patient still having dyspepsia with the taking of his Augmentin; no new concerns regarding his foot at this point. He is somewhat frustrated about not seeing the specialist which is scheduled for later on today

## Objective

| BP: | Temp: | Pulse: 74 | Resp: 14 | Wt: | Sa02: | BS: | Pain: |
|-----|-------|-----------|----------|-----|-------|-----|-------|
| 113/57 | 97.1 | | | | 100 | | |

Vitals are stable

Chest is clear

Heart is regularly regular

## Assessment

Long-term pressure ulcer in his right heel that possibly has developed osteo myelitis of the calcaneus

Nausea associated with Augmentin; will add Zofran with the Augmentin

## Plan

To follow-up with orthopedic surgery today

Will add Zofran to the Augmentin

| Drug Name | Drug Strength | Quantity | Start | Stop | Complete Sig |
|-----------|---------------|----------|-------|------|--------------|
| Baclofen Oral | 20 MG | 1 | 5/28/2020 8:00:00 AM | 6/26/2020 11:59:59 PM | Take 20 mg by mouth twice per day for 30 day(s). Dispense 60 tablet. 2 Refill(s) |

---

Donald Stechschulte MD POSTED ON 7/10/2020 10:04:13 AM EDT                                    Type: NURSE

Abnormal Vital Signs/Readings: Remains asymptomatic

Blood Pressure Diastolic: 57

---

Maria Ivona Chrzastowska PA POSTED ON 7/10/2020 11:38:15 AM EDT                                    Type: PA NOTE

Reviewed labs: sed rate and CRP elevated.

Thrombocytosis 656, likely reactive w/ongoing foot infection/osteo.

Albumin 3.9 wnl, prealbumin decreased 14.0 (17-42).

WBC wnl, hgb 12.3<13.8 in May.

---

Donald Stechschulte MD POSTED ON 7/10/2020 1:31:06 PM EDT                                    Type: MEDICAL ASSISTANT

Apparently late yesterday afternoon of Dr. Sferra's office called and canceled the appointment stating it was an interval appropriate referral and the patient should be seen by podiatry.  In fact the patient was seen by podiatry who then referred the patient to the wound care clinic who then stop referred the patient specifically to Dr. Sferra

who is the head of foot and ankle issues at Allegheny.  After numerous phone calls and in terminal bull weight is on hold I was able to speak to the scheduling person in the residents Clinic who stated that he could be seen by them next week at 1:30 p.m. On Friday the 17th of July.  I will take that

---

Donald Stechschulte MD POSTED ON 7/10/2020 1:54:00 PM EDT                    Type: MEDICAL ASSISTANT

Patient has been scheduled for a follow-up appointment on the 17th. I explained to the patient that he was scheduled to go out today at the last minute the orthopedic office called and canceled it and it was just made known to me just as he was supposed to be leaving. He was appropriately upset and I explained that I will do everything I can to ensure that he makes his appointment.

---

Kristen Wilson-Hall RN POSTED ON 7/11/2020 4:38:11 AM EDT                            Type: NURSE

Abnormal Vital/Reading - Indicate who was notified: Provider made aware. Asymptomatic.

Blood Pressure Diastolic: 59

---

Maria Ivona Chrzastowska PA POSTED ON 7/11/2020 7:54:28 AM EDT                     Type: PA NOTE

Reviewed VS-stable, remains afebrile, uneventful night as per RN report.
Cont. current Rx/wound care.
Awaiting ortho-foot spec. appt next week

---

Natalie Austin PA POSTED ON 7/12/2020 4:18:22 AM EDT                                Type: PA NOTE

Saw pt in cell- RLE- elevated on bed; he said it feels better with the ted hose off. Pain is minimal now.
O- vss, NAD
RLE trace edema, good color, no blisters, dried ss drainage on plantar dressing/kerlex
psych- A&O x 3
A- chronic non healing foot ulcer with osteo
P- cont as planned- ortho surgery r/s for Friday 7/17.
Cont vit c and zinc for wound healing.

---

Natalie Austin PA POSTED ON 7/12/2020 4:31:13 AM EDT                                Type: PA NOTE

Calcaneus xray ordered- R heel.
Observe improvement or decline of osteomyelitis since starting antbx.

---

Patricia Brewer LPN POSTED ON 7/13/2020 4:49:41 AM EDT                               Type: NURSE

Abnormal Vital/Reading - Indicate who was notified: Dr. Park

Blood Pressure Diastolic: 58

---

Abnormal Vital Signs Readings: This has been his baseline. He remains asymptomatic

Blood Pressure Diastolic: 58

---

Aeriel Garner CMA POSTED ON 7/17/2020 12:30:12 PM EDT                    Type: MEDICAL ASSISTANT

inmate out for appt.

---

Donald Stechschulte MD POSTED ON 7/17/2020 3:20:16 PM EDT                Type: MEDICAL ASSISTANT

I observed the patient walking down the hall after his appointment at AGH and in spite of being told to be nonweightbearing of the patient continues to walk bearing weight on that infected foot.  The papers accompanying him were left in intake I will try to go directly to epic to ascertain what happened during that visit with Orthopedics

---

Donald Stechschulte MD POSTED ON 7/17/2020 3:26:19 PM EDT                Type: MEDICAL ASSISTANT

There was no orthopedic note in epic at the time that I reviewed however in the encounter area I can see that an MRI of the ankle in foot was ordered and vascular studies of the right leg were ordered as well as a referral to the vascular surgery service
Finally once the MRIs are completed they want to see him back in Orthopedics.
According to the correction officer that accompanied him they also want him to have twice a day wound care which we will initiate
Will continue on Augmentin

---

Natalie Austin PA POSTED ON 7/17/2020 7:02:58 PM EDT                       Type: PA NOTE

Notes reviewed. Dr. S ordered all of the testing and referrals.
R/o Augmentin per ortho note.

---

Laura Williams Chief Deputy Warden of Healthcare Services POSTED ON 7/17/2020 8:21:02 PM EDT    Type: HSA/DHSA

Spoke with Mr. Clayton McCray through cell door #M4 on 5B, at his request. He asked why I had not responded to his written requests. I apologized, but informed him that I had not recalled receiving any requests from him. He asked me if I knew about his situation. I informed him that I had an understanding that he had a wound on his heel that required extensive monitoring and treatment. I asked him about his conduct as I had heard that he had not been complying with expectations and had been reportedly disrespectful to staff. He denied such allegations. He reported that he was complying and was concerned about his health condition.

I asked him if there was something specific that he wanted to discuss. He said, "maybe next time." He seemed to be interested in knowing that I had some level of awareness of his condition.

---

SOAP NOTE BY: Natalie Austin PA POSTED ON 7/18/2020 5:30:15 AM EDT        Type: PA NOTE

**Subjective**

Pt seen after vitals- c/o edema above right eye and 3 cm oval raised area on right scapula- +pruritis, started after he took Augmentin, even though he

MCCRAY, CLAYTON LAMONT JR 169149 (2019-11068)

## Assessment

Right heel chronic wound

Osteomyelitis right calcaneous

neuropathy RLE

Loose fixation hardware right ankle from remote surgery

prominent vein right medial leg

## Plan

Discussed with clinic manager the necessity of getting the right foot/ankle MRI scheduled asap in addition to the vascular consult and testing- these will be needed in anticipation of possible surgery

NWB status

Daily wound care.

| Drug Name | Drug Strength | Quantity | Start | Stop | Complete Sig |
|---|---|---|---|---|---|
| Baclofen Oral | 20 MG | 1 | 5/28/2020 8:00:00 AM | 6/26/2020 11:59:59 PM | Take 20 mg by mouth twice per day for 30 day(s). Dispense 60 tablet. 2 Refill(s) |

---

Michael Warner RN POSTED ON 7/28/2020 8:37:12 PM EDT                                    Type: NURSE

Inmate refused to have dressing changed this evening

Inmate only wants dressing changed once a day.

---

Patricia Brewer LPN POSTED ON 7/29/2020 4:51:48 AM EDT                                    Type: NURSE

Abnormal Vital/Reading - Indicate who was notified: D.Turcinhodzic, PA-C

Blood Pressure Diastolic: 8

---

Patricia Brewer LPN POSTED ON 7/29/2020 4:52:35 AM EDT                                    Type: NURSE

Abnormal Vital/Reading - Indicate who was notified:

Blood Pressure Diastolic: 48

---

Donald Wilt Physical Therapist POSTED ON 7/29/2020 6:56:33 AM EDT                    Type: PHYSICAL THERAPIST

7-27,28,29 institutional lockdown unable to see patient

---

SOAP NOTE BY: Donald Stechschulte MD POSTED ON 7/30/2020 7:16:20 AM EDT          Type: MEDICAL ASSISTANT

## Subjective

MCCRAY, CLAYTON LAMONT JR 169149 (2019-11068)

Patient inquired about the ultrasound that was done several days ago which turned out to be absolutely normal no evidence of DVT I explained this to him.

Also check the schedule for his upcoming appointments in the MRI was initially scheduled for October 5th that is for far too long await I spoke to the clinic manager and implored upon him the necessity of getting this scheduled as soon as possible because all his other appointments depend on that MRI

## Objective

| BP: | Temp: | Pulse: 83 | Resp: 18 | Wt: | Sa02: 99 | BS: | Pain: |
|---|---|---|---|---|---|---|---|
| 115/67 | 97.5 | | | | | | |

Vitals are stable

Chest is clear

Heart is regularly regular

## Assessment

Chronic ulcer of the right calcaneus possible osteomyelitis of that same bone

## Plan

Attempting to reschedule his MRI sooner so that subsequent appointments can also be scheduled in a much more timely fashion

| Drug Name | Drug Strength | Quantity | Start | Stop | Complete Sig |
|---|---|---|---|---|---|
| Baclofen Oral | 20 MG | 1 | 5/28/2020 8:00:00 AM | 6/26/2020 11:59:59 PM | Take 20 mg by mouth twice per day for 30 day(s). Dispense 60 tablet. 2 Refill(s) |

---

Patricia Brewer LPN POSTED ON 7/31/2020 5:15:43 AM EDT          Type: NURSE

Abnormal Vital/Reading - Indicate who was notified: Dr.S.

Blood Pressure Diastolic: 52

---

SOAP NOTE BY: Donald Stechschulte MD POSTED ON 7/31/2020 9:43:42 AM EDT          Type: MEDICAL ASSISTANT

### Subjective

Patient was sitting up in a chair without any complaints did have his dressing changed yesterday and is in store to have it done today in checking the scheduled for outpatient procedures he has not been rescheduled for a date for his MRI sooner than October 5th which she currently has

### Objective

| BP: | Temp: | Pulse: 83 | Resp: 14 | Wt: | Sa02: 99 | BS: | Pain: |
|---|---|---|---|---|---|---|---|
| 111/52 | 97.2 | | | | | | |

Vitals remained stable

Chest is clear

## Assessment

Right lower leg neuropathy with a pressure ulcer that may have infected his calcaneus

Still having daily dressing changes

Is in need of an MRI of his foot sooner rather than later with follow-up ortho and vascular surgery appointments

## Plan

Will make every attempt to reschedule his MRI

| Drug Name | Drug Strength | Quantity | Start | Stop | Complete Sig |
|-----------|---------------|----------|-------|------|--------------|
| Baclofen Oral | 20 MG | 1 | 5/28/2020 8:00:00 AM | 6/26/2020 11:59:59 PM | Take 20 mg by mouth twice per day for 30 day(s). Dispense 60 tablet. 2 Refill(s) |

---

Donald Stechschulte MD POSTED ON 7/31/2020 9:43:49 AM EDT                                      Type: NURSE

Abnormal Vital Signs/Readings: Remains asymptomatic

Blood Pressure Diastolic: 52

---

Natalie Austin PA POSTED ON 7/31/2020 9:40:11 PM EDT                                      Type: PA NOTE

Saw pt in his cell- says his right ankle is sore. He has it elevated with dressing off.  Calcaneal wound looks good- no odor or drainage.  The tramadol is not working anymore to help with pain.

O- NAD, vss

right ankle- +edema, warm to touch, no erythema, calcaneal wound- packing intact, callous on periwound. pink moist, 2 cm round, no drainage, no odor no infx

A- ankle pain

P- gave ice pack and extra 50mg tramadol; will inc tramadol to 100mg qhs.  Xray tomorow; monitor vitals.

---

Natalie Austin PA POSTED ON 8/1/2020 12:16:31 AM EDT                                      Type: PA NOTE

Hot pack and benadryl ordered.

---

Natalie Austin PA POSTED ON 8/1/2020 4:19:27 AM EDT                                      Type: PA NOTE

Patient is having increased pain and edema in his RLE, with hx of osteomyelitis, non healing calcaneal ulcer, and right foot drop secondary to GSW. He is asking for stronger pain meds due to the pain.

Request is for a PICC line to start IV antibiotcs of vanco and zosyn and MRI of RLE per ortho recs.

O- VSS, afebrile

RLE- has edema, erythema, calcaneal ulcer no odor or purulent drainage, 2cmx1cm

psych- A&O, anxious about his foot edema

lungs- non labored.

A- Acute osteomyelitis R calcaneus

Labs- 7/9 sed rate-88, C reactive protein- 5.7

    7/25- sed rate 52, C reactive protein- 1.5 (after PO clinda and augmentin), Prealb- 14, WBC- 6.78.

P- Send to AGH ED for PICC line placement for IV vanco and zosyn; MRI Right ankle per orthopedic recs.

---

Natalie Austin PA POSTED ON 8/1/2020 5:12:56 AM EDT                    Type: PA NOTE

I spoke with AOD, who agreed with ED transfer.  I called AGH ED/ One call and spoke with the physician about the pt- dx of acute osteomyelitis, requesting PICC line, poss ID consult to obtain vanco and zosyn IV dosing recs; poss MRI per ortho recs, which are pushed out due to COVID-19 restrictions.  PMHx, labs and xray results d/w MD as well.  Chart copied for transfer.

---

Jennifer Kelly Director of Nursing POSTED ON 8/1/2020 6:56:00 AM EDT            Type: NURSE

Priority One EMS to arrive at 0715 to tranport inmate to AGH

---

Maria Ivona Chrzastowska PA POSTED ON 8/1/2020 7:47:17 AM EDT            Type: PA NOTE

Called ER AGH 412-359-6840/d/w ER attending-George- inm would beneft from admission/IV abx Rx and further eval. by ortho/vascular teams.

---

Natalie Austin PA POSTED ON 8/1/2020 6:44:12 PM EDT                    Type: PA NOTE

Abnormal Vital/Reading - Indicate who was notified:  These are AGH ED vitals

Blood Pressure Diastolic: 49

---

Natalie Austin PA POSTED ON 8/1/2020 7:13:33 PM EDT                    Type: PA NOTE

Hospital return- same labs and xrays we completed were done there. ESR 59, CRP 4.6.
No MRI ; no PICC line. F/u ortho, which is already scheduled.

I asked for the ortho resident to call me. Tarrell Coley, ortho resident did and said since the pt is not acutely ill, the MRIs and vascular studies can be done outpatient, and aren't urgent. WBC WNL. They will proceed with partial calcanectomy once studies are completed.

MRI x 2 scheduled for 8/17/20 @ 9:45 AM & Ankle-brachial indicies Ultrasound for 8/27/20 @10:45 AM.

---

Patricia Brewer LPN POSTED ON 8/3/2020 5:06:33 AM EDT                    Type: NURSE

Abnormal Vital/Reading - Indicate who was notified: D.Turcinhodzic, PA-C

Blood Pressure Diastolic: 56

CC meds

wound care/PT/NWB status

MRI right foot/ankle TODAY

scheduled for RLE vascular studies

vascular consult ordered per ortho

ID consult ordered

| Drug Name | Drug Strength | Quantity | Start | Stop | Complete Sig |
|-----------|---------------|----------|-------|------|--------------|
| Baclofen Oral | 20 MG | 1 | 5/28/2020 8:00:00 AM | 6/26/2020 11:59:59 PM | Take 20 mg by mouth twice per day for 30 day(s). Dispense 60 tablet. 2 Refill(s) |

---

Nancy Park MD POSTED ON 8/17/2020 3:28:47 PM EDT                                      Type: MEDICAL MD/DO

EPIC review.  MRI right foot/ankle  8/17/20

1.1 cm open wound plantar hindfoot with adjacent cellulitis/phlegmon

MRI signal changes indicative of osteomyelitis throughout much of the calcaneus.  Possible early osteomyelitis of talus.

Plantar fasciitis

Severe posttraumatic osteoarthrosis at the tibiotalar joint, chronic multifocal ligamentous disruption

chronic partial tear of peroneus brevis tendon and low-grade peroneus longus tendinosis

muscular signal changes of neuropathy

---

Dennis Larkin Physical Therapist POSTED ON 8/18/2020 9:53:44 AM EDT                    Type: PHYSICAL THERAPIST

Pt seen today but not tx pt reported he is having too much pain in R foot

---

Nancy Park MD POSTED ON 8/18/2020 2:33:25 PM EDT                                      Type: MEDICAL MD/DO

No interval changes or new concerns today.

MA did his wound care.

I briefly reviewed his MRI right foot/ankle with him.

AVSS

I left a voicemail with the ortho nurse for Drs Martinkovich and Huebner who saw him on 7/17/20 and requested the MRI.

I asked the nurse to advise them of MRI completion and to review the report.  Advised to let us know for any additional directives while awaiting arterial doppler studies and vascular surgery consult.

---

Natalie Austin PA POSTED ON 8/19/2020 4:38:18 AM EDT                                  Type: PA NOTE

Late entry- pt req diphenhydramine and toradol injections due to foot pain/non healing wound.

PM tramadol held and both injections given. +hot pack given also. Pt satisfied.

---

SOAP NOTE BY: Donald Stechschulte MD POSTED ON 8/19/2020 10:13:51 AM EDT              Type: MEDICAL ASSISTANT

| Drug Name | Drug Strength | Quantity | Start | Stop | Complete Sig |
|---|---|---|---|---|---|
| Baclofen Oral | 20 MG | 1 | 5/28/2020 8:00:00 AM | 6/26/2020 11:59:59 PM | Take 20 mg by mouth twice per day for 30 day(s). Dispense 60 tablet. 2 Refill(s) |

---

Colette Jones RN POSTED ON 8/23/2020 4:01:04 AM EDT                                      Type: NURSE

Inmate c/o right foot pain asking for something stronger than toradol 50mg NP Karen made aware and new order for Toradol 60mg given IM in left thigh.  Tolerated well.

---

Kimberly Dennis MA POSTED ON 8/23/2020 11:47:47 AM EDT                        Type: MEDICAL ASSISTANT

Saw patient today, his foot was bleeding/leaking fluid. It was cleaned and patched back up with his foot medication, ankle is swollen.

---

SOAP NOTE BY: Nancy Park MD POSTED ON 8/24/2020 10:40:01 AM EDT                  Type: MEDICAL MD/DO

**Subjective**

Inmate evaluated when I did his wound care in treatment room. He remains clinically stable. He admits that he has more right heel area pain nocturnally.

He asks questions about the types of testing requested by orthopedics and I answered him without giving dates.

**Objective**

| BP: / | Temp: | Pulse: | Resp: | Wt: | Sa02: | BS: | Pain: |
|---|---|---|---|---|---|---|---|

AVSS per record

alert NAD

Extr- 0.8-1 cm open site plantar aspect of right heel, thick surrounding callous, NO odor or drainage

Healthy pinkd granulation at base, approx 0.6 cm depth

No LE edema

Wound care performed using Dakin's Solution and dressing applied, lower leg wrapped with COBAN

**Assessment**

chronic wound right calcaneus- underlying osteomyelitis right calcaneus

RLE neuropathy/chronic pain

Hx GSW right ankle 2016- loosened hardware

right epididymal cyst

**Plan**

CC meds

wound care bid

Arterial doppler studies RLE 8/27/20

Vascular consult per cardiovascular request

ID consult ordered

NOTE: I LEFT A DETAILED MESSAGE WITH THE ORTHOPEDIC NURSE OF DR HUEBNER THAT THE MRI IS COMPLETED FOR THEIR REVIEW AND ASKED THEM TO CALL US FOR ANY CONCERNS OR CHANGE OF PLANS.

| Drug Name | Drug Strength | Quantity | Start | Stop | Complete Sig |
|---|---|---|---|---|---|
| Baclofen Oral | 20 MG | 1 | 5/28/2020 8:00:00 AM | 6/26/2020 11:59:59 PM | Take 20 mg by mouth twice per day for 30 day(s). Dispense 60 tablet. 2 Refill(s) |

---

Christina Grunwald RN POSTED ON 8/25/2020 12:19:55 AM EDT          Type: NURSE

Due to Tech Care malfunction, Midnight dose of tramadol is was not signed off. Given at 0005 am.

---

Donald Wilt Physical Therapist POSTED ON 8/25/2020 8:17:35 AM EDT          Type: PHYSICAL THERAPIST

S: Pain present R quad- cont to feel weak

O: RLE press man resist ( place at arch as not interfere with wound) 4x10 r hip flex/abd, LAQ, hamstring curl with grade man resist 3x10 R ham isometric at 90,60, and 30 degrees 2x5 each

A: tol ther ex well, hip abd 4/5 and ham 4-/5

P: Cont with PREs to increase RLE strength

---

Nancy Park MD POSTED ON 8/25/2020 10:05:40 AM EDT          Type: MEDICAL MD/DO

Phone call from Dr Martinkovich, AGH Ortho:

He has reviewed the MRI right foot and ankle 8/17/20.

There is some concern for osteomyelitis of the ankle joint area in addition to the findings at the calcaneus.

Severe posttraumatic OA at tibiotalar joint and chronic ligamentous disruption.

Orthopedics leans toward performing a BKA and they discussed this idea with inmate at his last encounter with them per ortho call today.  BKA due to the severe chronic findings in the ankle and the osteo of calcaneus.

Arterial doppler study will be 8/27/20 and if normal Dr Martinkovich states that he could defer seeing vascular surgeon and followup wtih ortho sooner than October.

They can review the options once again with inmate at that time.

---

SOAP NOTE BY: Nancy Park MD POSTED ON 8/25/2020 10:19:28 AM EDT          Type: MEDICAL MD/DO

**Subjective**

Seen in his cell this AM. No concerns or complaints to address this AM. He denies pain overnight.

**Objective**

BP: /     Temp:     Pulse:     Resp:     Wt:     SaO2:     BS:     Pain:

NAD

EOMI PERRLA

RRR no M

CTA b/l

R plantar 1 cm x 1 cm x 1.5 cm deep/sc wound w/o bleed

## Assessment

- RLE chronic plantar open wound w/associated cellulitis/phlegmon/osteomyelitis-awaits surgical intervention

- s/p lumbar GSW 2011/R ankle fusion 2013

- RLE severe posttraumatic osteoarthrosis tibiotalar joint/fatty atrophy/multifocal ligamentous disruptions/plantar fascitis/neuropathy

## Plan

con.t current Rx

ortho offsite consult today

awaiting echo results

| Drug Name | Drug Strength | Quantity | Start | Stop | Complete Sig |
|---|---|---|---|---|---|
| Baclofen Oral | 20 MG | 1 | 5/28/2020 8:00:00 AM | 6/26/2020 11:59:59 PM | Take 20 mg by mouth twice per day for 30 day(s). Dispense 60 tablet. 2 Refill(s) |

---

Sandra Simms CRNP POSTED ON 9/4/2020 4:27:18 PM EDT                                        Type: NP NOTE

Inmate returned from appt with AGH Orthopedic surgery(1307 Federal street, 2nd floor, suite 200 412-359-3895). No note in Epic at the time of this note. Recommendation on paperwork accompanying pt was a below the knee amputation with instruction to call the office when ready to schedule. Ortho will contact Dr Ward for any input on viable options to this surgery to avoid amputation. Local wound care and packing to continue as directed by vascular surgery. He was instructed to continue baclofen, gabapentin, and tramadol.

Xray of the right ankle and foot were completed at the orthopedic office.

---

Natalie Austin PA POSTED ON 9/5/2020 1:09:41 AM EDT                                        Type: PA NOTE

Pt req toradol injection due to pain and banofen for allergies. Both ordered.

---

Trala Freeman MA POSTED ON 9/5/2020 5:28:52 AM EDT                                        Type: NURSE

Abnormal Vital Signs/Readings: Send Alert to Nurse's Queue

Blood Pressure Diastolic: 58

---

Sarah Kielek CRNP POSTED ON 9/5/2020 4:46:46 PM EDT                                        Type: NP NOTE

Sheldon Summers RN POSTED ON 9/8/2020 5:10:57 AM EDT    Type: NURSE

During 4am vitals this inmate reported having very bad leg pain. I advised the provider. This is a chronic issue. He already has several pain medications prescribed. After vitals and during the normal prescribed time he was medicated.

Dennis Larkin Physical Therapist POSTED ON 9/8/2020 10:03:49 AM EDT    Type: PHYSICAL THERAPIST

S: Pt seen today pt pt feeling down pt reported pt saw ortho MD and he wants to performed BKA to his R LE pt is having a lot of pain to his R ankle

O: Pt did performed, RLE press man resist ( place at arch as not interfere with wound) 4x10 r hip flex/abd, LAQ, hamstring curl with grade man resist 3x10 R ham isometric at 90,60, and 30 degrees 2x5 each

A: tol ther ex well, hip abd 4/5 and ham 4-/5

P: Cont with PREs to increase RLE strength

SOAP NOTE BY: Nancy Park MD POSTED ON 9/8/2020 1:08:58 PM EDT    Type: MEDICAL MD/DO

**Subjective**

Inmate has had increasing pain right foot/ankle/lower leg areas past week.

Orthopedic consult notes from 9/4 reviewed: in summary a right BKA is recommended for multiple reasons including nonhealing wound right heel with osteomyelitis of calcaneus, prior right ankle fusion for foot drop now with severe posttraumatic osteoarthosis at tibiotalar joint, multifocal ligamentous disruption, chronic partial tear peroneus brevis tendon and peroneus longus tendinosis, signal changes on MRI of neuropathy

Dr Rinaldi consulted with Dr Patric Ward, AGH Ortho foot and ankle specialist- Dr Stechschulte received a call from them today confirming that after convening they continue to recommend the right BKA surgery. I spoke with their clinic representative today and she confirms that they have placed him on the OR schedule for 9/16/20.

**Objective**

BP: /    Temp:    Pulse:    Resp:    Wt:    Sa02:    BS:    Pain:

AVSS per record.

Wound Care: right heel wound cleaned with Dakin's Solution and packed with Dakin's soaked gauze packing. Dressing applied and lower leg wrapped with Coban.

**Assessment**

Osteomyelitis right calcaneus, chronic nonhealing wound right plantar calcaneus

Failed right ankle fusion with severe changes summarized above on MRI

neuropathy

old GSW 2011

**Plan**

Inmate consented to right BKA today verbally.

Order for the surgery on 9/16/20 placed in Techcare and approved.

Preop CBC, CMP ordered. He will also need an EKG.

CC wound care regimen daily

Echocardiogram had been ordered (and completed per inmate)- I called Tristate to get this result as not in chart

MCCRAY, CLAYTON LAMONT JR 169149 (2019-11068)

| Drug Name | Drug Strength | Quantity | Start | Stop | Complete Sig |
|---|---|---|---|---|---|
| Baclofen Oral | 20 MG | 1 | 5/28/2020 8:00:00 AM | 6/26/2020 11:59:59 PM | Take 20 mg by mouth twice per day for 30 day(s). Dispense 60 tablet. 2 Refill(s) |

Nancy Park MD POSTED ON 9/8/2020 1:10:08 PM EDT                                    Type: MEDICAL MD/DO

addendum:

Pain management regimen changed today.  He will receive T4 q 6 hrs.  Tramadol will be d/c'd when T4 available.

Nancy Park MD POSTED ON 9/8/2020 2:04:51 PM EDT                                    Type: MEDICAL MD/DO

Inmate asked to speak with me.

He states that he would like to have a second opinion about his BKA surgery outside of the AGH Ortho practice that he has seen.

I did not know the ACJ policy about whether second opinions are covered.

Janet Bunts was in a meeting and she will get back to me to discuss if this is an option.

Laura Williams will also need to be aware of this request.

Nancy Park MD POSTED ON 9/8/2020 3:08:08 PM EDT                                    Type: MEDICAL MD/DO

Phone call:

I spoke with inmate's mother, Nicole Woodson.  412-969-2485

She was given an overview of his medical diagnoses and the rationale for the orthopedic recommendation for a right BKA by Drs Rinaldi and Ward.

She expressed an understanding of what I shared with her.

His mother asks for a second independent opinion before proceeding with surgery.

I have been given permission by Deputy Williams to proceed with a second opinion.

Patricia Brewer LPN POSTED ON 9/9/2020 4:45:50 AM EDT                                    Type: NURSE

Abnormal Vital/Reading - Indicate who was notified: D.Turcinhodzic, PA-C

Blood Pressure Diastolic: 56

SOAP NOTE BY: Nancy Park MD POSTED ON 9/9/2020 11:55:34 AM EDT                                    Type: MEDICAL MD/DO

**Subjective**

No clinical changes past 24 hours.

He reports pain level a bit better with change from tramadol to tylenol #4.

He was seen today in his cell earlier this AM and in the treatment room during his wound care session.

We discussed the second opinion about right BKA once again which was initiated by him. He wants to do a second opinion but he also does not wish to delay the surgery if it would further jeopardize his health if delayed. He wants to know what AGH Ortho thinks about a possible delay for a second opinion.

Natalie Austin PA POSTED ON 9/12/2020 6:26:59 AM EDT                                    Type: PA NOTE

Due to inc neuropathy, gaba inc to 800 bid; rec decrease oxy dose.

---

Laura Williams Chief Deputy Warden of Healthcare Services POSTED ON 9/12/2020 11:02:36 AM EDT     Type: HSA/DHSA

Spoke with Mr. McCray at his request. He reported that he was provided with conflicting information and stated that he wanted to go to UPMC for a 2nd opinion. I informed him that it was his right to request a 2nd opinion because he would be making a serious and permanent healthcare decision that would impact his life. I clarified that we have an obligation to provide him access to a 2nd opinion, of a qualified practitioner, but that did not mean that he had the right to choose the provider. Mr. McCray briefly expressed his frustration and identified that he felt that this writer had not been responsive to him. I provided validation that he was entitled to his perspective and encouraged him to focus on his upcoming consult. Conversation was discontinued with no further incident.

---

Dennis Larkin Physical Therapist POSTED ON 9/14/2020 10:24:08 AM EDT                    Type: PHYSICAL THERAPIST

S: Pt seen today pt reported feeling better today with decrease pain

O: Pt did performed, RLE press man resist ( place at arch as not interfere with wound) 4x10 r hip flex/abd, LAQ, hamstring curl with grade man resist

3x10 R ham isometric at 90,60, and 30 degrees 2x5 each

A:  tol ther ex well, hip abd 4/5 and ham 4-/5

P: Cont with PREs to increase RLE strength

---

SOAP NOTE BY: Nancy Park MD POSTED ON 9/14/2020 11:31:32 AM EDT                          Type: MEDICAL MD/DO

**Subjective**

Mental health consult appreciated

Inmate seen in 5B treatment room and evluated during wound care session.

He stated that his right LE pain is improved at times but would be no more specific than that.

He had no new complaints, concerns or questions.

**Objective**

| BP: / | Temp: | Pulse: | Resp: | Wt: | Sa02: | BS: | Pain: |
|-------|-------|--------|-------|-----|-------|-----|-------|

AVSS as per record this AM

MSK:

right foot and ankle with mild to mod chronic swelling

1 cm open wound plantar surface of right heel with approx 1 cm depth

pink granulation at base, no odor or drainage

Wound Care: wound cleaned with Dakin's solution and Dakins soaked 2x2 place loosely in the wound, site wrapped with rolled gauze.

Coban applied from the foot to the right infrapatellar area.

**Assessment**

failed right ankle fusion related to old GSW- severe osteoarthrosis and multiple ligamentous disruptions

osteomyelitis right calcaneus

nonhealing right plantar heel wound

## Plan

Orthopedic foot and ankle second opinion with South Hills Orthopedics- Dr Combs 9/15/20- take records and MRI/plain film images

Right BKA currently scheduled for 9/16/20

CC wound care regimen

CC meds/analgesia

PT

Mental Health following.

| Drug Name | Drug Strength | Quantity | Start | Stop | Complete Sig |
|---|---|---|---|---|---|
| Baclofen Oral | 20 MG | 1 | 5/28/2020 8:00:00 AM | 6/26/2020 11:59:59 PM | Take 20 mg by mouth twice per day for 30 day(s). Dispense 60 tablet. 2 Refill(s) |

---

SOAP NOTE BY: Nancy Park MD POSTED ON 9/15/2020 1:00:13 PM EDT                                  Type: MEDICAL MD/DO

### Subjective

Inmate evaluated today after return from second opinion with South Hills Orthopedics re R lower leg failed ankle fusion and osteomyelitis right calcaneus.

The orthopedic office did the dressing change at the encounter.

Inmate expressed understanding that the specialist concurs with a right BKA.

He has NO further questions or concerns at this time.

### Objective

BP: /        Temp:        Pulse:        Resp:        Wt:        Sa02:        BS:        Pain:

AVSS as per record

Lungs CTAB

COR RRR

MSK- right lower leg with dressing in place per orthopedics

### Assessment

Failed right ankle fusion related old GSW with severe changes noted on MRI- osteoarthrosis, ligamenous disruptions

Osteomyelitis right calcaneus

nonhealing right plantar heel wound

### Plan

Right BKA scheduled for 9/16/20

NPO after midnight

Preop labs and EKG completed and placed in packet to go out with him in the AM.

CC meds/plan at this time

MCCRAY, CLAYTON LAMONT JR 169149 (2019-11068)

| Drug Name | Drug Strength | Quantity | Start | Stop | Complete Sig |
|-----------|--------------|----------|-------|------|--------------|
| Baclofen Oral | 20 MG | 1 | 5/28/2020 8:00:00 AM | 6/26/2020 11:59:59 PM | Take 20 mg by mouth twice per day for 30 day(s). Dispense 60 tablet. 2 Refill(s) |

Natalie Austin PA POSTED ON 9/16/2020 6:47:19 PM EDT                    Type: PA NOTE

EPIC review- pt s/p right BKA; rec 1/2 suture removal in 2 weeks and the rest removed in 4 weeks;
rec Asa 325 mg daily x 6 weeks for dvt prophy.

Dennis Larkin Physical Therapist POSTED ON 9/17/2020 9:59:02 AM EDT        Type: PHYSICAL THERAPIST

Pt not seen pt OTH

Nancy Park MD POSTED ON 9/17/2020 3:26:09 PM EDT                    Type: MEDICAL MD/DO

Inmate returned from AGH post R LE BKA.

Hospital notes, PT/OT notes reviewed and printed.

Discharge summary not available yet.

Orders placed in Techcare including analgesia-oxycodone.

Sandra Simms CRNP POSTED ON 9/17/2020 8:31:24 PM EDT                    Type: NP NOTE

S: Pt resting in his cell POD # 1 Right BKA 2/2 Chronic osteomyelitis of the right calcaneus with draining sinus. He denies pain at this time. Resting flat in bed in no distress.

O: Alert and oriented.

Resps easy

Lungs CTA

RRR, No M/R/G

Abd soft, flat

Right ACE wrap dressing dry and intact. Knee immobilizer on.

A: POD# 1 Right BKA

P: Pain management with Tramadol and NSAIDs

Non weight bearing on the RLE, has crutches with him in room

ASA 325mg daily X 6 weeks for DVT prophylaxis

Trala Freeman MA POSTED ON 9/18/2020 5:02:13 AM EDT                    Type: NURSE

Abnormal Vital Signs/Readings: Send Alert to Nurse's Queue

Blood Pressure Diastolic: 60

MCCRAY, CLAYTON LAMONT JR 169149 (2019-11068)

GEN: NAD; APPEARS SAD

HEENT: NCAT, EOMI

NECK: NO JVD OR LAD VISIBLE

CARDIOVASCULAR: NML SKIN TONE AND EASY WOB AND CLEAR EASY SPEECH

EXT: NOT EVALUATED AT THIS VISIT

NEURO: AAOX3. CN2-12I

## Assessment

Young male s/p R BKA with well healing stump per Ortho report.

Pt depressed without SI. MH alerted earlier to see pt today.

Phantom limb pain continues. Pt's pain regimen unchanged.

## Plan

as above.

| Drug Name | Drug Strength | Quantity | Start | Stop | Complete Sig |
|-----------|---------------|----------|-------|------|--------------|
| Baclofen Oral | 20 MG | 1 | 5/28/2020 8:00:00 AM | 6/26/2020 11:59:59 PM | Take 20 mg by mouth twice per day for 30 day(s). Dispense 60 tablet. 2 Refill(s) |

---

Michael Warner RN POSTED ON 10/2/2020 6:17:47 PM EDT          Type: NURSE

Spoke with Dr Winter and Dr S about give Inmate 1800 Oxycodone

Inmate received his 12pm dose at 1405

Got permission to give him 1800 dose

---

Laura Williams Chief Deputy Warden of Healthcare Services POSTED ON 10/3/2020 9:58:04 AM EDT          Type: HSA/DHSA

Spoke with Mr. McCray in the dayroom of 5B, at his request. He primarily wanted to discuss the current implementation of tablets within the institution. He was advocating for his capacity to be able to speak to his family and identified that it would address his ability to connect with his supports. We briefly discussed his reaction and response to his surgery, his pain management level, and how he was coping, in general. He identified that he was speaking with mental health, but identified he was feeling "depressed and stressed." He declined to elaborate further, but was willing to engage in additional conversation. He discussed his left of trust/distrust with employees in the facility (correctional and healthcare professionals). He discussed frustrations regarding other systemic matters. I attempted to validate and normalize his feelings. Additionally, I offered process comments regarding his willingness to get out of bed, be seated in a wheelchair, get dressed, make a cup of coffee, come out of his cell, watch TV, and speak with me. We discussed how these were all choices and I reflected that they may have been difficult choices (due to his additional stressors, recent surgery, coping with the loss of a limb, and symptoms of depression). He appeared to respond to that feedback by being contemplative and indicated that it was "perfect" as a summary of my statement that he was "okay."

---

Colette Jones RN POSTED ON 10/4/2020 5:24:51 AM EDT          Type: NURSE

Abnormal Vital Signs/Readings: .

Blood Pressure Diastolic: 56

Allegheny County Jail
950 2nd Ave
Pittsburgh, PA 15219

**MEDICAL HOUSING CLASSIFICATION** - Electronically Signed By: Nicole Trader ADON on 9/23/2019

6:35:32 PM EDT

| Patient: | MCCRAY, CLAYTON LAMONT JR | #: 169149 (2019-11068) | Lang: | |
|---|---|---|---|---|
| DOB: | ▉▉▉▉▉ | Sex: M | Race: B | |
| Housing: | | SSN#: **HIDDEN** | Type: | |
| Status: NOT ACTIVE | | Booking Date: 9/23/2019 4:56:00 PM EDT | Release: 10/9/2020 10:46:19 AM | |

Date: 9/23/2019

**Medical Order for Special Housing Status: (choose all that apply)**

- ☑ Lower Level
- ☐ Remove from Lower Level
- ☑ Lower Bunk
- ☐ Remove from Lower Bunk
- ☐ Handicapped Cell
- ☐ Single Cell
- ☐ Medical Bed Rest (Single Cell or housed with another inmate on same status. Must remain in cell.)
- ☐ Cleared from Medical Housing Unit to General Population
- ☑ TB read done, cleared to General Population
- ☐ TB read done, remain in General Population
- ☐ TB read done, not cleared from Detox
- ☐ TB read done, not cleared from Mental Health
- ☐ TB read done, not cleared from Medical Housing Unit
- ☐ TB read done, requires chest x-ray
- ☐ Chest x-ray complete, cleared to General Population
- ☐ Medical Housing Unit
- ☐ Cleared from Mental Health Housing
- ☐ Cleared from Detox Housing to General Population
- ☐ Move to Detox Housing
- ☐ Move to Juvenile Pod
- ☐ Cleared from Medical Housing Unit to Detox Housing
- ☐ Cleared from Medical Housing Unit to Segregation
- ☐ Mental Health Housing 5C
- ☐ Mental Health Housing 5D

MCCRAY, CLAYTON LAMONT JR 169149 (2019-11068)

☐ Mental Health Housing 5F

☐ Mental Health Housing 5MD

_____

Duration of Order:

Physician/Practitioner:

Allegheny County Jail
950 2nd Ave
Pittsburgh, PA 15219

**WOUND CARE** - Electronically Signed By: Alexandra Bieselt MA on 10/8/2019 10:17:05 PM EDT

| Patient: | MCCRAY, CLAYTON LAMONT JR | #: | 169149 (2019-11068) | Lang: | |
|---|---|---|---|---|---|
| DOB: | ▮▮▮▮▮ | Sex: | M | Race: | B |
| Housing: | | SSN#: | **HIDDEN** | Type: | |
| Status: | NOT ACTIVE | Booking Date: | 9/23/2019 4:56:00 PM EDT | Release: | 10/9/2020 10:46:19 AM |

**Current Allergies**

Ibuprofen, Rocephin

**Current Medications:**

Acetaminophen-Codeine #4 Oral 300-60 MG (QTY: 1) (QPM: 2000) 10/1/2019 - 10/15/2019

Boost Oral   (QTY: 1) (BID: 0800 2000) 10/1/2019 - 10/30/2019

Clotrimazole External 1 % (QTY: 1) (BID: 0800 2000) 9/29/2019 - 10/19/2019

Mapap Oral 500 MG (QTY: 2) (QAM: 0800) 10/1/2019 - 10/30/2019

**SUBJECTIVE:**

| Location: |
|---|

| Chronic Conditions: |
|---|
| PVD, Other Chronic Care, Hypertension, Chronic Pain |

Onset: ☐ New   ☐ Chronic   ☐ Recurrent   ☐ Trauma/Injury:   Duration

Mechanism of injury:

Pain (1 - 10): ☐ Burning   ☐ Cold   ☐ Crushing   ☐ Hot   ☐ Numb   ☐ Radiating
☐ Stabbing   ☐ N/A

**OBJECTIVE:**

☐ Patient Refused

| BP | Temp | Pulse | Resp | SaO2 | BS | Pain | Height(ft) |
|---|---|---|---|---|---|---|---|
| / | | | | | | | 5 |

| Height(in) | Weight | BMI | MAP |
|---|---|---|---|
| | | | |

Wound opening measurements (clock): 12 - 6  9 - 3

Color:    ☐ WNL     ☐ Flushed     ☐ Pale     ☐ Cyanotic

Skin:    ☐ Hot     ☐ Warm     ☐ Cool     ☐ Dry     ☐ Moist/Clammy     ☐ Diaphoretic

Bleeding:    ☐ None     ☐ Scant/Small     ☐ Moderate/Large     ☐ Uncontrollable

Character:    ☐ Dirty     ☐ Foreign material     ☐ Gaping     ☐ Crusted

Open:    ☐ Incision     ☐ Laceration     ☐ Abrasion     ☐ Puncture     ☐ N/A

Closed:    ☐ Contusion     ☐ Hematoma     ☐ Crushing     ☐ N/A

Exudate:    ☐ None     ☐ Small     ☐ Moderate     ☐ Large

Type:    ☐ Bloody     ☐ Sero-sanguineous     ☐ Serous     ☐ Purulent     ☐ Odoriferous     ☐ N/A

Last Tetanus Immunization:    ☐ Unknown

**ASSESSMENT:**

☐ Deferred (as above)     ☐ VS within normal limits - no acute distress/episode     ☐ Fever greater than 101

☐ Cellulitis/streaking

PLAN: (If initiating medications, must write medication orders on order form)
Provider must be contacted for medication orders for any PREGNANT patients

Contact Provider

Wounds with uncontrolled bleeding despite direct pressure:

☐ Dress wound(s) with heavy gauze pressure bandages

☐ Activate EMS via 911, if shock or uncontrolled bleeding

Wounds with active bleeding:

☐ Apply firm, direct pressure on wound for 10 minutes with moist saline gauze

☐ If bleeding is NOT controlled, dress with heavily moistened saline gauze pressure bandage. * DO NOT remove saturated

dressings: apply additional dressings as needed

Fever greater than 101:

☐ Document provider wound order on the Wound Care Order Sheet

Small or Uncomplicated lacerations, abrasions or puncture wounds (including taser removal):

☐ Gently cleanse area with warm water and antibacterial soap

☐ If applicable, apply a bandaid

☐ Provider contacted

MCCRAY, CLAYTON LAMONT JR 169149 (2019-11068)

EDUCATION:

☐ Wound care instructions    ☐ Fill out HNR if symptoms continue

☐ Provide patient educaiton on signs/symptoms of infection

Comments:

inmate was a no show for dressing change

Allegheny County Jail
950 2nd Ave
Pittsburgh, PA 15219

**WOUND CARE** - Electronically Signed By: Briana Bujanowski MA on 11/19/2019 12:50:10 PM EST

| Patient: | MCCRAY, CLAYTON LAMONT JR | #: | 169149 (2019-11068) | Lang: | |
|---|---|---|---|---|---|
| DOB: | ███████ | Sex: | M | Race: | B |
| Housing: | | SSN#: | **HIDDEN** | Type: | |
| Status: | NOT ACTIVE | Booking Date: | 9/23/2019 4:56:00 PM EDT | Release: | 10/9/2020 10:46:19 AM |

Current Allergies

Ibuprofen, Rocephin

Current Medications:

Acetaminophen-Codeine #3 Oral 300-30 MG (QTY: 1) PRN (QPM) 11/7/2019 - 11/20/2019

Docusate Sodium Oral 100 MG (QTY: 2) (QAM: 0800) 11/7/2019 - 11/20/2019

Gabapentin Oral 800 MG (QTY: 1) (BID: 0800 2000) 10/20/2019 - 2/16/2020

Mapap Oral 500 MG (QTY: 1) PRN (BID) 11/11/2019 - 2/8/2020

Thera Oral   (QTY: 1) (QAM: 0800) 11/1/2019 - 11/30/2019

**SUBJECTIVE:**

Location:

Chronic Conditions:

PVD, Other Chronic Care, Hypertension, Chronic Pain

| Onset: | ☐ New | ☐ Chronic | ☑ Recurrent | ☐ Trauma/Injury: | Duration |
|---|---|---|---|---|---|

Mechanism of injury:

Pain (1 - 10): ☐ Burning  ☐ Cold  ☐ Crushing  ☐ Hot  ☐ Numb  ☐ Radiating  ☐ Stabbing  ☐ N/A

**OBJECTIVE:**

☐ Patient Refused

| BP | Temp | Pulse | Resp | SaO2 | BS | Pain | Height(ft) |
|---|---|---|---|---|---|---|---|

MCCRAY, CLAYTON LAMONT JR 169149 (2019-11068)

| Height(in) | Weight | BMI | MAP |
|---|---|---|---|
| 7 | | | |

Wound opening measurements (clock): 12 - 6  9 - 3

Color:  ☐ WNL    ☐ Flushed    ☐ Pale    ☐ Cyanotic

Skin:  ☐ Hot    ☐ Warm    ☐ Cool    ☐ Dry    ☐ Moist/Clammy    ☐ Diaphoretic

Bleeding:  ☐ None    ☐ Scant/Small    ☐ Moderate/Large    ☐ Uncontrollable

Character:  ☐ Dirty    ☐ Foreign material    ☐ Gaping    ☐ Crusted

Open:  ☐ Incision    ☐ Laceration    ☐ Abrasion    ☐ Puncture    ☐ N/A

Closed:  ☐ Contusion    ☐ Hematoma    ☐ Crushing    ☐ N/A

Exudate:  ☐ None    ☐ Small    ☐ Moderate    ☐ Large

Type:  ☐ Bloody    ☐ Sero-sanguineous    ☐ Serous    ☐ Purulent    ☐ Odoriferous    ☐ N/A

Last Tetanus Immunization:    ☐ Unknown

## ASSESSMENT:

☐ Deferred (as above)    ☐ VS within normal limits - no acute distress/episode    ☐ Fever greater than 101

☐ Cellulitis/streaking

PLAN: (If initiating medications, must write medication orders on order form)
Provider must be contacted for medication orders for any PREGNANT patients

Contact Provider

Wounds with uncontrolled bleeding despite direct pressure:

☐ Dress wound(s) with heavy gauze pressure bandages

☐ Activate EMS via 911, if shock or uncontrolled bleeding

Wounds with active bleeding:

☐ Apply firm, direct pressure on wound for 10 minutes with moist saline gauze

☐ If bleeding is NOT controlled, dress with heavily moistened saline gauze pressure bandage. * DO NOT remove saturated dressings: apply additional dressings as needed

Fever greater than 101:

☐ Document provider wound order on the Wound Care Order Sheet

Small or Uncomplicated lacerations, abrasions or puncture wounds (including taser removal):

☐ Gently cleanse area with warm water and antibacterial soap

☐ If applicable, apply a bandaid

MCCRAY, CLAYTON LAMONT JR 169149 (2019-11068)

☐ Provider contacted

Time:

EDUCATION:

☑ Wound care instructions          ☐ Fill out HNR if symptoms continue

☑ Provide patient educaiton on signs/symptoms of infection

Comments:

Inmate stated that he was about to get a shower and asked if he I could just give him the supplies and he will do it after his shower. I gave him all the supplies that he needed to do his dressing,

Allegheny County Jail
950 2nd Ave
Pittsburgh, PA 15219

# WOUND CARE - Electronically Signed By: Briana Bujanowski MA on 1/1/2020 10:43:35 AM EST

| | | | | | |
|---|---|---|---|---|---|
| **Patient:** | MCCRAY, CLAYTON LAMONT JR | **#:** 169149 (2019-11068) | | **Lang:** | |
| **DOB:** | ███████ | **Sex:** M | | **Race:** B | |
| **Housing:** | | **SSN#:** **HIDDEN** | | **Type:** | |
| **Status:** NOT ACTIVE | | **Booking Date:** 9/23/2019 4:56:00 PM EDT | | **Release:** 10/9/2020 10:46:19 AM | |

**Current Allergies**

Ibuprofen, Rocephin, Sulfa Antibiotics

**Current Medications:**

Boost Oral   (QTY: 1) (TID: 0800 1200 2000) 12/30/2019 - 2/27/2020

diphenhydrAMINE HCl Oral 50 MG (QTY: 1) for hives, itch (BID: 0800 2000) 12/25/2019 - 1/23/2020

Gabapentin Oral 800 MG (QTY: 1) (BID: 0800 2000) 10/20/2019 - 2/16/2020

Mapap Oral 500 MG (QTY: 1) PRN (BID) 11/11/2019 - 2/8/2020

Polyethylene Glycol 3350 Oral   (QTY: 1) (QAM: 0800) 12/20/2019 - 1/18/2020

predniSONE Oral 20 MG (QTY: 1) (QAM: 0800) 12/30/2019 - 1/3/2020

raNITIdine HCl Oral 150 MG (QTY: 1) (BID: 0800 2000) 12/25/2019 - 1/23/2020

Santyl External 250 UNIT/GM (QTY: 1) apply to right heel ulceration during wound care as directed (QAM: 0800) 11/25/2019 - 1/23/2020

Tolnaftate External 1 % (QTY: 1) apply between toes for athletes foot (BID: 0800 2000) 12/24/2019 - 1/22/2020

## SUBJECTIVE:

Location:

Chronic Conditions:

Chronic Pain

MCCRAY, CLAYTON LAMONT JR 169149 (2019-11068)

| Onset: | ☐ New | ☐ Chronic | ☑ Recurrent | ☐ Trauma/injury: | Duration |
|---|---|---|---|---|---|

Mechanism of injury:

Pain (1 - 10):  ☐ Burning  ☐ Cold  ☐ Crushing  ☐ Hot  ☐ Numb  ☐ Radiating
☐ Stabbing  ☐ N/A

## OBJECTIVE:

☐ Patient Refused

| BP | Temp | Pulse | Resp | SaO2 | BS | Pain | Height(ft) |
|---|---|---|---|---|---|---|---|
| / | | | | | | | 0 |

| Height(in) | Weight | BMI | MAP |
|---|---|---|---|
| 0 | | | |

Wound opening measurements (clock): 12 - 6  9 - 3

Color:  ☐ WNL  ☐ Flushed  ☐ Pale  ☐ Cyanotic

Skin:  ☐ Hot  ☐ Warm  ☐ Cool  ☐ Dry  ☐ Moist/Clammy  ☐ Diaphoretic

Bleeding:  ☐ None  ☐ Scant/Small  ☐ Moderate/Large  ☐ Uncontrollable

Character:  ☐ Dirty  ☐ Foreign material  ☐ Gaping  ☐ Crusted

Open:  ☐ Incision  ☐ Laceration  ☐ Abrasion  ☐ Puncture  ☐ N/A

Closed:  ☐ Contusion  ☐ Hematoma  ☐ Crushing  ☐ N/A

Exudate:  ☐ None  ☐ Small  ☐ Moderate  ☐ Large

Type:  ☐ Bloody  ☐ Sero-sanguineous  ☐ Serous  ☐ Purulent  ☐ Odoriferous  ☐ N/A

Last Tetanus Immunization:  ☐ Unknown

## ASSESSMENT:

☐ Deferred (as above)    ☐ VS within normal limits - no acute distress/episode    ☐ Fever greater than 101

☐ Cellulitis/streaking

PLAN: (If initiating medications, must write medication orders on order form)
Provider must be contacted for medication orders for any PREGNANT patients

Contact Provider

Wounds with uncontrolled bleeding despite direct pressure:

☐ Dress wound(s) with heavy gauze pressure bandages

☐ Activate EMS via 911, if shock or uncontrolled bleeding

Wounds with active bleeding:

☐ Apply firm, direct pressure on wound for 10 minutes with moist saline gauze

MCCRAY, CLAYTON LAMONT JR 169149 (2019-11068)
APPENDIX - PAGE 136

☐ If bleeding is NOT controlled, dress with heavily moistened saline gauze pressure bandage. * DO NOT remove saturated dressings: apply additional dressings as needed

Fever greater than 101:

☐ Document provider wound order on the Wound Care Order Sheet

Small or Uncomplicated lacerations, abrasions or puncture wounds (including taser removal):

☐ Gently cleanse area with warm water and antibacterial soap

☐ If applicable, apply a bandaid

☐ Provider contacted

Time:

EDUCATION:

☑ Wound care instructions        ☐ Fill out HNR if symptoms continue

☑ Provide patient educaiton on signs/symptoms of infection

Comments:

Inmate was called to 5B and inmate stated that he was about to get a shower and that he just wanted the supplies and that he will do it himself when he gets out the shower. I gave inmate 4x4 gauze, non stick gauze, a tiny bit of santyl in paper medicine cup and gauze roll so he can bandage his wound when he gets out the shower. Patient left without incident

MCCRAY, CLAYTON LAMONT JR 169149 (2019-11068)

Allegheny County Jail
950 2nd Ave
Pittsburgh, PA 15219

## WOUND CARE - Electronically Signed By: Briana Bujanowski MA on 1/27/2020 1:19:42 PM EST

| | | | | | |
|---|---|---|---|---|---|
| **Patient:** | MCCRAY, CLAYTON LAMONT JR | **#:** 169149 (2019-11068) | | **Lang:** | |
| **DOB:** | ███████ | **Sex:** M | | **Race:** B | |
| **Housing:** | | **SSN#:** **HIDDEN** | | **Type:** | |
| **Status:** NOT ACTIVE | | **Booking Date:** 9/23/2019 4:56:00 PM EDT | | **Release:** 10/9/2020 10:46:19 AM | |

**Current Allergies**

Ibuprofen, Rocephin, Sulfa Antibiotics

**Current Medications:**

Boost Oral   (QTY: 1) (TID: 0800 1200 2000) 12/30/2019 - 2/27/2020

Gabapentin Oral 800 MG (QTY: 1) (BID: 0800 2000) 1/9/2020 - 5/7/2020

Mapap Oral 500 MG (QTY: 1) PRN (BID) 11/11/2019 - 2/8/2020

Santyl External 250 UNIT/GM (QTY: 1) apply to foot wound as directed during wound care session (QAM: 0800) 1/25/2020 - 4/23/2020

## SUBJECTIVE:

Location:

Chronic Conditions:

Chronic Pain

Onset:   ☐ New    ☐ Chronic    ☑ Recurrent    ☐ Trauma/Injury:    Duration

Mechanism of injury:

Pain (1 - 10):   ☐ Burning    ☐ Cold    ☐ Crushing    ☐ Hot    ☐ Numb    ☐ Radiating
☐ Stabbing    ☐ N/A

## OBJECTIVE:

☐ Patient Refused

| BP | Temp | Pulse | Resp | SaO2 | BS | Pain | Height(ft) |
|---|---|---|---|---|---|---|---|
| / | | | | | | | 5 |

| Height(in) | Weight | BMI | MAP |
|---|---|---|---|
| | | | |

MCCRAY, CLAYTON LAMONT JR 169149 (2019-11068)

Wound opening measurements (clock): 12 - 6  9 - 3

Color: ☐ WNL ☐ Flushed ☐ Pale ☐ Cyanotic

Skin: ☐ Hot ☐ Warm ☐ Cool ☐ Dry ☐ Moist/Clammy ☐ Diaphoretic

Bleeding: ☐ None ☐ Scant/Small ☐ Moderate/Large ☐ Uncontrollable

Character: ☐ Dirty ☐ Foreign material ☐ Gaping ☐ Crusted

Open: ☐ Incision ☐ Laceration ☐ Abrasion ☐ Puncture ☐ N/A

Closed: ☐ Contusion ☐ Hematoma ☐ Crushing ☐ N/A

Exudate: ☐ None ☐ Small ☐ Moderate ☐ Large

Type: ☐ Bloody ☐ Sero-sanguineous ☐ Serous ☐ Purulent ☐ Odoriferous ☐ N/A

Last Tetanus Immunization: ☐ Unknown

## ASSESSMENT:

☐ Deferred (as above)     ☐ VS within normal limits - no acute distress/episode     ☐ Fever greater than 101

☐ Cellulitis/streaking

PLAN: (If initiating medications, must write medication orders on order form)
Provider must be contacted for medication orders for any PREGNANT patients

Contact Provider

Wounds with uncontrolled bleeding despite direct pressure:

☐ Dress wound(s) with heavy gauze pressure bandages

☐ Activate EMS via 911, if shock or uncontrolled bleeding

Wounds with active bleeding:

☐ Apply firm, direct pressure on wound for 10 minutes with moist saline gauze

☐ If bleeding is NOT controlled, dress with heavily moistened saline gauze pressure bandage. * DO NOT remove saturated dressings: apply additional dressings as needed

Fever greater than 101:

☐ Document provider wound order on the Wound Care Order Sheet

Small or Uncomplicated lacerations, abrasions or puncture wounds (including taser removal):

☐ Gently cleanse area with warm water and antibacterial soap

☐ If applicable, apply a bandaid

☐ Provider contacted

EDUCATION:

☑ Wound care instructions     ☐ Fill out HNR if symptoms continue

☑ Provide patient educaiton on signs/symptoms of infection

Comments:

Inmate asked just to have supplies for his dressing change and that he would do it himself when he gets out the shower. I gave inmate 4x4 gauze, non stick gauze, stretch bandage, a ace bandage and a tiny bit of santyl in a cup to take back with him.

Allegheny County Jail
950 2nd Ave
Pittsburgh, PA 15219

**MEDICAL HOUSING CLASSIFICATION** - Electronically Signed By: Jennifer Kelly Director of Nursing on

5/26/2020 8:28:58 AM EDT

| Patient: | MCCRAY, CLAYTON LAMONT JR | #: 169149 (2019-11068) | Lang: | |
|---|---|---|---|---|
| DOB: | ████████ | Sex: M | Race: B | |
| Housing: | | SSN#: **HIDDEN** | Type: | |
| Status: NOT ACTIVE | | Booking Date: 9/23/2019 4:56:00 PM EDT | Release: 10/9/2020 10:46:19 AM | |

Date:

**Medical Order for Special Housing Status: (choose all that apply)**

- ☐ Lower Level
- ☐ Remove from Lower Level
- ☐ Lower Bunk
- ☐ Remove from Lower Bunk
- ☐ Handicapped Cell
- ☐ Single Cell
- ☐ Medical Bed Rest (Single Cell or housed with another inmate on same status. Must remain in cell.)
- ☐ Cleared from Medical Housing Unit to General Population
- ☐ TB read done, cleared to General Population
- ☐ TB read done, remain in General Population
- ☐ TB read done, not cleared from Detox
- ☐ TB read done, not cleared from Mental Health
- ☐ TB read done, not cleared from Medical Housing Unit
- ☐ TB read done, requires chest x-ray
- ☐ Chest x-ray complete, cleared to General Population
- ☑ Medical Housing Unit
- ☐ Cleared from Mental Health Housing
- ☐ Cleared from Detox Housing to General Population
- ☐ Move to Detox Housing
- ☐ Move to Juvenile Pod
- ☐ Cleared from Medical Housing Unit to Detox Housing
- ☐ Cleared from Medical Housing Unit to Segregation
- ☐ Mental Health Housing 5C
- ☐ Mental Health Housing 5D

MCCRAY, CLAYTON LAMONT JR 169149 (2019-11068)

☐ Mental Health Housing 5F

☐ Mental Health Housing 5MD

_____

Duration of Order:

Physician/Practitioner:

park

Allegheny County Jail
950 2nd Ave
Pittsburgh, PA 15219

## WOUND CARE - Electronically Signed By: Michael Warner RN on 5/26/2020 9:13:15 PM EDT

| | | | |
|---|---|---|---|
| **Patient:** MCCRAY, CLAYTON LAMONT JR | **#:** 169149 (2019-11068) | **Lang:** | |
| **DOB:** ▓▓▓▓▓ | **Sex:** M | **Race:** B | |
| **Housing:** | **SSN#:** **HIDDEN** | **Type:** | |
| **Status:** NOT ACTIVE | **Booking Date:** 9/23/2019 4:56:00 PM EDT | **Release:** 10/9/2020 10:46:19 AM | |

Current Allergies

Ibuprofen, Rocephin, Sulfa Antibiotics

Current Medications:

Acetaminophen-Codeine #3 Oral 300-30 MG (QTY: 1) for right leg pain related to chronic right heel wound (QPM: 2000) 5/20/2020 - 6/18/2020

Boost Oral    (QTY: 1) (QAM: 0800) 5/4/2020 - 6/2/2020

Dakins (1/2 strength) External 0.25 % (QTY: 1) foot osteomyelitis- use for cleanse and packing of foot wound (QPM: 2000) 5/26/2020 - 11/21/2020

Gabapentin Oral 300 MG (QTY: 1) to be taken with gabapentin 600mg po BID; total dose 900mg po BID (BID: 0800 2000) 4/10/2020 - 10/6/2020

Gabapentin Oral 600 MG (QTY: 1) to be taken with gabapentin 300mg po BID; total dose 900mg po BID (BID: 0800 2000) 4/10/2020 - 10/6/2020

Ketoconazole External 2 % (QTY: 1) apply between affected toes for athletes foot, KOP done (BID: 0800 2000) 5/14/2020 - 6/3/2020

Mapap Oral 500 MG (QTY: 2) PRN (BID) 4/23/2020 - 6/21/2020

Moxifloxacin HCl Oral 400 MG (QTY: 1) osteomyelitis- (allergic to sulfa) (QPM: 2000) 5/25/2020 - 6/7/2020

## SUBJECTIVE:

Location: Left heel

Chronic Conditions:

Chronic Pain

| Onset: | ☐ New | ☑ Chronic | ☐ Recurrent | ☐ Trauma/Injury: | Duration |
|---|---|---|---|---|---|

Mechanism of injury:

MCCRAY, CLAYTON LAMONT JR 169149 (2019-11068)

**APPENDIX - PAGE 143**

Pain (1 - 10): 0    ☐ Burning    ☐ Cold    ☐ Crushing    ☐ Hot    ☐ Numb    ☐ Radiating

☐ Stabbing    ☐ N/A

## OBJECTIVE:

☐ Patient Refused

| BP | Temp | Pulse | Resp | SaO2 | BS | Pain | Height(ft) |
|---|---|---|---|---|---|---|---|
| / | | | | | | | 0 |

| Height(in) | Weight | BMI | MAP |
|---|---|---|---|
| 0 | | | |

Wound opening measurements (clock): 12 - 6  9 - 3

Color: ☑ WNL    ☐ Flushed    ☐ Pale    ☐ Cyanotic

Skin: ☐ Hot    ☑ Warm    ☐ Cool    ☐ Dry    ☐ Moist/Clammy    ☐ Diaphoretic

Bleeding: ☐ None    ☑ Scant/Small    ☐ Moderate/Large    ☐ Uncontrollable

Character: ☐ Dirty    ☐ Foreign material    ☑ Gaping    ☐ Crusted

Open: ☐ Incision    ☐ Laceration    ☐ Abrasion    ☑ Puncture    ☐ N/A

Closed: ☐ Contusion    ☐ Hematoma    ☐ Crushing    ☐ N/A

Exudate: ☐ None    ☑ Small    ☐ Moderate    ☐ Large

Type: ☑ Bloody    ☐ Sero-sanguineous    ☑ Serous    ☐ Purulent    ☐ Odoriferous    ☐ N/A

Last Tetanus Immunization:    ☐ Unknown

## ASSESSMENT:

☐ Deferred (as above)    ☐ VS within normal limits - no acute distress/episode    ☐ Fever greater than 101

☐ Cellulitis/streaking

PLAN: (If initiating medications, must write medication orders on order form)
Provider must be contacted for medication orders for any PREGNANT patients

Contact Provider

Wounds with uncontrolled bleeding despite direct pressure:

☐ Dress wound(s) with heavy gauze pressure bandanges

☐ Activate EMS via 911, if shock or uncontrolled bleeding

Wounds with active bleeding:

☐ Apply firm, direct pressure on wound for 10 minutes with moist saline gauze

☐ If bleeding is NOT controlled, dress with heavily moistened saline gauze pressure bandage. * DO NOT remove saturated dressings: apply additional dressings as needed

MCCRAY, CLAYTON LAMONT JR 169149 (2019-11068)

Fever greater than 101:

☐ Document provider wound order on the Wound Care Order Sheet

Small or Uncomplicated lacerations, abrasions or puncture wounds (including taser removal):

☐ Gently cleanse area with warm water and antibacterial soap

☐ If applicable, apply a bandaid

☐ Provider contacted

Time:

EDUCATION:

☐ Wound care instructions          ☐ Fill out HNR if symptoms continue

☐ Provide patient educaiton on signs/symptoms of infection

Comments:

Dressing changed

Allegheny County Jail
950 2nd Ave
Pittsburgh, PA 15219

**MEDICAL HOUSING CLASSIFICATION** - Electronically Signed By: Jennifer Kelly Director of Nursing on

5/27/2020 9:46:41 AM EDT

| | | | |
|---|---|---|---|
| **Patient:** MCCRAY, CLAYTON LAMONT JR | **#:** 169149 (2019-11068) | **Lang:** | |
| **DOB:** ▓▓▓▓▓ | **Sex:** M | **Race:** B | |
| **Housing:** | **SSN#:** **HIDDEN** | **Type:** | |
| **Status:** NOT ACTIVE | **Booking Date:** 9/23/2019 4:56:00 PM EDT | **Release:** 10/9/2020 10:46:19 AM | |

Date: 5/27/2020

**Medical Order for Special Housing Status: (choose all that apply)**

- ☐ Lower Level
- ☐ Remove from Lower Level
- ☐ Lower Bunk
- ☐ Remove from Lower Bunk
- ☐ Handicapped Cell
- ☐ Single Cell
- ☐ Medical Bed Rest (Single Cell or housed with another inmate on same status. Must remain in cell.)
- ☐ Cleared from Medical Housing Unit to General Population
- ☐ TB read done, cleared to General Population
- ☐ TB read done, remain in General Population
- ☐ TB read done, not cleared from Detox
- ☐ TB read done, not cleared from Mental Health
- ☐ TB read done, not cleared from Medical Housing Unit
- ☐ TB read done, requires chest x-ray
- ☐ Chest x-ray complete, cleared to General Population
- ☑ Medical Housing Unit
- ☐ Cleared from Mental Health Housing
- ☐ Cleared from Detox Housing to General Population
- ☐ Move to Detox Housing
- ☐ Move to Juvenile Pod
- ☐ Cleared from Medical Housing Unit to Detox Housing
- ☐ Cleared from Medical Housing Unit to Segregation
- ☐ Mental Health Housing 5C
- ☐ Mental Health Housing 5D

MCCRAY, CLAYTON LAMONT JR 169149 (2019-11068)

☐ Mental Health Housing 5F

☐ Mental Health Housing 5MD

_____

Duration of Order:

Physician/Practitioner:

stech

Allegheny County Jail
950 2nd Ave
Pittsburgh, PA 15219

## MEDICAL HOUSING CLASSIFICATION - Electronically Signed By: Michael Warner RN on 5/28/2020

3:06:46 PM EDT

| Patient: | MCCRAY, CLAYTON LAMONT JR | #: 169149 (2019-11068) | Lang: | |
|---|---|---|---|---|
| DOB: | ▮▮▮▮▮▮ | Sex: M | Race: B | |
| Housing: | | SSN#: **HIDDEN** | Type: | |
| Status: NOT ACTIVE | | Booking Date: 9/23/2019 4:56:00 PM EDT | Release: 10/9/2020 10:46:19 AM | |

Date: 5/28/2020

**Medical Order for Special Housing Status: (choose all that apply)**

- ☑ Lower Level
- ☐ Remove from Lower Level
- ☑ Lower Bunk
- ☐ Remove from Lower Bunk
- ☐ Handicapped Cell
- ☐ Single Cell
- ☐ Medical Bed Rest (Single Cell or housed with another inmate on same status. Must remain in cell.)
- ☑ Cleared from Medical Housing Unit to General Population
- ☐ TB read done, cleared to General Population
- ☐ TB read done, remain in General Population
- ☐ TB read done, not cleared from Detox
- ☐ TB read done, not cleared from Mental Health
- ☐ TB read done, not cleared from Medical Housing Unit
- ☐ TB read done, requires chest x-ray
- ☐ Chest x-ray complete, cleared to General Population
- ☐ Medical Housing Unit
- ☐ Cleared from Mental Health Housing
- ☐ Cleared from Detox Housing to General Population
- ☐ Move to Detox Housing
- ☐ Move to Juvenile Pod
- ☐ Cleared from Medical Housing Unit to Detox Housing
- ☐ Cleared from Medical Housing Unit to Segregation
- ☐ Mental Health Housing 5C
- ☐ Mental Health Housing 5D

☐ Mental Health Housing 5F

☐ Mental Health Housing 5MD

_____

Duration of Order:

UFN

Physician/Practitioner:

Dr Stechschulte

Allegheny County Jail
950 2nd Ave
Pittsburgh, PA 15219

**MEDICAL HOUSING CLASSIFICATION** - Electronically Signed By: Nancy Park MD on 6/18/2020

1:45:38 PM EDT

| Patient: | MCCRAY, CLAYTON LAMONT JR | #: 169149 (2019-11068) | Lang: | |
|---|---|---|---|---|
| DOB: | ▓▓▓▓▓▓ | Sex: M | Race: B | |
| Housing: | | SSN#: **HIDDEN** | Type: | |
| Status: NOT ACTIVE | | Booking Date: 9/23/2019 4:56:00 PM EDT | Release: 10/9/2020 10:46:19 AM | |

Date: 6/18/2020

**Medical Order for Special Housing Status: (choose all that apply)**

- [x] Lower Level
- [ ] Remove from Lower Level
- [x] Lower Bunk
- [ ] Remove from Lower Bunk
- [x] Handicapped Cell
- [x] Single Cell
- [ ] Medical Bed Rest (Single Cell or housed with another inmate on same status. Must remain in cell.)
- [ ] Cleared from Medical Housing Unit to General Population
- [ ] TB read done, cleared to General Population
- [ ] TB read done, remain in General Population
- [ ] TB read done, not cleared from Detox
- [ ] TB read done, not cleared from Mental Health
- [ ] TB read done, not cleared from Medical Housing Unit
- [ ] TB read done, requires chest x-ray
- [ ] Chest x-ray complete, cleared to General Population
- [ ] Medical Housing Unit
- [ ] Cleared from Mental Health Housing
- [ ] Cleared from Detox Housing to General Population
- [ ] Move to Detox Housing
- [ ] Move to Juvenile Pod
- [ ] Cleared from Medical Housing Unit to Detox Housing
- [ ] Cleared from Medical Housing Unit to Segregation
- [ ] Mental Health Housing 5C
- [ ] Mental Health Housing 5D

MCCRAY, CLAYTON LAMONT JR 169149 (2019-11068)

**APPENDIX - PAGE 150**

☐ Mental Health Housing 5MD

_____

Duration of Order:

inmate is non weightbearing and has use of crutches and wheelchair

Physician/Practitioner:

Nancy H Park, MD

Allegheny County Jail
950 2nd Ave
Pittsburgh, PA 15219

## MEDICAL HOUSING CLASSIFICATION - Electronically Signed By: Paul Veto Psychiatric Aide on

6/30/2020 2:05:35 PM EDT

| Patient: | MCCRAY, CLAYTON LAMONT JR | #: 169149 (2019-11068) | Lang: | |
|---|---|---|---|---|
| DOB: | ▮▮▮▮▮ | Sex: M | Race: B | |
| Housing: | | SSN#: **HIDDEN** | Type: | |
| Status: NOT ACTIVE | | Booking Date: 9/23/2019 4:56:00 PM EDT | Release: 10/9/2020 10:46:19 AM | |

Date: 6/30/2020

**Medical Order for Special Housing Status: (choose all that apply)**

- ☐ Lower Level
- ☐ Remove from Lower Level
- ☐ Lower Bunk
- ☐ Remove from Lower Bunk
- ☐ Handicapped Cell
- ☐ Single Cell
- ☐ Medical Bed Rest (Single Cell or housed with another inmate on same status. Must remain in cell.)
- ☐ Cleared from Medical Housing Unit to General Population
- ☐ TB read done, cleared to General Population
- ☐ TB read done, remain in General Population
- ☐ TB read done, not cleared from Detox
- ☐ TB read done, not cleared from Mental Health
- ☐ TB read done, not cleared from Medical Housing Unit
- ☐ TB read done, requires chest x-ray
- ☐ Chest x-ray complete, cleared to General Population
- ☐ Medical Housing Unit
- ☑ Cleared from Mental Health Housing
- ☐ Cleared from Detox Housing to General Population
- ☐ Move to Detox Housing
- ☐ Move to Juvenile Pod
- ☐ Cleared from Medical Housing Unit to Detox Housing
- ☐ Cleared from Medical Housing Unit to Segregation
- ☐ Mental Health Housing 5C
- ☐ Mental Health Housing 5D

MCCRAY, CLAYTON LAMONT JR 169149 (2019-11068)

☐ Mental Health Housing 5F

☐ Mental Health Housing 5MD

_____

Duration of Order:

Physician/Practitioner:

TOM PATTS, PA-C

**FORM ACJ-141 D PART IIB**
HEARING COMMITTEE ACTION
☒ MISCONDUCT   ☐ OTHER

**ALLEGHENY COUNTY JAIL**
950 2ND AVENUE
PITTSBURGH, PA 15219

**MISCONDUCT NUMBER**
20-1572

| D.O.C. # | Name | Institution | Misconduct Time 24 Hr. Base | Misconduct Date |
|---|---|---|---|---|
| 169149 | MCCRAY, CLAYTON | ACJ | 1450 / Hearing Date 6/4/20 | 5-28-20 / Hearing Time 1653 |

| CHARGES | PLEA | DISPOSITION | SENTENCE |
|---|---|---|---|
| MURDER - MANSLAUGHTER | | | |
| ESCAPE | | | |
| POSS. OF CONTRABAND | GUILTY  NOT GUILTY  NO PLEA | GUILTY  NOT GUILTY  NO PLEA | 10 days |
| CARRYING A DEADLY WEAPON | | | |
| ARSON | | | |
| ROBBERY | | | |
| BURGLARY | | | |
| THEFT | | | |
| TAMPERING WITH OR DESTROYING PROPERTY | | | |
| SEXUAL ASSAULT | | | |
| INDECENT EXPOSURE | | | |
| RIOT OR INCIDENTING A RIOT | | | |
| DISRUPTION | GUILTY  NOT GUILTY  NO PLEA | GUILTY  NOT GUILTY  NO PLEA | 10 days |
| BRIBERY | | | |
| THREATENING AN EMPLOYEE WITH BODILY HARM | | | |
| Resisting Officers | | | |
| ASSAULTS AND FIGHTING | | | |
| ADULTERATION OF FOOD OR DRINK | | | |
| REFUSING TO OBEY AN ORDER | | | |
| POSSESION OR USE OF A DANGEROUS OR CONTROLLED SUBSTANCE | | | |
| REFUSING TO WORK | | | |
| VIOLATION OF PRE-RELEASE | | | |
| BREAKING RESTRICTION | | | |
| INTOXICATION | | | |
| MAKING FERMENTED BEVERAGES | | | |
| LYING TO AN EMPLOYEE | | | |
| CONDUCTING A GAMBLING OPERATION | | | |
| UNAUTHORIZED USE OF MAIL OR TELEPHONE | | | |
| CONDUCT WITH VISITOR IN VIOLATION OF REGULATIONS | | | |
| UNAUTHORIZED AREA | | | |
| LOANING PROPERTY FOR PROFIT | | | |
| INSOLENCE OR DISRESPECT TOWARD A STAFF MEMBER | | | |
| POSSESSION OF STOLEN PROPERTY | | | |
| | | | |
| BODY PUNCHING OR HORSEPLAY | | | |
| TAKING UNAUTHORIZED FOOD FROM KITCHEN LOUNGE OR PANTRY | | | |
| POSSESSION OF UNAUTHORIZED CLOTHING | | | |
| TATTOOING | | | |
| | | | |
| LOANING OR BORROWING PROPERTY | | | |
| | | | |
| FAILURE TO STAND FOR COUNT | | | |
| SMOKING | | | |

**TOTAL DAYS SENTENCED:** 10 days

**SUSPENDED DAYS ( Ø )**

**RELEASE DATE:** 6/17/20

X CAPT YOUNG    Lt. Hall
**HEARING OFFICER'S SIGNATURE**

| | | |
|---|---|---|
| YES ☑ | NO ☐ | I have heard the decision and have been told the reason for it and what will happen. |
| YES ☑ | NO ☐ | The circumstance of the charge has been read and fully explained to me. |
| YES ☑ | NO ☐ | I have had the opportunity to have my version reported as part of the record. |
| YES ☑ | NO ☐ | I have been advised that I may, within 15 days, request a formal review, and understand that this request must contain specific reasons for the review. |

X Clayton L. McCray
**INMATE'S SIGNATURE**

WHITE-JBC-15      YELLOW-CLASSIFICATION      PINK-STAFF MEMBER REPORTING MISCONDUCT      GOLDENROD-INMATE CITED

# Allegheny County Jail

| Misconduct Number # |
| --- |
| 20-1572 |

☒ Misconduct report    ☐Other

| Pod | Name | | Time 24hrs | Misconduct date |
| --- | --- | --- | --- | --- |
| 5-B | McCray, Clayton | | 1450 hours | 5/28/2020 |
| Cell# | DOC | | Place of Misconduct | |
| M4 | 169149 | | Inside cell M4 | |

| Name | | I | W | | | Name | I | W |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

Misconduct Charges:  Class 1: #14 Disruption of Normal Routine    Class1:  #3 Possession of Contraband

Staff Member's Version:  On the above date after multiple times through out the day smelling smoke from cell M4 Sergeant Andrascik was notified. This reporting Officer, Officer Noullet and Sergeant Andrascik searched inmate McCray's cell. While searching the cell this reporting officer noticed 2 suspicious pieces of paper that were handed over to Sergeant Andrascik. These pieces of paper were tested and came back positive as 5FMDMBPICA. Nothing further to report at this time.

Immediate Action Taken: Locked in pre-hearing status

| Staff Member Reporting Misconduct (printed name, title, and signature) | Action Approved by Ranking Staff on Duty (printed name, title, and signature) | Date and Time Inmate Given copy | |
| --- | --- | --- | --- |
| Officer Vetterly | Sgt. Andrascik | Date 5/28/20 | Time 1545 |

| Hearing Date | Hearing Time | Location of hearing | Misconduct Category | Inmate signature affirming receipt of Misconduct form and Statement form |
| --- | --- | --- | --- | --- |
| | | | ☒Class 1  ☐ Class 2 | Refused  15:45  5-28-20 |

## Notice to Inmate

You will be scheduled for a hearing within 7 business days (not including weekends, holidays, Emergencies, or Jail wide lock downs) from the date of the misconduct, you may Remain silent if you wish, and anything you say will be used against you both at the hearing and in the court of law if this matter is referred for criminal prosecution. If you choose to remain silent, the hearing committee may hold your silence against you, but they must have some other evidence besides your silence in order to find you guilty. If you indicate that you wish to remain silent, you will be asked no further questions.

You may be represented by another inmate of general population status or a member of the institutional staff at your hearing.
You may request witnesses who will be permitted to testify at the hearing provided that they are willing, relevant and so not create a security hazard, relevancy and security will be determined by the chairman of the hearing committee.
If you wish to take advantages of either or both of these choices, please notify the chairman of the committee in writing immediately on the form provided

☐ If this block is checked and you are found guilty of the above misconduct, the hearing committee may suspend or revoke your work-release status.

## Allegheny County Bureau of Corrections Complaint Officer's Findings Form

Complaint #: _1542_     Sub-Category Code: _____     Complaint Category: _____

Date of Complaint: _10/9/19_

Inmate Name: _Clayton McCray_     (print legibly)

DOC #: _169149_

Pod: _3E_ _1C_     Cell #: _116_

### Complaint Disposition (check one)

Valid _____     Invalid _✓_     Inmate released before disposition _____

Your complaint has been reviewed and investigated and the disposition of the complaint is listed above. Below are my findings from the investigation of your complaint. If you refuse to sign your name and/or date this document you will forfeit your right to appeal this disposition. If you are dissatisfied with the disposition of the complaint you have five days after receipt of this notice to appeal to the Warden or designee in writing using an Inmate Appeal Form only if you signed and dated this document.

Findings:

_According to our records you refused to come up for your dressing change on 10/7/19_

Staff Name: _Nichole Froehlich_     (print)     Staff Title: _Admin_     (print)

Staff Signature: _____     Date: _10/16/19_

Inmate Signature: _Clayton L. McCray_     Date: _10/22/19_

White: Staff Copy     Pink: Inmate Copy

## Allegheny County Bureau of Corrections Inmate Complaint/Appeal Form

Complaint or Appeal # _____ (Staff Only)      Sub-category Code: _____ (Staff Only)      Released: _____ (Staff Only)

To: Grievance Officer

Date of Complaint: _10·9·19_

Inmate Name: _Clayton L. McCray_ (Print Legibly)

DOC #: _169149_

Pod: _3F_      Cell #: _116_

Complaint Shift (check *one* shift)

7x3 _____      3x11 _✓_      11x7 _____

Complaint Category (circle *one* category OR write the complaint # decision you are appealing)

| | | | | |
|---|---|---|---|---|
| Inmate Account | Food Service | Mailroom | Maintenance | Records |
| Mental Health | (Medical) | Staff Conduct | Jail Procedure | Property |
| Other: _____ (print) | | Appealing Complaint # _____ | | |

**Inmate Instructions:** Complete the above sections then briefly state your complaint or reason for appealing a complaint decision below on one form only. Sign your name at the bottom of this form then place the white copy in the housing unit complaint box located at the Officer's desk. Matters dealing with institutional disciplinary procedures will be dealt with by the Program Review Committee (P.R.C.) and cannot be grieved. Inappropriately filed complaints or a submission that concerns a non-grievance issue will be returned to you and not processed. This includes but is not limited to submissions on multiple forms, checking more than one shift, circling more than one category, not printing your name legibly, not signing your name, filing an appeal before your complaint has been answered, and/or filing an appeal five or more days after a decision was rendered. If you are appealing a complaint decision you must submit your original pink copies of your Inmate Complaint Form and the Complaint Findings Form that you were given.

Inmate Complaint **OR** Reason for Appeal (Print Legibly)

I have a ulcer on my Right heel that is supposed to get changed daily. On 10·7·19 I had my pod officer call after I got out of the shower the pod officer said there was a pregnant woman in medical they'll call back when done. It was now the next shift, I asked this pod officer he said they'll see me in the morning. I was asking every shift officer for 2 days and received no help from the medical department. I'm hoping this issue can be addressed so I won't catch an infection. I highly appreciate your time and effort.

Inmate Signature: _Clayton L. McCray_      Today's Date: _10·9·19_

**White: Staff Copy**          **Pink: Inmate Copy**

## Allegheny County Bureau of Corrections Complaint Officer's Findings Form

Complaint # 15576    Sub-Category Code: _____    Complaint Category: _____

Date of Complaint: 10/21/19

Inmate Name: Clayton McCray    (print legibly)

DOC #: 169149

Pod: 10 6E    Cell #: 223 - 6E -123    Moved To

### Complaint Disposition (check one)

Valid ✓    Invalid _____    Inmate released before disposition _____

Your complaint has been reviewed and investigated and the disposition of the complaint is listed above.
Below are my findings from the investigation of your complaint. If you refuse to sign your name and/or date this
document you will forfeit your right to appeal this disposition. If you are dissatisfied with the disposition of the
complaint you have five days after receipt of this notice to appeal to the Warden or designee in writing using an
Inmate Appeal Form only if you signed and dated this document.

Findings:

Thank you for bring this to our attention. We are in the proccess of revviewing our wound care procedures, to ensure people are getting proper care

Staff Name: Nichol Froehlich    (print)    Staff Title: Admin    (print)

Staff Signature: _____    Date: 11/4/19

Inmate Signature: Clyfer M Cray    Date: 11-7-12

White: Staff Copy        Pink: Inmate Copy

## Allegheny County Bureau of Corrections Inmate Complaint/Appeal Form

Complaint or Appeal # _____ (Staff Only)    Sub-category Code: _____ (Staff Only)    Released: _____ (Staff Only)

**To: Grievance Officer**

**Date of Complaint:** 10·21·19

**Inmate Name:** Clayton L. McCray _____ (Print Legibly)

**DOC #:** 169149

**Pod:** 1C    **Cell #:** 223

**Complaint Shift (check _one_ shift)**

7x3 _____    3x11 ✓    11x7 _____

**Complaint Category** (circle _one_ category OR write the complaint # decision you are appealing)

Inmate Account    Food Service    Mailroom    Maintenance    Records

Mental Health    (Medical)    Staff Conduct    Jail Procedure    Property

Other: _____ (print)    **Appealing Complaint #** _____

---

**Inmate Instructions:** Complete the above sections then briefly state your complaint or reason for appealing a complaint decision below on one form only.  Sign your name at the bottom of this form then place the white copy in the housing unit complaint box located at the Officer's desk.  **Matters dealing with institutional disciplinary procedures will be dealt with by the Program Review Committee (P.R.C.) and cannot be grieved.  Inappropriately filed complaints or a submission that concerns a non-grievance issue will be returned to you and not processed.  This includes but is not limited to submissions on multiple forms, checking more than one shift, circling more than one category, not printing your name legibly, not signing your name, filing an appeal before your complaint has been answered, and/or filing an appeal five or more days after a decision was rendered.  If you are appealing a complaint decision you must submit your original pink copies of your Inmate Complaint Form and the Complaint Findings Form that you were given.**

---

**Inmate Complaint OR Reason for Appeal** (Print Legibly)

I am writing a grievance due to the fact I am being neglected medical treatment. I am ordered to get a dressing change daily for my ulcer I have on my right foot. Medical staff missed 2 days without changing my dressing, 10·18·19 and 10·19·19 This has been an ongoing thing since I've been in the Allegheny County Jail, I have filed a previous complaint on 10·9·19 about the same issue and have yet received a response. I'm hoping that I can get some relief by medical staff changing my bandage as ordered before I catch an infection.

**Inmate Signature:** Clayton L. McCray    **Today's Date:** 10·21·19

White: Staff Copy          Pink: Inmate Copy

## Allegheny County Bureau of Corrections Inmate Complaint/Appeal Form

Complaint or Appeal # _____ (Staff Only)    Sub-category Code: _____ (Staff Only)    Released: _____ (Staff Only)

To: Grievance Officer

Date of Complaint: 10-29-19

Inmate Name: Clayton L. McCray (Print Legibly)

DOC #: 169149

Pod: 123    Cell #: 6E

Complaint Shift (check one shift)

7x3 ✓    3x11 _____    11x7 _____

Complaint Category (circle one category OR write the complaint # decision you are appealing)

Inmate Account    Food Service    Mailroom    Maintenance    Records

Mental Health    Medical    Staff Conduct    Jail Procedure    Property

Other: Commissary (print)    Appealing Complaint # _____

Inmate Instructions: Complete the above sections then briefly state your complaint or reason for appealing a complaint decision below on one form only. Sign your name at the bottom of this form then place the white copy in the housing unit complaint box located at the Officer's desk. Matters dealing with institutional disciplinary procedures will be dealt with by the Program Review Committee (P.R.C.) and cannot be grieved. Inappropriately filed complaints or a submission that concerns a non-grievance issue will be returned to you and not processed. This includes but is not limited to submissions on multiple forms, checking more than one shift, circling more than one category, not printing your name legibly, not signing your name, filing an appeal before your complaint has been answered, and/or filing an appeal five or more days after a decision was rendered. If you are appealing a complaint decision you must submit your original pink copies of your Inmate Complaint Form and the Complaint Findings Form that you were given.

Inmate Complaint OR Reason for Appeal (Print Legibly)

I had officer call Commissary to see if my #128 order was still there from me ordering 2 weeks ago on 3F. The Commissary department said he will be up to discuss the issue, which never did. I'm hoping that my family's hard earned money be returned on my account of receiving my order from 2 weeks ago. Highly Appreciate your time & effort.

Inmate Signature: Clayton J. McCray    Today's Date: 10·29·19

White: Staff Copy    Pink: Inmate Copy

## Allegheny County Bureau of Corrections Complaint Officer's Findings Form

Complaint # 16094     Sub-Category Code: _____     Complaint Category: _____

Date of Complaint: 12/18/19

Inmate Name: Clayton McCray     (print legibly)

DOC #: 169149

Pod: 63F     Cell #: 128

### Complaint Disposition (check one)

Valid __J__          Invalid _____          Inmate released before disposition _____

Your complaint has been reviewed and investigated and the disposition of the complaint is listed above.
Below are my findings from the investigation of your complaint. If you refuse to sign your name and/or date this
document you will forfeit your right to appeal this disposition. If you are dissatisfied with the disposition of the
complaint you have five days after receipt of this notice to appeal to the Warden or designee in writing using an
Inmate Appeal Form only if you signed and dated this document.

Findings:

This will be investigated and addressed oppropiratly.
will have infection Control Coordinator Come and speak
with you to help address Concerns

Staff Name: Nichole Froehlich (print)     Staff Title: Admin (print)

Staff Signature: _____     Date: 1/2/20

Inmate Signature: C M     Date: 1-2-20

White: Staff Copy          Pink: Inmate Copy

# Allegheny County Bureau of Corrections Inmate Complaint/Appeal Form

Complaint or Appeal # _____ (Staff Only)     Sub-category Code: _____ (Staff Only)     Released: _____ (Staff Only)

**To: Grievance Officer**

Date of Complaint: _12·18·19_

Inmate Name: _Clayton L. McCray_ (Print Legibly)

DOC #: _169149_

Pod: _6E_          Cell #: _128_

**Complaint Shift (check one shift)**

7x3 ___✓___          3x11 _____          11x7 _____

**Complaint Category (circle one category OR write the complaint # decision you are appealing)**

| | | | | |
|---|---|---|---|---|
| Inmate Account | Food Service | Mailroom | Maintenance | Records |
| Mental Health | (Medical) | Staff Conduct | Jail Procedure | Property |
| Other: _____ (print) | | Appealing Complaint # _____ | | |

**Inmate Instructions:** Complete the above sections then briefly state your complaint or reason for appealing a complaint decision below on one form only.  Sign your name at the bottom of this form then place the white copy in the housing unit complaint box located at the Officer's desk.  **Matters dealing with institutional disciplinary procedures will be dealt with by the Program Review Committee (P.R.C.) and cannot be grieved.  Inappropriately filed complaints or a submission that concerns a non-grievance issue will be returned to you and not processed.  This includes but is not limited to submissions on multiple forms, checking more than one shift, circling more than one category, not printing your name legibly, not signing your name, filing an appeal before your complaint has been answered, and/or filing an appeal five or more days after a decision was rendered.  If you are appealing a complaint decision you must submit your original pink copies of your Inmate Complaint Form and the Complaint Findings Form that you were given.**

**Inmate Complaint OR Reason for Appeal** (Print Legibly)

I am ordered to have my dressing change for my foot ulcer daily. This has been an ongoing problem, since I been in the Allegheny County Jail. I had officer Demis call medical department on 12·14·19 and Officer Demis said medical said they are busy they'll get to me when they can. I never received treatment on this day. I had Officer Finney call for me 12·15·19 and it was the same response, we'll get to him when we can. I've filed previous grievances about the same issue and one of my grievances got approved but there is no change. I'm already living in a filthy enviroment to where as I can catch an infection easy, due to being neglected for treatment by the Allegheny Medical Dept. I've stressed this issue to humerous medical staff and Correctional Officers about me being neglected for treatment while I have a open wound. In hoping that this grievance help me so I can be treated daily. If not I'm left no choice but to file a civil lawsuit.

Inmate Signature: _Clayton L. McCray_          Today's Date: _12·18·19_

**White: Staff Copy**          **Pink: Inmate Copy**

## Allegheny County Bureau of Corrections Complaint Officer's Findings Form

Complaint # _14453_       Sub-Category Code: _____       Complaint Category: _____

Date of Complaint: _2/15/2020_

Inmate Name: _Clayton E McCray_ _____ (print legibly)

DOC #: _16949_

Pod: _2D_       Cell #: _101_

### Complaint Disposition (check one)

Valid _____          Invalid _✓___          Inmate released before disposition _____

Your complaint has been reviewed and investigated and the disposition of the complaint is listed above. Below are my findings from the investigation of your complaint. If you refuse to sign your name and/or date this document you will forfeit your right to appeal this disposition. If you are dissatisfied with the disposition of the complaint you have five days after receipt of this notice to appeal to the Warden or designee in writing using an Inmate Appeal Form only if you signed and dated this document.

Findings:

_You spoke to medical about this concern on 2/16/2020_

Staff Name: _Nichole Froehlich_ (print)   Staff Title: _Admin_ (print)

Staff Signature: _____   Date: _2/19/2020_

Inmate Signature: _____   Date: _35.20_

**White: Staff Copy**          **Pink: Inmate Copy**

## Allegheny County Bureau of Corrections Inmate Complaint/Appeal Form

Complaint or Appeal # _____ (Staff Only)    Sub-category Code: _____ (Staff Only)    Released: _____ (Staff Only)

**To: Grievance Officer**

Date of Complaint: 2·15·20

Inmate Name: Clayton L. McCray _____ (Print Legibly)

DOC #: 169149

Pod: 2D        Cell #: 101

**Complaint Shift (check _one_ shift)**

7x3 _____    3x11 ✓    11x7 _____

**Complaint Category (circle _one_ category OR write the complaint # decision you are appealing)**

Inmate Account    Food Service    Mailroom    Maintenance    Records

Mental Health    (Medical)    Staff Conduct    Jail Procedure    Property

Other: _____ (print)    Appealing Complaint # _____

**Inmate Instructions:** Complete the above sections then briefly state your complaint or reason for appealing a complaint decision below on one form only. Sign your name at the bottom of this form then place the white copy in the housing unit complaint box located at the Officer's desk. **Matters dealing with institutional disciplinary procedures will be dealt with by the Program Review Committee (P.R.C.) and cannot be grieved. Inappropriately filed complaints or a submission that concerns a non-grievance issue will be returned to you and not processed. This includes but is not limited to submissions on multiple forms, checking more than one shift, circling more than one category, not printing your name legibly, not signing your name, filing an appeal before your complaint has been answered, and/or filing an appeal five or more days after a decision was rendered. If you are appealing a complaint decision you must submit your original pink copies of your Inmate Complaint Form and the Complaint Findings Form that you were given.**

**Inmate Complaint OR Reason for Appeal** (Print Legibly)

I am writing this grievance due to the fact I've been cut off for my daily dressing change for a reason I was unaware of. So I was given supplies to do it myself. Since I've been doing it myself I've noticed my wound getting worse. On 2/12/20 a 3x11 shift nurse brought me supplies to change my dressing. I then let her know I've put in a sick call and also let her know it was getting worse. I was then sent to 5B where I seen 2 male nurses. I let them know it was getting worse and the one nurse said he agree to put me back on the list for daily dressing to keep a good look on it. ① The next 2 days luckily I still had left over supplies because no one called for me. Today I had my C/O call up the nurse said they will call me when they get a chance then later that night stated they were to busy. I've had an appointment approved to go to a outside hospital - follow-up which never happened and been approved over a month. This has become very frustrating dealing with these incompetent medical staff here at ACJ. I've wrote numerous grievances that's been approved but yet dealing with the same results.

Inmate Signature: Clayton L. McCray        Today's Date: 2·15·20

White: Staff Copy            Pink: Inmate Copy

## Allegheny County Bureau of Corrections Complaint Officer's Findings Form

Complaint #_16735_    Sub-Category Code: _____    Complaint Category: _____

Date of Complaint: _3/17/2020_

Inmate Name: _Clayton McCray_    _12v_ (print legibly)

DOC #: _169149_

Pod: _3B8F_    Cell #: _119_

### Complaint Disposition (check one)

Valid _✓_    Invalid _____    Inmate released before disposition _____

Your complaint has been reviewed and investigated and the disposition of the complaint is listed above.

Below are my findings from the investigation of your complaint. If you refuse to sign your name and/or date this document you will forfeit your right to appeal this disposition. If you are dissatisfied with the disposition of the complaint you have five days after receipt of this notice to appeal to the Warden or designee in writing using an Inmate Appeal Form only if you signed and dated this document.

Findings:

_you have been receiving regular wound care since 3/18_

Staff Name: _Nichole Froehlich_ (print)    Staff Title: _Admin_ (print)

Staff Signature: _____    Date: _3/25/2020_

Inmate Signature: _C. M_    Date: _4-2-20_

White: Staff Copy    Pink: Inmate Copy

## Allegheny County Bureau of Corrections Inmate Complaint/Appeal Form

Complaint or Appeal # _____ (Staff Only)     Sub-category Code: _____ (Staff Only)     Released: _____ (Staff Only)

**To: Grievance Officer**

Date of Complaint: 3·17·20

Inmate Name: Clayton L. McCray _____ (Print Legibly)

DOC #: 169149

Pod: 3B     Cell #: 119

**Complaint Shift (check _one_ shift)**

7x3 _____     3x11 ✓     11x7 _____

**Complaint Category (circle _one_ category OR write the complaint # decision you are appealing)**

| | | | | |
|---|---|---|---|---|
| Inmate Account | Food Service | Mailroom | Maintenance | Records |
| Mental Health | (Medical) | Staff Conduct | Jail Procedure | Property |
| Other: _____ (print) | | Appealing Complaint # _____ | | |

**Inmate Instructions:** Complete the above sections then briefly state your complaint or reason for appealing a complaint decision below on one form only. Sign your name at the bottom of this form then place the white copy in the housing unit complaint box located at the Officer's desk. **Matters dealing with institutional disciplinary procedures will be dealt with by the Program Review Committee (P.R.C.) and cannot be grieved. Inappropriately filed complaints or a submission that concerns a non-grievance issue will be returned to you and not processed. This includes but is not limited to submissions on multiple forms, checking more than one shift, circling more than one category, not printing your name legibly, not signing your name, filing an appeal before your complaint has been answered, and/or filing an appeal five or more days after a decision was rendered.** If you are appealing a complaint decision you must submit your original pink copies of your Inmate Complaint Form and the Complaint Findings Form that you were given.

**Inmate Complaint OR Reason for Appeal** (Print Legibly)

Basically it's been 2 days now of my ulcer wound not being changed. C.O. Englert supposedly called 3/16/20 3x11 shift, he never gave me a response to what happened. The next morning I noticed my foot was bleeding. I let the 7-3 C.O. working know he said he called and they'll get me the next shift. This occured around 8:00 A.M. So I waited til next shift I then informed him once informed he once again didn't let me know what happened if he called me anything. So I hit my emergency button to see if he can call medical he replied "I'm on there's schedule. I'm on there's" it I hit my button again he's gone to ignore me." I'm hoping that these issues can be properly established so I'm able to receive proper prescribed medical treatment. And also not facing cruel & unusual punishment for whatever reason from staff for trying to get a medical issue handled. Thank you for your time and effort.

Inmate Signature: Clayton L. McCray _____     Today's Date: 3·17·20

White: Staff Copy          Pink: Inmate Copy

APPENDIX - PAGE 166

## Allegheny County Bureau of Corrections Complaint Officer's Findings Form

16926 •

Complaint # 16925          Sub-Category Code: _____          Complaint Category: _____

Date of Complaint: 3-31-20

Inmate Name: Clayton McCray (print legibly)          103

DOC #: 169149

Pod: 9E/8G          Cell #: M4-1

**Complaint Disposition (check one)**

Valid  X _____          Invalid _____          Inmate released before disposition _____

Your complaint has been reviewed and investigated and the disposition of the complaint is listed above. Below are my findings from the investigation of your complaint. If you refuse to sign your name and/or date this document you will forfeit your right to appeal this disposition. If you are dissatisfied with the disposition of the complaint you have five days after receipt of this notice to appeal to the Warden or designee in writing using an Inmate Appeal Form only if you signed and dated this document.

Findings: The wound has been evaluated multiple times since this complaint and orders changed. If no improvement within the week. Pt has also been housed on SB for closer monitoring & interventions for wound on foot

Staff Name: Jennifer Vensel RN ADON (print)     Staff Title: ADON (print)

Staff Signature: _____ RN ADON          Date: 5-28-2020

Inmate Signature: Refused  14:20  5/29/30          Date: _____

White: Staff Copy          Pink: Inmate Copy

APPENDIX - PAGE 167

## Allegheny County Bureau of Corrections Inmate Complaint/Appeal Form

Complaint or Appeal # _____ (Staff Only)    Sub-category Code: _____ (Staff Only)    Released: _____ (Staff Only)

**To: Grievance Officer**

Date of Complaint: 3-26-20

Inmate Name: Clayton L. McCray    (Print Legibly)

DOC #: 169149

Pod: 8E    Cell #: 120

**Complaint Shift** (check *one* shift)

7x3 ✓    3x11 _____    11x7 _____

**Complaint Category** (circle *one* category OR write the complaint # decision you are appealing)

Inmate Account    Food Service    Mailroom    Maintenance    Records

Mental Health    (Medical)    Staff Conduct    Jail Procedure    Property

Other: _____ (print)    Appealing Complaint # _____

**Inmate Instructions:** Complete the above sections then briefly state your complaint or reason for appealing a complaint decision below on one form only. Sign your name at the bottom of this form then place the white copy in the housing unit complaint box located at the Officer's desk. **Matters dealing with institutional disciplinary procedures will be dealt with by the Program Review Committee (P.R.C.) and cannot be grieved. Inappropriately filed complaints or a submission that concerns a non-grievance issue will be returned to you and not processed. This includes but is not limited to submissions on multiple forms, checking more than one shift, circling more than one category, not printing your name legibly, not signing your name, filing an appeal before your complaint has been answered, and/or filing an appeal five or more days after a decision was rendered. If you are appealing a complaint decision you must submit your original pink copies of your Inmate Complaint Form and the Complaint Findings Form that you were given.**

**Inmate Complaint OR Reason for Appeal** (Print Legibly)

I am writing this complaint due to the fact that I am being neglected over and over again by the ACJ medical department. Due to the fact I have a ulcer (hole) on the bottom of my right foot that is ordered to be changed daily. This has been an ongoing problem to whereas I've caught numerous infections for not being properly treated. Now I'm housed in the RHU for however long where I'm not able to wash my wound daily before my dressing change, wearing hard sandals instead of shoes with ordered insoles for my wound and my AFO brace. I spoke with P.A Sarah Kielek about these issues 3/26/20 letting her know this is very unsanitary for me due to these being dried up blood all over my floor. That no nurse came to change my wound on 3/25 and 3/26. It's going to be difficult for me to be treated on the daily basis in the RHU for numerous reasons and also for my wound to properly heal without proper medical treatment. I am requesting to be housed in the medical housing unit until my wound is healed. Also spoke with Warden Harper about these continuous issues. 3/27/20

Inmate Signature: Clayton L. McCray

White: Staff Copy    Pink: Inmate Copy    Today's Date: 3-27-20

**Allegheny County Bureau of Corrections Complaint Officer's Findings Form**

16926
Complaint # 16925          Sub-Category Code: _____          Complaint Category: _____

Date of Complaint: 3-31-20                                                  103
Inmate Name: Clayton McCray. (print legibly)
DOC #: 169149
Pod: 9E 6B          Cell #: M4-1

**Complaint Disposition (check one)**

Valid  X               Invalid _____          Inmate released before disposition _____

Your complaint has been reviewed and investigated and the disposition of the complaint is listed above.
Below are my findings from the investigation of your complaint. If you refuse to sign your name and/or date this
document you will forfeit your right to appeal this disposition. If you are dissatisfied with the disposition of the
complaint you have five days after receipt of this notice to appeal to the Warden or designee in writing using an
Inmate Appeal Form only if you signed and dated this document.

Findings: The wound has Been evaluated multiple times
Since this complaint and orders changed if no improvemen.
within the week. Pt has also. Been movedd on SB for
closer monitoring & interventions for wound on foot

Staff Name: Jennifer Vensel RN  ADON (print) Staff Title: ADON (print)
Staff Signature: _____ RN ADON     Date: S28-2020

Inmate Signature: Refused  14:20  5/29/30     Date: _____

White: Staff Copy          Pink: Inmate Copy

## Allegheny County Bureau of Corrections Inmate Complaint/Appeal Form

Complaint or Appeal # _____ (Staff Only)    Sub-category Code: _____ (Staff Only)    Released: _____ (Staff Only)

To: Grievance Officer

Date of Complaint: 3·31·20

Inmate Name: Clayton L McCray _____ (Print Legibly)

DOC #: 169149

Pod: 8E    Cell #: 120

**Complaint Shift (check _one_ shift)**

7x3 ✓    3x11 _____    11x7 _____

**Complaint Category (circle _one_ category OR write the complaint # decision you are appealing)**

Inmate Account    Food Service    Mailroom    Maintenance    Records

Mental Health    (Medical)    Staff Conduct    Jail Procedure    Property

Other: _____ (print)    Appealing Complaint # _____

**Inmate Instructions:** Complete the above sections then briefly state your complaint or reason for appealing a complaint decision below on one form only. Sign your name at the bottom of this form then place the white copy in the housing unit complaint box located at the Officer's desk. **Matters dealing with institutional disciplinary procedures will be dealt with by the Program Review Committee (P.R.C.) and cannot be grieved. Inappropriately filed complaints or a submission that concerns a non-grievance issue will be returned to you and not processed. This includes but is not limited to submissions on multiple forms, checking more than one shift, circling more than one category, not printing your name legibly, not signing your name, filing an appeal before your complaint has been answered, and/or filing an appeal five or more days after a decision was rendered. If you are appealing a complaint decision you must submit your original pink copies of your Inmate Complaint Form and the Complaint Findings Form that you were given.**

**Inmate Complaint OR Reason for Appeal** (Print Legibly)

I've exhausted all remedies, I've put numerous complaints in about the same issue and seem to receive the same results. I caught numerous infections, my wound has gotten worse. My leg is now swollen, I've been in extreme pain all of a sudden. I've been through sick call processes, I've seen P.A.'s, DR's, Capt's and other staff who are aware of the incompetent medical staff. This has become very frustrating. I am living in a filthy housing unit with a cell that has yet to be cleaned. Due to all the above I am being neglected proper medical treatment. This is cruel and unusual punishment. Now I am left with no choice but to get my family and civil attorney involved, I've tried everything and received the same results. Was not seen at all 3/30 nor 3/31/20.

Inmate Signature: Clayton L. McCray

White: Staff Copy    Pink: Inmate Copy    Today's Date: 3·31·20

## Allegheny County Bureau of Corrections Complaint Officer's Findings Form

Complaint # 16986          Sub-Category Code: _____          Complaint Category: _____

Date of Complaint: 3-31-2020

Inmate Name: Clayton McCray          (print legibly)

DOC #: 169149

Pod: 3E          Cell #: 106

Appealing Complaint #
16925, 16926, 16986

Complaint Disposition (check one)

Valid _____          Invalid ✓          Inmate released before disposition _____

Your complaint has been reviewed and investigated and the disposition of the complaint is listed above. Below are my findings from the investigation of your complaint. If you refuse to sign your name and/or date this document you will forfeit your right to appeal this disposition. If you are dissatisfied with the disposition of the complaint you have five days after receipt of this notice to appeal to the Warden or designee in writing using an Inmate Appeal Form only if you signed and dated this document.

Findings: Wound care has been completed. You have been seen by a provider and wound care has been re-evaluated. You have received multiple interventions and medications

Staff Name: Nichole Froehlich          (print)   Staff Title: Admin          (print)

Staff Signature: _____          Date: 4/30/2020

Inmate Signature: Clayton L. McCray          Date: 5-1-20

White: Staff Copy          Pink: Inmate Copy

APPENDIX - PAGE 171

## Allegheny County Bureau of Corrections Inmate Complaint/Appeal Form

Complaint or Appeal # _____ (Staff Only)       Sub-category Code: _____ (Staff Only)       Released: _____ (Staff Only)

**To: Grievance Officer**

Date of Complaint: _3·31·20_

Inmate Name: _Clayton L. McCray_ _____ (Print Legibly)

DOC #: _169149_ _____

Pod: _3E_ ____       Cell #: _106_ ____

Complaint Shift (check **one** shift)

7x3 _✓_ ____       3x11 _____       11x7 _____

Complaint Category (circle **one** category OR write the complaint # decision you are appealing)

Inmate Account       Food Service       Mailroom       Maintenance       Records

Mental Health       (Medical)       Staff Conduct       Jail Procedure       Property

Other: _____ (print)       Appealing Complaint # _16925/16926_

**Inmate Instructions:** Complete the above sections then briefly state your complaint or reason for appealing a complaint decision below on one form only. Sign your name at the bottom of this form then place the white copy in the housing unit complaint box located at the Officer's desk. Matters dealing with institutional disciplinary procedures will be dealt with by the Program Review Committee (P.R.C.) and cannot be grieved. Inappropriately filed complaints or a submission that concerns a non-grievance issue will be returned to you and not processed. This includes but is not limited to submissions on multiple forms, checking more than one shift, circling more than one category, not printing your name legibly, not signing your name, filing an appeal before your complaint has been answered, and/or filing an appeal five or more days after a decision was rendered. If you are appealing a complaint decision you must submit your original pink copies of your Inmate Complaint Form and the Complaint Findings Form that you were given.

**Inmate Complaint OR Reason for Appeal** (Print Legibly)

I am appealing this complaint due to the fact if the medical records or the log book on 8E is checked it will show that I did not receive wound care on these dates. Nickole Froehlich is going as far to make up a lie about me receiving wound care when I wasn't. Instead of taking accountability and try to fix the problem she's lying and once again the proof is in the log book and SHOULD be in the medical records. This is causing me stress due to the fact I am not able to do daily activities and limited activities. I've also fell in my cell from being in severe pain from my wound. I'm very depressed due to me trying to get the proper treatment from the medical department and ending with the same results. I'm seeking money compensation for all my issues stated above 1,000,000. I'm asking that camera footage be held on 8E on 3/30 and 3/31/20 to show that I never received wound care.

Inmate Signature: _Clayton L. McCray_ _____       Today's Date: _4·19·20_

**White: Staff Copy**       **Pink: Inmate Copy**

## Allegheny County Bureau of Corrections Complaint Officer's Findings Form

Complaint #: 17649  
17652  
17653  
17648  
Sub-Category Code: _____    Complaint Category: _____

Date of Complaint: 6/1/2020

Inmate Name: Clayton McCray _____ (print legibly)

DOC #: 169149

Pod: 5B      Cell #: M4

### Complaint Disposition (check one)

Valid _____        Invalid  X        Inmate released before disposition _____

---

Your complaint has been reviewed and investigated and the disposition of the complaint is listed above.

Below are my findings from the investigation of your complaint. If you refuse to sign your name and/or date this document you will forfeit your right to appeal this disposition. If you are dissatisfied with the disposition of the complaint you have five days after receipt of this notice to appeal to the Warden or designee in writing using an Inmate Appeal Form only if you signed and dated this document.

---

Findings:

you have been moved to 5B as of 6/30/2020.
And is now getting daily wound care

Staff Name: Nichole Froehlich _____ (print)    Staff Title: Admin _____ (print)

Staff Signature: _____        Date: 7/1/2020

Inmate Signature: C, M _____        Date: 7·1·2020

White: Staff Copy        Pink: Inmate Copy

APPENDIX - PAGE 173

## Allegheny County Bureau of Corrections Inmate Complaint/Appeal Form

Complaint or Appeal # _____ (Staff Only)    Sub-category Code: _____ (Staff Only)    Released: _____ (Staff Only)

**To: Grievance Officer**

**Date of Complaint:** 6.19.20

**Inmate Name:** Clayton L. McCray _____ (Print Legibly)

**DOC #:** 169149

**Pod:** 3B    **Cell #:** 128

**Complaint Shift** (check *one* shift)

7x3 _____    3x11 _____    11x7 ✓_____

**Complaint Category** (circle *one* category OR write the complaint # decision you are appealing)

Inmate Account    Food Service    Mailroom    Maintenance    Records

Mental Health    (Medical)    Staff Conduct    Jail Procedure    Property

Other: _____ (print)    Appealing Complaint # _____

**Inmate Instructions:** Complete the above sections then briefly state your complaint or reason for appealing a complaint decision below on one form only. Sign your name at the bottom of this form then place the white copy in the housing unit complaint box located at the Officer's desk. **Matters dealing with institutional disciplinary procedures will be dealt with by the Program Review Committee (P.R.C.) and cannot be grieved. Inappropriately filed complaints or a submission that concerns a non-grievance issue will be returned to you and not processed. This includes but is not limited to submissions on multiple forms, checking more than one shift, circling more than one category, not printing your name legibly, not signing your name, filing an appeal before your complaint has been answered, and/or filing an appeal five or more days after a decision was rendered. If you are appealing a complaint decision you must submit your original pink copies of your Inmate Complaint Form and the Complaint Findings Form that you were given.**

**Inmate Complaint OR Reason for Appeal** (Print Legibly)

I spoke w/ PA Maria this morning while she was on 8E about me just getting out the shower with my wound open and not yet receiving wound care. She said "yes we know you, we will be back up here today to do your wound care." I never received wound care up until past midnight on 3B cell 128. Due to the fact I got up to use the restroom and noticed blood stains on my floor and let C.O. Kelly Know to call medical to make them aware of the situation. I 100% believe was the only reason I received medical treatment (daily wound care). C.O. Kelly seen the blood on my floor and after nurse Colette, got done doing my wound care she cleaned the blood up for me. This is totally unacceptable and NO reason why I am not receiving my daily wound care, or having to be in bad situations like such to get treatment. I have nurse's saying to me I need to make sure I take care of it before I lose my foot. There is nothing I can do but hope and pray the medical dept. do what I need done. I am not allowed to walk upstairs to receive treatment everyday I have to wait until medical call.

**Inmate Signature:** Clayton L. McCray    **Today's Date:** 6.20.20

White: Staff Copy    Pink: Inmate Copy

## Allegheny County Bureau of Corrections Complaint Officer's Findings Form

Complaint #17649 17652 17653 17648

Sub-Category Code: _____     Complaint Category: _____

Date of Complaint: 6/1/2020

Inmate Name: Clayton McCray     (print legibly)

DOC #: 169149

Pod: 5B     Cell #: M4

### Complaint Disposition (check one)

Valid _____     Invalid __X__     Inmate released before disposition _____

___

Your complaint has been reviewed and investigated and the disposition of the complaint is listed above. Below are my findings from the investigation of your complaint. If you refuse to sign your name and/or date this document you will forfeit your right to appeal this disposition. If you are dissatisfied with the disposition of the complaint you have five days after receipt of this notice to appeal to the Warden or designee in writing using an Inmate Appeal Form only if you signed and dated this document.

Findings:

You have been moved to 5B as of 6/30/2020. And is now getting daily wound care

Staff Name: Nichole Froehlich (print)     Staff Title: Admin (print)

Staff Signature: _____     Date: 7/1/2020

Inmate Signature: C. M     Date: 7/1/2020

White: Staff Copy     Pink: Inmate Copy

## Allegheny County Bureau of Corrections Inmate Complaint/Appeal Form

Complaint or Appeal # _____ (Staff Only)     Sub-category Code: _____ (Staff Only)     Released: _____ (Staff Only)

**To: Grievance Officer**

Date of Complaint: 6·18·20

Inmate Name: Clayton L. McCray                              **(Print Legibly)**

DOC #: 169149

Pod: 8E          Cell #: 103

**Complaint Shift (check _one_ shift)**

7x3 ✓          3x11 _____          11x7 _____

**Complaint Category (circle _one_ category OR write the complaint # decision you are appealing)**

Inmate Account      Food Service          Mailroom          Maintenance          Records

Mental Health      (Medical)          Staff Conduct      Jail Procedure      Property

Other: _____ (print)          Appealing Complaint # _____

**Inmate Instructions:** Complete the above sections then briefly state your complaint or reason for appealing a complaint decision below on one form only. Sign your name at the bottom of this form then place the white copy in the housing unit complaint box located at the Officer's desk. **Matters dealing with institutional disciplinary procedures will be dealt with by the Program Review Committee (P.R.C.) and cannot be grieved. Inappropriately filed complaints or a submission that concerns a non-grievance issue will be returned to you and not processed. This includes but is not limited to submissions on multiple forms, checking more than one shift, circling more than one category, not printing your name legibly, not signing your name, filing an appeal before your complaint has been answered, and/or filing an appeal five or more days after a decision was rendered. If you are appealing a complaint decision you must submit your original pink copies of your Inmate Complaint Form and the Complaint Findings Form that you were given.**

**Inmate Complaint OR Reason for Appeal (Print Legibly)**

I had a video conference with Dr. Taft from AGH 6.16.20 8:00 am & Dr. Parks. We spoke about my pressure ulcer on my right heel. Dr. Taft's main concern was that medical change whatever there applying to my ulcer and 100% NO weight bearing. Dr. Parks said after the conf. that she would have a meeting with Dr. ___ because she felt the best thing for me would be housed in the Infirmary. 6·18·20 about 1:30 PM Dr. Parks came to 8E to do my woundcare we spoke briefly about my plan for being released from the RHU which was suppose to happen 6·17·20. She said I've been denied to go to the Infirmary for treatment instead you will be housed on a Regular unit in a handicap cell. I let her know I don't think that's a good plan due to the fact I will have to stand in the shower. She said I agree. There are many other issues that can be raised to the reason why I need to be housed on a medical unit until I'm properly Healed and ready for General Population. I'm hoping something can be resolved due to the fact I was just being housed in the Infirmary by Dr. Parks before coming to 8E. Dr. Parks said we feel as though you need to be housed in the Inf. so we can keep a letter eye on you. When I am on Regular units I have reas of several past grievances of me being neglected wound care. Due to everything stated above I'm hoping issues can be discussed and the right decision can be made.

Inmate Signature: Clayton L. McCray                    Today's Date: 6·19·20

White: Staff Copy          Pink: Inmate Copy

## Allegheny County Bureau of Corrections Complaint Officer's Findings Form

Complaint #: 17649
17652
17653
17648

Sub-Category Code: _____

Complaint Category: _____

Date of Complaint: 6/1/2020

Inmate Name: Clayton McCray _____ (print legibly)

DOC #: 169149

Pod: 5B    Cell #: M4

### Complaint Disposition (check one)

Valid _____    Invalid X _____    Inmate released before disposition _____

Your complaint has been reviewed and investigated and the disposition of the complaint is listed above.
Below are my findings from the investigation of your complaint. If you refuse to sign your name and/or date this
document you will forfeit your right to appeal this disposition. If you are dissatisfied with the disposition of the
complaint you have five days after receipt of this notice to appeal to the Warden or designee in writing using an
Inmate Appeal Form only if you signed and dated this document.

Findings:

You have been moved to 5B as of 6/30/2020.
And is now getting daily wound care

Staff Name: Nichole Froehlich (print)    Staff Title: Admin (print)

Staff Signature: _____    Date: 7/1/2020

Inmate Signature: C. M    Date: 7/1/2020

White: Staff Copy    Pink: Inmate Copy

APPENDIX - PAGE 177

## Allegheny County Bureau of Corrections Inmate Complaint/Appeal Form

Complaint or Appeal # _____ (Staff Only)    Sub-category Code: _____ (Staff Only)    Released: _____ (Staff Only)

**To: Grievance Officer**

**Date of Complaint:** 6·1·20

**Inmate Name:** Clayton L. McCray                    (Print Legibly)

**DOC #:** 169149

**Pod:** 8E        **Cell #:** 103

**Complaint Shift** (check _one_ shift)

7x3 ✓          3x11 _____          11x7 _____

**Complaint Category** (circle _one_ category OR write the complaint # decision you are appealing)

| Inmate Account | Food Service | Mailroom | Maintenance | Records |
| Mental Health | (Medical) | Staff Conduct | Jail Procedure | Property |

Other: _____ (print)     Appealing Complaint # _____

**Inmate Instructions:** Complete the above sections then briefly state your complaint or reason for appealing a complaint decision below on one form only.  Sign your name at the bottom of this form then place the white copy in the housing unit complaint box located at the Officer's desk.  **Matters dealing with institutional disciplinary procedures will be dealt with by the Program Review Committee (P.R.C.) and cannot be grieved.  Inappropriately filed complaints or a submission that concerns a non-grievance issue will be returned to you and not processed.  This includes but is not limited to submissions on multiple forms, checking more than one shift, circling more than one category, not printing your name legibly, not signing your name, filing an appeal before your complaint has been answered, and/or filing an appeal five or more days after a decision was rendered.  If you are appealing a complaint decision you must submit your original pink copies of your Inmate Complaint Form and the Complaint Findings Form that you were given.**

**Inmate Complaint OR Reason for Appeal** (Print Legibly)

I seen Dr S and Dr Parks today for my wound care I let them know about me not receiving any wound care the last 3 days. I feel like I have a fever, my cell conditions that I've been throwing up and most importantly my legs been extremely painful. Dr Parks said nothing she did Dr S there main concern was getting me to sign a paper for a phone conference for tomorrow with a lady from AGH about my ulcer on my right heel. They did not address none of my issues at the time. I let Dr Parks know that I understand I am on a nice bit of pain meds and wouldn't like an increase rather I would like to be checked for infection. It's been over a week that neither of these Dr's tryed to get me checked. CRNP Jodi has tryed her best when I see her and speak of my issues. Now I'm receiving antibiotics for something that has not been checked. In my medical records it will show that I have reactions to different antibiotics. And now medical is just trying medications without properly checking me out

**Inmate Signature:** Clayton L. McCray            **Today's Date:** 6·9·20

Never checked my vitals are anything.

White: Staff Copy        Pink: Inmate Copy

## Allegheny County Bureau of Corrections Complaint Officer's Findings Form

Complaint #: 17649
17652
17653
17648

Sub-Category Code: _____

Complaint Category: _____

Date of Complaint: 6/1/2020

Inmate Name: Clayton McCray    (print legibly)

DOC #: 169149

Pod: 5B    Cell #: M4

### Complaint Disposition (check one)

Valid _____    Invalid ✗    Inmate released before disposition _____

Your complaint has been reviewed and investigated and the disposition of the complaint is listed above. Below are my findings from the investigation of your complaint. If you refuse to sign your name and/or date this document you will forfeit your right to appeal this disposition. If you are dissatisfied with the disposition of the complaint you have five days after receipt of this notice to appeal to the Warden or designee in writing using an Inmate Appeal Form only if you signed and dated this document.

Findings:

You have been moved to 5B as of 6/30/2020. And is now getting daily wound care

Staff Name: Nichole Froehlich    (print)    Staff Title: Admin    (print)

Staff Signature: _____    Date: 7/1/2020

Inmate Signature: C. M    Date: 7/1/2020

White: Staff Copy    Pink: Inmate Copy

## Allegheny County Bureau of Corrections Inmate Complaint/Appeal Form

Complaint or Appeal # _____ (Staff Only)    Sub-category Code: _____ (Staff Only)    Released: _____ (Staff Only)

**To: Grievance Officer**

**Date of Complaint:** 5·31·20

**Inmate Name:** Clayton L. McCray _____ (Print Legibly)

**DOC #:** 169149

**Pod:** 8E    **Cell #:** 103

**Complaint Shift (check _one_ shift)**

7x3 _____    3x11 ✓ _____    11x7 _____

**Complaint Category (circle _one_ category OR write the complaint # decision you are appealing)**

| | | | | |
|---|---|---|---|---|
| Inmate Account | Food Service | Mailroom | Maintenance | Records |
| Mental Health | (Medical) | Staff Conduct | Jail Procedure | Property |
| Other: _____ (print) | | Appealing Complaint # _____ | | |

**Inmate Instructions:** Complete the above sections then briefly state your complaint or reason for appealing a complaint decision below on one form only. Sign your name at the bottom of this form then place the white copy in the housing unit complaint box located at the Officer's desk. **Matters dealing with institutional disciplinary procedures will be dealt with by the Program Review Committee (P.R.C.) and cannot be grieved. Inappropriately filed complaints or a submission that concerns a non-grievance issue will be returned to you and not processed. This includes but is not limited to submissions on multiple forms, checking more than one shift, circling more than one category, not printing your name legibly, not signing your name, filing an appeal before your complaint has been answered, and/or filing an appeal five or more days after a decision was rendered. If you are appealing a complaint decision you must submit your original pink copies of your Inmate Complaint Form and the Complaint Findings Form that you were given.**

**Inmate Complaint OR Reason for Appeal** (Print Legibly)

I came to the RHU from 5B on 5·29·20. I'm supposed to receive daily wound care, but I did not the morning I was on 5B nor that day on 8E nor the next day 5·30·20 on 8E. On 6·1·20 during night pill line Holly came and I let her know that I haven't had my foot done in the last 2 days. She came back with supplies for me to do it myself. I let her know this cell I'm in is filthy, she replied well I did my best and I still have meds to pass. So I was forced to do it myself without any gloves. Also the day I came here 8E 5·29·20 I was prescribed a pro-antibiotic /whatever/ and I asked why. The nurse replied it's to make sure /you don't get an infection. So I took it and I instantly got sick sweating and throwing up. Due to the RHU not having grievances/this is the reason for the delay. Please save camera footage! I Appreciate your time to investigate and stop this ongoing treatment I'm being neglected.

**Inmate Signature:** Clayton L. McCray    **Today's Date:** 6·9·20

White: Staff Copy    Pink: Inmate Copy

## Allegheny County Bureau of Corrections Complaint Officer's Findings Form

Complaint # 18385          Sub-Category Code: _____          Complaint Category: _____

Date of Complaint: 9-27-20

Inmate Name: Clayton McCray (print legibly)

DOC #: 169149

Pod: 5B          Cell #: M4

### Complaint Disposition (check one)

Valid _____          Invalid _____          Inmate released before disposition  X

Your complaint has been reviewed and investigated and the disposition of the complaint is listed above. Below are my findings from the investigation of your complaint. If you refuse to sign your name and/or date this document you will forfeit your right to appeal this disposition. If you are dissatisfied with the disposition of the complaint you have five days after receipt of this notice to appeal to the Warden or designee in writing using an Inmate Appeal Form only if you signed and dated this document.

Findings: Released

Staff Name: Radaci (print)     Staff Title: Sergeant (print)

Staff Signature: Rude          Date: 10-10-20

Inmate Signature: Released          Date: 10-9-20

White: Staff Copy          Pink: Inmate Copy

## Allegheny County Bureau of Corrections Inmate Complaint/Appeal Form

Complaint or Appeal # _____ (Staff Only)    Sub-category Code: _____ (Staff Only)    Released: _____ (Staff Only)

To: Grievance Officer

Date of Complaint: 9·27·20

Inmate Name: Clayton L. McCray _____ (Print Legibly)

DOC #: 169149

Pod: 5B    Cell #: M4

Complaint Shift (check *one* shift)

7x3 ✓    3x11 _____    11x7 _____

Complaint Category (circle *one* category OR write the complaint # decision you are appealing)

| Inmate Account | Food Service | Mailroom | Maintenance | Records |
| Mental Health | Medical | (Staff Conduct) | Jail Procedure | Property |

Other: _____ (print)    Appealing Complaint # _____

Inmate Instructions: Complete the above sections then briefly state your complaint or reason for appealing a complaint decision below on one form only. Sign your name at the bottom of this form then place the white copy in the housing unit complaint box located at the Officer's desk. Matters dealing with institutional disciplinary procedures will be dealt with by the Program Review Committee (P.R.C.) and cannot be grieved. Inappropriately filed complaints or a submission that concerns a non-grievance issue will be returned to you and not processed. This includes but is not limited to submissions on multiple forms, checking more than one shift, circling more than one category, not printing your name legibly, not signing your name, filing an appeal before your complaint has been answered, and/or filing an appeal five or more days after a decision was rendered. If you are appealing a complaint decision you must submit your original pink copies of your Inmate Complaint Form and the Complaint Findings Form that you were given.

Inmate Complaint OR Reason for Appeal (Print Legibly)

I am writing this complaint due to the fact C.O Wilson told C.O Maire that I came out for my rec at 11 after 11. I let them know, rather I let N.O Maire know I never came out of my cell. C.O Wilson then came over the box saying she witnessed me come out for 10 minutes then go back in my cell. She said she was gone to watch the camera. At 11:00 am to 12:00 pm I never stepped out my cell I hit my button to see if I can get my bandage changed & my door opened, I shut my door back immediately never leaving M4. Please check camera footage, because there was a incident the last time C.O Wilson worked this unit with a male officer stopping at my door saying I said "did you say I look like Janotti 10x bigger". I'm hoping this can be prevented future reference. I highly appreciate your time and effort. And the C.O was Ingram who worked when she made that accusation.

Inmate Signature: Clayton L. McCray    Today's Date: 9·27·20

White: Staff Copy    Pink: Inmate Copy

## Allegheny County Bureau of Corrections Complaint Officer's Findings Form

Complaint # 18389          Sub-Category Code: _____          Complaint Category: _____

Date of Complaint: 10-1-20

Inmate Name: Clayton MCCRay          (print legibly)

DOC #: 169149

Pod: 53          Cell #: M4

### Complaint Disposition (check one)

Valid ___✓___          Invalid _____          Inmate released before disposition _____

Your complaint has been reviewed and investigated and the disposition of the complaint is listed above.

Below are my findings from the investigation of your complaint. If you refuse to sign your name and/or date this document you will forfeit your right to appeal this disposition. If you are dissatisfied with the disposition of the complaint you have five days after receipt of this notice to appeal to the Warden or designee in writing using an Inmate Appeal Form only if you signed and dated this document.

Findings:

Mr McCRay it appears that you have major (concerns) regarding a discussion you had with mental health staff being shared with correctional staff. HIPPA does state that privacy of each person is of importance but it really speaks to sharing information outside of the facility. We are considered one covered intity. I would agree that there may be parts of a conversation that is not related to your physical health that doesn't need to be shared but sharing that information would not be violating HIPPA. It is a violation of confidentiality if that has been called upon. I will investigate this with staff

Staff Name: Michael Barfield (print)     Staff Title: MH Director (print)

Staff Signature: Michael Barfield          Date: 10-9-20

Inmate Signature: Refused          Date: _____

White: Staff Copy          Pink: Inmate Copy

APPENDIX - PAGE 183

## Allegheny County Bureau of Corrections Inmate Complaint/Appeal Form

Complaint or Appeal # _____ (Staff Only)     Sub-category Code: _____ (Staff Only)     Released: _____ (Staff Only)

**To: Grievance Officer**

**Date of Complaint:** 10·1·20

**Inmate Name:** Clayton L. McCray     (Print Legibly)

**DOC #:** 169149

**Pod:** 5B     **Cell #:** M4

**Complaint Shift (check _one_ shift)**

7x3 _____      3x11 ✓      11x7 _____

**Complaint Category (circle _one_ category OR write the complaint # decision you are appealing)**

Inmate Account          Food Service          Mailroom          Maintenance          Records

(Mental Health)          Medical          (Staff Conduct)          Jail Procedure          Property

Other: _____ (print)          Appealing Complaint # _____

**Inmate Instructions:** Complete the above sections then briefly state your complaint or reason for appealing a complaint decision below on one form only. Sign your name at the bottom of this form then place the white copy in the housing unit complaint box located at the Officer's desk. **Matters dealing with institutional disciplinary procedures will be dealt with by the Program Review Committee (P.R.C.) and cannot be grieved. Inappropriately filed complaints or a submission that concerns a non-grievance issue will be returned to you and not processed. This includes but is not limited to submissions on multiple forms, checking more than one shift, circling more than one category, not printing your name legibly, not signing your name, filing an appeal before your complaint has been answered, and/or filing an appeal five or more days after a decision was rendered.** If you are appealing a complaint decision you must submit your original pink copies of your Inmate Complaint Form and the Complaint Findings Form that you were given.

**Inmate Complaint OR Reason for Appeal (Print Legibly)**

I spoke with Mental health specialist Vincent around 4.15pm while in my cell (M4) I spoke to him briefly about my depression from just recently having a below the knee amputation. I spoke about mental health issues, while speaking he said the tablets will help out alot, I then let him know that we never received them yet. He left stating he's going to call a Court to see whats going on & he will be sending Michelle (MH) a email so she can see me in the a.m. When I came out for rec. I around 4:30, C.O McClain said to me don't hit your button for mental health to talk to him about tablets, I let C.O McClain know I spoke to MH about what was going on with me, I then asked C.O McClain how does she know what was talked about with me and mental health. She said MH Vincent came in the bubble & said what we discussed. This is not obeying the HIPAA LAW. due to me having the right to confidentiality. Highly appreciate an thorough investigation due to this not being the first incident with MH Vincent!

**Inmate Signature:** Clayton L. McCray

White: Staff Copy          Pink: Inmate Copy

**Today's Date:** 10·1·20

| | |
|---|---|
| **From:** | Ramsey, Diana |
| **To:** | Spieler, Susan; Joseph, Aloysius; Brinkman, Ashley; Williams, Laura |
| **Cc:** | Dillon, Frances |
| **Subject:** | REVISION: Hospital Trips for Tuesday - March 24, 2020 |
| **Date:** | Monday, March 23, 2020 3:37:38 PM |

Dear Colleagues,

Due to the Coronavirus epidemic, McCray, Clayton #11068 will not be going out to his appointment scheduled for Tuesday – March 24th, 2020. His appointment will be schedule again for another date and time.

**Diana Ramsey**
**Administrative Assistant – Scheduler**
**950 Second Avenue**
**Pittsburgh, PA 15219**
**Phone: 412-350-2260**
**Fax:  412-350-0491**
**Email: Diana.Ramsey@AlleghenyCounty.US**

---

**From:** Ramsey, Diana
**Sent:** Monday, March 23, 2020 12:47 PM
**To:** Spieler, Susan <Susan.Spieler@AlleghenyCounty.US>; Joseph, Aloysius <Aloysius.Joseph@AlleghenyCounty.US>; Brinkman, Ashley <Ashley.Brinkman@AlleghenyCounty.US>; Williams, Laura <Laura.Williams@AlleghenyCounty.US>
**Cc:** Dillon, Frances <Frances.Dillon@AlleghenyCounty.US>; Ramsey, Diana <Diana.Ramsey@AlleghenyCounty.US>
**Subject:** RE: Hospital Trips for Tuesday - March 24, 2020

March 23, 2020

Dear Susan,

The list for the inmates scheduled for the **Off-Site** appointments for **Tuesday – March 24, 2020**

are**:**

- **McCray, Clayton  #11068 (Wound Care) (8:45 AM)**



**Diana Ramsey**
**Administrative Assistant – Scheduler**
**950 Second Avenue**
**Pittsburgh, PA 15219**
**Phone: 412-350-2260**
**Fax:  412-350-0491**
**Email: Diana.Ramsey@AlleghenyCounty.US**

Confidentiality Notice: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, forwarding, or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. Any questions should be directed to Allegheny County Service Desk at 412-350-HELP (412-350-4357) or e-mail ServiceDesk@AlleghenyCounty.US

| | |
|---|---|
| **From:** | Williams, Laura |
| **To:** | Kohler, Matthew |
| **Cc:** | # ACJ Administration; Andrascik, Jesse |
| **Subject:** | Re: 5B inmate Clayton McCray 169149 |
| **Date:** | Thursday, May 28, 2020 3:26:44 PM |

He has a wound that needs to be addressed and cared for. Unless he is cleared by the physicians, he needs to remain on 5B.

Please excuse errors as this was sent from an iPhone.

Laura K. Williams, NCC
**Chief Deputy Warden of Healthcare Services**
Allegheny County Jail
950 2nd Avenue
Pittsburgh, PA 15219
Phone: 412-350-2025
Fax: 412-350-2032
Laura.Williams@AlleghenyCounty.US

Confidentiality Notice: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, forwarding, or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. Any questions should be directed to Allegheny County Service Desk at 412-350-HELP (412-350-4357) or e-mail ServiceDesk@AlleghenyCounty.US

> On May 28, 2020, at 3:17 PM, Kohler, Matthew <Matthew.Kohler@alleghenycounty.us> wrote:
>
>
> Sorry he is housed on 5B as of yesterday
>
> ---
>
> **From:** Kohler, Matthew <Matthew.Kohler@AlleghenyCounty.US>
> **Sent:** Thursday, May 28, 2020 3:16 PM
> **To:** Williams, Laura <Laura.Williams@AlleghenyCounty.US>
> **Cc:** # ACJ Administration <ACJAdministration@alleghenycounty.us>; Andrascik, Jesse <Jesse.Andrascik@AlleghenyCounty.US>
> **Subject:** 5B inmate Clayton McCray 169149
>
> Can we Move Inmate McCray to Rhu we found 2 sheets of k-2
>
> Thank You
>
> Major Matthew Kohler

Allegheny County Bureau of Corrections

950 2nd Avenue

Pittsburgh PA 15219

Matthew.Kohler@AlleghenyCounty.US

Office: 412-350-2080

Cell: 412-506-7209

| | |
|---|---|
| **From:** | Williams, Laura |
| **To:** | Kohler, Matthew |
| **Cc:** | # ACJ Administration; Andrascik, Jesse |
| **Subject:** | RE: 5B inmate Clayton McCray 169149 |
| **Date:** | Thursday, May 28, 2020 3:40:00 PM |
| **Attachments:** | image001.png |

Cleared to go.



Laura K. Williams, NCC
**Chief Deputy Warden of Healthcare Services**
Allegheny County Jail
950 2nd Avenue
Pittsburgh, PA 15219
Phone: 412-350-2025
Fax: 412-350-2032
Laura.Williams@AlleghenyCounty.US

Confidentiality Notice: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, forwarding, or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. Any questions should be directed to Allegheny County Service Desk at 412-350-HELP (412-350-4357) or e-mail ServiceDesk@AlleghenyCounty.US.

**From:** Williams, Laura <Laura.Williams@AlleghenyCounty.US>
**Sent:** Thursday, May 28, 2020 3:27 PM
**To:** Kohler, Matthew <Matthew.Kohler@AlleghenyCounty.US>
**Cc:** # ACJ Administration <ACJAdministration@AlleghenyCounty.us>; Andrascik, Jesse <Jesse.Andrascik@AlleghenyCounty.US>
**Subject:** Re: 5B inmate Clayton McCray 169149

He has a wound that needs to be addressed and cared for. Unless he is cleared by the physicians, he needs to remain on 5B.

Please excuse errors as this was sent from an iPhone.

Laura K. Williams, NCC
**Chief Deputy Warden of Healthcare Services**
Allegheny County Jail
950 2nd Avenue
Pittsburgh, PA 15219
Phone: 412-350-2025
Fax: 412-350-2032
Laura.Williams@AlleghenyCounty.US

Confidentiality Notice: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, forwarding, or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. Any questions should be directed to Allegheny County Service Desk at 412-350-HELP (412-350-4357) or e-mail ServiceDesk@AlleghenyCounty.US

On May 28, 2020, at 3:17 PM, Kohler, Matthew <Matthew.Kohler@alleghenycounty.us> wrote:

Sorry he is housed on 5B as of yesterday

**From:** Kohler, Matthew <Matthew.Kohler@AlleghenyCounty.US>
**Sent:** Thursday, May 28, 2020 3:16 PM
**To:** Williams, Laura <Laura.Williams@AlleghenyCounty.US>
**Cc:** # ACJ Administration <ACJAdministration@AlleghenyCounty.us>; Andrascik, Jesse <Jesse.Andrascik@AlleghenyCounty.US>

**Subject:** 5B inmate Clayton McCray 169149

Can we Move Inmate McCray to Rhu we found 2 sheets of k-2

Thank You

Major Matthew Kohler
Allegheny County Bureau of Corrections
950 2nd Avenue
Pittsburgh PA 15219
Matthew.Kohler@AlleghenyCounty.US
Office: 412-350-2080
Cell: 412-506-7209

**From:** Williams, Laura
**To:** Smith, Adam
**Subject:** FW: McCray, Clayton 169149
**Date:** Wednesday, June 3, 2020 1:51:00 PM

Laura K. Williams, NCC
**Chief Deputy Warden of Healthcare Services**
Allegheny County Jail
950 2nd Avenue
Pittsburgh, PA 15219
Phone: 412-350-2025
Fax: 412-350-2032
Laura.Williams@AlleghenyCounty.US

Confidentiality Notice: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, forwarding, or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. Any questions should be directed to Allegheny County Service Desk at 412-350-HELP (412-350-4357) or e-mail ServiceDesk@AlleghenyCounty.US

**From:** Park, Nancy H. <Nancy.Park@AlleghenyCounty.US>
**Sent:** Wednesday, June 3, 2020 1:47 PM
**To:** Williams, Laura <Laura.Williams@AlleghenyCounty.US>
**Cc:** Stechschulte, Donald W. <Donald.StechschulteJr@AlleghenyCounty.US>
**Subject:** McCray, Clayton 169149

This individual has a chronic nonhealing wound on plantar surface of right heel.
We had a Facetime encounter scheduled with Dr Taffe, AGH Wound Care at 8 AM today which did NOT occur due to problems on 8E with another inmate.
I did speak with Dr Taffe this AM and she strongly advises complete non weight bearing status with leg elevation.  Wound care strategies also discussed.
He is unable to have his wheelchair in cell on 8E and even if he did I believe there would  be limits with compliance.
5B housing would be more ideal if this is possible.
Dr S is aware of all of this also.
Please let us know how this should be handled.
Dr Taffe is willing to try Facetime visit again after we try these strategies or even consider a face to face visit.
TY!!

| | |
|---|---|
| **From:** | Williams, Laura |
| **To:** | Smith, Adam; Young Jr, Fred R. |
| **Subject:** | FW: Clayton McCray 169149 |
| **Date:** | Friday, June 12, 2020 8:25:00 AM |

---

Laura K. Williams, NCC

**Chief Deputy Warden of Healthcare Services**

Allegheny County Jail

950 2nd Avenue

Pittsburgh, PA 15219

Phone: 412-350-2025

Fax: 412-350-2032

Laura.Williams@AlleghenyCounty.US

Confidentiality Notice: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, forwarding, or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. Any questions should be directed to Allegheny County Service Desk at 412-350-HELP (412-350-4357) or e-mail ServiceDesk@AlleghenyCounty.US

---

**From:** Park, Nancy H. <Nancy.Park@AlleghenyCounty.US>
**Sent:** Thursday, June 11, 2020 2:07 PM
**To:** # ACJ ADON <ACJADON@AlleghenyCounty.us>; Williams, Laura <Laura.Williams@AlleghenyCounty.US>
**Cc:** Donald Stechschulte (dstechsc@bucknell.edu) <dstechsc@bucknell.edu>
**Subject:** Clayton McCray 169149

I have completed a housing form today stating that when this inmate is ready for transfer OFF of 8E the medical providers ask that he be sent to 5B MHU.
This is to insure non weight bearing as best we can and close monitoring and care of the wound.
This will also give rehab a chance to assist him with using crutches.
We will release him from 5B promptly when able but feel that initial care on 5B is justified.
We are also trying again to set up a video/facetime visit with AGH Wound Care once again, the first visit did not happen due to issues on 8E that day.

TY

**From:** Glogowski, Kevin R.
**To:** Williams, Laura
**Subject:** FW: Transfer
**Date:** Thursday, June 18, 2020 12:02:11 PM

---

**From:** Young Jr, Fred R. <Fred.YoungJr@AlleghenyCounty.US>
**Sent:** Thursday, June 18, 2020 11:56 AM
**To:** Glogowski, Kevin R. <Kevin.Glogowski@AlleghenyCounty.US>
**Cc:** Panaia, Richard J. <Richard.Panaia@AlleghenyCounty.US>
**Subject:** Transfer

Clayton Mccray 169149is done with his time today.

Captain Fred Young
Segregation Captain / Unit Manager Level 6-8
Allegheny County Bureau of Corrections
950 2nd Avenue
Pittsburgh, PA 15219

| | |
|---|---|
| **From:** | Williams, Laura |
| **To:** | Glogowski, Kevin R.; # ACJ ADON; # ACJ-DTX |
| **Cc:** | Donald Stechschulte (dstechsc@bucknell.edu); Park, Nancy H.; Smith, Adam; Young Jr, Fred R. |
| **Subject:** | RE: Transfer |
| **Date:** | Thursday, June 18, 2020 12:11:00 PM |

Please be advised that Dr. Stechschulte indicated that Mr. McCray does NOT need to be transferred to 5B. He will need to be placed in a handicap cell on a housing unit (per his classification).

Laura K. Williams, NCC
**Chief Deputy Warden of Healthcare Services**
Allegheny County Jail
950 2nd Avenue
Pittsburgh, PA 15219
Phone: 412-350-2025
Fax: 412-350-2032
Laura.Williams@AlleghenyCounty.US

Confidentiality Notice: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, forwarding, or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. Any questions should be directed to Allegheny County Service Desk at 412-350-HELP (412-350-4357) or e-mail ServiceDesk@AlleghenyCounty.US

**From:** Glogowski, Kevin R. <Kevin.Glogowski@AlleghenyCounty.US>
**Sent:** Thursday, June 18, 2020 11:57 AM
**To:** # ACJ ADON <ACJADON@AlleghenyCounty.us>
**Subject:** FW: Transfer

Needs temp check.

**From:** Young Jr, Fred R. <Fred.YoungJr@AlleghenyCounty.US>
**Sent:** Thursday, June 18, 2020 11:56 AM
**To:** Glogowski, Kevin R. <Kevin.Glogowski@AlleghenyCounty.US>
**Cc:** Panaia, Richard J. <Richard.Panaia@AlleghenyCounty.US>
**Subject:** Transfer

Clayton Mccray 169149is done with his time today.

# Captain Fred Young
# Segregation Captain / Unit Manager Level 6-8
# Allegheny County Bureau of Corrections
# 950 2nd Avenue

Pittsburgh, PA 15219

**From:**     Olean, Matthew
**To:**       Williams, Laura
**Date:**     Tuesday, June 30, 2020 2:20:54 PM

Hey, the one guy we cleared, should be housed on 5B. Clay Mcray 169149. He is in a wheelchair, and Judy the Medical PA is also recommending that he go to 5B. But she also said, 5B was full.


Just an FYI
Mat Olean

| | |
|---|---|
| **From:** | Williams, Laura |
| **To:** | # ACJ ADON |
| **Cc:** | Austin, Natalie; Del Prete, Louis; Donald Stechschulte (dstechsc@bucknell.edu) |
| **Subject:** | Hospital Return |
| **Date:** | Saturday, August 1, 2020 5:41:00 PM |

Clayton McCray returned from the hospital this evening. X-Rays were obtained and they continue to recommend an MRI, but did not complete. Findings are concurrent with osteomyelitis. He was not started with PICC or vancomycin. Discharged with recommended follow up at the hospital on an outpatient basis.

Laura K. Williams, NCC
**Chief Deputy Warden of Healthcare Services**
Allegheny County Jail
950 2nd Avenue
Pittsburgh, PA 15219
Phone: 412-350-2025
Fax: 412-350-2032
Laura.Williams@AlleghenyCounty.US

Confidentiality Notice: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, forwarding, or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. Any questions should be directed to Allegheny County Service Desk at 412-350-HELP (412-350-4357) or e-mail ServiceDesk@AlleghenyCounty.US

**From:**     Williams, Laura
**To:**       # ACJ ADON
**Subject:**  FW: Inmate medical concern?
**Date:**     Friday, November 1, 2019 2:20:43 PM

Please follow up.

He was given supplies for dressing changes after showers on 10/28/19 by MA Clementine. He is reporting issues.

Laura K. Williams, NCC
Chief Deputy Warden of Healthcare Services
Allegheny County Jail
950 2nd Avenue
Pittsburgh, PA 15219
Phone: 412-350-2025
Fax: 412-350-2032
Laura.Williams@AlleghenyCounty.US

Confidentiality Notice: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, forwarding, or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. Any questions should be directed to Allegheny County Service Desk at 412-350-HELP (412-350-4357) or e-mail ServiceDesk@AlleghenyCounty.US

-----Original Message-----
From: Zetwo, David <David.Zetwo@AlleghenyCounty.US>
Sent: Friday, November 1, 2019 2:18 PM
To: Williams, Laura <Laura.Williams@AlleghenyCounty.US>
Subject: Inmate medical concern?

Inmate McCray 169149 on 6E said his foot dressing is not being changed as he was told it would be

Sent from my iPhone



| | | |
|---|---|---|
| **ALLEGHENY COUNTY BUREAU OF CORRECTIONS** | **APPLICABILITY: All Authorized Personnel** | |
| | **POLICY NUMBER: # 2401** | **EFFECTIVE: 07/25/2017 REVISED: 06/17/2019 REVISED: 3/29/2021 REVIEWED: 3/25/2022 REVISED: 7/11/2023** |
| | **TITLE: Medication Services - Ordering and Administration** **NCCHC: J-D-02** **ACA: 4-ADLF-4C-38** | |
| | **AUTHORIZED BY: ORLANDO L. HARPER** **SIGNATURE:** _Orlando L. Harper_ **AUTHORIZED BY: ASHLEY BRINKMAN, PhD, LPC** **SIGNATURE:** _____ **AUTHORIZED BY: WILLIAM JOHNJULIO, MD** **SIGNATURE:** _____ | |

## POLICY

It is the policy of the Allegheny County Bureau of Corrections Health Care Services Department that all medication ordered will be clinically appropriate and administered in a timely, safe, and sufficient manner.

## PURPOSE

To establish guidelines ensuring the appropriate administration of medication to all patients.

**PROCEDURAL GUIDELINES**

1. Medications are administered or delivered to the patient in a timely and safe manner.

2. Prescription medications are administered or delivered to the patient only upon the order of a physician, dentist, or other legally authorized individuals.

3. A policy identifies the expected time frames from ordering to administration or delivery and a backup plan if the time frames cannot be met.

4. The responsible physician determines prescribing practices in the facility.

5. If the facility maintains a formulary, this should be a documented process for obtaining nonformulary medications in a timely manner.

6. Medications are prescribed only when clinically indicated.

7. Medications are kept under the control of appropriate staff members, except for self-medication programs approved by the facility administrator and responsible physician.

8. Inmates are permitted to carry medications necessary for the emergency management of the condition when ordered by a prescriber.

9. Inmates entering the facility on verifiable prescription medication continue to receive the medication in a timely fashion, or justification for an alternative treatment plan is documented.

10. The ordering prescriber is notified of the impending expiration of an order so that the prescriber can determine whether the drug administration is to be continued or altered.

11. Administration and management of medication services are in accordance with state and federal law and supervision is provided by properly licensed personnel.

**PROCEDURAL DETAILS**

1. All medications are to be administered or delivered to a patient only on the order and directions of a physician, dentist, physician assistant, or certified registered nurse practitioner, or other legally authorized professional.

2. Medications available through purchase on commissary do not require a prescriber order per policy 2408 non-prescription medications.

3. Prescriptive practices of the ACJ are under the direct supervision of the medical director.

4. Medications are prescribed only when clinically indicated for serious medical conditions.

5. Patients entering the facility on verifiable prescription medication continue to receive the medication in a timely fashion, or justification for an alternate treatment plan is documented.

6. During the intake process, the RN/LPN will review the medication that the patient reports taking and verify the medications by:

   a. utilizing the medication verification software to verify medication the patient self-reports.

   b. reviewing the transfer documents and/or hospital records accompanying the patient for transfer returning from an outside facility.

   c. Completing an ROI for any individual at a UPMC facility or outpatient clinic.

   d. calling the outside facility if needed records do not accompany the patient.

   e. calling the local pharmacy for a complete prescription if necessary.

   f. Information collected must include the medication name, dose, frequency, and most recent fill date.

   g. Documentation in the electronic health record (EHR) should include the name and phone number of any contacts made by the RN/LPN.

    h.  In the event, the RN/LPN is not able to confirm medications as described above (e.g., after hours), then documentation should include this specific information, and phone numbers subsequent clinicians should contact.

7.  The RN/LPN will verify the medication by running the SureScripts medication verification report in the EHR.  The report will automatically be placed in the history section of the EHR dashboard.

8.  The RN/LPN will review the SureScripts report with the patient during the intake process and note any medications the patient is currently taking but are not reflected on the SureScripts report.  The RN/LPN will attempt to verify these medications as noted above in item (6d).

9.  The provider will be notified of any verifiable medication, including behavioral health medication from the sources noted above and will continue the medication or prescribe an acceptable alternate medication as indicated based on clinical guidelines and the ACJ prescribing guidelines.

10. A treatment plan is documented to justify the alternative medication. The diagnosis is included in the documentation and placed on the problem list.

**PRESCRIBING MEDICATION**

1.  The healthcare provider will prescribe medication following a review of

    a.  the patient's verified current medication,

    b.  current clinical condition,

    c.  and diagnosis.

2.  The healthcare provider will review the patient's condition and response to the medication at frequent intervals and document

    a.  response,

    b.  side effects and

    c.  to adjust the medication when appropriate.

3. At the time medications are ordered or initiated, the healthcare provider will instruct the patient of

    a. the risks and benefits of the proposed medication,

    b. possible side effects, and

    c. alternative treatments

4. Providers are obligated to review the use of medication that may be medically inappropriate under the following conditions:

    a. Individuals admitted to the facility under the influence of intoxicants or withdrawing from intoxicants. Verified necessary medications will be initiated when a facility health care provider deems it is safe to do so.

    b. Individuals admitted to the facility who are/have been misusing (overusing, underusing, selling, or diverting) medication.

    c. Individuals admitted to the facility taking a medication that does not match their diagnoses will have the medication reviewed by a health care provider and may have the medication modified under the following conditions:

        i. Medication is inconsistent with purported diagnosis.

        ii. A change is noted in the individual's condition.

        iii. Medication has been continued beyond clinical requirements.

        iv. The diagnosis requires additional clarification prior to administration (assessment, lab, etc.)

    d. Individuals who are not compliant with or have duplicative medications:

        i. Medication prescribed several months ago and not recently filled.

        ii. Medication not used in the manner intended.

        iii. Medications that have the same therapeutic effect.

    e. Individuals who are admitted to the jail whose medication cannot be verified and no rationale for the medication is identified.

    f.   Individuals who have been prescribed medication that is not appropriate to the correctional setting (unless significant symptoms and definitive diagnosis are objectively established) including the following:

        i.   If the medication is for sleep and/or sleep disorder.

        ii.   If the medication is for hyperactivity/attention deficit disorder.

        iii.   If the medication exceeds clinical guidelines for use.

        iv.   If the medication is prohibited by law.

        v.   If the medication route of administration is inappropriate for use in the correctional facility.

    g.   Individuals who decline medication while in the facility or who do not report/admit medication use.

5.   Stimulant medications generally are not used for patients in the jail system. Patients presenting with a documented history of attention deficit disorder are referred to mental health staff for behavioral treatment and/or the psychiatric provider who determines the most appropriate treatment.

6.   Anxiolytic medications with addictive properties are utilized sparingly on a time-limited basis and only after the following criteria are considered:

    a.   The patient is being detoxified from benzodiazepines (anxiolytics) with the potential for withdrawal.

    b.   The patient is being detoxified from alcohol with the potential for withdrawal.

    c.   Assuming no current alcohol withdrawal symptoms, the patient does not have a history or current tendency to abuse substances and/or no other indicators (i.e., history of DUIs).

    d.   The patient has a documented history of an anxiety disorder and other treatment approaches have failed.

    e. The patient has an acute anxiety reaction, and the medication is being prescribed for a brief period.

    f. The patient is compliant with other recommended medications.

    g. Anxiolytics may be ordered on an emergent basis for a behavioral health emergency.

7. Medications with sedating side effects, including Trazadone, quetiapine, and chlorpromazine, are avoided when possible and used only when other options have been documented as treatment failures.

8. These medications are not used to promote sleep.

    a. Problems with sleep, common to the jail environment, are generally treated with psycho-education and referred to mental health staff, when appropriate, for ongoing treatment.

    b. The psychiatric provider determines the clinical need for treatment of disturbed sleep. Medication for such treatment, if ordered, is used on a short-term basis.

    c. Sleep aids should be final clinical treatment prescribed after other documented therapies have been exhausted.

9. Medication that creates a physiological dependence may be tapered and discontinued.

10. All controlled substances dispensed from the MedSelect machine will be written as a single dose NOW order by the physician or mid-level provider utilizing the electronic prescribing of controlled substance (EPCS) process.

**VERBAL ORDERING of MEDICATION**

1. Medications will be ordered only by practitioners authorized by state law to prescribe or order medications.

2. All medications are to be entered directly into the EHR by a physician or mid-level provider. Verbal orders are to be given by the provider only in a

medical/psychiatric emergency or the provider is off site. Verbal orders for controlled substances must be approved via the (EPCS) process, as soon as possible, following the issuing of the verbal order.

3. Only RNs or LPNs may receive a telephone or verbal order from a healthcare provider.

4. Verbal or telephone orders may only be implemented after direct contact with the healthcare provider.

5. The registered nurse or licensed practical nurse is to verify all prior medications before obtaining verbal orders for a patient so that they will be able to communicate this information to the practitioner.

6. Upon placing the call to the practitioner, the RN/LPN should be prepared to provide the following patient information as appropriate
   a. What is the situation?
   b. What is the background?
   c. Allergies- Medication
   d. Results of current assessment (RN only), and
   e. Recommendations.

7. The RN/LPN receiving the verbal order will repeat the order to the provider to verify understanding of the order.

8. The nurse will initiate the order in the electronic health record noting that the order is either a verbal or telephone order.

9. The prescriber will sign off the medication order via the electronic record as soon as possible but by the end of the shift if on-site or on the first day back to work if the provider was off-site when the order was given.

10. The physician/midlevel practitioner is responsible to review all verbal orders for accuracy prior to signing off on them.

11. Over the counter (OTC) medications may be ordered and administered by licensed nursing staff per physician-approved nursing protocols without an additional order.

12. Medication orders requested will be delivered based on the following schedule:

    a. medication orders received at the pharmacy during the pharmacy business hours, 7 AM-7 PM Monday -- Friday and 8 AM – 4 PM Saturday and Sunday, will be delivered within 24 hours.

    b. medication orders received by the pharmacy during non-business hours will be delivered within 48 hours,

    c. medication orders entered Sunday – Thursday for medication that is out of stock received during business hours will be delivered with 24 hours; medication orders entered Friday and Saturday for medication that is out of stock received during business hours will be delivered within 72 hours.

    d. emergency orders can be called in at any time and will be delivered as soon as possible 24 hours a day/7days a week by contacting the pharmacy during business hours or the pharmacist on-call during non-business hours.

    e. The ACJ maintains a MedSelect machine at the facility that is stocked by the pharmacy with the most used medications.  The nursing staff may use this machine for medication that is needed sooner than the delivery schedule.

13. The ordering healthcare provider is notified in the EHR of the impending expiration of an order so that the clinician can determine whether the drug order is to be continued or altered.

**ADMINISTRATION OF MEDICATION AND DIRECTLY OBSERVED THERAPY (DOT)**

1. Medication orders properly entered into the electronic health record will automatically enter the order onto the eMAR.

2. All known medication allergies, along with important non-medication allergies (e.g., bee stings), should be included on the eMAR or no known drug allergies should be documented. Food preference should not be entered as allergies.

3. The order being entered into the eMAR must include the name of the medication, strength, route, frequency, and start and stop dates.

4. The medication administration record will contain the following information

    a. name and number of patients,

    b. name and strength of the medication,

    c. directions for use,

    d. date and time of issue,

    e. initials or electronic signature of official issuing medication,

    f. amount of medication used and,

    g. special instructions or limitations on use.

5. Unless the medication order states a specific required administration time, medications will be administered based on the corresponding medication pass assignment AM or PM. Patients requiring specific dosing times schedules will be housed on the medical housing unit.

6. Auto start and stop dates populate based on the date that the medication is entered and the number of days the medication is ordered.

7. Medication administration and documentation will be completed by trained staff only.

8. Licensed nurses have primary responsibility in ensuring that medications are administered safely and understood by the patient. RNs/LPNs must take full responsibility for their actions when administering medications.

9. Licensed nurses must follow the 5 rights when administering medication

    a. Right patient

        i. Check the name on the EMAR and the patient armband

    b. Right medication,

    c. Right dose,

    d. Right route, and

    e. Right time

        i. Check the medication card label and the EMAR

10. RNs/LPNs are responsible for building and maintaining current medication knowledge comprised of the following:

    a. the generic and proprietary names for medications.

    b. drug classifications.

    c. normal drug dosages or dosages ranges.

    d. appropriate route(s) for administering medications.

    e. desired actions of medication(s).

    f. common side effects of medications.

    g. toxic and undesired effects of medications.

    h. contraindications in the uses of medication.

    i. drug incompatibilities with other medications; and,

    j. nursing implications of the administration of medications.

11. When an unfamiliar drug is ordered, a resource should be consulted for review prior to administering the medication.

12. Additional information regarding a specific medication is available by right clicking on the medication in the current medication section of the EHR dashboard and following the prompt "view additional education"

13. When administering medications labeled as hazardous, National Institute for Occupational Safety and Health (NIOSH) recommends the use of personal protective equipment (PPE) in the following circumstances

    a. removing the medication pill labeled hazardous out of the card but not touching it – no PPE necessary.

    b. handling a medication pill labeled hazardous – gloves only with change after handling the drug.

    c. crushing a medication pill labeled hazardous – double chemotherapy gloves, gown, and a mask.

    d. administering injectable, IV or liquid medications labeled hazardous – double chemotherapy gloves, gown, mask, and face shield.

    e. topical medication labeled hazardous – double chemotherapy gloves, gown, eye shield, mask; and

    f. changing gloves after handling any medication labeled as hazardous.

14. Gloves and masks are available on the med cart and gowns and face shields are available in the med room for use when administering hazardous medications that require these additional items.

15. Accurate documentation is a major responsibility for medication administration. All medications administered should be clearly documented on the eMAR at the time of administration.

16. The RN/LPN should always question an incorrect, incomplete, or unclear medication order. The RN/LPN should refuse to accept an order that is considered unsafe and should immediately report the order to the medical director and/or the health services administrator or designee for action.

17. Documentation of administering of medication will not occur until the medication is actually administered to the patient.

18. Documentation of medication will only be done by the person who actually prepared and administered the medication.

19. The computers used for electronic medication administration are to remain on the docking station until the medication administration procedures begin and should be returned to the docking station for syncing.

20. If the RN/LPN, while administering medications, observes or receives a report of a potentially serious health problem, a referral should be made to a healthcare provider.

21. Medication is to be administered from designated areas that are clean, secure, and free from excessive noise and distraction.

22. Thorough hand washing will be performed prior to preparing and administering medications.

23. The RN/LPN administering medication will perform oral cavity checks of each patient administered medications orally. Correction staff will perform oral cavity checks of each patient administered medications orally prior to the patient leaving the medication administration area.

24. Critical and/or essential medications must be administered to patients who present after regular medication pass hours.

25. Should the incident be an isolated event, the patient will be counseled about the importance of reporting on time and any obstacles to attending medication pass are to be identified and resolved.

26. Should the patient be chronically late for medication pass with no known obstacles, the health care staff should inform the custody staff of the pattern.

27. No medication will be preset, including insulin, which adheres to the plastic in the syringe.

28. The RN/LPN administering medication will compare the eMAR and medication label for consistency with the order. If any discrepancies are noted, the RN/LPN will immediately check the order in the health record.

29. If the patient doubts or questions the medication being administered, the RN/LPN will double-check the order to reduce medication errors.

30. If a prescription is unavailable for a patient at the time of administration, the RN/LPN will attempt to locate the medication by contacting the medication room. In the event the medication cannot be located, the RN/LPN will note that the medication was not available on the eMAR and provide the patient's name, DOC and medication to the medication room technician who will follow up with the pharmacy.

31. Medication will never be borrowed from one patient's prescription to give another.

32. At the conclusion of medication administration, the staff will run a missed medication report on the pod to determine which medications were not administered because the patient did not come to medication pass. Correctional staff should locate all patients who failed to receive medications and have them report to the medication administration area on the pod to receive their medication.

33. If the patient refuses medication, the RN/LPN will document the refusal on the eMAR and counsel the patient regarding the need to take prescribed medication and complete a progress note.  Attempts will be made to have the patient sign a refusal. If unable to obtain a written refusal from the patient, the RN/LPN will sign a refusal and obtain a signature from the correctional officer as a witness. If the patient continues to refuse medication the policy for non-adherence/refusal will be followed. Health care staff will also document the refusal on the eMAR.

34. PRN or as needed medication entered on the eMAR will include the dates started and stopped, medication strength, directions, route, dose, times given, and the electronic signature of the staff member administering the medication.

35. STAT/ NOW medications entered on the eMAR should include the date, time, medication, route, and electronic signature of appropriate staff members. STAT doses will also be documented in the progress notes of the electronic health record. All STAT/NOW orders must be given within thirty (30) minutes of the order.

36. One-time only medications entered on to the eMAR should include the date, time, medication, route, and electronic signature of appropriate staff members.

37. All STAT, NOW, and or PRN medications administered should be documented on the eMAR at the time of administration.

38. The RN/LPN will review the supply of medication available for the patient.  The RN/LPN will reorder the medication supply by removing the label on the bubble pack and placing it on the reorder form.  The reorder form will be given to the medication room technician at the end of the medication pass for reordering.

39. All discontinued medications will appear in red on the eMAR.

40. When a medication order is changed, the clinical provider must discontinue the previous order and re-enter the order with the new start and stop dates.

41. If a prescription has expired and not been discontinued, the nurse will notify a provider for evaluation and reorder. Chronic medication should ideally be reordered during chronic care clinic visits.

42. All unused or expired medication(s) are to be disposed of in accordance with local requirements.

**FLOATING OF MEDICATIONS PRIOR TO ADMINISTRATION**

1. Floating solid medications is done at the risk of changing the pharmacokinetics of the formulation. Medications may only be crushed and/or floated if they do not fall into the categories listed below:

   a. Medications designed to be administered as sublingual, buccal, or enteric-coated or that are designed as extended/slow-release formulas should not be crushed or floated

   b. Some medications are inherently corrosive to the oral mucosa and/or upper gastrointestinal tract may be markedly bitter or may be capable of staining the oral mucosa and teeth

2. The healthcare provider must write a specific order of limited duration, for a specific patient for medication that is to be floated. The medications must be prepared individually and administered individually to each patient.

3. All medications administered to patients housed in segregated housing will be crushed of floated unless excluded due to a change the formulation that would result in floating the medication.

4. The licensed nurse should follow the guidelines outlined in item 14 of the administration section of this policy when crushing a medication labeled as hazardous.



| | | |
|---|---|---|
| **ALLEGHENY COUNTY BUREAU OF CORRECTIONS** | **APPLICABILITY:  All Authorized Personnel** | |
| | **POLICY NUMBER:   # 2407** | **EFFECTIVE:  8/5/2016**<br>**REVISED: 8/10/2017**<br>**REVISED: 2/21/2019**<br>**REVISED: 4/16/2020**<br>**REVIEWED: 12/6/2021**<br>**REVIEWED; 8/8/2022**<br>**REVIEWED: 8/28/2023** |
| | **TITLE:  Use of Dietary Supplements** | |
| | **AUTHORIZED BY:  ORLANDO L. HARPER**<br><br>**SIGNATURE:** _Orlando L. Harper_<br>**AUTHORIZED BY:  ASHLEY BRINKMAN, PhD, LPC**<br><br>**SIGNATURE:** _____<br>**AUTHORIZED BY:  WILLIAM K. JOHNJULIO, MD**<br><br>**SIGNATURE:** _____ | |

## POLICY

It is the policy of the Allegheny County Bureau of Corrections Health Care Services Department to provide dietary supplements when necessary to meet the patient's dietary needs based on their clinical condition.

## PURPOSE

To meet the dietary needs of the patient based on current clinical conditions.

Page **1** of **2**

## **PROCEDURAL GUIDELINES**

1. Dietary supplements (ex. BOOST, multi vitamins) will only be prescribed by a physician or mid-level practitioner.
2. Dietary supplements will be prescribed to meet the dietary needs of the patient based on specific clinical criteria.
3. Dietary supplements will be prescribed for a maximum of 15 days at which time the patient will be reevaluated regarding the need for continuation of the order.

## **PROCEDURAL DETAIL**

1. The dietary supplement Boost is prescribed for patients based on the following criteria:
   A. A BMI less than 18
   B. Chemotherapy and recommended by oncology
   C. Liquid diet due to jaw fracture, or difficulty chewing/swallowing
   D. Hunger Strike
   E. Pregnancy if mother has a BMI <18

2. Multi vitamins are prescribed for patients based on the following criteria:
   A. Pregnancy
   B. Chronic Alcoholism
   C. Severe debilitation from disease
   D. Medical Diagnosis of hypovitaminosis
   E. Surescripts documentation/continuation

3. The prescriber will include the criteria in the order for the supplement.
4. The prescriber will re-evaluate the patient every 15 days to determine the need to continue the treatment.



| | |
|---|---|
| **ALLEGHENY COUNTY BUREAU OF CORRECTIONS** | **APPLICABILITY:  All Authorized Personnel** |
| | **POLICY NUMBER:   # 2603** / **DATE:   10/31/2016 REVISED: 10/2/2017 REVISED:8/1/2019** |
| | **TITLE:   Personal Durable Medical Equipment and Medical Items** **NCCHC: J-F-1** **ACA: 4- ALDF-4C-35** |
| | **AUTHORIZED BY:  ORLANDO L. HARPER** **SIGNATURE:** _Orlando L. Harper_ **AUTHORIZED BY:  ACHLEY BRINKMAN PhD, LPC** **SIGNATURE:** ___PhD, LPC___ **AUTHORIZED BY:  DONALD STECHSCHULTE Jr., MD** **SIGNATURE:** _____ |

**POLICY:**

It is the policy of the Allegheny County Bureau of Corrections (ACBOC) to provide quality, timely, and medically necessary healthcare to all incarcerated individuals and attempt to procure durable medical equipment or medical items belonging to an incarcerated individual which did not accompany the incarcerated individual to the jail.

**PURPOSE:**

To be fiscally responsible and reduce the cost of purchasing duplicate durable medical equipment for incarcerated individuals.

**DEFINITION:**

**Durable Medical Equipment/Medical Items**

Durable Medical Equipment (DME) is any equipment that provides therapeutic benefits to a patient in need because of certain medical conditions and/or illnesses. Durable Medical Equipment (DME) consists of items which:

- are primarily and customarily used to serve a medical purpose;
- are not useful to a person in the absence of illness, disability, or injury;
- are ordered or prescribed by a licensed practitioner;
- are reusable;
- can stand repeated use, and
- are appropriate for use in the home

The term "durable medical equipment" - DME - includes but is not limited to wheelchairs (manual and electric), hospital beds, traction equipment, canes, crutches, braces, foot inserts, or hand splints, walkers, kidney machines, ventilators, oxygen, monitors, lifts, & nebulizers or other items used to support, or supplement weakened or abnormal joints or limbs.

Medical items could include eyeglasses, contacts, dentures, C-pap's, breast pumps. Medical items and DME are provided when clinically indicated, medically necessary, and are not subject to co-pays.

**Prostheses:**

Devices to replace missing body parts such as limbs, eyes, or heart valves


**PROCEDURAL GUIDELINES**

**NCCHC/ACA**

1. Medical and dental orthoses, prostheses, and other aids to reduce effects of impairment are supplied in a timely manner when the health of the

incarcerated individual would otherwise be adversely affected, as determined by the responsible licensed practitioner. Adaptive devices are provided.

**PROCEDURAL DETAILS:**

1. During the intake assessment process, when the nurse is notified by the incarcerated individual that he/she uses durable medical equipment at home, the nurse will obtain an Authorization for Release of Information (ROI) from the incarcerated individual to contact the person(s) identified who would be able to bring the durable medical equipment to the jail. The nurse will notify the clinic manager, or his/her designee, by email for follow up.

2. At the time of notification, the clinic manager, or his/her designee, will seek medical approval of the equipment via the health care providers.

3. **All durable medical equipment must be deemed medically necessary for entry/ issuance for use in the jail.**

4. If medical approval is given, the provider will write a treatment order for the use of the specific equipment. The order should include the duration of use.

5. Upon approval, the clinic manager or designee will then contact the person(s) identified in the ROI to notify them of the location for the drop off as well as the time of delivery of equipment.

6. The clinic manager will request jail administration for approval two (2) days in advance of delivery, exceptions can be made based on the severity of the need for DME.

7. The healthcare staff assigned by the clinic manager to pick up the equipment or medical items at the visitor's entrance will complete a DME or medical items pick up form which will be completed at the time of the pickup of the equipment. The primary point of contact will be the manager on duty and the correctional staff at the visitor's entrance shall contact x2277.

8. The healthcare staff assigned to pick up the DME or medical Items will scan the completed DME, or medical items form into the patient electronic record and will notify the clinic manager.

9. The clinic manager will ensure that the approved medical equipment is delivered to the incarcerated individual and that a flag is set in the incarcerated individuals electronic health record for assistive device with a comment identifying the specific assistive device being issued.

10. The healthcare provider will schedule follow-up appointments at clinically appropriate intervals to determine if the equipment continues to be medically necessary.

11. If it is determined that the equipment is no longer medically necessary, the provider will discontinue the treatment order and notify the clinic manager.

12. The clinic manager or designee will coordinate with corrections to have the equipment removed from the incarcerated individual and remove the flag from the record. Corrections will cross off the equipment on the incarcerated individual's identification card.

13. All DME or medical items will be searched by correctional personnel for security reasons. Equipment is subject to not being authorized for entrance. No liquid material at any time will be accepted to include but not limited to distilled water, contact solution, denture cleaner, etc.

14. Healthcare staff can determine the urgency and necessity of durable medical equipment.  If an alternate drop-off time is required due to urgency, a request must be sent to administration noting the urgency and it will be accommodated.

15. The administration will notify visiting officers in advance of incoming durable medical equipment.

16. In the event there is a medical need for the incarcerated individual to use durable medical equipment while incarcerated, the responsible physician will

order the necessary equipment and complete the durable medical equipment request form and submit it to the medical director and director of nursing for review and approval.

17. Following approval, the request form will be forwarded to the medical supply clerk for purchase.  Once the equipment arrives, a treatment order will be placed in the patient's EHR for the specific equipment that includes duration of use.  Follow up at clinically appropriate intervals will be scheduled and the order for the equipment will be discontinued when no longer medically necessary. The clinic manager will be notified, and step 12 above will be followed.



| | | |
|---|---|---|
| **ALLEGHENY COUNTY BUREAU OF CORRECTIONS** | **POLICY NUMBER: # 2605** | **EFFECTIVE: 3/29/2021 REVIEWED:4/29/2022 REVIEWED: 9/20/2023** |

**TITLE**: Medical Housing Unit Levels of Care

**NCCHC: J-F-02**

AUTHORIZED BY: ORLANDO L. HARPER

SIGNATURE: _Orlando L. Harper_

AUTHORIZED BY: ASHLEY BRINKMAN, PhD, LPC

SIGNATURE:_____

AUTHORIZED BY: WILLIAM K. JOHNJULIO, MD

SIGNATURE:_____

## POLICY

It is the policy of the Allegheny County Bureau of Corrections (ACBOC) Healthcare Services Department that patients who require housing on the medical housing unit will receive the appropriate level of care including skilled nursing care as required.

## PURPOSE

To ensure that when healthcare is provided, including infirmary level of care, it is appropriate to meet the needs of the patients.

## PROCEDURAL GUIDELINES

## NCCHC:

1.  The policy defines the scope of medical, psychiatric, and nursing care available on-site to patients who need infirmary-level care.

2.  Patients who need infirmary-level care are always within sight or hearing of a facility staff member, and a qualified health care professional can respond in a timely manner.

3.  The number of qualified health care professionals providing infirmary-level care is based on the number of patients, the severity of their illnesses, and the level of care required for each.

4.  At least daily, supervising RN ensures that care is being provided as ordered.

5.  The frequency of provider and nursing rounds for patients who need infirmary-level of care is specified based on clinical acuity and the categories of care provided.

6.  Health records for patients who need infirmary-level care include

    a.  an initial clinical note that documents the reason for infirmary-level care and outlines the treatment and monitoring plan, and

    b.  complete documentation of the care and treatment given.

## PROCEDURAL DETAILS

1.  The medical housing unit provides the appropriate level of care for patients who require infirmary level of care, medical housing or sheltered housing, or medical observation for less than 23 hours.

2.  All patients must be able to be independent in all activities of daily living (ADL's) to include eating, dressing, toileting, and transferring.

3.  Infirmary-level care is care provided to patients with an illness or diagnosis that requires daily monitoring, medication and/ or therapy at a level meeting skilled nursing intervention in the medical housing unit.  This includes any of the following

    a.  intravenous therapy,

    b.  tube feedings,

    c.  wound care that requires daily dressings,

    d.  daily physical or speech therapy, and/or

    e.  daily injections that require three or more order changes within a week.

4.  Medical /sheltered housing is provided on the medical housing unit.  Patients in medical /sheltered housing are in a protective environment but do not require 24-hour skilled nursing services and are medically stable.  The patient may be housed for either security or medical reasons.  These may include

    a.  observation of pregnant patient for 72 hours following admission to the jail;

    b.  adjustment in mental health medications;

    c.  observation for post-seizure;

    d.  patients with metal braces;

    e.  patients with oxygen requirements;

    f.  patients with a life vest;

    g.  a short-term illness, i.e., mild influenza or  gastroenteritis, or for validation of stated symptoms (i.e., vomiting).

    h.  patient needing isolation due to non-airborne communicable disease;

    i.  patients receiving more frequent care intervals than is typically managed through routine medication pass or treatment times, (i.e., frequent accu-checks, frequent detox assessments, frequent medication dosing);

    j.  stable patients receiving controlled medications that the jail administration wants to minimize administration areas within the facility, and/or

    k.  patients requiring assistive devices that security wants to limit from a large area within the facility.

5. Patients may be placed in the medical housing unit for medical or mental health observation for a specific purpose.

6. Medical or mental health observation is limited to only those patients who require a short-term (<23 hours) medical intervention to determine if the patient requires either more intensive treatment (such as formal admission to infirmary – level care status or transfer to an outside treatment facility), or can be safely managed in a lower acuity environment in the medical housing or in a general population housing unit.  Examples of a patient needing medical or mental health observation patient include

    a.  post medical emergency that did not require off-site treatment,

    b.  a post-ictal patient without unusual presentation,

    c.  diabetic with recent significant hypo-or hyperglycemic episode receiving intensive monitoring,

    d.  patient with recent medication change requiring immediate monitoring,

    e.  the recent return from ER/hospital admission,

    f.  the recent return from an uncomplicated outpatient procedure,

    g.  isolated administration of IV fluids/medication, and/or

    h.  patient receiving pre-op care (NPO etc.) or monitoring of an acute illness or injury.

7. Following the observation period (23 hours), a determination is made that the patient is to be either formally admitted to infirmary level care status, released to a lower level of care within the medical housing unit, or released to the general population.

8. The director of nursing (DON) will determine the number of sufficient qualified health care staff needed to provide the levels of care based on the number of patients, the severity of their illnesses, and the level of care required for each patient.

Page **4** of **10**

9. All patients admitted to the medical housing unit in one of the above noted levels of care will be placed in the EHR admissions management section based on the identified level of care.

ADMISSION INFIRMARY–LEVEL CARE

1. A patient admitted to the infirmary-level care will be admitted on the order of a provider and will meet the criteria for admission as stated in #2 above.

2. Admitting documentation should include the following
   a. reason for admission, initial impression, and anticipated length of stay;
   b. activity level,
   c. diagnostic or therapeutic measures to be taken during the infirmary level care stay (testing, medications, diet, vital signs, etc.).

3. Upon arrival at the medical housing unit, the provider will admit the patient and document appropriately in the medical record. The provider will enter the patient to infirmary level of care in the admissions management section in the EHR.

4. The nursing assessment will be completed upon admission and orders obtained within thirty (30) minutes of admission.

5. The provider will complete a history and physical as soon as is practical and within one (1) business day.

6. If a patient is admitted to infirmary-level care on a holiday or weekend and a provider is not on site, the on-call provider will be notified at the time of admission and will determine whether an evaluation needs to be done within twenty-four (24) hours or the next business day.

7. Nursing staff will record the decision in the health record.

8. Patients will be provided with a verbal orientation to infirmary-level care procedures upon admission which will be documented in the health record.

9. Patients may not refuse placement in the infirmary–level care if the admitting provider deems it medically necessary to observe or house the patient in this location.

10. Patients will not be admitted to infirmary-level care solely for security reasons.

MONITORING AND DOCUMENTATION OF INFIRMARY-LEVEL CARE PATIENTS

1. A provider will make rounds daily, Monday through Friday.  The physician or designee will conduct rounds on weekends and holidays should it be required by the patient's condition.  All rounds and pertinent findings are to be documented in the patient's health record.

2. Documentation in the patient's health records should include

   a. The admitting order, placed in the EHR in the admission management queue, for all patients placed in the infirmary-level care or the reason for placement in the observation unit, including the diagnosis, medications, diet, diagnostic tests required, activity restriction, follow-up orders, etc.

   b. Complete documentation of monitoring and nursing assessments at least each shift.

   c. An assessment of the current status and plan for follow-up care upon discharge from the infirmary-level care or observation.

   d. All medical documentation should be recorded in the patient's health record.

3. Nursing documentation will require an admission note which includes, at a minimum

   a. a chief complaint,

   b. vital signs,

      c.  relevant history,

      d.  relevant observations,

      e.  an admission assessment, and

      f.  A nursing plan of care.

4. Vital signs are to be measured and documented at least once per shift or as ordered by the provider.

5. All medication is to be documented on the patient's eMAR.

6. All lab results, EKGs, and x-ray reports should be kept in the patient's chart. TechCare will automatically generate results in the patient's health record where applicable.

7. A progress note will be documented in the health record reflecting the plan for any patient transferred to the medical housing unit.

8. At the time of discharge from the infirmary-level of care, nursing documentation will include a nursing discharge assessment, patient education, and a follow-up plan.

RE-ADMISSION TO THE INFIRMARY- LEVEL CARE

1. If a patient is readmitted to the infirmary-level care within three (3) days of discharge for the same condition, it is permissible to begin infirmary-level care documentation with an abbreviated history and physical written by the admitting provider in the form of progress note which references the previous admission's complete history and physical. Beyond three (3) days of discharge, a new history and physical is required.

2. For all re-admissions, new physician orders and a complete nursing assessment are required.

DISCHARGE OF PATIENTS FROM THE INFIRMARY- LEVEL CARE

1. A SOAP note will be documented in the health record by the provider upon discharge from the infirmary-level care and will clearly reflect the patient's

discharge diagnosis and care plan.

2. The medical housing unit RN will document a discharge nursing assessment in the health record.

3. The provider will

   a. update the problem list, as medically indicated, and

   b. update the admissions management to reflect the change in the level of care.

MONITORING AND DOCUMENTATION OF MEDICAL HOUSING/SUPPORTIVE HOUSING

1. Patients admitted to the medical housing  for reasons noted in item # 3 above (medical housing sheltered housing) and need a protective environment but do not require 24-hour skilled nursing services and are medically stable will be monitored as follows:

   a. Nursing will complete a nursing assessment and enter the patient into  the admission management medical supportive housing to document the ordered level of care/assessment/treatment plan (SOAP note

   b. Provider will provide orders medications, treatments, diagnostic test, and frequency of vital signs as appropriate.

   c. Provider will see the patient as needed based on clinical need but at least weekly and document the encounter in the health record.

   d. Nursing will document vital signs every shift for the first 72 hours then every day unless ordered more frequently by a provider.

   e. Nursing documentation will be completed every shift for the first 72 hours and then daily.

2. The provider will

   a. update the problem list, as medically indicated, and

   b. update the admissions management to reflect the change in the level of

care.

PLACEMENT IN OBSERVATION STATUS

1. A provider may place a patient in the medical housing unit for medical observation.

2. The provider will provide orders as to how the patient should be medically treated, monitored (i.e., vital signs every 30 minutes), and the clinical criteria for notifying the provider or releasing the patient back to the general population.

3. The nurse will enter the patient into the admission management medical housing observation to document the level of care/assessment/treatment plan (SOAP note)

4. Vital signs are to be obtained at a minimum once per shift.

5. Nursing documentation is to be completed at the time the patient is placed in the medical housing unit for observation and at least every shift thereafter.

6. If a provider wishes to keep a patient in observation status longer than twenty-three (23) hours, the requirements of the level of care being provided (medical housing or infirmary level of care)

7. Patients for whom the severity of the medical condition exceeds the criteria for placement in observation status at any time will be immediately referred to the provider for an evaluation.

## MEDICAL HOUSING UNIT (5B) LEVEL OF CARE WORKFLOW

The patient can present to the 5B Sally Port from intake, a pod, medical emergency, ER, or return form offsite visit

1. The provider will assess the patient and make a determination to either return the patient to a pod with follow-up or admit the patient to 5B.

2. If the determination is to admit the patient to 5B (Admission Management), the provider will order observation, medical housing or infirmary level of care.

| Level of Care | Provider | Nurse |
|---|---|---|
| Return of POD with follow-up | Creates a SOAP note and scheduled follow-up appointments | N/A |
| Infirmary | Admit to admission management infirmary in the admissions management queue to document ordered level of care using the Infirmary SOAP note.<br><br>Provider assesses the patient daily<br>Provider reviews patient's progress weekly for discharge disposition | Nurse finds patient in admission management infirmary and completes the Nursing Admission Assessment.<br><br>Nurse sets the frequency of nurse charting for every eight hours in the admission management queue for the first 72 hours and then every (1) day thereafter. |
| Admit to 5B Medical Housing Unit | Confirm that housing classification form has been completed<br><br>Documents in admission management medical supported housing to document ordered level of care/assessment/treatment plan with estimated LOS.  (SOAP note)<br><br>Provider assesses the patient weekly for discharge disposition | Nurse enters the patient in admission management supported housing in the admission management queue and completes a SOAP note.<br><br>Nurse sets the frequency of nurse charting for every (1) day in the admission management queue |
| Admit to 5B Observation | Confirm that housing classification form has been completed<br><br>Documents level of care/assessment/treatment plan (SOAP note) in the admissions management<br><br>Provider assesses patient for disposition prior to 23 hours. | Enters the patient to admission management medical housing observation in the admission management queue to document (SOAP note)<br><br>Nurse monitors admission management queue for patients approaching the 23-hour mark<br><br>Nurse sets the frequency of nurse charting for every six hours in the admission management queue |

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT

OF PENNSYLVANIA

* * * * * * * *

CLAYTON MCCRAY,          *

    Plaintiff          * Case No.

    vs.                * 2:22-CV-00493-KT

ALLEGHENY COUNTY;    *

DONALD STECHSCHULTE, *

Medical Director;    *

NANCY PARK; JENNIFER *

KELLY; LAURA         *

WILLIAMS, Chief      *

Deputy Warden of     *

Healthcare Services, *

    Defendant          *

* * * * * * * *


DEPOSITION OF

LAURA WILLIAMS

May 30, 2024


Any reproduction of this transcript is

prohibited without authorization by

the certifying agency.

18

1      County Jail in January of 2014

2      as a substance use counselor.

3      I was originally hired by

4      Horizon Healthcare that was the

5      correctional healthcare

6      contracted employer during that

7      time period.

8            I was in that role until

9      the end of August of 2015, at

10     which time the contract with

11     Horizon ended and we worked to

12     de-privatize and the County

13     assumed the healthcare

14     operations in the institution.

15     I was promoted to one of the

16     leadership positions as the

17     Director of Substance Use

18     Programs during that time

19     period in August of 2015.

20            Following that, I was

21     promoted to the position of

22     Deputy Health Services

23     Administrator, I think, in

24     February of 2017.  And held

25     that position until I was

19

1          appointed to the position of

2          Chief Deputy Warden of

3          Healthcare Services in

4          September of 2018.  And I held

5          that position until I left at

6          the end of January prior to

7          starting my current employment

8          role.

9     BY ATTORNEY RASHATWAR:

10    Q.     And when was that?  To be

11    clear, when did you leave the

12    Allegheny County Jail?

13    A.     It was approximately - I would

14    say like the 24th of January.  I could

15    be wrong about that.  But very shortly

16    before I started this position

17    Q.     In 2022.

18           Right?

19    A.     Yeah.

20    Q.     Thank you.

21           You said yes.

22           Right?

23    A.     Yes.

24    Q.     Okay.  Perfect.

25           And what were your roles and

20

1    responsibilities in your position at

2    the Allegheny County Jail?  Would you

3    go through and tell me what your roles

4    and responsibilities for in your

5    various positions?

6    A.     For each of them?

7    Q.     Yes, please.

8    A.     Okay.

9          I'll start from when I started

10   as a substance use counselor.  My

11   roles and responsibilities were to

12   provide substance use treatment.  We

13   had an inpatient unit that was with

14   females.  And we had two separate

15   programs for males.  We were also

16   involved in several other program

17   units in the housing of the

18   incarcerated individuals.

19          I was responsible for doing

20   assessments, sometimes for court

21   evaluations, for levels of care for

22   substance use treatment.  I was

23   responsible for doing case management,

24   discharge planning, and providing both

25   individual and group therapy, as well

21

1    as psychoeducation to the incarcerated

2    population.  I had a caseload of

3    approximately 45 individuals at any

4    given time, either males or females.

5         I also worked with the

6    juveniles that we have within the

7    institution and provided services of

8    substance-use-related matters.

9         As the Director of Substance

10   Use programs, I was responsible for

11   managing the operations of those

12   programs as well as supervising the

13   staff that were providing services.  I

14   was responsible for the hiring,

15   disciplinary actions, terminations,

16   training, onboarding.

17        I still fulfilled many of those

18   same roles as a substance use

19   counselor and would definitely step in

20   if we had staffing shortages.  So I

21   was still acting as a clinician as

22   well.

23        I was also part of the

24   healthcare leadership team.  I was

25   responsible at the time for

22

1    implementing several programs such as

2    Narcan upon release, started a

3    Vivitrol program within the facility

4    and working to continue MAT, which I

5    know is still being continued to this

6    day.

7          As the Deputy Health Services

8    Administrator, I oversaw the operation

9    of the Healthcare Department.  I had

10   several direct reports that included

11   the clinic manager, the Director of

12   Substance Use programs, the Director

13   of Mental Health Services, the

14   Director of Nursing.  I worked closely

15   and provided some administrative

16   supervision support to the clinical

17   team, such as the physicians who

18   received their clinical supervision

19   from AHN.

20         I was responsible again for

21   recruitment, hiring, corrective

22   action, or discipline, worked very

23   closely with labor relations,

24   negotiations of union contracts,

25   grievance matters, and worked closely

23

1    with the County Executive Command

2    Team.

3           And then when I joined the

4    Executive Command Team under the

5    leadership of the warden, my duties

6    did not go away.  They just further

7    expanded.  And so I was at a higher

8    level of administration for the

9    healthcare services team and worked

10   directly with the Healthcare Services

11   Administrator.

12          I was also responsible for

13   managing or supervising our education

14   services, any other inmate programs,

15   alternative housing, religious

16   services, contracts such as dietary/

17   commissary, budget, as well as human

18   resources and administrative

19   personnel.

20   Q.     Thanks for going through that.

21          And when you were on the - when

22   you got moved to go into the Executive

23   Command Team, was there any additional

24   interviewing process that had to

25   happen for you to get that role?

25

1    Correctional Healthcare.

2    Q.    And were you responsible for

3    creating or implementing healthcare

4    policies?

5    A.    I was part of the team that was

6    responsible for that, yes.

7    Q.    Who else was on the team?

8    A.    For healthcare policies, we

9    would have typically the Medical

10   Director was part of that team.

11   Depending on the nature of the policy,

12   we could change the makeup of who was

13   on the team.  It might - if it was

14   nursing specific, include the Director

15   of Nursing. If it was mental health

16   specific, it might include the

17   Director of Mental Health.

18         But it would have been

19   healthcare leadership or managers that

20   would have been responsible.  We also

21   included the union in a lot of the

22   policy development.  And then Mary

23   Jean Serafin, who was employed by

24   Allegheny Health Choices,

25   Incorporated, on a consultant basis.

26

1            She was one of the persons

2    primarily responsible for the

3    drafting, reviewing process of policy

4    development and implementation.

5    Q.      And you mentioned that you were

6    working with the Health Services

7    Administrator.

8            What work - can you just

9    elaborate on the work that you did

10    with them?

11    A.      I don't know how to -.

12    Q.      Would you like me to clarify my

13    question?

14    A.      That would be helpful.

15    Q.      Yeah.

16            How --- how did you work with

17    and engage with the Health Services

18    Administrator when you were Chief

19    Deputy Warden for Healthcare Services?

20    A.      We would have frequent

21    meetings.  There were a number of

22    different initiatives or programs or

23    projects that were in development.  If

24    we had policies that needed to be

25    reviewed, audits that needed to be

27

1    managed, there were weekly check-ins

2    as well as monthly meetings.  If there

3    were challenges within labor

4    relations, we were --- I mean,

5    whatever was going on that required

6    additional discussion, oversight, or

7    support.

8         In my position, I was one of

9    the persons responsible for working

10   with County leadership to secure

11   assets or resources for the agency.

12   So we would have a lot of those

13   conversations as well.

14   Q.    Are you a member of any

15   correctional associations?

16   A.    Yes.

17   Q.    Which ones?

18   A.    I am a member of the

19   Pennsylvania Prison Wardens

20   Association.  I'm a member of the

21   Pennsylvania County Correctional

22   Agencies Association.  I am a member

23   of NCCHC, the National Commission of

24   Correctional Healthcare, and ACA, the

25   American Correctional Association.

62

1    regard to intake, regarding

2    incarcerated people who are prescribed

3    mobility assistive devices.

4    A.      The process, if somebody came

5    into the institution with an assistive

6    mobility device was typically to call

7    one of the providers that was on site.

8    So there was 24/7 on-site coverage

9    from an NP, PA, or MD.  And so if

10   somebody came in, we don't yet know if

11   they are actively prescribed, but we

12   would have one of those qualified

13   practitioners assess the individual,

14   seek records as indicated, and make a

15   determination as to whether or not

16   they would still be issued that.

17           There were multiple times when

18   we would need to immediately replace

19   the item that somebody had come in

20   with, either because it was not ---

21   like it was broken to a degree, and so

22   it was not actually safe.  They would

23   need --- if they had a cane that was

24   broken, or crutches that were broken,

25   were able to immediately replace those

63

1    as long as they were still clinically

2    indicated.  But that was at the

3    discretion of the physical health

4    provider.

5    Q.    Was there a security protocol

6    for determining what devices could or

7    could not come into the jail?

8    A.    There was always a security

9    search of devices in the facility.

10   But we deferred to what the

11   practitioners indicated was medically

12   necessary and then would search the

13   device.

14        There were times when we would

15   have to collaborate to determine

16   additional steps for risk mitigation

17   that may need to be taken.  But it was

18   result of a physician order.

19   Q.    And you mentioned that you

20   sometimes had to engage in risk

21   mitigation.

22        What did that entail?

23   A.    We had individuals who would

24   come in with full metal devices and

25   would require --- they were

64

1    immobilizers to stabilize somebody,

2    maybe postoperatively, for their

3    injury recovery.  And so somebody in

4    that condition could be victimized

5    because they may --- you know, they

6    are, they're not --- they're not fully

7    healthy or capable.  So when I'm

8    saying risk mitigation, it means we

9    would be making very early housing

10   determinations to make sure that that

11   person was safe and that the device

12   would not be manipulated, broken,

13   destroyed, or at risk.  And that they

14   could be housed separately from

15   others.

16   Q.    And what was ACJ's policy with

17   respect to assessing such medical

18   devices and providing accommodations

19   if there needed to be, like you said,

20   a risk to be mitigated?

21                ATTORNEY BOND:

22                Object to form.  Go

23         ahead.

24                ATTORNEY CULLEN:

25                Join.

65

1                    T H E   W I T N E S S :

2                    If you're asking ---

3          well, I will respond this way

4          and hopefully it answers your

5          question.  If somebody came in

6          and they required some form of

7          durable medical equipment, and

8          the training practitioner or

9          prescriber was continuing that

10         order or modifying it, we would

11         understand what was the ---

12         what were the potential risks

13         of the device, many of which

14         were not aware of even before.

15         So we might review images.  And

16         that we would typically house

17         that person on the medical

18         housing unit and keep them kind

19         of separate from other

20         individuals.

21                   They may be able to have

22         recreation with persons who

23         were of similar circumstances

24         or mobility, so as to not

25         increase the risk of any

66

1          persons while they were having
2          recreation or socialization.
3     Q.     Okay.
4          So were you involved with the
5     process of individuals getting placed
6     on the medical housing unit?
7     A.     Yes and no.
8     Q.     Can you clarify?
9     A.     Sure.  We have procedures in
10    the agency that did not require an
11    official sign off.  But it also did
12    during COVID-19.  And so that's why I
13    answered yes and no.
14         Typical procedures were that if
15    somebody needed to be housed on one of
16    the medical housing units, one of the
17    physicians or prescribers would write
18    an order for that.  And that
19    information would go to
20    classification.
21         It did not include any
22    diagnostic information.  It was simply
23    a housing determination that that
24    person clinically needed to be housed
25    on that unit.

67

1          Prior to COVID-19 it just
2     happened pretty automated.  While we
3     were in COVID-19, some additional
4     steps typically did need to take place
5     just because we were limiting or
6     co-hording movement.  And so it would
7     not deny somebody's movement.  We just
8     needed to make sure that the
9     additional steps were being taken.
10          And that would be to determine
11     whether or not the housing unit that
12     that person was coming from was on
13     quarantine or isolation status.  If we
14     needed to take any additional
15     precautions during the transportation
16     of moving that person to the housing
17     unit, the property concerns, et
18     cetera.
19          So that's --- that's why it's
20     yes and no.
21     Q.     So it sounds like there were
22     additional protocols that had to be
23     taken during COVID-19 with respect to
24     an individual being placed in the
25     medical housing unit.

71

1    medical housing unit.

2    Q.    And you mentioned that COVID-19

3    positive individuals were housed on

4    the medical housing unit.  When was

5    that the practice at the jail?

6    A.    That was the practice through

7    multiple different points of the

8    pandemic.  When we initially had

9    positive cases, they were on the

10    medical housing unit, but it ebbed and

11    flowed in the disease process within

12    the institution.  And so we did adapt

13    protocols several times to identify

14    other units that would be utilized for

15    quarantine or isolation.

16          However, if somebody was having

17    a complicated expression of the

18    disease, and more severe, then they

19    were typically housed on the medical

20    housing unit so that they could

21    receive more frequent care, maybe

22    continuous oxygen as well.

23          And so it depended on the

24    clinical circumstance of the patient.

25    Q.    What was the process for

72

1    someone getting placed out of the

2    medical housing unit and into another

3    unit?

4    A.    They would have to be cleared

5    medically to --- to be moved from the

6    housing unit.

7    Q.    Who was responsible for the

8    ultimate decision about where someone

9    was housed?

10   A.    There were ---.

11                   ATTORNEY CULLEN:

12                   Object to form.  Go

13            ahead, Laura.

14                   THE WITNESS:

15                   There were multiple kind

16            of layers to that.  So if

17            somebody no longer required

18            housing on the medical housing

19            unit because they didn't meet

20            the medical criteria and they

21            could be managed in general

22            population, they were typically

23            assigned to a housing unit

24            based on their classification

25            level.  There might still need

73

1              to be accommodations.

2                    So if you have a CPAP,

3              which is a medical device, you

4              could be housed in a housing

5              unit based on your

6              classification, as long as

7              there was a cell that had an

8              electrical outlet.  And so

9              there could be multiple

10             different persons making those

11             determinations.

12    BY ATTORNEY RASHATWAR:

13    Q.    And who specifically was

14    involved in that process?

15    A.    The healthcare practitioners

16    would determine whether or not they

17    required housing on the medical

18    housing unit.  If not, the

19    classification department and/or

20    administrative or command staff would

21    make those decisions.

22    Q.    And what were your

23    responsibilities with respect to

24    putting people or placing people in

25    the medical housing unit?

74

1    A.      I feel like --- I don't know

2    how to answer this differently.  My

3    role was adaptive or evolved during

4    COVID-19 to ensure I was overseeing

5    that the administration of our

6    policies and procedures for safe

7    transport within the institution was

8    occurring.  There were times when were

9    confirming the authorization or status

10   of an individual, so we had a lot of

11   complicated cases that there may be

12   some complex needs or management of

13   the patients.  So if they no longer

14   require physical healthcare on 5

15   bravo, they may still have acute

16   mental health needs.  And so they

17   would be transferred to one of the

18   mental health units.

19        It's really difficult to state

20   other than I was involved as much as I

21   needed to be.

22   Q.    What were the policies with

23   respect to housing someone in a

24   medical housing unit?

25                ATTORNEY CULLEN:

75

1          Object to form.  Go
2     ahead, Laura.
3              THE WITNESS:
4          I don't know if we had a
5     specific --- well, we did. We
6     had a policy. I can't recall
7     what the name of it, what were
8     --- the number of it was
9     related to the clinical
10    admission criteria for the
11    medical housing unit.  But the
12    policy was if a doctor, an NP,
13    or a PA stated that somebody
14    needed to be on the medical
15    housing unit, then we needed to
16    accommodate that.
17  BY ATTORNEY RASHATWAR:
18  Q.    Were you responsible for
19  ensuring that patients who are
20  prescribed lower bunk or lower tier
21  status was provided if it was
22  recommended by a provider?
23  A.    I was responsible for
24  overseeing or monitoring the
25  implementation of our policies and

120

1    physical therapists provided that
2    treatment.
3    Q.    How did the jail ensure that
4    any physical therapy program was
5    appropriate for a patient's medical
6    needs?
7                ATTORNEY MICHEL:
8                Objection.
9                ATTORNEY CULLEN:
10               Objection.
11               THE WITNESS:
12               The jail did not.
13   BY ATTORNEY RASHATWAR:
14   Q.    And was the physical therapist
15   responsible for ordering any mobility
16   devices for patients?
17   A.    They may have, yes.
18   Q.    Did the jail have any written
19   policies on the provision of
20   nutritional supplements?
21               ATTORNEY MICHEL:
22               Objection.
23               ATTORNEY CULLEN:
24               Join.
25               THE WITNESS:

121

1                     I believe that there was

2          a policy that included

3          nutritional supplements such as

4          BOOST or Ensure or Ingevity.

5   BY ATTORNEY RASHATWAR:

6   Q.     And did the jail have a

7   practice of providing those

8   supplements?

9                     ATTORNEY MICHEL:

10          Objection.

11                     ATTORNEY CULLEN:

12          Join.

13                     THE WITNESS:

14          Those would need to be

15          prescribed and ordered, and

16          would have been carried out of

17          the order of the physician,

18          nurse practitioner, physician's

19          assistant.

20   BY ATTORNEY RASHATWAR:

21   Q.     And how frequently were

22   nutritional supplement orders assessed

23   and reassessed?

24                     ATTORNEY MICHEL:

25          Objection.

164

1          asking me about one patient

2          several years ago during a

3          pandemic, so I could refer to

4          documents or review those, but

5          based on my recollection, I

6          don't know.

7    BY ATTORNEY RASHATWAR:

8    Q.      And when before someone was

9    placed in the RHU or the restrictive

10   housing unit, did they have to be

11   medically-cleared?

12   A.      Yes.

13   Q.      And were you involved in that

14   process, similar to what you described

15   earlier regarding the other housing

16   placement processes?

17   A.      Yes.

18          And during COVID, because I was

19   also qualified from a

20   behavioral-health perspective, I might

21   have actually assisted in completing

22   that portion of the segregation

23   clearance.

24   Q.      And what did --- the process of

25   medically clearing someone, what did

165

1    that entail, from your experience?

2    A.    There's a form that we would

3    specifically follow.  It was completed

4    by typically a physical health and a

5    behavioral health qualified healthcare

6    professional.  It could be one single

7    RN completing both portions because

8    they had training in both.

9          But the physical health would

10   assess for immediate injury or acute

11   risk of having somebody confined to a

12   cell by themselves.  And, you know, I

13   think would assess ---.  I don't know.

14   I have to really look at the form.

15         I didn't complete that portion,

16   so I'm not as able to recall it.

17         The behavioral-health portion

18   was assessing for risk of suicidality,

19   as well as any other acute behavioral

20   health conditions that might require

21   behavioral-health monitoring instead

22   of having that person in a

23   segregation.

24   Q.    I'm going to go ahead and show

25   you a copy of this form.

172

1    ones I just named if they were

2    transferred into the RHU and

3    medically-cleared?

4                    ATTORNEY CULLEN:

5                    Objection to form.

6                    ATTORNEY MICHEL:

7                    Join.

8                    THE WITNESS:

9                    Corrections would

10           provide whatever was

11           medically-ordered and would not

12           have the authority to override

13           that unless there was an

14           immediate safety threat.

15                    Some persons may have

16           been ordered multiple mobility

17           devices, and so they would,

18           again, have to probably

19           coordinate with healthcare

20           staff to determine what should

21           be issued and when.

22                    They may not be entitled

23           to maintain all of those

24           devices in their cells.

25    BY ATTORNEY RASHATWAR:

199

1    Q.      Okay.

2           So certain shifts had different

3    numbers of inmates that could go to

4    outside appointments at a time?

5    A.      Yes.

6    Q.      Okay.

7                   ATTORNEY PAKLER:

8                   I don't think I have any

9           further questions.  Thank you.

10                  ATTORNEY CULLEN:

11                  Lisa, do you have

12          anything?

13                  ATTORNEY MICHEL:

14                  I have nothing for the

15          County.

16                  ATTORNEY CULLEN:

17                  All right.

18                  I just got one for you,

19          Laura.

20                      ---

21                  EXAMINATION

22                      ---

23    BY ATTORNEY CULLEN:

24    Q.      When you were serving as Chief

25    Deputy Warden at Allegheny County

200

1    Jail, were there circumstances in

2    which you or the Correctional staff

3    would overrule an inmate's medical

4    housing designation that was made by

5    the medical team?

6    A.    No.

7                    ATTORNEY CULLEN:

8                    All right.  That's all I

9          have.  Thank you.

10                   COURT REPORTER:

11                   Thank you.

12                   Okay, now I just need to

13         ask if everybody wants a copy

14         and how.  And provide me your

15         emails.

16                   ATTORNEY CULLEN:

17                   All right.

18                   COURT REPORTER:

19                   I have yours, Mr.

20         Cullen.

21                   ATTORNEY CULLEN:

22                   Yeah, and just for the

23         record, we're going to read.

24                   Laura, thank you so

25         much.

Transcript of the Testimony of

# MCCRAY CLAYTON

August 16, 2024

## CLINTON MCCRAY  VS  ALLEGHENY COUNTY, ET AL



**412-261-2323**
**depo@akf.com**
**www.akf.com**

MCCRAY CLAYTON - 8/16/2024

77

1     brace while you were in the Allegheny

2     County Jail?

3         A.  Did I receive any of these devices?

4         Q.  At any time.

5         A.  Yes.  I received a wheelchair, a

6     brace.

7         Q.  Did you have access to those the

8     whole time you are at the jail?

9         A.  Absolutely, not.

10        Q.  When didn't you have it?

11        A.  I didn't have crutches or

12    wheelchair all the way up until it got

13    severe and another doctor let them know

14    this order was from outside of the jail.

15        Q.  When was that do you remember?

16        A.  Close to around infection time.

17        Q.  Close to June of 2020?

18        A.  Maybe right before then.

19        Q.  Prior to that, you had nothing?

20        A.  My cane.

21        Q.  You got a cane?

22        A.  Correct.

23        Q.  Did you have that the whole time

24    until --

25        A.  Sometimes my cane was taken from

MCCRAY CLAYTON  -  8/16/2024

78

1      me.

2            Q.   Who took it?

3            A.   Staff at the ACJ.

4            Q.   Do you remember specifically who?

5            A.   I don't.

6            Q.   Did they tell you why they took it?

7            A.   No.

8            Q.   Did you have it when you were in

9      the disciplinary housing unit?

10           A.   This was the time I'm speaking of

11     when I can recall where it was taken from

12     me and I had to be like carried by two

13     staff to get me to the shower, because it

14     was taken from me.  So I do remember it

15     being taken from me there.

16           Q.   Other than when you were in the

17     disciplinary housing unit, did you have a

18     cane?

19           A.   Yes, but there were times I was in

20     the disciplinary unit and had my cane, too.

21      I'm saying this is a time I can recall

22     they took it.  It's not like in the

23     disciplinary unit you're not allowed to

24     have it.

25           Q.   Sometimes you had it in the

MCCRAY CLAYTON - 8/16/2024

79

1    disciplinary unit and?

2          A.  Yes, and they took it and I

3    couldn't go to rec, because I didn't have

4    my cane and couldn't do nothing unless

5    staff came and got me.

6          Q.  You don't remember who took it or

7    why? You have to answer verbally?

8          A.  No, I don't.

9          Q.  Do you remember how long it was

10   taken from you?

11         A.  I know it was taken from me while I

12   was in RHU, and I believe my AFO brace

13   actually was taken from me, too.  They said

14   they lost it and they had to order another

15   one while I was in the RHU.  I was without

16   my brace.

17         Q.  Do you know what happened to it?

18         A.  I don't.

19         Q.  You said it got lost do you know

20   what happened?

21         A.  They said it got lost.

22         Q.  Did you ever get it back?

23         A.  I believe they said that ordered

24   one and think I did.  I can't recall.

25               MR. BACHARACH:  About another

MCCRAY CLAYTON - 8/16/2024

161

1     prescribe these things to inmates.
2     I've never experienced anything else, so I
3     believe that was the doctor's issue.
4          Q.  When you were asked earlier about
5     the fight, is it your testimony that you
6     did not use your cane in that fight?
7          A.  I did not.
8          Q.  Did you ever use your wheeled
9     walker in the fight?
10         A.  My wheeled walker.
11         Q.  Did you ever hit someone with the
12    walker?
13         A.  No.
14         Q.  Did correction ever come and take
15    devise off of you because they said you
16    were using them in fights?
17         A.  Correct.  The cane.
18         Q.  Who took the AFO from you?
19         A.  I can't recall.  I don't know.  I
20    can't recall.
21         Q.  Do you remember when it was taken
22    off of you?
23         A.  Like I said, I believe when I first
24    got there, and I got it back -- I don't
25    know when I got it back.  Like I said, they

MCCRAY CLAYTON - 8/16/2024

162

1   said they lost it once I went to RHU.  When

2   I went to RHU I don't know who took it.

3   When I got to the jail, medical -- I don't

4   know if it was corrections or medical.

5       Q.  Prior to that, were you always

6   wearing your AFO?

7       A.  Yes.  I would wear it sometimes.  I

8   would see if I could walk small distances

9   without it.

10      Q.  Do you remember telling providers

11  at SCI Fayette that you did not wear it

12  because you felt like it made your foot

13  weaker?

14      A.  Like I just said to you, there

15  would be sometimes I wouldn't wear it

16  because I was trying to strengthen my leg.

17  I knew I had to wear it because I would

18  trip over sometimes.

19      Q.  What is your understanding of what

20  wearing AFO does?

21      A.  Keeps my foot from dragging.

22      Q.  Are you aware of Dr. Stechschulte

23  ordering a new AFO for you after the one

24  was lost?

25      A.  That's what the record states.

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT

OF PENNSYLVANIA

* * * * * * * *

CLAYTON MCCRAY,        *

    Plaintiff        * Case No.

    vs.              * 2:22-cv-00493-KT

ALLEGHENY COUNTY;    *

DONALD STECHSCHULTE,*

Medical Director;    *

NANCY PARK; JENNIFER*

KELLY; LAURA         *

WILLIAMS; Chief      *

Deputy Warden of     *

Healthcare Services,*

    Defendants        *

* * * * * * * *


DEPOSITION OF

HOLLY MARTIN

June 21, 2024


Any reproduction of this transcript is

prohibited without authorization by

the certifying agency.

34

1    Q.    And the records requested

2    pertained to medical diagnosis and

3    medical treatment?

4    A.    Correct.

5    Q.    Was there other staff who could

6    request medical records for a patient

7    even if the nurse decided not to?

8    A.    Yes.  A physician could have.

9    Any of the providers could have also

10   done that.

11   Q.    And when the records were

12   received, what happened after that?

13   A.    They would go into an area for

14   the physicians to review and the

15   physician was in charge of reviewing

16   those records and making any

17   adjustments to current orders if

18   needed.

19   Q.    Were the records uploaded into

20   the electronic record?

21   A.    2019 --- yes.  At that time,

22   yes.  We didn't go electronic until

23   '17, so ---.

24   Q.    Who would be responsible for

25   ordering the medications?

35

1    A.    One of the providers.

2    Q.    And who was responsible for

3    ordering the patient a mobility device

4    such as a cane, crutch, wheelchair?

5    A.    A provider.

6    Q.    Who was responsible for

7    ordering a patient a shower chair?

8    A.    Did you say wound care?

9    Q.    Shower chair.

10   A.    Oh, a shower chair.  That would

11   be a provider as well.

12   Q.    I know we've been talking about

13   diagnosis of a patient and obtaining

14   their records, but I'd like to go back

15   to finishing up the rest of your

16   employment history.

17   A.    Sure.

18   Q.    What years were you an ADON?

19   A.    2016 to 2022.

20   Q.    And what were your job

21   responsibilities with respect to

22   patient care?

23   A.    As an ADON, my responsibilities

24   --- my job responsibilities?

25   Q.    Yes.

45

1    standards to determine whether the
2    policy needed to be modified or
3    changed?
4    A.    We follow NCCHC.  I don't know
5    if you ever heard of that.  It's an
6    accrediting body.  We follow their
7    standards for our policies, and we
8    would review our policies to see if
9    we're matching what they recommend
10   versus what we're practicing.
11   Q.    And when you say matching, does
12   that mean the policy is verbatim to
13   the NCCHC standard?
14   A.    The NCCHD standard is verbatim
15   in our policy.  Our procedural details
16   are written out in more detail from
17   what their standard says on how we
18   regulate that.
19   Q.    So an explanation of how to
20   implement the ---
21   A.    Yeah, correct.
22   Q.    --- the standard.  How did you
23   decide what the implementation process
24   would be for the healthcare policy?
25   A.    That got real choppy.  I'm

63

1    they would be escorted.  Daylight,

2    they would, you know, just be able to

3    move a pod themselves.

4    Q.    There was no other

5    documentation of the inmate's

6    disability or accommodations aside

7    from this booking card, at least ---?

8    A.    To the corrections officer

9    during that timeframe, not that I can

10   remember.

11   Q.    Did ACJ have policies or

12   procedures concerning the medical

13   treatment for wounds?

14   A.    I can't remember a specific

15   policy labeled wound care, no.

16   Q.    Did the jail have any unwritten

17   practices concerning the medical

18   treatment of wounds?

19   A.    We would complete the wound

20   care as it was ordered in the --- you

21   know, their health record.

22   Q.    And who had the authority to

23   order wound care?

24   A.    The providers.

25   Q.    Were there times when patients

64

1    were treated by outside wound care

2    specialists?

3    A.     If needed.  Patients have been

4    sent off site for consults, yes.

5    Q.     You said if needed.  How was it

6    determined off site specialty care was

7    needed for a wound?

8    A.     It would depend on, you know,

9    that patient's situation, the severity

10   of the wound itself.  And again, that

11   would be all coming from the

12   provider's determination.

13   Q.     Did patients see podiatrists

14   and wound care specialists at ACJ ---

15   while they were --- strike that.

16          While a patient was

17   incarcerated at ACJ, were there times

18   that patients with a wound infection

19   saw a podiatrist or wound care

20   specialist?

21   A.     Yes.

22   Q.     Did that happen frequently?

23   A.     I wouldn't call it frequently,

24   no.  But if it was warranted, then,

25   you know, that will get put in for an

75

1    Q.    Does the determination of

2    whether medical staff should

3    administer wound care depend on the

4    location of the patient's wound?  For

5    example, if it's on the bottom of his

6    heel versus on his hand.

7    A.    I would say that's dependent

8    upon the actual wound itself, not

9    necessarily location.

10   Q.    And when you say it's dependent

11   on the wound itself, does that mean

12   the severity of the wound?

13   A.    Severity or --- yeah, I would

14   say severity or the complication.  Is

15   it --- how complicated is it?

16   Q.    What if it was infected or very

17   painful for the patient to administer

18   the wound care?

19   A.    Again, that would have to be

20   dependent upon --- you know, a

21   physician will make that assessment.

22   Is a patient capable of doing self

23   wound care?  And again, it could be a

24   hybrid.  A patient could do some wound

25   care on his own, and the nurse still

76

1    does wound care as well.  It wouldn't

2    be a cut or dry all patient or all

3    nurse.  It could be a hybrid of both.

4    Q.    What if the patient has

5    attempted to do his wound care several

6    times, but he isn't able to do it

7    effectively or the wound worsens?

8    Would those be factors that the

9    medical staff or the provider would

10   consider in warranting staff to do the

11   wound care?

12   A.    If the patient reported all

13   those items, I would, you know, assume

14   another visit would definitely need to

15   be completed to see if a change of

16   plan needed to happen.

17   Q.    And what do you mean by change

18   of plan?

19   A.    Well, if the patient was

20   ordered self care, maybe they do need

21   to have more, you know, nurse visits

22   over more, you know, self care.

23   Q.    If a patient is doing self

24   wound care on the pod, how is it that

25   he gets the supplies to do the wound

77

1    care?

2    A.    The medication nurse can drop

3    it off, or one of the other medical

4    staff would drop off items.

5    Q.    And when they dropped it off,

6    was it also policy or practice to

7    assess or evaluate the condition of

8    the wound?

9    A.    If they're just dropping off

10   supplies, no.

11   Q.    Okay.

12        And what happens after the

13   medical staff drops off the supplies?

14                  ATTORNEY MICHEL:

15                  I'm sorry, Jackie, you

16        cut out.

17   BY ATTORNEY KURIN:

18   Q.    Sorry.  What happened after the

19   medical staff member drops off the

20   supplies for the inmate?

21   A.    I don't understand what you

22   mean.

23   Q.    Do they leave?.

24   A.    Yes.  They would continue on

25   with their day.

78

1    Q.    Okay.

2          Continue on with their day.

3    All right.

4          Did ACJ's wound care policies

5    change depending on where the patient

6    was housed at the jail?

7    A.    No, the policy itself wouldn't

8    change.

9    Q.    Would the practice change

10   depending on where the patient is

11   housed in the jail?

12   A.    It could.  Depending how ---

13   you know, I just mentioned maybe we

14   need to clean a table off differently

15   than we would in a treatment room, but

16   the wound care itself wouldn't change.

17   Q.    And if a patient is doing self

18   wound care, that happens in his cell?

19   A.    Correct.

20   Q.    If the nurse is doing the wound

21   care on the pod, where would it

22   happen?  Would it still be in the

23   cell?

24   A.    It could be in the cell.

25   Certain pods have different rooms,

86

1    treated by a specialist, does the

2    specialist provide the jail with any

3    discharge instructions or reports?

4    A.    Yes.

5    Q.    And what happens with the

6    discharge instructions and reports?

7    Are they added to the medical record?

8    A.    Yes.  They come back from the

9    visit.  The physician would review

10   them or provider --- I'll say provider

11   would review the discharge papers, and

12   they would get entered into the

13   healthcare record.

14   Q.    Do they automatically become

15   the patient's treatment plan?

16   A.    I can't guarantee an automatic.

17   You know, the provider has to review

18   everything that was sent back.

19   Q.    In what instances would

20   physicians follow up with the

21   specialist?

22               ATTORNEY MICHEL:

23               Objection.

24               THE WITNESS:

25               That would be all based

112

1    If they feel a need to get somebody to

2    MHU, they would have to consult a

3    provider for that order to be placed.

4    Q.    Does the --- once the provider

5    makes the recommendation, is

6    subsequent approval required?

7    A.    Not necessarily, no.  No.

8    Q.    So a provider would give a

9    recommendation, the completion of the

10    --- do they complete a form or ---?

11    A.    There is a form that we can use

12    for housing, yes.

13    Q.    Is that the only way a provider

14    can recommend a person to be placed on

15    the MHU?

16    A.    That's the only way we document

17    in the healthcare record is to create

18    a form.

19    Q.    Okay.

20          And did ACJ have any policies

21    or practices on housing inmates on the

22    MHU?

23    A.    Well, I don't understand what

24    you mean.

25    Q.    The eligible --- what

113

1    specifically is the eligibility

2    criteria for the MHU?

3    A.    Again, it would be anybody

4    who's deemed necessary by the

5    provider, who needs more frequent

6    monitoring, more level of care than

7    just, you know, our typical care that

8    we do in the pods.

9    Q.    Would that include patients who

10   are prescribed to be on non-weight

11   bearing status?

12   A.    Not necessarily, no.

13   Q.    What about patients with an

14   open, infected wound?

15   A.    That's a loaded question.

16   Potentially, but again, not

17   necessarily.

18   Q.    What about patients who are

19   prescribed a mobility device?

20   A.    No, that wouldn't be criteria

21   just to be on MHU.

22   Q.    Can corrections object to an

23   inmate's placement on the MHU?

24   A.    No.

25   Q.    Are there correctional reasons

114

1    for denying an inmate placement on the

2    MHU?

3    A.    Corrections can always give us

4    a concern if they have one.  That line

5    of communication is always open if

6    they have concerns.  But if there's a

7    medical need ordered by the provider

8    for us to have them on MHU, then they

9    would be there.

10   Q.    Were there inmates on

11   disciplinary custody status housed on

12   the MHU?

13   A.    There has.

14   Q.    Under what circumstances would

15   that happen?

16              ATTORNEY MICHEL:

17              Object to form.  You can

18         answer.

19              THE WITNESS:

20              Yeah, I don't understand

21         exactly what you're asking.

22   BY ATTORNEY KURIN:

23   Q.    You said that there are ---

24   there have been times when an inmate

25   who is on disciplinary custody status

115

1    has been housed on the MHU.  And I'm

2    trying to understand why that inmate

3    was allowed to stay on the MHU.

4    A.    It would be based on whatever

5    their level of care is at that time.

6    Q.    Under what circumstances would

7    an inmate be transferred off the MHU

8    to the RHU?

9            ATTORNEY MICHEL:

10            Object to form.

11            THE WITNESS:

12            If they were medically

13        stable to be transferred, then

14        the provider would say they're

15        medically stable.

16    BY ATTORNEY KURIN:

17    Q.    I believe you said that ACJ

18    permits inmates to use mobility

19    devices on all the pods at the jail.

20    A.    In other areas of the jail,

21    yes.

22    Q.    What's the difference from

23    other --- in other areas?  Does that

24    mean the same thing?

25    A.    RHU pods are definitely treated

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT

OF PENNSYLVANIA

* * * * * * * *

CLAYTON MCCRAY,         *

    Plaintiff        * Case No.

    vs.              * 2:22-cv-00493-LPL

ALLEGHENY COUNTY;   *

DONALD STECHSHULTE,*

Medical Director,   *

NANCY PARK;         *

JENNIFER KELLY;     *

LAURA WILLIAMS,     *

Chief Deputy Warden*

of Healthcare       *

Services,           *

    Defendants       *

* * * * * * * *

DEPOSITION OF

DONALD STECHSHULTE, M.D.

June 5, 2024


Any reproduction of this transcript is

prohibited without authorization by

the certifying agency.


Sargent's Court Reporting Service, Inc.
(814) 536-8908

27

1    for the smooth running and the

2    provision of health care at the jail.

3    Q.    Did she have any supervisory

4    authority over you in any regard?

5    A.    Supervisory authority over me?

6    Is that what you asked?

7    Q.    Yes.

8    A.    You know, it was sort of a

9    strange relationship, but I always, I

10   thought, worked very well with Laura.

11   I thought we had a very --- you know,

12   a very open and honest relationship,

13   and I honestly enjoyed my time with

14   her and ---.

15        But did she have any

16   supervisory?  I mean, did she have any

17   input into medical care, per se?  No,

18   she did not have input into the direct

19   medical care.  Now, because of the way

20   corrections works and when certain

21   things would happen on the --- you

22   know, on the pod, so to speak, would

23   there be situations where she would

24   not she would --- but would

25   corrections interfere with medical

30

1    Williams.  You use the word strange.

2    Can you explain what you meant by

3    strange?

4    A.    No.

5                    ATTORNEY CULLEN:

6                    Objection to form.

7                    THE WITNESS:

8                    Strange is not quite

9          sure how I would put it.  She

10         was essentially my overall

11         boss, but yet I was in charge

12         of the provision of medical

13         care.  And most of the time, we

14         were able to, you know, work

15         without --- without issues,

16         but, you know, there were

17         certain things that, you know,

18         we disagreed on.

19    BY ATTORNEY GROTE:

20    Q.    As the medical director of ACJ,

21    when you had a disagreement with

22    corrections over a medical issue, what

23    steps did you take?

24    A.    Well, I mean, the step that I

25    would take would be to talk to Laura



**Date:** May 30, 2024

**Before:** 0524Kurin-Park 277777

Printed On: May 30, 2024

Sargent's Court Reporting Services, Inc.
Phone: 814-536-8908
Fax: 814-536-4968
Email: schedule@sargents.com
Internet: www.sargents.com

Page 186

1    some sort of issue and discipline with
2    Mr. McCray?
3    A. Yes. It was discipline. That
4    short term stay where he only stayed a
5    day and left was discipline related.
6    Q. Okay.
7    You testified earlier that you
8    felt there were some issues with
9    getting approval for the, for Mr.
10   McCray to be transferred to the
11   Medical Housing Unit. Fair?
12   A. Fair.
13   Q. Okay.
14   And would that have been that
15   May incident or were you referring to
16   some other specific incident?
17   A. I believe he was classified
18   earlier than May for the housing unit,
19   I believe.
20   Q. Okay.
21   If he was classified earlier
22   than May for the Medical Housing Unit,
23   would that be in the medical records?
24   A. It should be.
25   Q. Okay.

Page 187

1    Do you have any reason to
2    believe it would be, it wouldn't be
3    recorded or it would be recorded
4    somewhere other than the medical
5    records?
6    A. No.
7    Q. Okay.
8    So when you were talking about
9    having some difficulty with getting
10   approval, were you thinking of a
11   specific incident or incidents, or
12   were you, was that just a general
13   statement that sometimes there was
14   difficulty getting approval for Mr.
15   McCray to go to the Medical Housing
16   Unit?
17   A. I don't know. I'm not sure how
18   to answer. I'm not sure how to answer
19   that.
20   Q. Okay.
21   A. I can't think of an incident.
22   Q. Okay.
23   So did you ever have any
24   discussion with the chief deputy
25   warden or anybody else on the

Page 188

1    corrections side where they told you
2    that Mr. McCray would not be going to
3    the Medical Housing Unit in spite of
4    your order?
5    A. No, I don't recall that.
6    Q. And did you ever see any
7    document or email in which there was a
8    reason listed for why Mr. McCray
9    wouldn't be getting Medical Housing
10   Unit classification?
11   A. I never saw anything of that
12   sort.
13   Q. So putting the MHU issue aside,
14   there was some testimony earlier
15   about, I guess it was what you would
16   do if your instructions weren't being
17   followed on a number of topics.
18   A. Okay.
19   Q. Do you recall that?
20   A. Yes.
21   Q. Okay.
22   Are there any specific
23   instances in which your medical
24   instructions weren't followed that you
25   are aware of other than the MHU issue?

Page 189

1    A. No, not until after I reviewed
2    the records for the deposition. Then,
3    you know, you see things that you
4    weren't aware of perhaps. Not at the
5    time.
6    Q. Okay.
7    What --- yeah. What, in your
8    review retrospectively, did you order
9    that wasn't followed through?
10   A. I saw that he was gone. He
11   treatment was not done and he was
12   given supplies to do his own
13   treatment.
14   Q. So you're talking about
15   specifically the period of time or
16   specific incidences where Mr. McCray
17   was given supplies to do his own wound
18   care?
19   A. Yes.
20   Q. Anything else other than that?
21   A. I can't think of anything else.
22   Q. The only other thing I have is
23   I just want to clarify. There's some,
24   and you might not even remember this
25   at this point, but hours ago, there's

**Lee C. Ruotsi, MD, ABWMS, CWS-P, UHM**
**dba HyperDoc, LLC**
**27 Barrington Drive**
**Gansevoort, NY 12831**
HyperDoc93@gmail.com

1/5/25

Rupalee Rashatwar
Jaclyn Kurin
Bret Grote
990 Spring Garden Street
Philadelphia, PA 19123
Abolitionist Law Center

Re:  McCray v. Allegheny County

Dear Ms. Rashatwar,

Thank you for allowing me to offer my thoughts and opinions in this case.

I am a physician, licensed and practicing in the State of New York for the past 35 years.  For the past 13 years I have been in the full-time practice of Wound Care. From 2009 through 2019 I was the Medical Director of the Wound Healing and Hyperbaric Medicine Program at the Catholic Health System of Buffalo, NY.  In that role I was a full-time clinical physician, provided oversight for three outpatient wound clinics and provided consultative services within the five hospitals in the system.  During my ten years there I had an active teaching role in several residency programs and was the director of a Wound Care Fellowship.  In December 2019, I moved to Saratoga Springs, NY to develop and direct a new Wound Care and Hyperbaric Medicine Program with the Saratoga Hospital and Saratoga Hospital Medical Group.  I was continuously board certified in Family Practice from 1988 through 2016 at which point I voluntarily allowed those boards to lapse in that I was no longer practicing in the primary care environment. I am board certified in Undersea and Hyperbaric Medicine, and dually certified in Wound Care by the American Board of Wound Medicine and Surgery (ABWMS) and the American Board of Wound Management (ABWM).  I have more than 10 years of experience as medical director in a skilled nursing facility and memory care unit.  I was a member of the board of directors of the National Pressure Injury Advisory Panel (NPIAP), from 2018 – 2023 and was chair of its Education

1

Committee from 2020-2022, and was chair of its Public Policy Committee for the 2023 calendar year. I am a member of the Wound Healing Society and am faculty in the Wound Certification Prep Course (HMP Communications). The remainder of my experience and credentials are set forth in my current CV which you were provided.

Records Provided for my Review

- Amended Complaint
- Pennsylvania Department of Corrections Medical Records
- Allegheny County Jail Records
- Diagnostic Imaging Reports
- Deposition of Jennifer Kelly, RN
- Deposition of Donald Stechschulte, MD
- Deposition of Nancy Park, MD
- Deposition of Laura Williams
- Deposition of Clayton McCray
- County Answer to Amended Complaint
- Defendants' Answers to Plaintiff's Interrogatories
- Grievances and sick calls filed by Clayton McCray
- Grievances by incarcerated persons at ACJ
- Emails by medical and jail staff
- Expert report of Dr. Mary Ann Miknevich
- ACJ Policies on Medical Autonomy, Medically Necessary Footwear, Hospital and Specialty Care, and Ambulatory Medical Devices

The following report sets forth my professional and expert opinion of the many ways in which I believe Mr. McCray's care during his incarceration at ACJ in 2019-2020 deviated from the established standard of care, and the manner in which those deviations caused, contributed to, and/or increased unnecessary pain and the risk of his infections and ultimate below the knee amputation. All the opinions set forth in this report are held to a reasonable degree of medical certainty. In preparing this report, I relied on my education, training, and experience as a physician and wound care specialist, and the records that I referenced above.

2

General Course of Events

In 2011, Clayton McCray suffered a gunshot wound to the spine, resulting in nerve damage and a right sided foot drop.  As additional consequences of this injury, one of his kidneys had to be removed and his liver was repaired at the time of surgery. MCCRAY_000128

From 2018 to 2019, Mr. McCray developed a neuropathic ulcer on his right heel while he was incarcerated in Pennsylvania prisons SCI-Fayette and SCI-Mercer. While in those facilities, a prison doctor prescribed Mr. McCray a cane, an orthotic shoe and an AFO brace.  His foot wound was appropriately cleaned while at that facility, and he was housed in a handicapped accessible cell. MCCRAY_000002-332, AC_CM_000047, MCCRAY 000122, MCCRAY_000126-28. While in prison, he also received wound care from Washington Health System Wound Care. MCCRAY_000006-08, MCCRAY 000064, MCCRAY_000205-10, MCCRAY_056877-979.

In February of 2019, Mr. McCray was examined by Orthopedic Fellow Alan Slipak of the Allegheny Health Network ("AHN"). Slipak found Mr. McCray did not have osteomyelitis and noted so at that time. MCCRAY_000067. Slipak also noted that Mr. McCray's foot wound appeared to be improving with no sign of active infection at that time. Slipak recommended McCray continue offloading of his right heel and could bear weight on his toes with an assistive device. He was to continue dressing changes to the heel and follow-up as needed.

Several months later in May 2019, Mr. McCray's foot became infected, and he was transferred to University of Pennsylvania Medical Center ("UPMC") Presbyterian where he received IV antibiotics. MCCRAY_000013-63, MCCRAY_000034. Diagnostic testing showed Mr. McCray showed no evidence of osteomyelitis at that time. MCCRAY_000013-63, MCCRAY_000034 ("imaging of the foot did not reveal any osteo").

He was then transferred to SCI-Mercer and was allowed to continue outpatient wound treatment at UPMC Presbyterian.  While at SCI-Mercer, Mr. McCray received proper wound care, was housed in a handicap accessible cell, and was allowed to use his cane, orthotic shoe and AFO brace. He then returned to SCI-Fayette for a few months, where he again received adequate care in accordance with medical standards. During his incarceration within the Pennsylvania Department of Corrections, Mr. McCray was temporarily incarcerated at the Allegheny County Jail ("ACJ") on three separate occasions, pending court

3

appearances:

- 11/3/18 – 11/29/18
- 5/30/19 – 6/3/19
- 8/29/19 – 9/16/19

In September of 2019, Mr. McCray was transferred from SCI-Fayette,  to the Allegheny County Jail ("ACJ"). Expert Report of Miknevich, 19-21. Mr. McCray's medical records from the prisons were sent to ACJ along with a letter by Health Service Administrator Rachel Medlock of SCI-Fayette, in which she notified ACJ medical staff that Mr. McCray had been prescribed and still "requires the use" of several "medical devices: cane, ankle brace, heel cups/lift, AFO brace, and insoles." AC_CM_000047.

For just over a year starting in September 2019, Mr. McCray was incarcerated at ACJ, and he remained there until October 2020.  This timeframe is the subject of this case; it is when Mr. McCray developed osteomyelitis, which required a below the knee amputation of his right leg. As noted throughout my report, it is my opinion that the healthcare providers, who treated Mr. McCray and corrections officials and administrators who obstructed his receipt of care, deviated from the standard of care in many respects as outlined below.

- On admission to ACJ, Mr. McCray's assistive devices were confiscated, and during his time at ACJ he was only allowed to use them intermittently. Deposition of McCray 65:19-66:19, 76:24-79:24, 107.
- Mr. McCray's ACJ Medical Records show he was prescribed to be housed on a lower bunk and tier and housed in the Medical Housing Unit (MHU) due to his chronic care and chronic pain needs. AC_CM_000476, AC_CM_000478; AC_CM_000865-70.

Mr. McCray was housed on upper tiers and bunks several times during his September 2019 to October 2020 confinement. Mr. McCray had to walk up and down tiers to receive medicine, food, recreate and to receive other benefits and services of the jail. MCCRAY_003120. Many times, Mr. McCray couldn't retrieve his meals, medicine, or participate in recreation, showers and other jail activities because his mobility devices were confiscated and/or he was in too much pain to retrieve necessities from the cell door slot. McCray Grievances, AC_CM_002442, AC_CM_002185, AC_CM_002187; Deposition of McCray 65:19-66:19, 76:24-79:24.

On September 20, 2019, the following recommendations were made regarding

4

Mr. McCray's incarceration at the ACJ: Mr. McCray was prescribed to be in the Medical Housing Unit from 11/3/18 – 5/28/20 and further from 6/30/20 – 10/11/20. AC_CM_000476

In addition to failing to ensure that Mr. McCray received the assistive devices recommended by his medical providers at Fayette and Mercer prisons and Washington Health System Wound Care, defendants also disregarded numerous recommendations of medical professionals who specialize in wounds and treated Mr. McCray while he was at ACJ.  As explained below, these specialists of podiatry and wound care repeatedly told defendants about the severity of Mr. McCray's medical conditions and the risk of harm to Mr. McCray if their medical orders were not followed.

Medical staff failed to comply with several ACJ policies relevant to Mr. McCray's medical care. ACJ's Medical Autonomy Policy requires that clinical decisions about a patient be made by him and his provider, with the medical director having final authority over the decision. AC_CM_004170 - 72 ("clinical decisions and actions regarding health care provided to inmates meet their serious medical and mental health needs and are the sole responsibility of qualified health care professionals"). Custody and administrative staff were required to support the implementation of the clinical decision. Id. ("The warden will ensure that custody staff support the implementation of clinical decisions and provide administrative support for making services accessible to inmates."). Also, ACJ's policies require that patients who are prescribed medically necessary footwear receive them. The Ambulatory Medical Device Policy states orthoses and other aids are provided when the health of an inmate would otherwise be adversely affected. ACJ was required to supply the medical orthoses (and other aids) in a timely manner to reduce effects of impairment, as determined by the responsible physician. If the specific ambulatory device or specific aid is contraindicated for security reasons, ACJ must consider and provide alternatives to meet the inmate's health needs. AC_CM_004373 - 77. Similarly, ACJ's Medical Footwear Policy requires the medical and jail staff to provide appropriate footwear when the health of the incarcerated individual would otherwise be adversely affected. AC_CM_004410-13. The medical director, in with consultation with HSA and/or DHSA, was to determine the appropriate footwear or whether an alternative shoe is a medical necessity. Id. "For Incarcerated individuals with …neuropathy, appropriate foot care needs will be assessed during their chronic care visits" and will be ordered by the provider if he determines that the footwear is medically necessary. Furthermore, ACJ's Hospital and Specialty Care Policy permits patients to be referred to medical

5

facilities outside of the Allegheny Health Network when they are in need of care beyond ACJ or AHN's capabilities, including when there are no appointments available at outside facilities. A jail practitioner has the authority to approve the transfer of the patient to another facility that's available with appropriate security measures in place. AC_CM_002830-34.

However, as explained in detail below, medical and jail staff failed to comply with their own internal policies when it came to Mr. McCray's healthcare. ACJ's policies required medical decisions to be made by the healthcare staff including the medical director, and not by administrative or correctional staff.

In reviewing the records, it is evident that Deputy Warden Williams was fully informed and aware of Mr. McCray's condition upon his transfer to ACJ, but, in spite of this, effected regulations and permitted corrections to take actions that directly contradicted McCray's specialists' medical orders  for him to receive daily wound care, use prescribed mobility devices, and that he be housed in a location where he could be non-weight bearing—an accommodation that was available on the Medical Housing Unit. Flags- AC_CM_000476. Problems- AC_CM_000478, AC_CM_000524, AC_CM_000524-25, AC_CM_000530, AC_CM_000087-91, Deposition of Williams. These medical recommendations were based on the medical judgement of Mr. McCray's wound care specialists, which  were entirely appropriate given his specific clinical condition. AC_CM_000087-91. At the time, Mr. McCray's ACJ providers, Drs. Stechschulte and Park, who were general practitioners, knew the specialists' recommendations were medically necessary to prevent and/or reduce the risk of him developing a serious infection, osteomyelitis, amputation, sepsis, or even death. Mr. McCray's specialists informed defendants that these serious harms were highly likely to occur if these recommended treatments were not completed or were disregarded by them or other ACJ staff. AC_CM_000087, AC_CM_000529, AC_CM_000051-55,58, AC_CM_000063, AC_CM_000065, AC_CM_000069-71. Based on my review, the County and individual defendants were aware of Mr. McCray's medical needs yet failed to comply with the medical orders of the podiatrist and wound care specialist concerning the frequency of Mr. McCray's wound care and keeping him on 100% non-weight bearing status.

Deputy Warden Williams also allowed ACJ staff to confiscate Mr. McCray's prescribed assistive devices, placed Mr. McCray into solitary confinement and other housing units where he would not receive the necessary care, which was ordered by medical specialists.

6

Dr. Stechschulte testifies in his deposition that every effort was made to accommodate an inmate's medical care regardless of where the inmate was housed, but claimed that this was not always possible due to various circumstances within the prison, such as jail lockdowns and understaffing. He did not explain why Mr. McCray could not have been housed in the MHU at ACJ consistent with the orders of his specialist.

Mr. McCray had 3 visits with Podiatrist Matthew Hentges with determinations as follows:

- 10/7/19: Podiatrist Hentges diagnosed Mr. McCray with neuropathy and skin ulcer of plantar aspect foot with fat layer exposed. He ordered daily wound care and follow up appointment in 2 weeks. AC_CM_000051-55, 58.
- 11/25/19:  Skin ulcer of plantar aspect of right foot with fat layer exposed and wound cellulitis. AC_CM_000063, AC_CM_000065.
- 2/24/20:  Dr. Hentges referred Mr. McCray to wound care specialist for evaluation and treatment of a chronic right heel ulcer. AC_CM_000069-71.

Mr. McCray was placed in solitary confinement or the Restricted Housing Unit a total of 3 times while at ACJ. Mr. McCray was first placed in solitary confinement from September 25, 2019 to October 26, 2019. He was then placed in solitary confinement from March 24, 2020 through April 9, 2020 and then in the Medical Housing Unit (MHU) from May 26 through May 29, 2020. AC_CM_002251, AC_CM_000074. While in solitary confinement, Mr. McCray did not have access to a clean or sterile environment where he could clean his wound. Several times, Mr. McCray was forced to administer his own treatment; he had to dress his wound, even if he wasn't provided with essential wound care supplies, was denied the opportunity to rinse his wound in the shower first and lacked sufficient education to apply the bandages properly to protect his wound. McCray Grievances, AC_CM_002187, AC_CM_002185.   He testifies that while in those environments his wound care was not done on a consistent basis, and various assistive devices such as braces, crutches, cane and wheelchair were withheld from him. Around December 26, 2019, Mr. McCray wound tested positive for staph aureus and strep group b. AC_CM_002114-21.

On May 26 and 27, 2020, Dr. Park or Dr. Stechschulte, respectively, submitted separate requests for Mr. McCray to be housed on the MHU. AC_CM_001508-09, AC_CM_001513-14. Dr. Stechschulte documented that Mr. McCray had an

7

ulcerated open wound consistent with osteomyelitis, and on May 26 the diagnosis was documented as chronic osteomyelitis with draining sinus right ankle and foot and open wound of the right foot.  AC_CM_000520. The diagnosis of osteomyelitis was subsequently confirmed by Mr. McCray's wound care specialist Dr. Taffe. AC_CM_002687.

On May 26, 2020, Mr. McCray was transferred to the MHU per Dr. Stechschulte's order. He wanted Mr. McCray to be "brought to [MHU] 5B to be more aggressively treated for his foot wound and we could insure that medications were being given appropriately"). AC_CM_000520-21. Mr. McCray, however, remained in the MHU for only one day before being transferred to solitary confinement on 8E where he would remain until June 19.

On or about May 30, a culture result of Mr. McCray's right foot wound was positive for Group B Streptococcus, Staphylococcus aureus, and Diptheroids. AC_CM_002133-35, AC_CM_000523.

On June 3, 2020, Mr. McCray was scheduled for a virtual exam via Facetime with Wound Care Specialist Dr. Taffe. However, the exam was cancelled for non-medical reasons of Mr. McCray being housed in solitary confinement. AC_CM_000516-17, AC_CM_000524, AC_CM_002567.  Although Dr. Taffe was unable to visit with Mr. McCray that day, she still placed orders for Mr. McCray to be 100% non-weight-bearing on his right foot based on her review of his medical records. Non-weight-bearing means that pressure (weight) is not to be applied to the injured area.  Avoidance of pressure and weight to a neuropathic foot ulcer is considered an essential priority as well as standard of care in the treatment of a neuropathic ulcer. AC_CM_000524.  Around that time, Dr. Park documented that ACJ medical and correctional staff were failing to comply with Dr. Taffe's orders.  Dr. Park further documented that continuing to house Mr. McCray on the solitary confinement unit 8E was not recommended with regard to Mr. McCray's wound care because Mr. McCray was not being provided with his prescribed medical devices and housing accommodations which were necessary for him to be non-weight-bearing as per Dr. Taffe's orders. AC_CM_002567, AC_CM_002483, AC_CM_000524-25, AC_CM_000525-26, AC_CM_000527, AC_CM_000528, AC_CM_002484, AC_CM_002604.

On June 16, 2020, Dr. Taffe attempted to examine Mr. McCray remotely using the FaceTime feature on Dr. Park's cell phone. Once again, Dr. Taffe had to assess Mr. McCray  virtually as opposed to in-person.  AC_CM_000087-91. For Dr. Taffe the virtual  exam made it difficult to assess Mr. McCray's wound. She

8

did, however, continue to recommend that he be 100% non-weight-bearing for his right foot. AC_CM_000087-91. In my experience, video examinations for wound care issues are typically quite challenging to evaluate a wound as the lighting and camera views are frequently suboptimal, and the examiner is unable to utilize any additional physical exam findings such as subtle redness, odor, and tissue characteristics in making accurate diagnoses and treatment decisions. Dr. Taffe recommended that Mr. McCray  continue to offload his wound and ordered that he be provided appropriate footwear. Dr. Taffe also warned that if ACJ staff failed to comply with her orders it was highly likely that Mr. McCray would develop osteomyelitis. AC_CM_000087-AC_CM_000091.

From June 19 through June 29 Mr. McCray was housed in the general population on unit 3B. Dr. Park found that these housing conditions did not comply with Dr. Taffe's order for Mr. McCray to be on non-weight bearing status 100% of the time. While housed there, Mr. McCray fell, his crutches were confiscated, preventing him from offloading effectively and being able to walk, which wasn't rectified because ACJ staff replace the crutches with an unusable wheelchair, which had malfunctioning brakes, and couldn't fit in his cell. AC_CM_00249, AC_CM_002255-59, AC_CM_000532,, AC_CM_000532. While on the general population unit, Mr. McCray's wound care treatments continued to be sporadic and frequently inadequate.  Proper and timely escorts for wound care, failure of staff to respond for wound care assignments, soiled dressings left in place, accommodative and assistive devices being confiscated and withheld are all examples of deficiencies noted in the record as well as in Mr. McCray's testimony. Deposition of McCray at 76-77; Deposition of Park at 47-46, 53-57, 82-86.  From June 29 through June 30, 2020, he was in the Men's acute health pod, and from June 30 through October 3 he was housed on the MHU. Dr. Park says Mr. McCray was "[t]ransferred from 5C to MHU … in order to promote NWB status [order] and cleanliness and to continue aggressive wound care measures." AC_CM_000533-34.

It should be noted here that the above deficiencies were voiced in multiple grievances by other inmates at AJC as well. Dozens of grievances submitted by persons incarcerated at ACJ between 2018 and 2022 confirm a pattern of ACJ failing to provide medically necessary wound care and assistive devices that had been prescribed by an ACJ medical provider or outside specialist. Incarcerated persons didn't receive adequate wound care when housed on non MHU units. Corrections officers failed to escort patients to the MHU for wound care. Medical staff did not show up for wound care or respond to calls by pod officers. Wound care was frequently not received during lockdowns, and patients' soiled bandages

9

weren't changed for days. Systemic wound care problems pre-dated the COVID-19 pandemic, and problems with wound care continued during McCray's incarceration in 2020. Patients' prescribed medical assistive devices that were cleared by ACJ medical professionals were confiscated by corrections and not returned for months if at all. Patients on RHU grieved that corrections confiscated their wheelchairs, crutches, and orthotics. Patients also grieved not receiving exams with specialists or their diagnostic testing was delayed for months. AC_CM_007870 - AC_CM_007677.

During May and June 2020, prior to Mr. McCray's diagnosis of osteomyelitis on July 1, appropriate and timely wound care, assistive devices, and housing that would have permitted Mr. McCray to offload were all factors that should have been in place, and would have resulted in a substantially higher likelihood that the wound would not have become infected, or that the infection would have been contained and treated before it resulted in amputation.

On July 1, 2020, an X-Ray of Mr. McCray's right foot was interpreted as plantar ulceration with sinus tract and acute osteomyelitis of the plantar calcaneous. MCCRAY_003120, AC_CM_000236. It is at this point in time that arrangements should have been made for urgent workup and treatment of this problem. The appropriate approach at this time would have been hospitalization, MRI, surgical consultation and aggressive debridement of the soft-tissue and bony infection. Had this been carried out as I have suggested, it is quite likely that worsening of the infection and osteomyelitis leading to the below knee amputation (BKA) could have been avoided. Indeed, by the time the MRI was performed on August 17, 2020, the osteomyelitis had involved most of the calcaneous as well as part of the talus. The calcaneous is the "heel bone" and the talus is one of the large supporting mid-foot bones. Amputation of these 2 structures will leave an individual with a non-functional foot, so at this point BKA is the only viable and practical solution.

On July 6, 2020, the results of a wound culture revealed Group B Streptococcus and Proteus Vulgaris. AC_CM_002136-138.

On July 6, 2020, there was confirmation of the osteomyelitis by an outside specialty provider. AC_CM_000536-37, AC_CM_002687.

On July 14, 2020, the above impressions were again documented. MCCRAY_003124, AC_CM_000238.

10

On July 17, Mr. McCray was examined by Orthopedic Surgeon Dr. Stephen Martinkovich.  He ordered Mr. McCray to have an MRI and ultrasound of the foot as soon as possible. He recommended wound packing twice daily and recommended evaluation for appropriate footwear.  He additionally explained to Mr. McCray that he would likely require surgery to remove infected bone. AC_CM_000100-107.

On August 1, 2020, Mr. McCray was seen in the Emergency Department at Allegheny General Hospital and once again acute osteomyelitis of the calcaneous was diagnosed. AC_CM_000119 - 124, MCCRAY_004981- 85.    This was now 1 month from the date of the initial diagnosis of osteomyelitis.

On August 17, 2020, the MRI ordered by Dr. Martinkovich on July 17 was performed and revealed, not surprisingly, osteomyelitis that had involved most of the calcaneous as well as part of the talus. AC_CM_000127-130, MCCRAY_005066.

On September 4, 2020, Orthopedic Surgery recommended a below knee amputation (BKA) due to osteomyelitis of the calcaneous, and osteomyelitis was again confirmed by another physician who recommended that Mr. McCray proceed with a below the knee amputation (BKA) to prevent further spread of the osteomyelitis as well as possible sepsis and death. AC_CM_000144-47.  Once again, had there not been a 6-week delay from the initial diagnosis of osteomyelitis, Mr. McCray would likely have benefited from a much less catastrophic surgery and continue to have his leg and foot today.

Mr. McCray underwent BKA on September 16, 2020, and was ultimately discharged from Allegheny County Jail on October 9, 2020. AC_CM_000165-67, AC_CM_000169-171.

Observations and Opinions

As a wound care specialist, I was asked to opine on the treatment provided to Clayton McCray that led to his BKA. I do believe that Mr. McCray's clinical condition demanded that appropriate wound care and other necessary components of his treatment should have been in place regardless of where he resided in the jail.

11

<u>Wound Care</u>

Clayton McCray initially developed a foot ulcer in 2018. This ulcer remained open and in various stages of severity and acuity through his below the knee leg amputation in September of 2020.

There were several problems with the wound care administered at ACJ: (1) jail staff failed or refused to provide wound care and likely misrepresented its completion[1]; (2) Defendants impermissibly changed the frequency of wound care dressing and cleaning from daily to weekly; (3) Defendants failed to conduct audits or review after learning on numerous instances of nurse and medical assistants failing to complete wound care; (4) Institutional impediments such as lockdowns, understaffing, and clinic restrictions prevented Mr. McCray from receiving wound care; (5) Mr. McCray's self-administered wound care treatments were ineffective and worsened his wound; (6) Mr. McCray's wound care was often completed in a suboptimal environment.

There were delays in Mr. McCray being seen and having an initial examination and consultation. Defendants knew on February 24, 2020 that podiatrist Dr. Hentges referred Mr. McCray to be examined by wound care specialist Dr. Taffe. Defendants were told that the initial appointment for March 2020 was cancelled due to COVID-19. AC_CM_002421-22. Mr. McCray's appointment with the wound care specialist was delayed for several months because neither Dr. Park or Dr. Stechschulte timely submitted a request to reschedule the appointment. AC_CM_002676, AC_CM_002431. On June 3, corrections canceled Mr. McCray's appointment with Dr. Taffe. AC_CM_000516-17. When he was ultimately seen by Dr. Taffe on June 16, the visit was conducted on Facetime. AC_CM_000524, AC_CM_002567.

Mr. McCray had assistive devices when he was admitted to ACJ. He was prescribed devices during his incarceration but they were frequently confiscated. Defendants knew and disregarded Dr. Taffe's orders for Mr. McCray to be 100% non-weight bearing status. Dr. Taffe told Park that Mr. McCray was "at a high risk of further complications and developing osteomyelitis" if he was not permitted to use proper assistive devices.

---

[1] This assertion is based on the fact that numerous instances of wound completion forms do not possess corroborative documentation in Mr. McCray's progress notes, unit logbooks, and are contradicted by contemporaneous grievances filed by Mr. McCray and his deposition testimony. Regardless of the likely misrepresentation of the extent to which Mr. McCray was administered wound care, my findings and conclusions regarding the deficiencies in Mr. McCray's care remain the same.

12

Offloading of the affected foot was appropriately ordered as of June 3, 2020, and documentation as well as deposition testimony by Dr. Park suggests that the offloading orders were not carried out and Mr. McCray was not provided with the appropriate devices and housing accommodations that would accommodate those orders. AC_CM_000524. The above, however, only accounts for the later phase of his residency at AJC. Had appropriate wound care, assistive devices, and accommodations been provided in the many months prior to June and July, the progression of this wound and ultimate below knee amputation likely would have been avoided.

By July 1, 2020 the diagnosis of right calcaneal osteomyelitis was established and was further corroborated and documented throughout the months of July and August. AC_CM_000534-39, AC_CM_002687 AC_CM_002136-38, AC_CM_000540-41.

An MRI was appropriately ordered on July 17 by an outside provider, however, this MRI would not be performed until a full month later on August 17. This MRI sadly revealed progression of the osteomyelitis to the point that below knee amputation became the only practical and viable option. AC_CM_000100-AC_CM_000107, MCCRAY_004775- 76, AC_CM_000127-130. Had the MRI been performed in a timely fashion it would have, at the very least, provided an opportunity to intervene much sooner for the infected wound with underlying osteomyelitis.

Had appropriate evaluative and interventional measures been put in place in early July it is highly likely that a partial calcanectomy (selective debridement of the affected/infected portion of the calcaneous) followed by a course of antibiotics and non-weight-bearing would have prevented the BKA. This protracted approach to acute osteomyelitis falls well below the standard of care.

Moreover, based on my medical opinion as set forth in this report, I believe to a reasonable degree of medical certainty that the irreparable damage to Mr. McCray's right lower leg, and the partial calcanectomy, could have been prevented had the County and individual defendants not disregarded the wound care specialists' medical orders and the appropriate standards of care for his open neuropathic ulcer, which should have included keeping him on the MHU since that was the only housing unit at ACJ that provided around-the-clock monitoring, immediate access to medical providers and treatment, including daily wound care, nutritional supplements, pain relievers, antibiotics, and accommodations that would have enabled Mr. McCray to offload and elevate his wound,

13

thus improving healing and blood flow to the affected area. The MHU also would have ensured that Mr. McCray's use of assistive devices was not interfered with, and would have allowed him to safely shower in a handicap accessible shower stall.

<u>Summary of course of events and missed opportunities in July and August</u>

July 2: Dr. Taffe confirms osteomyelitis and informs Dr. Park that Mr. McCray needs surgery and a prolonged course of antibiotics.  Dr. Taffe instructs ACJ to schedule Mr. McCray to be seen by Orthopedic specialist Dr. Serra. AC_CM_000536, AC_CM_002687, AC_CM_000537.

July 6:  Dr. Park acknowledges diagnosis of osteomyelitis and that Mr. McCray needs to be seen by Dr. Serra asap.  Scheduler requested to make appointment. AC_CM_000539.

July 7: Dr. Stechschulte acknowledges fever, foot swelling, no sensation in foot and X-ray findings "suspicious" for osteomyelitis. AC_CM_000539-40. Dr. Park on this date notes 20 lb. weight loss and moderate swelling and edema of foot. AC_CM_000540- 41.  These observations by both of these ACJ providers should have triggered much more urgent action.

July 7:  Mr. McCray's scheduled appointment for July 9 with wound care.

July 10 with Ortho are cancelled due to non-medical administrative reasons and Mr. McCray would not see Dr. Martinkovich until 7/17. AC_CM_000100-AC_CM_000107, AC_CM_002505-06, AC_CM_002727.

ACJ scheduler did not fax the off-site MRI request until 7/24 and the MRI was ultimately accomplished on 8/17. MCCRAY_004768-67, AC_CM_000127-130, MCCRAY_005066.

It is noted that Dr. Stechschulte documented on 7/30 that efforts were being made to schedule the MRI sooner so that Mr. McCray's treatment could move in a more timely fashion, because his last MRI was canceled for non-medical reasons. AC_CM_002632.

The above delays clearly violated ACJ's Hospital and Specialty Care Policies and more likely than not cost Mr. McCray his leg.

14

Assistive Devices

The well understood and supported standard of care for a neuropathic foot ulcer includes but is not limited to the following:

- Complete offloading of the affected area and any assistive devices necessary to accomplish this.
- Appropriate wound care and dressings.
- Diagnosis and management of infection – soft tissue as well as bone.
- Determination of adequate arterial status.
- Ongoing close monitoring of progress to detect any progression of the osteomyelitis.

Care for Mr. McCray was not provided in keeping with appropriate and accepted standards of care between August 2019 and May 2020 and beyond through the time of amputation. I have noted above multiple points in time at which the course of events could have been dramatically altered. Mr. McCray's osteomyelitis could have most likely been prevented had appropriate wound care and offloading measures been put in place early in the course of his incarceration at ACJ.  There is documentation as early as August of 2019 that this was not the case.

With regard to the assistive devices, it is clear from the records that Mr. McCray did not have consistent access to those.  Given the fact that assistive devices are essential for the offloading of a neuropathic foot ulcer, and offloading is the most important intervention for a neuropathic foot ulcer, it becomes clear that the failure to offload this ulcer led to the worsening of the ulcer and exposure of the underlying bone to bacteria, ultimately leading to osteomyelitis.

Nutrition

Adequate nutrition is an important part of wound care recovery. There were several occasions on which Mr. McCray reported that he was not receiving his prescribed Boost nutritional supplement. Mr. McCray lost 20 pounds over the course of 6 months. AC_CM_000540-41. A lack of proper nutrition likely contributed to Mr. McCray's poor wound recovery.

Physical Therapy

Mr. McCray was prescribed physical therapy to prevent his right leg muscles

15

from atrophying. Mr. McCray reported that his physical therapy sessions were ineffective with exercises lasting for no more than a few minutes, being in too much pain to complete the exercises, or not occurring due to jail lockdowns or his housing placement. AC_CM_000521, AC_CM_000535, AC_CM_000572, AC_CM_000559. Mr. McCray also reported having a fear of falling, which he did several times while at ACJ. Many of the progress notes on the physical therapy session appear to be verbatim, which makes it difficult to assess if Mr. McCray's leg strength and ability to ambulate improved. AC_CM_000538, AC_CM_000546. Dr. Stechschulte and Dr. Park departed from the standard of care to devise and execute a physical therapy plan and effective exercises to enable Mr. McCray to walk safely with the least amount of pain. A lack of proper physical therapy likely contributed to Mr. McCray's pain, falls, and inability to ambulate safely before and after his amputation.

Wound Infection and Osteomyelitis

Moving to the issue of wound infection; the classic signs of infection are redness, warmth, drainage, malodor and pain. A challenge in Mr. McCray's case is that redness and warmth may not be evident due to the neuropathy associated with his spinal cord injury. In spite of this, there were multiple occasions throughout late 2019 and 2020 where more aggressive investigation should have taken place. Indeed, there were several notations in the progress notes and wound care forms describing changes suggestive of infection. On 2/12/20 Nurse Long documents that Mr. McCray told her "my right heel has a wound that smells now, some Dr. thought I could do it myself now worse." AC_CM_000510. On 4/3/20 McClung, MA "Went to 8E for wound care. Inmate has a quarter size hole on right heel. Since this writer has done inmate's wound care, it has gotten worse. Will notify provider. Inmate states his wound has gotten worse due to sporadic wound dressing." AC_CM_000513. On 5/4 20 McClung, MA documents "Went to pod to do wound care. Upon inmate removing his shoe, this writer smelled a foul smell, which I haven't noticed before. Inmate states he told med nurse he thinks his foot is infected. Alerted Dr. Park was issue. Also on 5/12/20, I called pod to ask if inmate wanted wound care done. CO on pod stated he refused. Doing the wound care today, inmate stated he did not refuse the wound care on 5/12/20, which he never does." Each of the above instances reflect missed opportunities to develop a more aggressive timeline and plan of care which likely would have prevented the amputation in September. AC_CM_000518.

At the very least the most fundamental of all interventions, which are offloading, daily wound care and necessary assistive devices, should have been provided in

16

an uninterrupted, daily fashion. Mr. McCray suffered from several falls at ACJ. Records show that he fell on December 19, 2019, April 2, 2020, April 10, 2020, and April 26, 2020. AC_CM_002269, AC_CM_002270-73, AC_CM_002245-AC_CM_002244, AC_CM_0002248-79, AC_CM_002255- AC_CM_002259). The use of proper assistive devices likely could have prevented his falls.

There is no data to support the routine culturing of wounds, but rather, a deep culture should be obtained when there is clinical evidence of infection based on the provider's judgement.  What is certain, however, is that the longer a wound remains open, the greater is the risk of wound infection and progression to osteomyelitis.  Once again, the surveillance, treatment and testing for this wound was performed in such a protracted fashion as to greatly increase the risk of wound infection and osteomyelitis.  It is certainly more likely than not, that if this situation would have been handled according to the accepted standard of care from the outset, the BKA would have been avoided.  There is documentation of several cultures and the resulting reports including well understood wound pathogens including Streptococcal and Staphylococcal species.

As late as May 22, 2020, X-Rays of the right foot failed to show evidence of osteomyelitis.  MCCRAY_003113-14. On or about May 30, 2020, Mr. McCray's wound culture was positive for Strep, Staph and diptheroids. AC_CM_002133-AC_CM_002135.  Shortly thereafter, Mr. McCray was transferred to solitary confinement and then to a general population unit, and during that time did not receive proper and timely wound care, did not complete a full course of antibiotics, and out of necessity was forced to bear weight on his right foot with the infected wound. AC_CM_000521.  Around July 1, Mr. McCray had repeat foot X-Rays performed and at that time there was, in fact, evidence of osteomyelitis. AC_CM_000541-42.  It is well understood and accepted that plain film X-Rays are not definitive for ruling out osteomyelitis, however, when the plain film does show osteomyelitis, there is no question that it is there.  Based on the above, it is quite apparent that Mr. McCray developed osteomyelitis, or at the very least his osteomyelitis worsened, between May 22 and July 7. MCCRAY_003113-14, AC_CM_000233-34, AC_CM_000478, AC CM 000476, AC CM 000520, AC CM 000087- 91, MCCRAY 003120, AC CM 000236, AC_CM_000536.  Once again, it is more likely than not that if the wound had been treated according to the above described standards of care the osteomyelitis and subsequent BKA could have been avoided.

17

Antibiotic Administration

Appropriate antibiotic agents, dosing and schedule should have been determined as soon as the definitive diagnosis of osteomyelitis was established – July 2. Acute osteomyelitis in a large weight bearing bone such as the calcaneous should be approached with a very real sense of urgency.  A phone consultation between the ACJ physicians, Dr. Taffe, and an Infectious Disease consultant could have quite easily set Mr. McCray on a proper course.  This obviously was not done, and failure to do so led to the loss of Mr. McCray's leg.   There is no reason whatsoever to delay appropriate antibiotics until the time of surgery.

Mr. McCray was allergic or sensitive to many antibiotics and medications, which he had an adverse reaction to or caused him pain. AC_CM_000541-44, AC_CM_000552-54, AC_CM_002630.  ACJ medical personnel documented in his ACJ medical record that Mr. McCray had only one kidney and knew or should have known that Mr. McCray could have a significant adverse reaction to specific antibiotics, which happened on several occasions. *Id.*, AC CM 000479, AC CM 000505, AC CM 000527, AC_CM_000535, AC_CM_002187, AC_CM_002189. Mr. McCray told Dr. Stechschulte, Dr. Park and medical staff about his adverse reactions and persistent infection. *See* AC_CM_000522-580. McCray was given diapers because of persistent diarrhea from improper antibiotics. AC_CM_000523, AC_CM_000526-27.

As both Dr. Park and Dr. Stechschulte stated, a deep tissue culture or biopsy is generally utilized to assess the infection and determine the proper antibiotic course. Deposition of Stechschulte at 82-83; Deposition of Park at 122:1-23. However, that did not happen in Mr. McCray's case, and he was administered short and interrupted doses of antibiotics that were ineffective, and the adverse side effects were painful, uncomfortable, rash-inducing, nauseating, and caused him to experience unnecessary discomfort.

Housing Accommodations

In terms of Mr. McCray's housing accommodations, it does appear that accommodations such as lower tier housing, lower beds on the bunks and a shower chair could have been provided and were medically recommended.  Such accommodations were not continuously provided throughout his stay at ACJ. AC_CM_002185, AC_CM_000499, AC_CM_002604.

Mr. McCray was diagnosed with chronic pain, which was documented in his medical records and persisted for his entire incarceration at ACJ. AC_CM_000478,

18

AC_CM_000476. There were many times that Mr. McCray did not receive his medications, including pain relievers, solution for wound care, and other medicine because ACJ did not have them in stock and failed to obtain them from a different pharmacy. He reported this to staff and Dr. Park and Dr. Stechschulte. Deposition of McCray at 167. Mr. McCray testified that his pain medications were also not reordered or consistently prescribed properly, as they "were getting cut off and cut back on." Deposition of McCray at 199:3-24. A patient's pain level is a factor in assessing whether the wound is improving from treatment or becoming worse. McCray testified that he fell multiple times at ACJ "[b]eing in so much pain." Deposition of McCray at 198-199.

Regarding pain management, the adequacy of this is difficult to ascertain, as pain is a very subjective phenomenon and is based solely on patient reporting. Additionally, much of the pain in a foot tends to be due to neuropathy and this is again a challenge. Mr. McCray was prescribed tramadol as well as oxycodone for his ongoing pain, and he was also prescribed gabapentin for the neuropathic component of the pain AC_CM_000539; AC_CM_000588-89. Records and grievances filed by Mr. McCray suggest that Mr. McCray's pain management was often ineffective and inadequate. AC_CM_000119 -AC_CM_000124, AC_CM_000569-70, AC_CM_000588-89, AC_CM_000592-93, AC_CM_002187.

Since the amputation, Mr. McCray has reported experiencing ongoing phantom pain, among other types. Mr. McCray said he suffered from unnecessary pain, falls, and pain so severe he was unable to eat, sleep, and which caused him to urinate on himself all because defendants failed to develop a plan that could adequately alleviate his pain and phantom pain. They would propose one type of pain reliever for him to use for about 10 days. But any relief he felt was inconsistent and the pain would come again. Since his release, Mr. McCray continues to suffer from pain due to frequent infections and phantom pain. AC_CM_000598, AC_CM_000603, AC_CM_000605.

Mr. McCray testifies that he can't do any activities when the phantom pain comes. "I'm still dealing with phantom-pain problems. I'm dealing with pain every day. It's different. Not the same as it was before. Way more excruciating." He reports his pain level is "[s]ometimes more than ten, [or] higher than ten…" is what I told them." He's unable to function, walk around, take care of his daily activities, get dressed, get cleaned up when he has phantom pain. There's "[n]othing" he can do when he has phantom pain. He can only "Lay in bed holding my legs, crying sometimes. If I have phantom pain, it wakes me up out of my sleep. I can't even put on my leg….Because every walk, every step it's

19

hurting." Deposition of McCray at 90-92.

Concluding, it is abundantly clear that the below knee amputation will have a profound and lifelong impact on Mr. McCray. While modern prostheses are remarkably good in terms of ambulation, they certainly are not an equal match for one's natural leg and foot. People who undergo major lower extremity amputations are at increased risk for amputation site breakdown, infection, re-operation and mental health conditions such as depression. Those of us who practice full-time wound care see neuropathic foot ulcers every day, and it is the heel ulcers that are the most worrisome. As we see in this case, the only viable option for an advanced heel and midfoot ulcer with extensive osteomyelitis is a below knee amputation.

Clayton McCray was admitted to ACJ with a neuropathic ulcer to his heel. From the outset, the care provided to him relative to the foot wound was, at best, sporadic and in suboptimal conditions, which was contrary to the appropriate standard and to specialist orders for Mr. McCray. Wounds such as this are not a mystery and there was much opportunity to provide care which would allow this wound to heal. Additionally, there was considerable outside consultant support and recommendations which sadly went unheeded.

It is my opinion, within a reasonable degree of medical certainty, that if Mr. McCray's wound care would have been provided within the appropriate standard of care and proper accommodations been provided to him, his below knee amputation and all of its attendant challenges and potential complications would have been avoided.

Respectfully,

*Lee Ruotsi, MD*

Lee Ruotsi, MD

20

# LEE C. RUOTSI, MD, ABWMS, CWS-P, UHM
# CURRICULUM VITAE

27 Barrington Drive                                              407-454-1137
Gansevoort, NY 12831                                       hyperdoc93@gmail.com

## EDUCATION

**Ross University School of Medicine,** *Roseau, Dominica*
*M.D.  June, 1985*

**Family Practice Residency.  Niagara Falls Memorial Medical Center.  Affiliate
program State University of New York at Buffalo.**
*Resident, Family Medicine.  1985 – 1988*
*Chief Resident, 1987 – 1988*

## CERTIFICATION

**Board Certification, Family Practice:**  Continuously board certified 1988 through
2016**.**

**Board Certified, Undersea and Hyperbaric Medicine.** *American Board of
Preventive Medicine (ABPM).  2008 – recertified 2018.*

**Board Certified, Wound Care.**  American Board of Wound Medicine and Surgery
*2012 - Recertified 2015.*

**Certified Wound Specialist – Physician. (CWS-P)** *American Academy of Wound
Management (ABWM).  2007, recertified 2018.  Accredited:  National Commission
for Certifying Agencies.*

**Advanced Cardiac Life Support Instructor,** *American Heart Association*
*1985 - 2017*

**Advanced Cardiac Life Support Provider**
*1985 - present*

**Advanced Trauma Life Support provider,** American College of Surgeons
1988 - 2008

**N.O.A.A. Certified Diving Medical Officer**
*National Oceanic and Aerospace Administration*
*2006 - present*

# STATE MEDICAL LICENSURE

*State of New York*

# CLINICAL PRACTICE

**Medical Director**
Saratoga Hospital Center for Wound Healing and Hyperbaric Medicine
Saratoga Springs, NY
December, 2019 to present

**Medical Director**
*Catholic Health Centers for Advanced Wound Healing*
*Catholic Health System of Western New York*
*9/2009 to 11/2019*
*Active Hospital Medical Staff Privileges: Sisters of Charity – Main Street Campus,*
*Sisters of Charity – St. Joseph Campus, Mercy Hospital of Buffalo, Kenmore Mercy*
*Hospital, Mt. St. Mary's Hospital and Medical Center*

**Wound Care and Hyperbaric Medicine Consultant (non-staff)**
**Consultation regarding complex wounds**
**Departmental Education**
- Wound Healing in Graft vs Host Disease
- Wound Healing and Hyperbaric Oxygen Therapy in Delayed Radiation Soft
    Tissue Injury
- Hyperbaric Oxygen Therapy in Radiation Induced Hemorrhagic Cystitis
- Hyperbaric Oxygen Therapy in Radiation Induced Hemorrhagic Proctitis
*Roswell Park Cancer Institute, Buffalo, NY*
*2013 – 2019*

**Christian Kivi, M.D.,** Niagara Falls, New York
*Locum Tenens – Private Practice*
*7/1988 – 1/1989*

**Niagara Falls Memorial Medical Center,** Niagara Falls, New York
*Emergency Department Assistant Director/Attending Physician*
*1/1989 – 3/1990*

**Lee C. Ruotsi, M.D.**
*Private Practice – Family Medicine – Lewiston, NY*
*3/1990 – 7/1992*

**Ruotsi & Bertolino, MD, PC**
*Private Practice (Partnership) Family Medicine – Lewiston, NY*
*7/1992 – 9/2009*

**Medical Director**
*Center for Wound Healing & Hyperbaric Medicine*
*Mount St. Mary's Hospital*
*2005 - 2009*

**Medical Director**
*Center for Wound Healing and Hyperbaric Medicine at Olean General Hospital*
*2007 - 2009*

**Medical Director**
*Elderwood Health Care at Riverwood*
*Skilled Nursing Facility*
*1999 – 2010*

**Mount St. Mary's Hospital and Health Care Center,** Lewiston, New York
*Emergency Department Attending Physician*
*1997 - 2004*

**Niagara Falls Memorial Medical Center,** Niagara Falls, New York
*Emergency Department Assistant Director/Attending Physician*
*1989 - 1990*

**F.D.R. Emergency Medicine Associates**
*Emergency Department Attending Physician*
*1995 – 2011*

**Medical Director Alzheimers Unit**
*Northgate Manor Skilled Nursing Facility*
*2004 – 2008*

## ACADEMIC and TEACHING APPOINTMENTS

**Program Director – Wound Care Fellowship**
*Catholic Health System of Buffalo, NY.  2017 - 2018*

**Clinical Instructor and Preceptor – Wound Care and Hyperbaric Medicine**
*Catholic Health System of Buffalo, NY.  2010 - 2019*

*Internal Medicine, Family Medicine and Podiatric Residency Programs, and Vascular Surgery Fellowship, The Catholic Health System of Buffalo, NY. Brian D'Arcy, MD, Director of Medical Education. Affiliate residency programs – State University of New York at Buffalo, Jacobs School of Medicine*

- *"Wound Care – What u Need 2 Know" Lecture Series*
    - o *Diabetic Foot Ulcers*
    - o *Venous Insufficiency Ulcers*
    - o *Arterial Insufficiency Ulcers*
    - o *Pressure Injuries*
    - o *Medical Comorbidities that Adversely Impact Wound Healing*

## APPOINTMENTS

**National Pressure Injury Advisory Panel (NPIAP)**
*Member, Board of Directors. Term 2018 – 2021*
*Re-elected to 2nd term 2021 - 2024*
*Co-chair Education Committee; 2019*
*Chair Education Committee; 2020 – 2022*
*Chair Public Policy Committee; 2023 - present*
*Annual Conference co-chair 2020, 2021, 2022*

**American Board of Wound Medicine and Surgery (ABWMS)**
*Board of Directors***,** *2011 – present*

**Symposium on Advanced Wound Care (SAWC)**
*Planning Committee*, 2014 – present

**American College of Clinical Wound Specialists (ACCWS)**
*Board of Directors and Chair, Education Committee, 2013 - 2015*

**Clinical Preceptor – Smith & Nephew Medical Science Liaisons**
2014 - present

**Residency Preceptor in Family Medicine**
*Niagara Falls Memorial Medical Center. Melvin B. Dyster, MD, Program Director. 1988 – 2002*

**Emergency Physician**
*National Hockey League, (Buffalo Sabres Hockey)*
*1997 – 2002*

**Wound Care and Hyperbaric Medicine Consultant**
*Precision Health Care Inc. Boca Raton, Florida*

**Medical Director, Emergency Medical Services**
*Grand Island Volunteer Fire Company, Grand Island NY*
*1985 - 2011*

**Medical Staff President**
*Mount St. Mary's Hospital and Health Care Center, Lewiston, New York*
*2001 - 2003*

**President**
*Niagara County Medical Society*
*2006 - 2008*

**Trustee**
*Mount St. Mary's Hospital and Health Care Center, Lewiston, New York*
*2001 – 2003*

**Physician of the Year**
Niagara County Hospice – 1992

**Physician Liaison**
*Pressure Injury Team*
*Catholic Health System of Buffalo, NY  2017 - 2019*


## Lectureships: Moderator and Speaker

**Symposium on Advanced Wound Care (SAWC)  2013 through present**
- *Medical Comorbidities and Their Impact on Wound Healing*
- *The Wounded Psyche*
- *Debridement; Back to the Basics and Back to the Future*
- *Bio-surgical Debridement*
- *Wound Scene Investigation: Atypical and Autoimmune Wounds*
- *Hyperbaric Oxygen Therapy; Present Indications and Evidence*
- *How to Make a Wound Center Run Smoother*
- *Post-conference Debridement Workshop 2012 - 2015*
- *How to Avoid Wound Care Litigation*
- *Novel Debridement Tools…  What Works?*
- *Venous Leg Ulcers;  There's More to it Than Just Compression*
- *Preventing Recurrence of Ulcers*
- *Wound Scene Investigation 1 and 2*
- *Post-Conference debridement Workshop*
- *Medical comorbidities and their impact on Wound Healing*
- *Venous Leg Ulcers – How to Compress*
- *Case Studies in Hyperbaric Oxygen Therapy*
- *Venous Leg Ulcers – Standards of Care and Imposters*
- *Legal Pearls for the Wound Provider*

**National Pressure Ulcer Advisory Panel – National Meetings**
- 2018:  Clinical Effects of Biofilm on Wound Healing
- 2019:  Pressure injuries on the Fast track – Pre-Hospital and ED
         Special Populations – Pain Management in Wound Healing

**Amputation Prevention (AMP) Symposium – Chicago Hilton**
- Medical Co-Morbidities and Their Impact on Wound Healing – 2015
- Nutrition in Wound Healing – 2015
- The Epidemiology of Wounds; The Numbers – 2015
- The Chronic Wound Beyond the Basics; When to Use What – 2016
- Hyperbaric Oxygen Therapy in Critical Limb Ischemia – 2016
- Co-chair Wound Summit

**Desert Foot**
- *Debridement Workshop - 2014*

**2013 Southeast Region Wound Ostomy Continence Nurses Association**
- *The Evolution of a Wound Care Doctor*

**2017 National Meeting – Wound Ostomy Continence Nurses Association**
- Debridement Workshop, didactic and hands-on

**Save a Leg – Save a Life (SALSAL) National and Local**
- *The Psychology of Wound Healing*
- *Evaluation and Management of Venous Leg Ulcers*

**Vascular Interventional Associates; Annual Symposium**
- *Hyperbaric Oxygen therapy in Critical Limb Ischemia – 2015*
- *Venous Leg Ulcers – What to do When Compression isn't Enough – 2016*
- *Hyperbaric Oxygen Therapy in Critical Limb Ischemia – 2018*
- *Venous and Arterial Ulcers – When to Refer - 2019*

**American College of Clinical Wound Specialists (ACCWS)**
- *Medical Comorbidities and Their Impact on Wound Healing*
- *The Epidemiology of Wounds*
- *Nutrition in Wound Healing*

**Canadian Association of Wound Care (CAWC)**
- *Medical Comorbidities and their Impact on Wound Healing (2015)*
- *Evaluation and Management of Lower Extremity Ulcers; Arterial and Venous (2015)*
- *Myth Busters – Commonly Held Misbeliefs in Wound Healing (2016)*
- *Wound Cleansers – What, When & Why (2016)*

**New York State Academy of Family Practice Annual Winter Meeting**
- *Keynote lecturer and workshop leader, January 2016*
- *Keynote lecturer, January 2017*

**Professional Leadership Academy – South America: 2013, 2014**
- *Diabetic Foot Ulcers*
- *Venous Leg Ulcers*
- *Pressure Ulcers*

**Wound Certification Prep Course.  HMP Communications**
- *Faculty  2013 – present*

**Defense Research Institute (DRI) – Scottsdale, AZ  2016**
- *Update in Staging and Pathophysiology of Pressure Ulcers*

**Legal Consulting**

- *Negligence and malpractice consulting and case review*

**Publications**

- Chapter author; <u>Hyperbaric Oxygen Therapy</u>.  In "Atlas and Text of Skin and Integumentary Disorders"  Rose Hamm, PT Editor.  McGraw Hill Publishing, 2014.  Revisions for 2nd edition 2018.  Revisions for 3rd edition 2022.
- Contributing author:  Today's Wound Clinic; <u>"Thank You for Letting Me Take Care of You Today"</u>
- <u>Panelist; T.I.M.E. – C.D.S.T.</u>  TIME Clinical Decision Support Tool. <u>International Consensus Document.</u>  London, England  2019
- Co-author: Best Practices for Preventing Skin injury Beneath Personal Protective Equipment During the COVID-19 Pandemic: A Position Paper from the National Pressure Injury Advisory Panel (NPIAP). Journal of Clinical Nursing; February, 2021

- Co-author:  The Impact of the SARS-CoV-2 Pandemic on the Management of Chronic Limb Threatening Ischemia and Wound Care.  Accepted for publication October, 2021, Wound Repair and Regeneration

**Research**

- **Principal Investigator:**  CM001: A Multi-Center, Prospective, Clinical Trial Comparing the Efficacy of AutoloGel™ Therapy to Usual and Customary Care in Wagner 1 and 2 Diabetic Foot Ulcers.  Trial discontinued prior to completion due to difficulties with enrollment parameters.
- **Principal Investigator:** Project Title: [699580-2] Prevention of Pressure Ulcers: Clinical Education on use of Allevyn Life to Reduce Incidence Rate.
  Sponsor:  Smith & Nephew Advanced Wound Care

**Humanitarian Volunteerism**

- 2005:  Sisters of St. Francis.  Chiapas, Mexico.  Indigent medical care.
- 2008:  Sisters of St. Francis  Chiapas, Mexico.  Indigent medical care.
- 2015:  Global Medical Brigades, Honduras.  Indigent medical care.
- 2016:  Global Medical Brigades, Nicaragua.  Indigent medical care
- Hospice Buffalo:  Wound care education presentations as requested

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CLAYTON MCCRAY,

               Plaintiff,

v.

ALLEGHENY COUNTY; DONALD
STECHSHULTE, Medical Director; NANCY
PARK; JENNIFER KELLY; LAURA
WILLIAMS, Chief Deputy Warden of
Healthcare Services,

               Defendants.

Case No. 2:22-cv-00493-LPL

**Initial Expert Report**
**of**
**Sean T. Stewart**

## Part I
## Introduction

I was retained by **Dickie, McCamey & Chilcote, P**.**C**., to serve as both a consulting expert and expert witness for the case of **Clayton McCray v. Allegheny County, et al**. The following is my report, prepared pursuant to Federal Rule Civil Procedure 26 (a) (2). I carefully reviewed and considered the materials listed in Part III. Additionally, the application of my knowledge, extensive detention experience, supervision of medical contracts, and training were carefully utilized and employed in the compilation, review, and final analysis of my expert opinion.

In preparation to assist as an expert witness in this case:

1. I carefully reviewed the file documents provided by the office of **Dickie, McCamey & Chilcote, P**.**C**. Additionally, I applied my knowledge, experience, and training in the review and final analysis of my expert opinions:

2. Moreover, I applied over thirty years as a correctional professional and corrections-related experience including, but not limited to, my extensive career in the profession of corrections and based on my professional qualifications as listed in Part VII.

3. Furthermore, I have never been an employee of **Allegheny County** or the **Allegheny County Sheriff's Department /Detention Center**.

## Part II
## A Foundation and Context for the Review of this Case

To begin with, let it be stated that I am not qualified to offer opinions regarding the medical care, evaluation, diagnosis, or treatment of inmates. I lack the medical expertise, qualifications, and license to second-guess the medical professionals assigned that responsibility. Thus, I offer no opinions – critical or supportive – regarding the decisions or actions of the **Contracted Doctors** and the onsite **Allegheny County medical staff**. I will, at times, discuss the medical professionals only to the extent that their work history, acts, or omissions are related to any opinions I have to discuss pertaining to **Deputy Chief**

Stewart IXR Clayton McCray v. Allegheny County, et al.     Page 1

APPENDIX - PAGE 314

**Williams** and/or the **Allegheny County corrections officers** or any omissions or failure to report information by **Clayton McCray** to the **Contracted Doctors** and the **Allegheny County medical staff.**

Furthermore, any reference I make to case law in this report will be provided only when my understanding of the case law and/or statutes are a factor in forming any of my opinions or to aid in explaining the reasoning behind my opinions. None of the references to statutes or case law are provided with any intent of presuming to interpret the law for the court. Obviously, that is the function of the court.

As a recently retired correctional professional, with over 30 years of experience in corrections and 14 years as a senior commander, with the Pima County Sheriff's Department, I had to investigate and provide critique of incidents. I was required to review incidents regarding staff intervention, actions taken and/or failure to act. Since the early 1990's, I have in various capacities been involved in the operation, management, auditing, and in providing training and technical assistance to my facility and others. I have recognized the general responsibility of corrections officials to take reasonable measures to protect the inmates they incarcerate. I am also, familiar with county medical staff such as **Contracted Doctors** and the **Allegheny County medical staff** who work in correctional facilities to provide medical care to inmates. I am very familiar with the team approach needed between security staff and medical staff to ensure reasonable medical care is provided to the inmates. I have participated in and supervised this relationship throughout my career.

Jails typically house persons who are involuntarily confined, many whom tend not to be honest, cooperative or compliant. Detainees are often uncooperative, unpredictable, deceptive, and manipulative. The task of safely and securely supervising and caring for a disparate prisoner population in a safe, secure, orderly manner, in any jail regardless of its size, is extremely difficult. **Chief Williams** and the **Allegheny County corrections officers** had to administer to the needs of **Clayton McCray** while, also, interacting with all other incarcerated persons.

When reviewing this case, it is important to consider the responsibilities of the different parties in a correctional setting.

1. The responsibility of corrections staff (**Allegheny County corrections officers**) to follow the medical professionals' orders pertaining to an inmates medical condition and to observe and report to the medical staff any known medical issues pertaining to an inmate.

2. The responsibility of medical staff (**Contracted Doctors** and the **Allegheny County medical staff** onsite) to diagnose and treat any medical issues known.

It is important to note that **Chief Williams** and the **Allegheny County corrections officers** *are not medical care specialists or experts*. They are *corrections officials* trained to incarcerate inmates while providing inmates with the basic necessities and maintaining security, safety, order, and discipline. Corrections officials *are not educated, trained, or licensed to diagnose or determine appropriate treatments for inmates*. Thus, corrections officials must rely on the medical care professionals to provide medical services to those prisoners in need of such care. In the instant case, that would indicate inmate medical care was the responsibility of the **Contracted Doctors** and the **Allegheny County medical staff**.

As a senior commander within my department, I had to critique incidents that took place within the facility. When assessing incidents, as to staff culpability pertaining to a duty to protect, I utilized the court's rulings in **Farmer v. Brennan,**[1] to aid in the evaluation of any alleged acts of reckless disregard and/or omissions by staff. I have applied the same technique and utilized it in assessing the instant case as it pertained to **Allegheny County**, **Deputy Chief Williams**, and/or the **Allegheny County corrections officers**.

---

[1] **Farmer v. Brennan,** 511 U.S. 825 (1994).

Stewart IXR Clayton McCray v. Allegheny County, et al.     Page 2

**APPENDIX - PAGE 315**

Corrections facilities are not and cannot be the absolute guarantor of inmate safety. At best, corrections officials can take ***reasonable steps*** to protect the safety, health and welfare of inmates. The Supreme Court has recognized this, ruling that, "Prison officials must ensure inmates receive adequate food, clothing, shelter and medical care" and must "take reasonable measures to guarantee the safety of inmates."[2] It is my understanding that corrections officials may be deemed deliberately indifferent to the serious needs of an inmate only if they had ***actual knowledge of a substantial threat of serious harm and took no reasonable steps to abate the risk***. Actual knowledge requires the defendants must both ***be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and then must***, ***also***, ***have actually drawn the inference***.

It is my understanding that a jail official may be deemed indifferent to the serious needs of inmates only if they ***acted deliberately*** and were ***callously indifferent*** to any known needs. Once an official has actual knowledge - is aware of and has drawn the inference of an excessive risk, the "official may be held liable…***only if he*** disregards that risk by failing to take ***Reasonable Measures*** to abate it." [3]

## Part III
## <u>Summary of Opinions</u>

In forming my opinions regarding whether **Allegheny County**, **Deputy Chief Williams**, and/or the **Allegheny County corrections officers** were indifferent to the needs of **Clayton McCray** I considered the following:

- The information known;

- The inferences drawn, if any, regarding an excessive risk of serious harm to **Clayton McCray**;

- What if any actions were taken to abate any known threat; and

- Did **Deputy Chief Williams** and/or the **Allegheny County corrections officers** act deliberately with callous indifference.

Based on the review of materials provided, for this instant case, I have concluded the following. Neither **Deputy Chief Williams** nor her corrections staff are medical professionals. Thus, the responsibility and authority for diagnosing, treating, and otherwise providing medical care for inmates, in the **Allegheny County Jail**, was the responsibility of the **Contracted Doctors** and the **Allegheny County medical staff** assigned that responsibility.

**Allegheny County** and/or **Deputy Chief Williams** met the reasonable standard of care for corrections facilities as it concerned **Clayton McCray**'s wellbeing and provided him access to medical care while incarcerated at the **Allegheny County Jail**. **Allegheny County** and/or **Deputy Chief Williams** met their constitutional duty to provide medical care to the inmates housed in the **Allegheny County Jail.** This, by assigning **Contracted Doctors** and the **Allegheny County medical staff** to provide medical services to the inmates housed in the **Allegheny County Jail**, including **Clayton McCray**.

**Clayton McCray** was clearly under the medical care of the **Contracted Doctors** and the **Allegheny County medical staff** from September 2019 to October 2020. Based on the extensive medical files reviewed, the **Contracted Doctors** and the **Allegheny County medical staff** were aware of his medical issues and were medically treating him.

---

[2] **Farmer v. Brennan,** 511 U.S. 825, 832 (1994), quoting **Hudson v. Palmer**, 468 U.S. 517, 526-527 (1984).

[3] **Farmer v. Brennan,** 511 U.S. 825, 847 (1994). **(emphasis added)**.

Stewart IXR Clayton McCray v. Allegheny County, et al.    Page 3

There is no evidence, in the case file materials received and reviewed, to conclude **Allegheny County**, **Deputy Chief Williams**, and/or the **Allegheny County corrections officers** delayed or interfered with **Clayton McCray**'s access to medical care while incarcerated.

There is no evidence, in the case file, indicating **Deputy Chief Williams** and/or the **Allegheny County corrections officers** failed in their duties in attempting to provide for **Clayton McCray**'s safety and/or the safety of any other inmate. **Deputy Chief Williams** undertook reasonable available measures to abate any known risks or posed risk to **Clayton McCray**. It is my opinion, **Deputy Chief Williams** and/or the **Allegheny County corrections officers** were not indifferent to any known safety concerns regarding **Clayton McCray**. Additionally, they made a good faith effort to provide him with medical treatment and a safe and secure environment.

There is no evidence, in the materials reviewed, that **Deputy Chief Williams**:

1. Directed or supervised the actions taken by any of the **Contracted Doctors** and the **Allegheny County medical staff** at any time.

2. Influenced the conduct and actions of the involved **Contracted Doctors** and the **Allegheny County medical staff** regarding the medical diagnoses and/or treatments of **Clayton McCray**.

3. Interfered with or refused any of the **Contracted Doctors** and/or the **Allegheny County medical staff** pertaining to their medical treatment of **Clayton McCray.**

This assessment is made with reasonable and professional certainty, based on my extensive career in the profession of corrections and based on my professional qualifications as listed in Part VII.

## Part IV
## Documents Reviewed/Facts Data Considered as Basis for Opinions

### Materials Received:

1. Plaintiff's Pleadings
   a. First Amended Complaint
   b. Second Amended Complaint

2. Allegheny County Jail Medical Records

3. Depositions:
   a. August 16, 2024, Deposition of Clayton McCray
   b. March 26, 2024, Deposition of Jennifer Kelly
   c. May 30, 2024, Deposition of Nancy Park, MD
   d. May 30, 2024, Deposition of Laura Williams
   e. June 5, 2024, Deposition of Donald Stechshulte, MD
   f. June 26, 2024, Deposition of Holly Martin
   g. July 2, 2024, Deposition of Jason Beasom
   h. August 15, 2024, Deposition of Robyn Smith

4. Allegheny County Jail Email Communications
   a. From and to Laura Williams
   b. From and to Jennifer Kelly

5. Corrections Documents
   a. Complaints and Findings
   b. Incident Reports

Stewart IXR Clayton McCray v. Allegheny County, et al.     Page 4

**APPENDIX - PAGE 317**

    c.   Misconducts
    d.   Property Receipts
    e.   Classification and Booking Documents
    f.   Fayette Transfer Sheet

## Part V
## Professional Opinions

**Opinion 0-1.**    **Chief Williams and the Allegheny County corrections officers were not responsible for any alleged flaws or missteps made by the Contracted Doctors and the Allegheny County medical staff regarding Clayton McCray.**

### Comments and Basis for Opinion

As previously stated, I am not qualified to offer opinions regarding the medical/mental health evaluation, diagnosis, or treatment of inmates. I offer no opinions – critical or supportive – regarding the decisions or actions of the healthcare professionals. Similarly, **Chief Williams** and the **Allegheny County corrections officers** lack the qualifications and responsibility for evaluating, diagnosing, and determining treatment for inmates. They must rely on the diagnosis and orders given by medical professionals then act on the orders given by those professionals. This, whether it pertains to hospital transport, medications prescribed, or treatment etc.

Even if arguendo, there were flaws in the medical care processes regarding **Clayton McCray**, those activities were not the responsibility of **Chief Williams** and the **Allegheny County corrections officers**. Diagnosing and determining treatment for inmates, in the **Allegheny County Jail**, was the responsibility of the **Contracted Doctors** and the **Allegheny County medical staff** assigned to the facility.

Further, **Clayton McCray**'s complaints, regarding his medical care issues, are directed at the **Contracted Doctors** and the **Allegheny County medical staff** not at the **Allegheny County corrections officers**. If and when the officers made an observation that they, *as laymen*, thought required medical attention and notification regarding **Clayton McCray** they proceeded to report it to the qualified medical staff onsite, as his testimony demonstrates.

**August 16, 2024, Deposition of Clayton McCray**

### Page 121:22–122:3

[ATTORNEY BACHARACH]: The next grievance . . . what is it about?

[McCRAY]: Continuous things. Things like two days missing again. I had officers call the medical department and no one came. No one helped.

### Page 122:15–22

[ATTORNEY BACHARACH]: The next grievance . . .. What is this one about?

[McCRAY]: Continuous things. I'm not receiving treatment. Staff calling and trying to get me wound care.

### Page 123:6–9

[McCRAY]: As you can see throughout the complaint, I asked staff. They were reaching out to medical staff and I was denied.

### Page 126:23–127:2

[McCRAY]: I had dried up blood all over my floor. Just being mistreated, basically throughout my time being in the RHU, as far as medical.

Stewart IXR Clayton McCray v. Allegheny County, et al.    Page 5

APPENDIX - PAGE 318

**Page 140:13–15**

[McCRAY]: I had to walk in the cell which caused bloodstains to be left on the floor. I let the CO know.  The CO called medical.

**Page 198:24–199:6**

[ATTORNEY CULLEN]: You described falling all over the place.  I'm trying to understand what you meant?

[McCRAY]: Being in so much pain to where as I fell in the unit. I fell in my cell. That's what I mean.

[ATTORNEY CULLEN]: Did anybody respond?

[McCRAY]: Yes. There was always a response.

**Opinion 0-2.**          **Chief Williams and the Allegheny County corrections officers did not dictate the medical treatment of Clayton McCray, nor did they interfere with any medical treatment. The medical treatment and medical decisions were made by the Contracted Doctors and the Allegheny County medical staff.**

<u>**Comments and Basis for Opinion**</u>

The case record materials are clear, **Chief Williams** and the **Allegheny County corrections officers** did not dictate any treatment for **Clayton McCray***,* nor did they interfere with any medical treatment for **Clayton McCray**. It was reasonable and appropriate for **Chief Williams** and the **Allegheny County corrections officers** to rely upon the **Contracted Doctors** and the **Allegheny County medical staff** to provide medical treatment to **Clayton McCray**. The record clearly indicates **Clayton McCray** was under direct medical care from September 2019 to October 2020 by the **Contracted Doctors** and the **Allegheny County medical staff.  Chief Williams** and the **Allegheny County corrections officers** must rely on the diagnosis and orders given by medical professionals then act on the medical orders given by those professionals. This, whether it pertains to transport to the hospital, medications prescribed, or treatment etc. There was nothing that was obvious to a layman requiring action by **Chief Williams** pertaining to the **Contracted Doctors** and the **Allegheny County medical staff**'s medical treatment of **Clayton McCray.**

**Clayton McCray's** complaints regarding **Chief Williams** are misguided because he thought she was part of the medical team, *she was not*. **Chief Williams** was part of the security team, and it appears to me she was more of a "go between" for security and the **Contracted Doctors** and the **Allegheny County medical staff.  Chief Williams**, during this time frame, was mainly supervising **Allegheny County Jail**'s Covid-19 response. **Doctor Stechschulte** was the medical director of the **Allegheny County Jail.**

**May 30, 2024, Deposition of Chief Deputy Laura Williams**

**Page 15:17-21**

[WILLIAMS]: Well , correctional medicine - - - I'm interpreting your intention, which maybe I shouldn't do, would deal with medical certifications. And I am not a medical practitioner.

**Page 22:14–17**

[WILLIAMS]: I worked closely and provided some administrative supervision support to the clinical team,

**Page 30:4–8**

Stewart IXR Clayton McCray v. Allegheny County, et al.     Page 6

APPENDIX - PAGE 319

[ATTORNEY RASHATWAR]: And what professional relationship did you have with Dr. Stechschulte? In a sense, how did you two work together?

[WILLIAMS]: He was the medical director at the agency.

**Page 31:1–8**

[ATTORNEY RASHATWAR]: And what was Dr. Stechschulte's responsibilities and role with respect to patients at the jail?

[WILLIAMS]: So he was the supervising medical physician of the agency and was responsible for providing direct supervision and oversight for clinical matters for any of the physicians

**Page 34:5–9**

[WILLIAMS]: but [Dr. Stechschulte] supervised all of the AHN staff that were on site, which might include other physicians as well, because he was the medical Director.

**Page 35:24–36:12**

[ATTORNEY RASHATWAR]: . . . but what types of medical staff did Doctor Stechschulte supervise? For instance, were they nurses? What were the positions of the individuals he supervised?

[WILLIAMS]: Medical Director, which supervised MDs, DOs, PAs, CRNPs. Now, more broadly, he's the prescribing physician, or one of them. And so he would work directly with RNs, LPNs, and MAs. And he would supervise the care that was being administered to a degree that any physician who is prescribing would .

**Page 37:11–13**

[WILLIAMS]: So if he was working with a nurse and the patient , he would be providing that supervision.

**Page 44:6–11**

[WILLIAMS]: If a doctor ordered some - - - if you're asking if a doctor ordered something, if they needed permission from command staff to execute a treatment order, the answer would be no.

**Page 155:10–12**

[WILLIAMS]: I'm not a medical clinician, so I can't audit the care.

**Page 199:24–200:6**

[ATTORNEY CULLEN]: When you were serving as Chief Deputy Warden at Allegheny County Jail, were there circumstances in which you or the Correctional staff would overrule an inmate's medical housing designation that was made by the medical team?

[WILLIAMS]: No.

**May 24, 2024, Deposition of Nancy Park, M.D.**

**Page 46:4–47:1**

[ATTORNEY RASHATWAR]: What was your relationship with Deputy Warden Williams? . . . I'm asking about your responsibilities mostly . . ..

[DR. PARK]: I did not see her directly very often. Very occasionally she would come into the Medical Housing Unit when I was there working, but her agenda was usually not to see

Stewart IXR Clayton McCray v. Allegheny County, et al.    Page 7

APPENDIX - PAGE 320

me. Her role was administrative, overseeing policies. She had direct access to the correctional side and, you know, balancing correctional needs of inmates with healthcare needs, policies, working with the Medical Director. I did not generally have a requirement to report directly to her on anything, and, you know, unless there was a serious concern, I would be able to do that. I wasn't barred from doing that . . ..

**June 5, 2024, Deposition of Donald Stechshulte, M.D.**

### Page 27:3–4, 15–19

[ATTORNEY GROTE]: Did [Deputy Warden Williams] have any supervisory authority over you in any regard?

* * *

[DR. STECHSHULTE]: But did she have any supervisory? I mean, did she have any input into medical care, perse? No, she did not have input into the direct medical care.

### Page 30:11–13

[DR. STECHSHULTE]: I was in charge of the provision of medical care.

**Opinion 0-3.**    **In the Allegheny County Jail medical staff would make a determination as to what medical devices are medically necessary. This is consistent with jails across the country.**

<u>**Comments and Basis for Opinion**</u>

The record is clear that the **Allegheny County Jail medical staff** would assess the need for medical devices for inmates booked into the facility. This is consistent with the industry norm.

**August 16, 2024, Deposition of Clayton McCray**

### Page 66:9–19

[McCRAY]: Whatever was prescribed for my foot was taken away from me.

[ATTORNEY BACHARACH]: Other than the shoes, what was prescribed for you?

[McCRAY]: Jail cups. I believe I had my brace transferred, too. Whatever was on the paper that was prescribed to me. It was taken from me.

[ATTORNEY BACHARACH]: Who took it?

[McCRAY]: Whoever was in medical of the intake of Allegheny County Jail.

### Page 193:16–194:1

[ATTORNEY CULLEN]: Did you see them take it and put it anywhere[? You] went to the search, and went to the medical area and by the time you got through the medical you didn't have it?

[McCRAY]: Yes. They took and said you have to talk to medical to get it.

[ATTORNEY CULLEN]: Was that a corrections officer who told you that?

[McCRAY]: I believe, but medical staffing had to be there to tell them he's not or he is allowed to have it. I believe medical was there, too, but it was corrections, I believe.

**May 30, 2024 Deposition of Chief Deputy Laura Williams**

### Page 62:4–16

Stewart IXR Clayton McCray v. Allegheny County, et al.       Page 8

[WILLIAMS]: The process if somebody came into the institution with an assistive mobility device was typically to call one of the providers that was on site. So there was 24/7 on – site coverage from an NP, PA, or MD. And so if somebody came in, we don't yet know if they are actively prescribed, but we would have one of those qualified practitioners assess the individual, seek records as indicated, and make a determination as to whether or not they would still be issued that.

**Page 63:5–13**

[ATTORNEY RASHATWAR]: Was there a security protocol for determining what devices could or could not come into the jail?

[WILLIAMS] There was always a security search of devices in the facility. But we deferred to what the practitioners indicated was medically necessary and then would search the device.

**Opinion 0-4.      Clayton McCray's movement and housing was assessed and approved by the Allegheny County medical staff.**

<u>Comments and Basis for Opinion</u>

The case materials reviewed demonstrated that **Clayton McCray**'s housing changes were due to his negative behavior.[4] The moves were medically evaluated and approved by the **Allegheny County medical staff**[5] and the **Allegheny County medical staff** continued to monitor **Clayton McCray**'s condition when not housed in the medical unit[6]

**May 30, 2024, Deposition of Chief Deputy Laura Williams**

**Page 71:25–72:6**

[ATTORNEY RASHATWAR]: What was the process for someone getting placed out of the medical housing unit and into another unit?

[WILLIAMS]: They would have to be cleared medically to - - - to be moved from the housing unit.

**Page 73:15–18**

[WILLIAMS]: The health care practitioners would determine whether or not they required housing on the medical housing unit.

**Page 164:8–12**

[ATTORNEY RASHATWAR]: And when before someone was placed in the RHU or the restrictive housing unit, did they have to be medically - cleared?

[WILLIAMS]: Yes.

**Page 199:24–200:6**

[ATTORNEY RASHATWAR]: When you were serving as Chief Deputy Warden at Allegheny County Jail, were there circumstances in which you or the Correctional staff would overrule an inmate's medical housing designation that was made by the medical team?

---

[4] Misconducts - AC_CM_002156 thru AC_CM_002164.

[5] 13. Segregation - AC CM 000028, AC CM 000059, AC CM 000074, AC CM 000074 and AC CM 000099.

[6] 13. Segregation - AC CM 000028, thru AC CM 000099.

Stewart IXR Clayton McCray v. Allegheny County, et al.      Page 9

[WILLIAMS]: No.

## Part VI
## Conclusion

Unquestionably, **Allegheny County** and/or **Deputy Chief Williams** met their duty to provide medical care to the inmates incarcerated in the **Allegheny County Jail**, including **Clayton McCray**.

Based on my training and experience there was nothing that would have been ***so obvious to a layman*** that would have required **Deputy Chief Williams** and /or the **Allegheny County corrections officers** to intervene with the **Contracted Doctors** and the onsite **Allegheny County medical staff** regarding **Clayton McCray**'s medical treatment.

It was reasonably appropriate for **Deputy Chief Williams** and/or the **Allegheny corrections officers** to rely upon and trust the medical decisions made by the medical professionals, the **Contracted Doctors**, and the onsite **Allegheny County medical staff**.

There is no evidence, in the case file materials received and reviewed, to conclude **Deputy Chief Williams** and/or the **Allegheny County corrections officers** interfered with **Clayton McCray**'s access to medical care while incarcerated.

There is no evidence, in the case files received and reviewed, to conclude **Deputy Chief Williams** and/or the **Allegheny County corrections officers** ignored or refused any medical directives given by the **Contracted Doctors** and the onsite **Allegheny County medical staff** as it pertained to **Clayton McCray**.

There were no barriers in the ability for **Clayton McCray** to contact and communicate to the **Allegheny County corrections officers** and/or the onsite **Allegheny County medical staff,** if and when he decided to do so, regarding any medical needs he wanted attending to.

The opinions provided are based on the review of information available as January 28, 2025. If in the future, additional information is made available, I reserve the option of supplementing my report prior to deposition.

I hereby certify, state, and verify, under penalty of perjury that the foregoing is true and correct. Executed on this 28th day of January 2025.

Sean T. Stewart

Stewart IXR Clayton McCray v. Allegheny County, et al.      Page 10

APPENDIX - PAGE 323

## Part VII

## Qualifications and Expertise:  Sean T. Stewart

**A.  Current work History**

**Consulting and Training Contractor for De Land and Associates** (2014 – present).

**Consulting and Training Contractor for National Institute for Jail Operations (N.I.J.O.)** (2012 – present).
- Technical assistance and/or trainer.
- Lead Instructor.
- Lead Accreditation Inspector.

**Consulting and Training Contractor for National Corrections and Detention Alliance (NCDA)** (2022-present).
- Technical consultant/assistance
- Lead instructor

**Site Inspections/Evaluations**

- **Mobile Alabama-** Mobile County Metro Jail (Detention Staffing Analysis 2019).
- **Florence Arizona-** Pinal County Jail (Accreditation Inspection 2021).
- **Bay Minette Alabama-** Baldwin County Corrections Center (Accreditation Inspection 2021).
- **Jackson Mississippi -** Harrison County Sheriff's Office (Accreditation Inspection 2021).
- **Forsyth Georgia -** Forsyth County Sheriff's Office (Accreditation Inspection 2022).
- **La Paz County Jail** (Site Inspection 2022).
- **Wyoming Department of Corrections Women's Center** (Site Inspection 2023).
- **Chester County Pennsylvania** (Operations Assessment 2023).
- **Florence Arizona-** Pinal County Jail (Accreditation Inspection 2024).
- **Chatom Alabama-** Washington County Jail (Site Inspection 2024).
- **Holbrook Arizona** – Navajo County Jail (Accreditation Inspection 2024).
- **Alabama Department of Corrections –** St. Clair Facility (Site walk-through 2024).
- **Alabama DOC -** Donaldson Facility (Site Tour 2024).
- **Alabama DOC –** Limestone Facility (Site Tour 2024).
- **Ohio DOC** (Critical Incident Review for NTOA 2024)

**Consulting Contractor National Tactical Officers Association (NTOA)** (2017 -present):

**Consulting Contractor for Encartele, Inc.** (2021 - 2022):

**Consulting Contractor for Lightning Law Technologies, Inc.** (2023 - present)

Ongoing professional interaction with various state corrections officials, county and other jail administrators, criminal justice researchers and writers, and other corrections and criminal justice experts and officials. Developing corrections pre-service and in-service training programs.

Stewart IXR Clayton McCray v. Allegheny County, et al.     Page 11

APPENDIX - PAGE 324

*While authoring my report I may reference legal authority in a limited number of instances when including such references will provide an element of the process for formulating an opinion or to illustrate a point or element of one or more of my opinions.*[7]

## B. Pima County Sheriff's Department Professional Positions

| | | |
|---|---|---|
| Hire Date | September | 1992 |
| Promoted to Sergeant | December | 1997 |
| Promoted to Lieutenant | June | 2006 |
| Promoted to Captain | November | 2012 |
| Retired | January | 2021 |

**Corrections Captain Detainee Services Division Commander Pima County Sheriff's Department (January 2019 – January 2021) -** Duties which include among other things supervising four (4) Lieutenants, 12 Sergeants, 100 Corrections Officers, One (1) Civilian supervisor, 16 Civilian Staff. Areas of responsibilities include:

**Medical Services Section:**
P.R.E.A
Infirmary & Clinic
Mental Health Units
Return to Competency Program
Policy and Procedure

**Tactical Response Unit:**
Fire Safety
Facility Emergencies/Special Ops
**Mission Facility:**
Work Furlough
Work Release Unit
Home Detention/Electronic Monitoring

**Judicial Services Section:**
Judicial Security Unit
Transportation Unit
Extraditions
**Planning and Research:**
Detainee File Maintenance
Detainee Grievances
Detainee Due Process
Detainee Classification

**Corrections Captain Corrections Support Division Commander Pima County Sheriff's Department (March 2017 – January 2019) -** Duties which include among other things supervising four (4) Lieutenants, one (1) Civilian Manager, 9 Sergeants, 15 Civilian Supervisors, 65 Corrections Officers, 140 Civilian Staff. Areas of responsibilities include:

**Intake Services Section:**
Booking, Intake, Identification & Release
Detainee Property
**Segregation Section:**
Disciplinary Housing
At-Risk and Predatory Detainee Housing
Protective Custody Housing
High Security and Administrative Segregation Housing

**Contracts/Compliance Section:**
Research & Statistics
Detainee File Maintenance
Detainee Due Process
Detainee Grievances
Revenue Contracts
Research & Development
Technology Unit

**Logistics Section:**
Food Service Unit
Supply Unit
Environmental Services Unit
Construction Unit
Fire Life and Safety Unit
Tactical Response Unit
**Custody Records Operations Section:**
Records Unit
Booking Unit

**Interim Corrections Chief Pima County Sheriff's Department (January 2017- March 2017) -** Duties which include among other things supervising the operations of the Corrections Bureau for the Pima County Sheriff's Department until the position was filled.

---

[7] Any reference I make to case law or statues in this report will be provided only when my layman's understanding of the case law and/or statutes was a factor in forming or explaining any of my opinions. None of the references to statutes or case law are provided with the intent of presuming to interpret the law for the court. Obviously, that is the function of the court; however, where any of my opinions are influenced to some degree by my understanding of legal authority or can be better illustrated by such references, referencing the legal authority will more fully disclose all bases for my opinions.

Stewart IXR Clayton McCray v. Allegheny County, et al.      Page 12

**Corrections Captain Corrections Support Division Commander Pima County Sheriff's Department (September 2015 – January 2017)** - Duties which include among other things supervising three (3) Lieutenants, one (1) Civilian Manager, 10 Sergeants, 14 Civilian Supervisors, 100 Corrections Officers, 145 Civilian Staff. Areas of responsibilities include:

| <u>Technology and Compliance Section</u>: | <u>Judicial Security Section:</u> | <u>Intake Services Section:</u> |
|---|---|---|
| Research & Statistics | Court Security Unit | Intake & Identification |
| Detainee File Maintenance | Extraditions | Detainee Classification |
| Detainee Due Process | Transportation Unit | <u>Release Integrity Section:</u> |
| Information Services Technologies | <u>Intelligence Unit:</u> | Intake &Training |
| Research and Development | Detainee Mail | Auditing |
| Technology Unit | Security Threat Group | Court Services Liaison |
| Revenue Contracts | Management | <u>Custody Records Operations</u> |
| Detainee Grievances | Surveillance | <u>Section:</u> |
| Legal Issues | Law Enforcement & Court Liaison | Records Unit |
| | | Booking Unit |

**Corrections Captain, Support Services Division Commander, Pima County Sheriff's Department (November 2014 - September 2015)** - Duties include, among other things, supervising three (3) Lieutenants, one (1) Civilian Manager, six (6) Sergeants, 13 Civilian Supervisors, 95 Corrections Officers, and 138 Civilian Staff. My areas of responsibilities include:

| <u>Medical Services Section:</u> | <u>Detainee Processing Section:</u> | <u>Logistics Section:</u> |
|---|---|---|
| P.R.E.A | Records Unit | Food Service Unit |
| Infirmary & Clinic | Booking Unit | Supply Unit |
| Mental Health Units | Property Unit | Environmental Services Unit |
| Return to Competency Program | <u>Judicial Services Section:</u> | Construction Unit |
| | Judicial Security Unit | Fire Life and Safety Unit |
| | Transportation Unit | |

**Corrections Captain, Operations Division Commander, Pima County Sheriff's Department (November 2012 - November 2014)** – Duties included, among other things, supervising five (5) Lieutenants, 30 Sergeants, 350 Corrections Officers & Civilian Staff. Managing an detainee population of 2000. Administering a safe and secure environment for staff and detainees utilizing the principles of direct supervision. Areas of responsibilities included:

<u>**All General Population Units consisting of Minimum, Medium, and Maximum Custody:**</u>

| | |
|---|---|
| The Intake and Identification Unit | Administrative Segregation Units |
| Tactical Response Unit | Intelligence, Investigation and Gang Unit |
| Female Detainee Housing Units | Remanded Juvenile Housing Units |
| Main Control | Emergency Planning Unit |
| Work Furlough/ Work Release Unit | Field Surveillance Unit |

**Main Jail Tower/Administrative Segregation Commander (Feb 2012–Nov 2012)** - Responsibilities included, but were not limited to, the management, safety, security, and welfare of the Main Jail Tower and the Administrative Segregation Units 24/7. Main Jail Tower – Nine (9) Sergeants, 100 Corrections Officers, eight (8) maximum custody housing units accommodating 576 detainees. Administrative Segregation – two (2) Sergeants, 25 Corrections Officers, "Super Max" four housing units with 150 detainees.

**Supervisor to Commander of the Security Services Section, Pima County Sheriff's Department, Corrections Bureau (Jan 1999 - Feb 2012)** - Security Services Section duties and supervision responsibilities included: The Detainee Mail Room, Detainee Phone System, PCJ Video Visitation System, PCJ Video Surveillance System, Intelligence Gathering and Investigating Criminal Activity ensuring a safe and secure facility and maintaining public safety. Routinely this led to investigations of criminal activities outside of the jail and

Stewart IXR Clayton McCray v. Allegheny County, et al.    Page 13

**APPENDIX - PAGE 326**

assistance to outside agencies with investigations as requested.

- Assist Pima County Attorney's Office, Courts and other Law Enforcement Agencies with investigations.
- Assist Sheriff's Department Internal Affairs Unit with investigations pertaining to the Pima County Jail.
- Assist Pima County Risk Management with investigations relevant to claims against the county.
- Assist Pima County Attorney's Civil Division with civil action claims against the Pima County Jail.
- Command of the Tactical Assistance Group (Emergency Response Team).
- Supervision and Command of the Transportation Unit.
- Supervision and Command of the Intake & Identification Unit.

## Preparing/Auditing Policies and Procedures

**Pima County Sheriff's Department Corrections Bureau (1999 - Present) -** Duties include, among other things, writing and updating the Pima County Jail's Policies and Procedures when changes are needed or based on current rulings from the courts. Ensuring the detention center has legal-based policies governing the operation of the Pima County Jail. Assistance to include research and reference of legal authority in a limited number of instances. The assistance of such legal references, by me, are made by way of providing and demonstrating an example or illustrating a point or element of one or more of my opinions. Ongoing professional interaction with various state corrections officials, county and other jail administrators, criminal justice researchers and writers, and other corrections and criminal justice experts and officials. Ongoing experience in the writing and development of corrections training and teaching courses, not limited to the Pima County Sheriff's Department Corrections Bureau. Ongoing experience in actually carrying out the teaching and training of those courses in pre-service and in-service training programs, corrections academies, seminars, and conventions throughout the United States.

## C.   Instructor/ Teaching Experience

My consulting and training experience include the following:

**Pima County Sheriff's Department Corrections Academy -** Providing instruction pertaining to operations/management training programs for the Pima County Jail.

**Pima County Mental Health & Juvenile Certificate Program -** Providing instruction/ training for Pima County Mental Health & Juvenile Certification Program.

**Pima County Sheriff's Department -** Providing instruction for the Pima County Sheriff's Department Corrections Bureau Annual In-Service Training Program.

**Arizona Homicide Investigators Association -** Providing instruction pertaining to operations and management in research and evidence gathering on gangs and gang-related activities within the jail and prison populations. Instruction on using the tools available to Correctional Facilities as a means of tracking, investigating and preventing outside criminal activities. Such as methods of investigation via the inspection of detainee mail, the monitoring of phone calls and useful techniques for interviewing detainees.

**JTTF Corrections Intelligence – Presentation in Washington D.C**. Providing instruction pertaining to operations/management in research and evidence gathering on gangs and gang-related activities within the jail and prison populations. Instruction on using the tools available to Correctional Facilities as a means of tracking, investigating and preventing outside criminal activities. Such as methods of investigation via the inspection of detainee mail, the monitoring of phone calls and useful techniques for interviewing detainees.

**Course Review Program for the Department of Homeland Security – Intersection with Terror**: The Role of Prosecutors and Community Corrections in Homeland Security. I was responsible for making global comments about the course, general comments on each module and a page-by-page analysis making sure the objectives were met, and that the material was appropriate for the target audience.

Stewart IXR Clayton McCray v. Allegheny County, et al.    Page 14

**Course Review Program for the Department of Homeland Security – Jail Evacuations**. I was responsible for making global comments about the course, general comments on each module and a page-by-page analysis making sure the objectives were met, and that the material was appropriate for the target audience.

**Utah Sheriff's Association -** Providing instruction pertaining to operations/management training programs for the Utah Sheriff's Associations Jail Commanders Certification Program on a continual basis.

**National Institute for Jail Operations Jail Training Advisory Committee -** Correctional Intelligence and Proactive Management of In-Custody Death.

**Columbia Southern University –** Online Advance Corrections Training.

**Pima County Sheriff's Department Supervision School (July 2013) -** Decision Making for First-Line Supervisors.

**National Institute for Jail Operations NSA Center for Public Safety Indiana Sheriff's Association (August 2013) –** Proactive Management of In-Custody Deaths.

**National Institute for Jail Operations NSA Center for Public Safety Louisiana Sheriff's Association (October 2013) –** Proactive Management of In-Custody Deaths.

**State of Hawaii Department of Public Safety (December 2013) -** Proactive Management of In-Custody Deaths.

**National Institute for Jail Operations NSA Center for Public Safety- Montgomery, Alabama (February 10, 2015) –** Prison Gangs in a Pre-Trial Setting & Correctional Intelligence.

**National Institute for Jail Operations NSA Center for Public Safety - Decatur, Alabama (February 09, 2015) –** Prison Gangs in a Pre-Trial Setting & Correctional Intelligence, Duty to Protect – Detainee Supervision, Security Threat Groups.

**National Institute for Jail Operations & Louisiana Sheriff's Association - New Orleans, Louisiana (September 2015) -** Key Litigation Issues & IM Rights, Use of Force.

**National Sheriff's Associations' Summer Conference and Jail Symposium, Institute for Jail Operations (June 2015) –** Panel Discussion and Presentation Topic: Solitary Confinement.

**National Sheriff's Associations' Summer Conference and Jail Symposium, Institute for Jail Operations (June 2015) -** Presentation Topic: Decision Making for First Line Supervisors.

**National Institute for Jail Operations & Kansas Sheriff's Association - Kansas City, KS (October 2015) –** Legal-Based Approach to Hot Jail Issues.

**Flinn-Brown Foundation/CivEx Learning and Public Policy (May 2016) –** Correctional Management, Policies, Practices and Procedures.

**University of Arizona School of Government and Public Policy (October 2016) -** Correctional Management, Policies, Practices and Procedures.

**University of Arizona Law School (November 2016) –** Technology and Security in Corrections.

**Project Central Class of XXV Center for Rural Leadership (November 2016) -** Correctional Management, Policies, Practices and Procedures.

**National Institute for Jail Operations & Kansas Sheriff's Association - Kansas City, KS (March 2017) –** Prison Gangs in a Pre-Trial Setting & Correctional Intelligence.

**National Institute for Jail Operations AZ Jail Conference - Scottsdale, AZ (April 2017):**
- Panel Discussion- Emerging Professional Issues, Current Trends, panel member.
- Instructor- Using New Technology as Effective Detainee  Management Tools.
- Panel Discussion- Litigation and Legal Issues, panel member.
- Instructor-In-Custody Deaths, Command Level Response and Investigations.
- Co-Instructor- Detainee  Communications (Telephone and Visitation).

Stewart IXR Clayton McCray v. Allegheny County, et al.    Page 15

**APPENDIX - PAGE 328**

**National Institute for Jail Operations Southern Regional Jail Conference - New Orleans Louisiana (December 2017):**
- Instructor-Combating Gang Activities in your facility.
- Panel Discussion- Emerging Professional Issues, Current Trends, Panel member.
- Instructor-In-Custody Deaths, Command Level Response and Investigations.
- Panel Discussion/Member - Litigation/Legal Issues- (past and present).

**National Tactical Officers Association (NTOA) (December 2017):**
- Providing consulting services pertaining to Correctional Emergency Response Teams best practices and the use of force in pre-trial facilities (Jails).

**National Institute for Jail Operations Arizona Jail Conference Scottsdale Arizona-(June 2018):**
- Instructor - In-Custody Suicides: Are We Ready.
- Instructor - Benefits of Conducting an Internal Staffing Analysis.
- Instructor - Decision Making for First-Line Supervisors.
- Instructor - In-Custody Deaths, Command Level Response, and Investigations.
- Instructor - Playing the Numbers Game to Win: How Internal Stats Can Benefit Your Agency.

**National Institute for Jail Operations Southern Regional Jail Conference - New Orleans Louisiana (August 2018):**
- Instructor - In-Custody Suicides: Are We Ready.
- Instructor- Decision Making for First-Line Supervisors.
- Instructor - Thinking Outside the Box with Detainee  Management.

**National Institute for Jail Operations Arizona Jail Conference Scottsdale Arizona-(June 2019):**
- Instructor- Critical Decision Making and Leadership.
- Co-Instructor- Preparations for Civil Litigation-Up to and in Including Testimony.
- Co-Instructor -Duty to Protect- Defensible against Challenges in Court.

**National Institute for Jail Operations Southern Regional Jail Conference - New Orleans Louisiana (August 2019):**
- Co-Instructor - Duty to Protect- Defensible against Challenges in Court.
- Instructor- Critical Decision Making and Leadership.
- Co-Instructor- Preparations for Civil Litigation-Up to and in Including Testimony.

**Western States Sheriff's Association and Oklahoma Sheriff's Association – Edmond, Oklahoma (November 2019):**
- Proactive Defense Against Liability- Qualified Immunity, Civil and Personal Liability.
- Administrative Necessities- Failure to Train, Failure to Supervise, Liability of Operating Understaffed.
- Duty to Protect.
- Policy and Procedure.
- Use of Force.
- Use of Solitary Confinement.

**Utah Sheriffs Association Jail Commanders Certification- St. George Utah (December 2019):**
- Litigation Preparation from the Incident through Testimony.

**Western States Sheriff's Association Conference – Reno Nevada (February 2020)**
- Policy and Procedure – Purpose, Function, Foundation and Legal Emphasis.
- Disciplinary Hearings - Purpose, Function and Requirements:
- Current Issues.

Stewart IXR Clayton McCray v. Allegheny County, et al.        Page 16

**National Institute for Jail Operations Approaching Hot Jail Issues Legally While Reducing Liability Columbia Missouri (March 2020)**
- Duty to Protect.
- Excessive Use of Force - 8th & 14th Amendment Application.
- Staffing Issues: Failure to Train.
- Staffing Issues: Failure to Supervise.
- Detainee Communications: Visitation, Mail, Phone-Purpose/ Function, Liability Issues.

**National Institute for Jail Operations National Jail Conference – Online (August 2020)**:
- Co-Instructor – Pros & Cons of Body Worn Cameras in Corrections.
- Instructor- Reducing Gang Activities in a Pretrial Facility.
- Instructor- Correctional Intelligence.

**Missouri Sheriff's Association 2020 Jail Administrators Conference (October 2020)**
- Managing In-Custody Death Investigations.

**Arizona Counties Insurance Pool and POST (February 2021)**

- The Evolution of Post-Arrest Pretrial Detention Standards for Law Enforcement.

**Use of Force in a Corrections Environment: Principles and Decision-Making-Considerations (February 2021)**
- Corrections case law governing the Use of Force.
- Use of Force Documentation.

**Michigan Jail Command Staff Academy – Lancing Michigan (March 2021)**

- Litigation Preparation from the Incident through Testimony.
- Leadership Management.
- Use of Force Documentation.
- Implementing a Departmental Strategic Plan.

**Use of Force in a Corrections Environment: Principles and Decision-Making-Considerations (February 2021)**
- Corrections case law governing the Use of Force.
- Use of Force Documentation.

**National Tactical Officers Association (NTOA) Correctional Conference (April 2021)**
- Managing the Media.
- Corrections Intelligence.

**Western States Sheriff's Association Conference – Reno Nevada (May 2021)**
- Leadership & Management.
- Preparing for Litigation.

**Western States Sheriff's Association and National Institute for Jail Operations Detention Training Eagle County, Colorado (May 2021)**
- Proactive Defense Against Liability.
- Deliberate indifference Duty to Protect:
- Report writing.
- Classification.
- PLRA, -Grievances

**National Institute for Jail Operations Western Jail Conference Scottsdale Arizona (June 2021)**:
- Gangs/Intelligence.
- In Custody Death Responsibilities and Litigation Preparation.
- Crime Scene Preservation.

*Stewart IXR Clayton McCray v. Allegheny County, et al.*     Page 17

**National Institute for Jail Operations Southern Regional Jail Conference - New Orleans Louisiana (August 2021)**:
- Gangs/Intelligence.
- In Custody Death Responsibilities and Litigation Preparation.
- Crime Scene Preservation.

**Utah Sheriffs Association Jail Commanders Certification- St. George Utah (September 2021)**:
- Leadership & Management.
- Managing the Media.

**Michigan Jail Command Staff Academy – Lancing Michigan (October 2021):**
- Leadership and Management.
- Litigation Preparation from the Incident through Testimony.
- Use of Force Documentation.
- Media Relations.
- Implementing a Departmental Strategic Plan.

**National Institute for Jail Operations ELITE Academy – Midway Utah (February 2022):**
- Leadership and Management.
- Litigation Preparation from the Incident through Testimony.
- Use of Force Documentation.
- Media Relations.

**Utah Sheriffs Association Jail Commanders Certification- St. George Utah (May 2022)**:
- Detainee  Disturbances & Forced Cell Extractions.
- Correctional intelligence.
- Gangs in a pretrial setting.

**National Institute for Jail Operations ELITE Academy – Midway Utah (May 2022):**

- Leadership and Management.
- Litigation Preparation from the Incident through Testimony.
- Use of Force Documentation.
- Media Relations.

**Michigan Jail Command Staff Academy – Petoskey Michigan (May 2022):**
- Leadership and Management.
- Litigation Preparation from the Incident through Testimony.
- Use of Force Documentation.
- Media Relations.
- Implementing a Departmental Strategic Plan.

**National Institute for Jail Operations Western Jail Conference Scottsdale Arizona (June 2022)**:
- Use of Force Documentation.
- Use of Force Active Resistance.
- In-Custody Death Investigations.

**Montana Sheriffs and Peace Officers Association Conference (June 2022):**
- Litigation Preparation from the Incident through Testimony.
- Qualified Immunity.
- Civil and Personal Liability.
- Detainee  Rights.
- Deliberate Indifference/ Duty to Protect.
- Gang Awareness and Supervision.

Stewart IXR Clayton McCray v. Allegheny County, et al.    Page 18

**APPENDIX - PAGE 331**

**National Institute for Jail Operations South Jail Conference Huntsville Alabama (August 2022):**
- Use of Force - Active Resistance.
- In Custody Death Investigations.
- Decision-Making for First Line Supervisors.

**Utah Sheriffs Association Jail Commanders Certification- St. George Utah (September 2022):**
- Use of Force - Active Resistance;
- Decision-Making for First Line Supervisors;
- Use of Force Documentation.

**Michigan Jail First Line Supervisors Academy – Lansing Michigan (October 2022):**
- Decision Making for First Line Supervisors;
- Supervisor Report Writing;
- Litigation Preparation;
- In Custody Deaths: Command Level Response;
- Use of Administrative Segregation;
- Duty to Protect/Proactive Defense Against Liability;
- Corrections Intelligence.

**Nat'l Institute for Jail Operations Central Jail Conference Indianapolis Indiana (October 2022):**
- Use of Force - Active Resistance;
- In Custody Death Investigations;
- Use of Force Documentation.

**Utah Sheriffs Association Jail Commanders Certification- Salt Lake City Utah (November 2022):**
- Supervisory Decision Making;
- Classification;
- Detainee Supervision and Effective Surveillance Procedures.

**National Institute for Jail Operations ELITE Academy – Midway Utah (February 2023):**

- Leadership and Management;
- Litigation Preparation from the Incident through Testimony;
- Use of Force Documentation;
- Media Relations.

**Chester County Leadership and Management Training – Chester Pennsylvania (February 2023):**

- Leadership and Management;
- Supervisory Decision Making.

**Arizona Counties Insurance Pool/National Institute for Jail Operations Arizona Jail Supervisor Training – Globe & Kingman Arizona (March 2023):**

- Report Writing;
- Critical Incidents;
- Suicide Prevention & Response;
- Detainee Medical Care;
- Prohibited Harassment.

**Michigan Jail First Line Supervisors Academy – Lansing Michigan (March 2023):**
- Decision Making for First Line Supervisors;
- Supervisor Report Writing;
- Litigation Preparation;
- In Custody Deaths: Command Level Response;
- Use of Administrative Segregation;
- Duty to Protect/Proactive Defense Against Liability;
- Corrections Intelligence.

Stewart IXR Clayton McCray v. Allegheny County, et al.     Page 19

APPENDIX - PAGE 332

**National Institute for Jail Operations Western Jail Conference Phoenix Arizona (June 2023)**:
- Decision Making for First Line Supervisors;
- Supervisory Liability;
- Staff Progressive Discipline.

**Utah Sheriffs Association Jail Commanders Certification- Salt Lake City Utah (June 2023)**:
- In Custody Deaths: Command Level Response;
- Supervisory Liability and Staff Discipline.

**Nat'l Institute for Jail Operations Southern Jail Conference Gulf Shores Alabama (August 2023)**:
- Decision Making for First Line Supervisors.
- Supervisory Liability.
- Staff Progressive Discipline.

**Utah Sheriffs Association Jail Commanders Certification- St. George Utah (September 2023)**:
- Supervisory Liability and Discipline.

**National Institute for Jail Operations ELITE Academy – Midway Utah (September 2023)**:
- Leadership and Management;
- Litigation Preparation from the Incident through Testimony;
- Use of Force Documentation;
- Media Relations.

**Michigan Jail Command Staff Academy – Petoskey Michigan (October 2023)**:
- Leadership and Management;
- Litigation Preparation from the Incident through Testimony;
- Use of Force Documentation;
- Media Relations;
- Implementing a Departmental Strategic Plan.

**Michigan Jail First Line Supervisors Academy – Lansing Michigan (November 2023)**:
- Decision Making for First Line Supervisors;
- Supervisor Report Writing;
- Litigation Preparation;
- In Custody Deaths: Command Level Response;
- Use of Administrative Segregation;
- Duty to Protect/Proactive Defense Against Liability;
- Corrections Intelligence.

**National Institute for Jail Operations ELITE Academy – Midway Utah (February 2024)**:
- Leadership and Management;
- Litigation Preparation from the Incident through Testimony;
- Use of Force Documentation;
- Media Relations.

**Alabama Department of Corrections – St. Clair Facility (April-May 2024)**:

**Use of Force - Report Writing / After Action**
- Primary Incident Report (302A)
- Secondary Amended Report (302B)
- Medical Involvement
- Line Staff Reports (302A, 302B)
- Incident Investigative Reports (327-A)
- Incident Report Package (327-C)
- Incident Review Boards (327-RB)

Stewart IXR Clayton McCray v. Allegheny County, et al.     Page 20

**APPENDIX - PAGE 333**

**Use of Force - Decision Making / Conflict Management-De-Escalation**
- Scenario: Decision Making
- Scenario: Voice Control
- Scenario: Proxemics

**Michigan Jail First Line Supervisors Academy – Lansing Michigan (May 2024):**
- Decision Making for First Line Supervisors;
- Supervisor Report Writing;
- Litigation Preparation;
- In Custody Deaths: Command Level Response;
- Use of Administrative Segregation;
- Duty to Protect/Proactive Defense Against Liability;
- Corrections Intelligence.

**Alabama Department of Corrections – Selma Alabama (June 2024):**

**Use of Force:**
- What changed? (policy/form changes)
- Why?
- What does it mean to you?

**Legal Foundation for Use of Force:**
- 8 th Amendment Application
- Deliberate Indifference
- Duty to Protect

**Application of Force:**
- Justification and Use of Less than Lethal Force
- Use of Deadly Force
- Disturbance Control (forced entry, forced meds,
- hostages, riots)
- Restraints / ERD (Protocol / Chairs)

**Use of Force Analysis & Investigations:**
- Scenario: Decision Making &amp; De-Escalation
- Conducting Investigations

**Report Writing / After Action:**
- Line Staff Reports (302A, 302B)
- Incident Investigative Reports (327-A)
- Incident Report Package (327-C)
- Incident Review Boards (327-RB)
- Scenario: Voice Control
- Scenario: Proxemics

**National Institute for Jail Operations Southern Jail Conference Mobile Alabama (August 2024):**
- Decision Making for First Line Supervisors.
- Detainee Transports.
- Corrections Intel.

Stewart IXR Clayton McCray v. Allegheny County, et al.    Page 21

APPENDIX - PAGE 334

**Alabama Department of Corrections – Donaldson Facility (September 2024):**
**Use of Force:**
- What changed? (policy/form changes)
- Why?
- What does it mean to you?

**Legal Foundation for Use of Force:**
- 8 th Amendment Application
- Deliberate Indifference
- Duty to Protect

**Application of Force:**
- Justification and Use of Less than Lethal Force
- Use of Deadly Force
- Disturbance Control (forced entry, forced meds,
- hostages, riots)
- Restraints / ERD (Protocol / Chairs)

**Use of Force Analysis & Investigations:**
- Scenario: Decision Making &amp; De-Escalation
- Conducting Investigations

**Report Writing / After Action:**
- Line Staff Reports (302A, 302B)
- Incident Investigative Reports (327-A)
- Incident Report Package (327-C)
- Incident Review Boards (327-RB)
- Scenario: Voice Control
- Scenario: Proxemics

**Utah Sheriffs Association Jail Commanders Certification- St. George Utah (September 2024)**:
- Administrative In- Custody Death Investigations.
- Litigation Preparation

**National Institute for Jail Operations ELITE Academy – Midway Utah (September 2024):**
- Leadership and Management;
- Litigation Preparation from the Incident through Testimony;
- Use of Force Documentation;
- Media Relations.

**National Institute for Jail Operations Central Jail Conference French Lick Indiana (October 2024)**:
- Decision Making for First Line Supervisors.
- Detainee Transports.
- Corrections Intel.
- Detainee Discipline and Hearings.

**Alabama Department of Corrections – Limestone and North Alabama Facilities (October 2024):**

**Use of Force:**
- What changed? (policy/form changes)
- Why?
- What does it mean to you?

**Legal Foundation for Use of Force:**
- 8 th Amendment Application
- Deliberate Indifference
- Duty to Protect

Stewart IXR Clayton McCray v. Allegheny County, et al.    Page 22

**APPENDIX - PAGE 335**

**Application of Force:**
- Justification and Use of Less than Lethal Force
- Use of Deadly Force
- Disturbance Control (forced entry, forced meds,
- hostages, riots)
- Restraints / ERD (Protocol / Chairs)

**Use of Force Analysis & Investigations:**
- Scenario: Decision Making &amp; De-Escalation
- Conducting Investigations

**Report Writing / After Action:**
- Line Staff Reports (302A, 302B)
- Incident Investigative Reports (327-A)
- Incident Report Package (327-C)
- Incident Review Boards (327-RB)
- Scenario:  Voice Control
- Scenario:  Proxemics

## Alabama Department of Corrections – Hamilton Facility (December 2024)

**Use of Force:**
- What changed? (policy/form changes)
- Why?
- What does it mean to you?

**Legal Foundation for Use of Force:**
- 8 th Amendment Application
- Deliberate Indifference
- Duty to Protect

**Application of Force:**
- Justification and Use of Less than Lethal Force
- Use of Deadly Force
- Disturbance Control (forced entry, forced meds,
- hostages, riots)
- Restraints / ERD (Protocol / Chairs)

**Use of Force Analysis & Investigations:**
- Scenario: Decision Making &amp; De-Escalation
- Conducting Investigations

**Report Writing / After Action:**
- Line Staff Reports (302A, 302B)
- Incident Investigative Reports (327-A)
- Incident Report Package (327-C)
- Incident Review Boards (327-RB)
- Scenario:  Voice Control
- Scenario:  Proxemics

## National Institute for Jail Operations Classification Training - Florance AZ (December 2024)
- Duty to protect
- Classification

**Outside Agencies** - Assisting other agencies with reviewing/writing policy & procedure manuals.

*Stewart IXR Clayton McCray v. Allegheny County, et al.*      Page 23

## D.  Continuing Education

- **Northwestern University-** SPSC 453 School of Police Staff and Command.
- **National Certified Corrections Executive -** National Institute for Jail Operations.
- **Certified Jail Executive -** National Sheriffs' Association.
- **Pima Community College -** Administration of Justice.
- **Pima Community College -** Criminal Law.
- **Indiana University South Bend -** Law Enforcement & Correctional Supervision.
- **U.S. Department of Justice National Institute of Corrections -** Correctional Supervision/Leadership.
- **Emergency Management Institute FEMA National Incident Management System** (M.I.M.S.) up to IS-700.
- **National Sheriff's Association -** Executive Level Management Education and Training.
- **Franklin Covey –** 7 Habits for Law Enforcement.
- **Arizona Post and Grand Canyon College -** Leadership in Police Organizations.
- **American Jail Association -** Dynamics and Challenges of Correctional Leadership.
- **American Jail Association -** Legal Issues in Today's Jails.
- **National Sheriff's Association -** Correctional Law Jail Manager's Survival Guide.
- **Pima County Sheriff's Department Corrections Bureau -** Correctional Officer Academy.
- **AZ Department of Corrections -** Correctional Officer Academy.

## E.  Professional Certifications

- **Basic Rifle Certification** (March 2010).
- **Gangs and Understanding the Criminal Mind Certificate** (December 2007).
- **Advanced Gang Violence Investigation Course Certificate** (April 2007).
- **Correctional Leadership Certificate** (July 2006).
- **Trace Series Ionscan 400B Operator Certification** (August 2005).
- **Gangs to Terrorism Certification** (November 2004).
- **M 26 Advanced Taser & Taser X26 Instructor Certification** (November 2003).
- **Police Edged Weapons Defense Course Certificate** (March 2003).
- **Institutional Combatives Officer Safety Certificate** (March 2003).
- **Command Post & Intelligence Operations Certificate** (February 2003).
- **Close Quarter Battle Instructor Certification** (December 2002).
- **Violent Behavior Control Certification** (September 2001).
- **Advanced Taser Instructor Certification** (June 2001).
- **Less Lethal Emergency Response Certificate** (May 2001).
- **Pepper Ball Instructor Certification** (May 2000).
- **Less Lethal Projectiles Instructor Certification** (April 2000).

Stewart IXR Clayton McCray v. Allegheny County, et al.      Page 24

- **Advanced Gang Training Certification** (April 2000).
- **Basic Gang School Certification** (January 2000).
- **Basic Supervision Program Certification** (June 1998).
- **Tactical Officer Certification** (April 1998).
- **Basic Defense Tactical Shotgun Certification** (November 1995).
- **ACJIS Network Terminal Operator Certification** (October 1994).
- **Impact Weapons Certification** (September 1994).
- **Corrections Officer Handgun Course** (December 1993)

## F.  Authored Material:

### National Institute for Jail Operations: Midway, Utah

*Articles on the National Institute for Jail Operations Web Site:*
- Stewart, Sean T., *Corrections Facilities Conduits for Criminal Activity*
- Stewart, Sean T., *Reasonable Suspicion and Trace Narcotic Detectors*
- Stewart, Sean T., *Decision Making for First-Line Supervisors*
- Stewart, Sean T., *Conducting Security Threat Group and Gang Interviews in a Pre-trial Setting "Jails"*
- Stewart, Sean T., *Electronic Messaging in Jails*
- Stewart, Sean T., *Using Solitary Confinement as an Detainee  Management Tool – Part I*
- Stewart, Sean T., *Using Solitary Confinement as an Detainee  Management Tool – Part II*
- Stewart, Sean T., *Photographing Arrestee Tattoos*

### Articles Published in the National Sheriffs Association's Magazine
- Stewart, Sean T., *Electronic Messaging in Jails* (November/December 2015-Volume 67-Number 6, Page(s) 26 and 27.)

### Arizona Detention Association: Phoenix, Arizona
- Stewart, Sean T., *Corrections Facilities Potential Conduits for Criminal Activity*
- Stewart, Sean T., *Promotions and Leadership Training*
- Stewart, Sean T., *Decision Making for First-Line Supervisors*

### Police and Fire Publishing: Spartanburg, South Carolina
- Stewart, Sean T. Co-Author, *Report Writing for the Corrections Professional* (Jan 10, 2016.)
- Stewart, Sean T. Co-Author, *The Prison Menace (Second Edition)* (December 18, 2017.)

### Washington Examiner: Washington DC
- **Washington Examiner- Opinion Editorial**
Stewart, Sean T. *How Tablets are Helping Clean Up our Prison* (Sep 5, 2017.)

### CorrectionsOne: correctionsone.com
*Articles on correctionsone.com Web Site:*
- Stewart, Sean T., *Why Correctional Facilities Should Photograph Detainee Tattoos -* (Sep 26, 2017.)
- Stewart, Sean T., *10 Ways Correctional Supervisors Can Improve Their Decision-Making Skills* (Sep 28, 2017.)
- Stewart, Sean T., *How Tablets are Helping Clean Up One Ariz. Prison* (Sep 19, 2017.)
- Stewart, Sean T., *How to Conduct Interviews with Gang Members* (Oct 10, 2017.)
- Stewart, Sean T., *How to Prevent Detainee  Crime in Correctional Facilities* (Dec 01, 2017.)

Stewart IXR Clayton McCray v. Allegheny County, et al.    Page 25

**APPENDIX - PAGE 338**

## Part IX
## Civil Cases in which I have Assisted and/or Testified.

*I have also given defense interviews and testified in over 200 Criminal Cases in Pima County Superior Court.*

## ALABAMA

***U.S. Department of Justice v. The State of Alabama and Alabama Department of Corrections*** (District Court for the Northern District of Alabama Southern Division 2:20-CV-01971-RDP currently open case)

***Gregory Carwie, as the conservator of the estate of Christopher Forwood v. Mobile County, et al.*** (District Court for the Southern District of Alabama Southern Division CV2022-015952 currently open case)

***Duke Mark et al, v. Alabama DOC Commissioner John Hamm, et al.*** (District Court for the Northern District of Alabama 4:14-CV-1952-RDP currently open case)

***Keith Allen Black v. Southern Health Partners, et al***. (District Court for the Northern District of Alabama Middle Division 4:21-cv-01555-ACA case settled)

 ***Tony Gene Lang, et al., v. Washington County, Alabama, et al.,*** ( District Court for the Southern District of Alabama Southern Division 4:14-CV-1952-RDP currently open case)

***A Pamela Smothers v. Roger Childers, et al.*** (United States District Court for the Northern District of Alabama Jasper Division 26:21-cv-01057-RDP case settled)

***Brandi King, as Personal Representative of the Estate of Delilah Sue McKee v. Mark Moon, et al.*** (District Court for the Northern District of Alabama Southern Division : 2:21-cv-01568-ACA currently open case)

***Michael Brown v. Elmore County Commission, et al.*** (District Court for the Middle District of Alabama Northern Division 2:20-cv-00281-RAH-SRW case settled)

***Robert Taylor, Jr. v. Eric Star, et al. and Southern Health Partners, Inc, et al.*** (United States District Court for the Northern District of Alabama Eastern Division 1:20-cv-00489-CLM currently open case)

***Terry Archie v. Covington County, Alabama, et al.*** (United States District Court for the Middle District of Alabama Northern Division 2:19-cv-508-MHT-JTA case settled)

***Laurie Dudley v Rick Singleton, Steven Carlton, and David Dison***.  (United States District Court for the Northern District of Alabama Northwestern Division 3:20-cv-00626-HNJ currently open case)

***Marcus Edwards v. Sheriff Jimmy Abbett, et, al.*** (District Court for the Middle District of Alabama Eastern Division 3:13 cv—00871-MHT-SRW currently open case)

***Estate of Vincent Rowell and his representative, Heracia Pickett v. Sheriff John Tirey, et al.*** (District Court for the Northern District of Alabama Northeastern Division 5:11-CV-03439-JHE case settled)

***Frankie Bryant, etc., v. Barbara Collins, et al*** (The Circuit Court of Greene County, Alabama CV-2014-900060 currently open case)

***Phillip Cordell Fikes personal Rep of the estate of Phillip Anderson v. Ron Abernathy, et al***.
(District Court for the Northern District of AL Western Division7:16-cv-00843-LSC currently open case)

***Landon Williams v. Keith McCray, Felton Johnson, James Scroggins and David Warren*** (District Court for the Middle District of Alabama Eastern Division 3:15-CV-00043-WKW-PWG case settled)

***Jeffery Trent James v. Lauderdale County*** (Circuit Court of Lauderdale County, Alabama CV-2014-900078 court dismissed the case with prejudice)

***Brenda Salter v. Edwin Booker, et al.*** (District Court for the Southern District of Alabama Southern Division 12-0174-CG-N Judgement in favor of the Defendants)

***Joshua Randall Kizzire v. Travis Wright, James Whitman; and Sheriff Rick Harris*** (District Court for the Northern District of Alabama Jasper Division 6:14-CV-00172-LSC case settled)

***Nathan Chambers v. Travis Wright, James Whitman; and Sheriff Rick Harris*** (District Court for the Northern District of Alabama Jasper Division 6:14-CV-00316-TMP case settled)

***Billy Shikles v. Travis Wright, James Whitman; and Sheriff Rick Harris*** (District Court for the Northern District of Alabama Jasper Division 6:14-CV-00363-JHE case settled)

***Alisha Gravitt v. Travis Wright, James Whitman; and Sheriff Rick Harris*** (District Court for the Northern District of Alabama Jasper Division 6:14-CV-00625-LSC case settled)

***Roger Gravitt v. Travis Wright, James Whitman; and Sheriff Rick Harris*** (District Court for the Northern District of Alabama Jasper Division 6:14-CV-00683-SLB case settled)

***Scotty Gosa v. Travis Wright, James Whitman; and Sheriff Rick Harris*** (District Court for the Northern District of Alabama Jasper Division 6:14-CV-00642-RDP case settled)

Stewart IXR Clayton McCray v. Allegheny County, et al.        Page 26

**APPENDIX - PAGE 339**

***Jonny Jones v. Travis Wright, James Whitman; and Sheriff Rick Harris*** (District Court for the Northern District of Alabama Jasper Division 6:14-CV-00446-SLB case settled)

***Derrick Kelly v. Travis Wright, James Whitman; and Sheriff Rick Harris*** (District Court for the Northern District of Alabama Jasper Division 6:14-CV-00697-LSC case settled)

***David Smith v. Travis Wright, James Whitman; and Sheriff Rick Harris*** (District Court for the Northern District of Alabama Jasper Division 6:14-CV-00723-SLB case settled)

***Johnson v. Barbour County*** (Circuit Court of Barbour County, Alabama CV-201-010 11/2012 case settled)

## ARIZONA

***Julie Cates, et al, v. Maricopa County, et al.*** (The Superior Court of the State of Arizona in and for the County of Maricopa CV2022-015952 case settled)

***John Lopez, v. Paul Penzone Sheriff of Maricopa County, et al.*** (The Superior Court of the State of Arizona in and for the County of Maricopa CV2022-095109 case settled)

***Audia Garcia et al, v. State of Arizona, et al***. (The United States District Court the District of Arizona 2:21-cv-01850-ROS-DMF Defense Verdict at Trial)

***Gunther Erich Herrmann, et al, v Maricopa County, et al.*** (The Superior Court of the State of Arizona in and for the County of Maricopa CV2022-092287currently open case)

***Erica Danielle Ramsay v. Sheriff David Clouse, et al.*** (The United States District Court the District of Arizona CV-3:21-cv-08117-SMB-CDB case settled)

***Dacota Neff, v. Sheriff William Risen and La Paz County*** (The Superior Court of the State of Arizona in and for the County of La Paz S1500CV202000069 currently open case)

***Jose Beltran, et al. v. Santa Cruz County, et al***. (The United States District Court the District of Arizona CV-20-00462-TUC-DCB currently open case)

***Lorenia Buelna, et al. v. Mark Dannels, et al.*** (The United States District Court the District of Arizona CV-21-00216-TUC-SHR Dismissed with Prejudice)

***Deborah Sanchez v Graham County, et al.*** (The United States District Court the District of Arizona CV 21-00073 TUC-JCH currently open case)

***Duwaun Latay Williams, v. Officer Mata #A9844 and Officer Garcia # UNK*** (The United States District Court the District of Arizona 2:21-cv-00343-JJT-JZB currently open case)

***Anthony Olagues, v. Mohave County et al.*** (The United States District Court the District of Arizona 3:20-cv-08271-PCT-SMB (ESW) currently open case)

***Jon Hyde and Michelle Hyde, v. City of Willcox, Arizona et al.*** (The United States District Court the District of Arizona 4:20-cv-00100-JGZ-PSOT case dismissed with prejudice)

***Trent Dossett v. Paul Penzone, et al.*** (The Superior Court of the State of Arizona in and for the County of Maricopa CV2021-000762 Sheriff Penzone and Maricopa County were Dismissed)

***Gregory Clay v. Paul Penzone, et al.*** (The Superior Court of the State of Arizona in and for the County of Maricopa CV2021-003020 currently open case)

***Winona Stevens; Winona Stevens as Conservator for the Minor M.S., v. Leon Wilmot, Sheriff of Yuma County, et al.*** (The US District Court for the District of AZ CV-20-00487-PHX-JJT (MTM) case settled)

***Justin Jon Seiter, v. Paul Penzone Sheriff of Maricopa County, et al.*** (The Superior Court of the State of Arizona in and for the County of Maricopa CV2020-055263 case settled)

***Jody McCormick, et al., v. State of Arizona, et al.,*** (The United States District Court the District of Arizona CV-19-04425-PHX-DGC (MHB) currently open case)

***Carrie Roth-Walker, et al., v. Mark D. Napier, et al.*** (The Superior Court of the State of Arizona in and for the County of Pima CV-C20181773 currently open case)

***Alexis Gabrielle Dinsbach v. Candice Harris, et al***. (The United States District Court the District of Arizona CV-18-03595-JAT-DMF currently open case)

***Robert L. Carter v Sheriff Paul Penzone*** (The United States District Court the District of Arizona CV-18-2315-PHX-ROS (JFM) currently open case)

***Hayden A. Beaulieu v K. Capas, H. Lopez, Shalonda McLean*** (The United States District Court for the District of Arizona CV 17-00608-TUC-RM currently open case)

***J.W. Carlson v. Sheriff Paul Penzone, et al.*** (The United States District Court for the District of Arizona CV-18-04111-PHX-SPL-JZB currently open case)

***Robert L. Carter v. Sheriff Paul Penzone, et al.*** In the Superior Court of the State of Arizona in and for the

Stewart IXR Clayton McCray v. Allegheny County, et al.        Page 27

County of Maricopa CV-2018-013256 Summary Judgment for the Defendants)

***Edward M. Bilducia, Jr., v. Maricopa County, Sheriff Paul Penzone.*** (The United States District Court for the District of Arizona CV-17-04313-PHX-SPL (ESW) Case dismissed by the court)

***Marcie Behlke v. Maricopa County, Sheriff Paul Penzone.*** (The United States District Court for the District of Arizona CV-17-03897-PHX-JJT (JFM) case settled)

***Carlo Adonis Butler v. Maricopa County, et al.*** (In the Superior Court of the State of Arizona in and for the County of Maricopa CV-2017-054154 case settled)

***Ramona Amaya, mother of deceased Reynaldo Amaya, v. Cochise County Sheriff Mark Dannels*** (In the Superior Court of State of AZ in and for the County of Cochise CV-2016-00305 Defense Verdict at Trial)

***McKinley Truein Brown III, v. Maricopa County Sheriff Paul Penzone et al.*** (The United States District Court for the District of Arizona CV 17-02824-PHX-DJH (ESW) case settled)

***Gilbert Bella Martinez v. Maricopa County Sheriff Paul Penzone et al.*** (The United States District Court for the District of Arizona 17-CV-01107-PHX-JJT (JFM) case settled)

***Curtis Ramsey v. Sheriff Penzone, et.al***. (The Superior Court of the State of Arizona in and for the County of Maricopa CV-2016-090486 case settled)

***Errol Wright v. Sheriff Kelly Clark, et.al.*** (The United States District Court for the District of Arizona 17-CV-08065-PCT-DJH (ESW) case settled)

***Ron Pettit v. Sheriff Paul Penzone, et al.*** (The United States District Court for the District of Arizona CV-17-01275-PHX-GMS-MHB case dismissed by the court)

***Pedro Ramos v. Paul Penzone, et al.*** (The United States District Court for the District of Arizona CV-17-00205-PHX-DLR (ESW) currently open case)

***Charles Eric Busby, an individual v. Unknown Party, et al.*** (The United States District Court for the District of Arizona CV-14-1300-PHX-DLR (DKD) currently open case)

***Shari Ferreira v Joseph M. Arpaio, et al.*** (Fed Court, AZ, 2:15-CV-01845-JAT Defense Verdict at Trial)

***Gunderson v. Rivas-Pardo, et al.*** (Federal Court, AZ, 13-CV-01131-JAF Judgement for the Defendants)

***Peterson v. Yuma County, et al.*** (Yuma County Superior Court AZ S-1400-CV-2015-00126 case settled)

***Samer Sannoufi v. Joseph Arpaio, et al.*** (Federal Court Arizona CV-14-00515-PHX-JJT case settled)

***Paul Rich v. Det. Officers Drexler, Segura, Flaherty*** (Fed Court AZ 15-cv-00328-PHX-DJH-ESW case settled)

***Tutty and Artiglio v. Mohave County*** (Federal Court Arizona, CV13-08201-PHX-GMS case settled)

***Sherwood v. State of Arizona*** (Maricopa County Superior Court Arizona, CV2011-003053 case settled)

***Moreno v. State of Arizona*** (Federal Court CV13-0004-Phx-DGC, Summary Judgment for Defendants')

***Melenoski v. State of Arizona*** (Maricopa County Superior Court Arizona, CV2013-002126 case settled)

***Cooney v. Dupnik*** (Federal Court, Arizona, currently open case)

***Jacquelyn Harrelson v. Pima County*** (Federal Court, Arizona, the case settled)

***Rodriguez v. Dupnik*** (Federal Court, Arizona, 05/2012)

***Marcus Hunley v. Pima County Sheriff's Department*** (Federal Court, Arizona, 05/2012)

***Makey v. Garrett*** (Federal Court, Arizona, 07/2011)

***Stephen Schwartz v. Pima County*** (Superior Court, Arizona, 01/2011)

***Clifford Linebarger v. Pima County*** (Superior Court, Arizona, 01/2011)

***Mohammed Rizaee v. Clarence Dupnik*** (Federal Court, Arizona, the arbitrator found for the Defendants')

***Van Brocklin v. Pima County Sheriff's Department*** (Federal Court, Arizona, 10/2010)

***Ammar Dean Halloum v. Sergeant Robert Cutbirth*** (Federal Court, Arizona, 02/2010)

***William Bodney v. Pima County Sheriff's Department*** (Fed Court, AZ, 01/2010 judgment for the Def.)

***John K. Bennett et al., v. Pima County Sheriff's Department*** (Federal Court, Arizona, 06/2009 Plaintiffs dismiss the case after certification denial by the court)

***Cleophus Jackson v. Clarence Dupnik (***Federal Court, Arizona, 04/2009)

***Jose Virgen v. Hyatt, et al.,*** (Federal Court, Arizona, 01/2009 Judgment for the County)

***Laya v. Pima County*** (Federal Court, Arizona, 12/2008 Summary Judgment for the County)

***Daryl Kramer v. Clarence Dupnik Sheriff of Pima County*** (Superior Court, Arizona, 11/2008)

***Vincent Dupree v. Pima County Sheriff's Department*** (Federal Court, Arizona, 04/2007)

***Abdullah, et al., v. Dupnik, et al.,*** (Federal Court, Arizona, 03/2007)

***Makey v. Garrett*** (Federal Court, Arizona, 01/2007)

Stewart IXR Clayton McCray v. Allegheny County, et al.    Page 28

## COLORADO

***The Estate of Brian Heath Roundtree v. Arapahoe County, et al.*** (District Court for the District of Colorado 1CV2018-013256 –MEH case settled)

***Estate of Jennifer Lobato v. Jefferson County, et al.*** (District Court for the District of Colorado 1:15-CV-02718-KMT case settled)

## FLORIDA

***Berl Zwiebel v. Gregory Tony Sheriff Broward County*** (United States District Court Southern District of Florida 0:21-cv-61795-RS case settled)

***Beverly Pecora Lamego, v. Sheriff Ken Mascara, et al.***  (United States District Court Southern District of Florida 2:20-cv-14294-KMM currently open case)

***Kishon Birch v. Stephen Lutze, et al.*** (United States District Court Middle District of Florida Jacksonville Division *3*:16-cv-01385-TJC-JRK currently open case)

***Susan Szakalos v. Bill Prumell, as Sheriff of Charlotte County, et al.*** (Circuit Court of the Twentieth Judicial Circuit in and for Charlotte County, FL 18--CA-0000463CA defense verdict for Charlotte County)

***Ilene Tillman, as Personal Representative of the Estate of the Estate of Tony Orlando Jackson v. Sheriff Ken J. Mascara.*** (Circuit Court of the Nineteenth Judicial Circuit in and for St. Lucie County Florida 2015-CA-000462-LSC Summary Judgment for Defendants)

## ILLINOIS

***Kelli Andrews as Administrator of the Estate of Tiffany Ann Rusher, deceased, v. Sangamon County, Illinois, Sheriff Jack Campbell*** (US District Court Central District of Illinois 1:18-cv-1100-SEM-TSH case settled)

## KANSAS

***The Estate of Sean E. Abbott, v Advanced Correctional Healthcare and Sheriff Gay,*** (In the Ninth District Court, Harvey County, Kansas Civil Department. 2020-CV-000081 case settled)

***Brantley v. Franklin County,*** (US District Court Case No. 18-2651 in the District of Kansas currently an open case)

## LOUISIANA

***Clinton Evans and Jeresa Morgan v. Sheriff Joseph Lopinto, et al.*** (United States District Court Eastern District of Louisiana Civil Docket # 18-cv-8972 currently open case)

***Dalton Guillot, et al. v. Sheriff Joseph P. Lopinto, et al.*** (United States District Court Eastern District of Louisiana Civil Docket # 19-12422 currently open case)

***Jamie Morel, et al. v Jefferson Parish Sheriff Joseph Lopinto, III, et al.*** (United States District Court Eastern District of Louisiana Civil Docket # 19-12422 Summary Judgment for the Defendants)***Cellette Crawford v. Marlin N. Gusman Orleans Parish Sheriff, et al.*** (United States District Court Eastern District of Louisiana Civil Docket # 17-13397 case settled)

## MASSACHUSETTS

***David Daoud Wright v. Jane Doe, et al.*** (United States District Court District of Massachusetts Civil Action No. 21-cv-10137-PBS Qualified Immunity as to substantive due process claims)

## MONTANA

***Anna Schraudner v. Yellowstone County, et al.*** (District Court for the District of Montana Billings Division CV 18-00108-SPW-TJC Dismissed with Prejudice)

***Estate of Steven Tylor Russo, et al., v. Yellowstone County, et al.*** (District Court for the District of Montana Billings Division CV 17-0038-BLG-SPW-TJC case settled)

Stewart IXR Clayton McCray v. Allegheny County, et al.      Page 29

## NEW MEXICO

*Jerry Moone v. San Juan County Detention Center, et al*. (In the United States District Court for the District of New Mexico 1:21-cv-01130-JHR-JFR currently open case)
*Diego Tijerina v. The State of New Mexico Corrections Department, et al*. (In the United States District Court for the District of New Mexico 1:20-CV-00706 JAP/JHR case settled)
*Henry Garcia v. Corrections Corporation of America* (District Court for the District of New Mexico Albuquerque 1:14-CV-00268-BRB-LAM case settled)
*Michael L. Bornholdt v. The New Mexico Department of Corrections (*District Court for the District of New Mexico Albuquerque D-1314-CV-2017-00008 case settled)

## OHIO

*The Estate of Alfonso C. Askew v. Trumbull County, et al. (*District Court for the Northern District of Ohio Eastern Division 4:21-cv-02133-BYP currently open case)
*John Whyde, Jr., v. Erie County, et al*. (District Court for the Northern District of Ohio Western Division 3:19-CV-00683 currently open case)
*Kristen McDonald v. Franklin County Ohio* (District Court for the Southern District of Ohio 2:13-CV-0503 case settled)

## OKLAHOMA

*Tyrese Drew, v. CoreCivic, Inc., et al.* (The United States District Court for the Eastern District of Oklahoma CIV-23-286-RA W-JAR currently open case)

## PENNSYLVANIA

*HLFIP Holding, Inc. dba Smart Communications v. York County, et al.* (District Court for the Middle District of Pennsylvania Harrisburg Division 1:20-cv-00186-JPW case dismissed against York County)

## SOUTH CAROLINA

*Cheryl A. Munday and Margaret Devine, et al, v. Beaufort County, et al.* (District Court for the District of South Carolina Beaufort Division 9:20-CV-02144-DCN-MHC2 currently open case)
*Edgar Hoch v. Greenville County, et al.* (District Court for the District of South Carolina Greenville Division 6:16-CV-03492-JMC-KFM 2012 case settled)

## TENNESSEE

*Amanda Deshea Wynn v. Hamilton County, TN, et al.* (District Court Eastern District of Tennessee at Chattanooga 1:21-cv-00008 case dismissed)

## UTAH

*Tristen Calder as personal representative of the Estate of Coby Lee Paugh v Uintah County, et al.* (United States District Court for the District of Utah 2:17-cv-01249 JNP-CMR Defense Verdict at Trial)
*Dustin Law Porter, et al., v. Daggett County, Utah, et al.* (United States District Court District of Utah No. 2:18-cv-00389-DBB currently open case)
*George Finlinson v Millard County, et al.* (United States District Court District of Utah Central Division 2:16-CV-01009 Defense Verdict at Trial)

## VIRGINIA

*Viapath Technologies v Jacs Solutions INC*. (United States District Court Eastern District of Virginia  No. 1:23-cv-00179-TSE-WEFcurrently open case)

## WEST VIRGINIA

*Mark Blue v. Jason Roberson, et al.* (District Court for the Northern District of  West Virginia Martinsburg 3:21-CV-151 (GROH) currently open case)
*Human Rights Defense Center v. Southwest Virginia Regional Jail Authority, et al.* (District Court for the Western District of Virginia Abingdon Division 1:18-cv-13 case settled)

Stewart IXR Clayton McCray v. Allegheny County, et al.       Page 30

## WYOMING

***Joshua Beacham v. Scott A. Steward, et al.*** (United States District Court for the District of Wyoming 022-CV-222 currently open case)

***Madison Rounds v. Wyoming Department of Corrections, et al. .*** (United States District Court for the District of Wyoming 0:21-cv-00238-NDF Dismissed with Prejudice)

***Jonathan Oliver and James Lackey v. Robert Hults, et al.*** (United States District Court for the District of Wyoming 17-CV-153-SWS Summary Judgment for the Defendants)

### CASES IN WHICH I HAVE TESTIFIED AS AN EXPERT WITNESS IN DEPOSITION

***Keith Allen Black v. Southern Health Partners, et al*.** (District Court for the Northern District of Alabama Middle Division 4:21-cv-01555-ACA)

***Duke Mark  et al, v. Alabama DOC Commissioner John Hamm, et al.*** (District Court for the Northern District of Alabama 4:14-CV-1952-RDP)

***A Pamela Smothers v. Roger Childers, et al.*** (United States District Court for the Northern District of Alabama Jasper Division 26:21-cv-01057-RDP)

***Audia Garcia et al, v. State of AZ, et al.*** (The US District Court the District of AZ 2:21-cv-01850-ROS-DMF)

***Tristen Calder as personal representative of the Estate of Coby Lee Paugh v Uintah County, et al.*** (United States District Court for the District of Utah 2:17-cv-01249 JNP-CMR)

***Jose Beltran, et al. v. Santa Cruz County, et al.*** (The US District Court the District AZ CV-20-00462-TUC-DCB)

***Robert Taylor, Jr. v. Eric Star, et al. and Southern Health Partners, Inc, et al.*** (United States District Court for the Northern District of Alabama Eastern Division 1:20-cv-00489-CLM)

***Dustin Law Porter, et al., v. Daggett County, Utah, et al.*** (US District Court District of Utah No. 2:18-cv-00389-DBB)

***Deborah Sanchez v Graham County, et al.*** (The US District Court the District of AZ CV 21-00073 TUC-JCH)

***Cheryl A. Munday and Margaret Devine, et al, v. Beaufort County, et al. (***District Court for the District of South Carolina Beaufort Division 9:20-CV-02144-DCN-MHC2)

***Susan Szakalos v. Bill Prumell, as Sheriff of Charlotte County, et al.*** (Circuit Court of the Twentieth Judicial Circuit in and for Charlotte County, Florida 18--CA-0000463CA)

***Jonathan Oliver and James Lackey v. Robert Hults, et al.  (****US District Court for the District of Wyoming 17-CV-153-SWS)*

***Carrie Roth-Walker, et al., v. Mark D. Napier, et al.*** (The Superior Court of the State of Arizona in and for the County of Pima CV-C20181773)

***Diego Tijerina v. The State of New Mexico Corrections Department, et al.*** (In the United States District Court for the District of New Mexico 1:20-CV-00706 JAP/JHR)

***Alexis Gabrielle Dinsbach v. Candice Harris, et al.*** (The United States District Court for the District of Arizona CV-18-03595-JAT-DMF)

***Kelli Andrews as Administrator of the Estate of Tiffany Ann Rusher, deceased, v. Sangamon County, Illinois, Sheriff Jack Campbell*** (US District Court Central District of Illinois 1:18-cv-1100-SEM-TSH)

***Human Rights Defense Center v. Southwest Virginia Regional Jail Authority, et al.*** (District Court for the Western District of Virginia Abingdon Division 1:18-cv-13)

***Kristen McDonald v. Franklin County Ohio*** (District Court for the Southern District of Ohio 2:13-CV-0503)

### CASES I HAVE TESTIFIED IN AS AN EXPERT WITNESS DURING THE PAST FIVE YEARS AT TRIAL

***Dustin Law Porter, et al., v. Daggett County, Utah, et al.*** (United States District Court District of Utah No. 2:18-cv-00389-DBB)

***Deborah Sanchez v Graham County, et al.*** (The US District Court the District of AZ CV 21-00073 TUC-JCH)

***Tristen Calder as personal representative of the Estate of Coby Lee Paugh v Uintah County, et al.*** (United States District Court for the District of Utah 2:17-cv-01249 JNP-CMR)

***George Finlinson v Millard County, et al.*** (US District Court District of UT Central Division 2:16-CV-01009)

***Susan Szakalos v. Bill Prumell, as Sheriff of Charlotte County, et al.*** (Circuit Court of the Twentieth Judicial Circuit in and for Charlotte County, Florida 18--CA-0000463CA)

Stewart IXR Clayton McCray v. Allegheny County, et al.      Page 31

*(Evidentiary Hearing, Defendants' Motion for Summary Judgement -Failure to Exhaust -PLRA) Michael Andrew Nunez v. Mark Napier, et al.* (The US District Court for the District of AZ 18-CV-00244-JAS)
*Ramona Amaya, mother of deceased Reynaldo Amaya, v. Cochise County Sheriff Mark Dannels* (In the Superior Court, County of Cochise, state of Arizona CV-2016-00305)
*Gunderson v. Rivas-Pardo, et al.* (Federal Court, Arizona, 13-CV-01131-JAF)
**Jose Virgen v. Hyatt, et al.,** (Federal Court, Arizona**)**

# Part X
# Fee Schedule

**Hourly Rate**:
$250hr. for file review and report writing.

**Daily Rate**:
$2,000 for each day or a partial day spent on-site or traveling for inspection of facilities, meetings with attorney(s), depositions, court or other travel required or approved by the client.

**Local Depositions**:
For travel, no more than 100 miles, depositions will be billed at a rate of:

$300/hr. for 1-2 hours
$400/hr. for time greater than 2 hours

**Expenses**:
Actual travel expenses, including airfare, ground travel, lodging, meals and related costs; and other reasonable expenses incurred (commercial printing, courier, or mailing costs, etc.). Reimbursable expenses shall also include any cost incurred due to postponement or cancellation of a trial, deposition, or other scheduled travel (e.g., any fee or penalty imposed by a hotel or airline due to cancellation or postponement of reservations).

The payment for services rendered in relation to my work on this case is in no way contingent or based on the contents of my opinions or the outcome of the case.

Stewart IXR Clayton McCray v. Allegheny County, et al.       Page 32