# EXHIBIT 2

## Expert Opinion Report

**Re:** *Clayton McCray vs. Allegheny County; Donald Stechschulte, Medical Director; Nancy Park; Laura Williams, Chief Deputy Warden of Healthcare Services*
*Case no. 2:22-cv-00493-LPL*

**Prepared by Alexander Meagher, MD, CCP**

*for*

**Shannon Voll Poliziani**
**Gordon Rees Scully Mansukhani**

2/28/25

This is the expert opinion of Alexander J. Meagher, MD regarding the actions of defendants, Donald Stechschulte and Nancy Park, in the above-referenced case.

I hereby provide my declared statement that the following is true and complete to the best of my knowledge:

I. My qualifications and experience to express an opinion on the licensed professional's standard of care or liability for the claim are outlined in the attached CV. I am the current clinical medical director of Travis County Jail since 2014. I am a family medicine board certified physician and have practiced medicine in corrections and in urgent care since 2014. I completed my undergraduate studies at the University of Texas in 2005. I completed my medical school training at St. George's Medical University in 2011. I completed my medical residency training at the University of Texas Southwestern in Austin, TX in 2014. I am a certified Correctional Healthcare Professional.

The Travis County Jail is an urban correctional facility with an average daily census of 2,200 detainees. We have two facilities, an intake facility in downtown Austin, TX and a larger facility in Del Valle, TX. My primary duties as the clinical medical director include daily direct patient care, providing support and supervision to our advanced practitioner providers and nursing staff, and developing and updating medical and nursing protocols, policies and procedures. I approve and manage all outside specialty care for our patients, as well as review all in house imaging and electrocardiograms.

I have not authored any publications in the last ten years.

I am being compensated for this case at a rate of $450.00/hr. for review of records, report generation, and $250/hr. portal-to-portal travel time. In the event of deposition, I will be compensated at a rate of $575/hr. plus travel time and related expenses. In the event of trial testimony, I will be compensated at a rate of $5,000.00/day plus travel time and related expenses.

1

014

This opinion letter represents my review of the documentation and records provided and listed below. All opinions are based on my medical education, training, experience, and literature/guideline reviews. All opinions are to a reasonable degree of medical certainty in the field of primary care and correctional health care.

I have reviewed and relied on the following documents related to the above-referenced litigation with regards to my expert opinions:

- Plaintiff's First Amended Complaint
- Allegheny County Jail file (AC_CM-000001 – AC_CM_002154)
- Dr. Stechschulte and Dr. Park's Objections and Answers to Plaintiff's First Set of Interrogatories
- Dr. Stechschulte and Dr. Park's Supplemental Objections and Answers to Plaintiff's First Set of Interrogatories
- Defendants Answer to the Second Amended Complaint
- Grievances and sick calls filed by Clayton McCray
- SCI-Fayette records (MCCRAY_000001-000332)
- UPMC medical records (MCCRAY_05728-057313)
- UPMC medical records (MCCRAY _000333-002860)
- Expert Report of Dr. Mary Ann Miknevich 10/25/24
- Expert Report of Dr. Lee Ruotsi 1/5/25
- Depositions:
  - Clayton McCray
  - Donald Stechschulte
  - Nancy Park
  - Jennifer Kelly
  - Ashley Brinkman
  - Randy Justice

II. I have been asked to provide my professional opinion regarding if the medical care provided to Mr. Clayton McCray ("Mr. McCray") was negatively affected by the actions and inactions of Dr. Stechschulte and Dr. Nancy Park.

   1. **Standard of Care**
   The standard of conduct to which a physician must conduct patient care is that of a reasonable physician under similar circumstances. In this case, the correctional medicine standard of care is similar to medical care given to patients who are not incarcerated. However, in correctional medicine the physician, physician's assistant, and medical staff must take into consideration access to care as the patient is unable to choose care freely as would be expected of a patient who is not incarcerated. Patients in an incarcerated setting do have a right to a clinical judgment from a licensed medical provider. In this case, Dr. Stechschulte and Dr. Park were contacted and made clinical judgments based on the knowledge that he and she had at the time. The clinical decisions must be evaluated in real time, based on the knowledge Dr. Stechschulte and Dr. Park had at the time. When a provider undertakes to treat a patient, he or she takes on an obligation to use medical judgment and render reasonable competent care in the course of services he or she provides. A provider does not guarantee recovery or cure. In this case, Dr. Stechschulte and Dr. Park provided Mr. McCray with the best care and tools they had available to them.

2

015

2. **SUMMARY OF MEDICAL RECORDS:**

    i. **Review of records**

**Antibiotic history: (AC_CM_000241)**

9/25/19-10/4/19: Clindamycin 450mg BID (PA Stanton), completed 10-day course

11/25/19-12/1/19: Amoxicillin-Pot Clavulanate 875-125mg BID (recommended by podiatry and ordered by Dr. Park), completed 5 day course

12/21/19-12/23/19: Sulfamethaxoazole-Trimethoprim 800-160mg BID (PA Lynch) (stopped due to allergy)

1/7/20-1/13/20: Silver sulfadiazine External (PA Austin), completed 7-day course

3/22/20-4/4/20: Amoxcillin-Pot Clavulanate 875mg-125mg (PA Lynch), completed 14-day course

5/25/20-5/28/20: Moxifloxacin HCl (PA Austin) discontinued as caused abdominal pain

5/29/20-5/30/20: Clindamycin 450mg BID (Dr. Stechschulte) discontinued as caused vomiting

5/30/20-6/2/20: Rifampin 300mg BID (PA Austin) (**Refused** on 6/1- 001526) discontinued by Dr. Park

5/31/20-6/2/20: Vancomycin Oral 300mg BID (PA Austin) discontinued by Dr. Park

7/3/30-7/5/20: Clindamycin HCl 300mg TID (PA Chrzastowska) (changed to different antibiotic)

7/5/20-7/14/20: Amoxicillin-Pot Clavulanate 875-125mg BID (PA Chrzastowska), completed 10-day course

7/17/20-7/18/20: Amoxicillin-Pot Clavulanate 875-125mg BID (ordered by ortho, discontinued by PA Austin due to concern for allergic reaction)

9/10/20-9/17/20: Amoxicillin-Pot Clavulanate 875-125mg BID (Dr. Park), completed 7-day course

**Wound care Orders: (AC_CM_000445-447)**

5/31/19-6/14/19 Daily (left custody)

8/29/19-9/20/19 Daily (left custody)

9/23/19-1/28/20 Daily

1/28/20-2/25/20 Weekly

2/25/20-7/17/20 Daily

7/17/20-9/8/20 BID

9/8/20-10/9/20-Daily (left custody)

3

016

**Wound Care Attendance: (AC_CM_000448-475)**

**Aug 2019:** 30, 31

**Sep 2019**: 1, 2, 3, 4, (5NS), 6, 7, 8, 9, 10, (11NS, 12NS), 13, 14 (Missed 3 days NS)

**Booked back in on 9/14/19**

**Sep 2019:** 24, 25, (26NS), 27, 28, 29, 30 (Missed 1 day NS)

**Oct 2019**: (1NS), 2, 3, 4, 5, (6NS), (7R), 8, (9NS), 10, 11, 12, 13, 14, 15, 16, (17NS, 18NS, 19NS), 20, (21NS), 22, 23, 24, 25, 26, 27, 28 (29 took supplies the day before), (30-crt, 31NS) (Missed 8 days NS, 1 day R, 1 day CRT)

**Nov 2019:** 1, 2, (3NS, 4R, 5NS 6NS), 7, (8NS, 9NS), 10, 11, (12NS), 13, 14, 15, (16R, 17R), 18, 19, 20, 21, 22, 23, 24, 25, (26NS), 27, 28, (29NS), 30 (Missed 8 days NS, 3 days R)

**Dec 2019:** 1, 2, (3NS), 4, 5, 6, 7, 8, (9R), 10, 11, 12, 13, (14NS, 15NS), 16, 17, (18NS), 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, (29NS), 30, 31 (Missed 5 days NS, 1 day R)

**Jan 2020:** 1, 2, 3, 4, 5 (6, 7- self care), 8, 9, 10, (11NS), 12, 13, 14, 15, 16, (17NS), 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, (28, 29, 30- weekly + self care) (Missed 1 day NS)

**Feb 2020:** (1, 2, 3, 4- weekly + self care) 5, (6, 7, 8, 9, 10, 11- weekly + self care), 12 (13, 14, 15, 16- weekly + self care), 17, (18- weekly + self care), 19, (20, 21, 22, 23, 24, 25- weekly + self care), 26, 27, 28, 29 (Missed 0 days NS)

**Mar 2020:** (1NS, 2NS), 3, 4, (5NS), 6, 7, (8NS), 9, 10, 11, 12, (13NS), 14, 15, (16NS, 17NS), 18, 19, 20, (21NS- Officer unavailable), 22, (23NS), 24, (25NS, 26R), 27, 28, 29, (30NS, 31NS) (Missed 12 days NS)

**Apr 2020**: 1, 2, 3, 4, 5, (6NS), 7, (8NS), 9, (10NS), 11, (12R, 13NS), 14, (15NS), 16, 17, 18, 19, (20NS, 21NS), 22, (23NS), 24, 25, 26, 27, 28, (29NS), 30 (Missed 9 days NS, 1 day R)

**May 2020:** 1, (2NS), 3, 4- self care), 5, 6, 7, 8, 9, 10, 11, (12R), 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, (23NS, 24NS), 25, 26, 27, 28, (29NS, 30NS, 31NS) (Missed 6 days NS, 1 day R)

**Jun 2020:** 1, 2, 3, 4, (5NS), 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, (19NS), 20, (21NS, 22NS, 23NS), 24, 25, 26, 27, 28, 29, 30 (Missed 5 days NS)

**Jul 2020:** 1, 2, 3, 4, 5, 6, 7, 8, 9, (10NS), 11, 12, 13, 14, 15, 16, 17, 18, (19NS), 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31 (Missed 2 days NS)

**Aug 2020:** (8/1-ER), 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, (27NS), 28, 29, 30, 31 (Missed 2 days NS)

**Sep 2020:** 1, 2, 3, 4, (5NS), 6, 7, 8, 9, 10, 11, 12, 13, 14, 15 (16-17 SURGERY), 18, 19, (20NS, 21NS, 22NS), 23, (24NS), 25, 26, 27, (28NS), 29, 30 (Missed 5 days NS)

**Oct 2020:** 1, 2, 3, 4, 5, (6NS), 7, 8 (Booked out 10/9/20) (Missed 1 day NS)

4

**Housing:**

9/23/19 – 3/24/20: Gen Pop
3/24/20 – 4/9/20: Disciplinary
4/9/20 – 5/27/20: Gen Pop
5/27/20 – 5/29/20: Medical Unit
5/29/20 – 6/19/20: Disciplinary
6/19/20 – 10/9/20: Gen Pop

## ii. Summary of records:

Clayton McCray was a pretrial detainee housed at Allegheny County Jail (ACJ) from 8/29/19 – 10/9/20. He was transferred from SCI-Fayette prison where he had most recently been incarcerated since 6/1/19. At the time of booking, Mr. McCray had a medical history of a pressure ulcer in his right heel that required daily dressing changes. He had suffered a spinal cord injury from multiple gunshot wounds in 2011 that caused a lumbar spine injury resulting in loss of sensation in the right foot and a right sided foot drop, an injury to his liver that required repair, an injury to his kidney that required a splenectomy, and chronic pain. He had a fusion procedure to his right ankle in 2013 requiring hardware in his ankle/foot. From the medical records available to me it is unclear when the right heel neuropathic ulcer wound first developed, but it was first documented in the ACJ medical records during an intake for a brief incarceration period on 5/30/19 – 6/3/19 (AC_CM_000029). There is documentation in Dr. Mary Ann Miknevich's expert witness report from 10/25/24 that Mr. McCray was noted to have an ulcer on his right foot during his initial examination upon intake to SCI-Fayette prison on 12/14/18 (page 16). Mr. McCray was sent to the hospital from this prison for concerns of osteomyelitis with possible sepsis in May 2019 (McCray_000045). The hospitalization diagnosis included acute sepsis and right foot infection, and he was treated with intravenous antibiotics and ultimately discharged back to SCI-Fayette on continued antibiotics. There is documentation by orthopedic surgery during a visit on 7/17/20 that this wound had been present since 2017 and required multiple debridement procedures (AC_CM_000100). Furthermore, a progress note from a spinal cord injury clinic visit on 6/25/2018 notes this wound developed from protrusion of a locking screw (placed for right ankle fusion in 9/2012) which was removed on 1/14/13 (MCCRAY_057294). This note also documents a history of early osteomyelitis in the right foot 1/13/14.

> INTERVAL HISTORY:[ER.1C]
> Since his last visit in July 2012 Clayton has experienced the following medical issues.[ER.1M]
> - Found to have protrusion of locking screw which created a pressure ulcer in right posterior heel (placed for right ankle fusion ~9/2012). Managed by Dr. Burns with screws and rods removed on 1/14/13. Found to have cellulitis[ER.1C] but[ER.1M] no osteo[ER.1C]myelitis[ER.1M][ER.1C] He did not receive a[ER.1M]bx therapy.
> - 7/9/13-7/23/13: hospitalized for decubitus ulcer of right buttock. Went to OR with plastics for sacral debridement and vac placement. Tx with IV abx. Foley placed for short period of time for hematuria. Urology rec UDS.
> - Aug 2013 bilateral ischial ulcers[ER.1C] which were debrided[ER.1M] ...[ER.1C]reportedly[ER.1M] noncompliant with wound vac[ER.1C][ER.1M].
> - 12/12/13 ED visit – two ulcers on plantar surface of right foot treated with topical abx
> - 1/13/14: foul odor from ulcers on right foot. Arrest for purchasing heroin. Found to have early osteo[ER.1C]myelitis in right foot[ER.1M]. Podiatry debrided wound. Discharged on augmentin for cellulitis.

Upon transfer to ACJ on 8/29/19, he was evaluated by nursing who ordered daily dressing changes, a cane, and lower bunk restrictions under advisement by NP Chrzastowska (AC_CM_000445). A medication for chronic pain, nortriptyline, was continued by NP Kielek (AC_CM_000241) and he was

5

provided with wound care (AC_CM000791-808). He was seen the following day by wound care where the wound was documented as appearing dirty, crusted, with scant/small bleeding and a small amount of exudate.

The first documentation of size of the foot wound I can find during this incarceration was on 9/6/19 by NP Kielek who documented "approx. 4 x 5 cm with a central ulceration approx. 5mm deep. No s/s infection or erythema, no overt exudate" (AC_CM_00494). This is larger than when documented on his prior incarceration by Dr. Stechschulte on 5/31/19 as being "approximately two and a half by 3cm and probably half a cm deep" (AC_CM_00494).

Mr. McCray continued to receive wound care by nursing staff. Despite being ordered as daily, there were days he missed wound care for various reasons, as outlined above. Mr. McCray was frequently evaluated by ACJ medical staff providers. He was treated with antibiotics, debridement, and referred to podiatry.

The chronic foot wound improved over time and wound care was advanced to self-care with weekly wound checks and supplies in late January 2020. Near the end of February, the patient had follow-up with podiatry who recommended resuming daily wound care, which was ordered.

Mr. McCray began to miss a fair amount of wound care in the months of March through May due to no-shows. In May of 2020 his wound deteriorated, and clinical staff began to display concern for infection into the bone (osteomyelitis). It is important to note that Mr. McCray might already have clinical evidence of osteomyelitis at this time. He received multiple rounds of antibiotics as outlined above. He was referred for specialty care consultations including podiatry, wound care, and orthopedics. He was encouraged offloading and eventually 100% non-weightbearing, though compliance was an issue. He was moved to medical housing, though he was caught smoking and was moved to disciplinary housing. This is notable as smoking can delay wound care by impairing healing, and discipline is necessary not only as it is a violation of custody rule, but he was also housed in medical around other high risk and medically vulnerable patients where smoking can lead to potential harm to others, as well as a risk of fire. It is of my opinion that smokers do not tend to smoke only one time. Also important to note is that medical staff do not discipline inmates, any such action was by custody officials. Frequent care by medical staff continued.

On 7/1/20 an XR report documented acute osteomyelitis of the plantar calcaneus. The patient was moved to medical housing, and wound care specialist was consulted. Wound care specialty recommended having the patient see orthopedic surgery urgently. Orthopedic surgery consult was ordered, and an appointment was made for 7/10/20, though on that date was rescheduled for 7/17/20. During this period the patient was being treated with antibiotics and monitored for clinical deterioration.

On 7/17/20 he saw orthopedics who noted he had chronic osteomyelitis with a draining sinus. Surgery was discussed and imaging was requested as well as vascular surgery consultation.

On 8/1/20 he was sent to the emergency room for worsening leg pain. He was evaluated by orthopedic surgery in the ER who did not feel there were any emergent needs to for hospitalization. He was advised to follow up with orthopedics as an outpatient and complete requested imaging and work up. This marked twice that orthopedic surgery saw the patient who knew of the concern for osteomyelitis in this

location and neither time was this deemed emergent or to require immediate imaging/surgery per the surgeons.

On 8/17/20 an MRI of the ankle confirmed the diagnosis of osteomyelitis of the calcaneus bone, as well as concern in the talar bone. The MRI also showed severe posttraumatic osteoarthritis at the tibiotalar joint. This was discussed immediately with the orthopedic group by the ACJ medical staff and there were no changes to the plan in place.

On 8/27/20 he was seen and cleared by vascular surgery to continue care with orthopedic surgery and follow-up as needed.

On 9/4/20 the patient was seen by Dr. Rinaldi of orthopedic surgery and was recommended to have a BKA (below the knee amputation) surgery. It is documented the reasoning for this surgery was to improve mobility given he had very minimal function of his ankle and foot, decrease pain with mobility, as well as limit the spreading infection (AC_CM_000144).

On 9/16/20 Mr. McCray was admitted to Allegheny General Hospital for surgery. The type of surgery was again discussed upon admission with orthopedic surgeons Dr. Rinaldi and Dr. Ward, who recommended proceeding with a BKA due to the risks of leaving residual infection, continued weight-bearing on an abnormal foot, minimal chance of ulcer-free ambulation and benefits of improved function and a much higher chance of no further surgical intervention. Mr. McCray proceeded with the BKA. There were no complications, and he was discharged back to ACJ on 9/17/20.

His care continued without any significant issues while at ACJ up until his release on 10/9/2020.

### III.   Nonhealing Lower Extremity Wounds, Osteomyelitis

A chronic wound is one that is physiologically impaired and does not heal in the expected time frame. The treatment for nonhealing lower extremity wounds revolves around wound care, offloading, debridement, and infection control. I am not an expert in wound care, but I treat many patients in a large county jail with wounds regularly. The correctional setting poses many challenges while trying to achieve these treatment measures. This includes patient compliance, security restrictions, housing changes, transportation issues. Many of these challenges were further impeded by COVID-19 restrictions.

Osteomyelitis is an infection of the bone. Once this occurs oral antibiotics are typically not indicated. Treatment is surgical resection and/or intravenous antibiotics managed by orthopedic surgeons and/or infectious disease specialists. If there is involvement of internal hardware, then surgery is the only viable solution.

### IV.   Opinions and Conclusions

I have reviewed the care provided to Clayton McCray during his incarceration at the ACJ from 8/29/19-10/9/20. He entered this facility with a chronic nonhealing heel wound that was months if not years old on a leg that had diminished sensation and function as well as internal hardware. There is documentation that this wound possibly stems back to 2013. It is my opinion that Mr. McCray may have had underlying undiagnosed chronic osteomyelitis by the time he was transferred

7

020

to ACJ. There is documentation that Mr. McCray had early osteomyelitis in 2014 during a spinal cord injury clinic visit on 6/25/2018 (MCCRAY_057294). Osteomyelitis is known for its high relapse rate despite appropriate medical and surgical interventions. While incarcerated at SCI-Fayette prison Mr. McCray was hospitalized in May 2019 for sepsis stemming from this right foot wound. During this hospitalization osteomyelitis was not visualized on x-rays, though advanced imaging of the foot was not performed. While plain radiographs are useful for initial evaluation, they may not be sufficient for early diagnosis of osteomyelitis. It is my opinion based on my education, training, and experience that he may have developed osteomyelitis and had incomplete treatment for it as far back as this this date. The patient developed a severe life-threatening infection because of his foot wound in May 2019 and the tests performed at the time did not effectively rule out osteomyelitis.

Upon transfer to ACJ in August 2019 Mr. McCray was ordered daily wound care for his foot wound, and despite improvement in his wound initially, the wound deteriorated and an infection in the bone of his foot (osteomyelitis) was eventually confirmed. It is my opinion this infection may have been an occult progression of an already-present chronic osteomyelitis that he had before he was even transferred to ACJ.

After evidence of osteomyelitis was demonstrated on 7/2/20, surgery is the most viable solution to resolve the infection. Antibiotics are unlikely to treat and cure osteomyelitis and prevent surgery from being required, especially in the presence of hardware. The patient was referred to orthopedic surgery, and a below the knee amputation (BKA) was determined to be the best option for him to improve his function, reduce pain, and reduce the need for future surgeries.

I have been asked to opine if the actions or inactions of Dr. Donald Stechschulte and Dr. Nancy Park with respect to the medical care of Clayton McCray were reasonable within the field of correctional health care during his incarceration at the ACJ from 8/29/19-10/9/20.

In my opinion, based on my education, training, and experience, the medical care provided to Mr. McCray by Dr. Stechschulte and Dr. Park was reasonable, appropriate, and consistent within the accepted practices within the field of correctional health care. At no point during my review did I discover any significant deviations from the standard of care that I can determine clearly lead to harm to Mr. McCray.

1. **Discussion of complaints made by Clayton McCray**

In 2011, Mr. McCray developed physical disabilities after suffering a gunshot wound to his spine. He underwent surgery that resulted in the removal of one of his kidneys. This procedure did not prevent him from being able to tolerate specific antibiotics as his renal function was noted to be normal on lab review (AC_CM_002126, 2140, 2153).

The complaint reports that Mr. McCray's foot condition is and was, at all relevant times, a physical disability. It states that "his doctor prescribed him a cane, crutches, and physical therapy for his foot disability" but also states that "before his confinement at ACJ in September 2019, McCray was able to play basketball, exercise in a gym, and participate in similar

8

recreational activities." This is confusing as it does not paint an accurate picture of Mr. McCray's physical abilities at the time of intake into ACJ.

The complaint states that his foot condition made him extremely vulnerable for developing neuropathic ulcers or wounds on his right foot which were highly likely to worsen into a severe bone infection without standard medical care, sanitary conditions, accommodations, or assistive devices. It states that he was receiving all these measures while at the facility prior to his transfer to ACJ, though also reports that Mr. McCray developed the ulcer wound while at the previous facility and required hospitalization and intravenous antibiotics in that facility as well. This is despite allegedly receiving the "proper care" and measures at this facility prior to his transfer. The complaint does not mention that this wound appears to be recurrent going back to as far as 2013. Upon transfer to ACJ the wound had not healed. It is my opinion that he may have developed infection in his bone prior to his transfer to ACJ that had not been completely treated (chronic osteomyelitis).

The complaint appears to reference the Federal Bureau of Prisons Clinical Practice Guidelines for Prevention and Management of Acute and Chronic Wounds as the standard of care for neuropathic ulcerative wounds. Wounds have best practices, but there are no specific guidelines that must be followed. Any credentialed staff can and should always use their clinical judgment first, and guidelines should not supersede clinical judgment. ACJ is not a state prison nor a federal prison, so it is unclear why these 'guidelines' were selected as implicitly applicable to ACJ.

### ACJ Denied McCray his Prescribed Assistive Devices
While it can at times be useful/helpful to know what type of management another provider/facility may have implemented for any condition, that does not make it necessary or indicated.  Just because something was done elsewhere does not preclude making one's own independent assessments for what is needed.  There are differences of opinions about proper care all the time in medicine and nursing care. Mr. McCray was ordered a cane upon entry to ACJ as well as an AFO. The AFO was lost, and another was ordered by Dr. Stechschulte (AC_CM_000445 and AC_CM_000459). Assistive devices including crutches and wheelchairs were ordered when indicated throughout his incarceration. In its Answer to the Complaint, Allegheny County averred that McCray's cane was not permitted at various times for "valid penological reasons," namely because he was "using it as a weapon."  Regarding the AFO, Allegheny County averred that McCray's AFO was "misplaced when he moved to segregated housing after a significant misconduct incident," but "efforts were made by Dr. Stechschulte (AC_CM_000514) and others to replace it."  Further, Dr. Ashley Brinkman testified that mobility devices could be confiscated by corrections and health care may or may not be notified. Dr. Nancy Park also testified to this. Therefore, any lack of assistive devices cannot be attributed to Drs. Stechschulte and Park.

### ACJ Denied McCray Adequate Wound Care
I have outlined and discussed Mr. McCray's access to wound care during his incarceration at ACJ, and do not find it deficient. Of note this wound had been present as far back as possibly

9

2013. During the time he had the wounds and was not incarcerated, I do not believe he would have been receiving daily nursing or specialty wound care 100% of the time. There would likely be days he would miss or not show up to wound care for some reason, similar to what happened during the ACJ incarceration. There would be time periods he or his family members may be performing his own wound cleaning, care, and dressing changes after receiving sufficient supplies and 'training' by nurses and specialists and that would be acceptable unless there was a new concern for deterioration. Wound care is not necessary to be completed in a sterile fashion or in a sterile room.

Wound care was properly ordered by providers during his incarceration at ACJ (AC_CM_000445-447). It is up to Allegheny County employees to provide this care. Providers do not routinely administer wound care. Furthermore, Mr. McCray testified that the longest he went without wound care was 2-3 days, and when that happened, he filed a grievance. Without proper documentation, it is difficult to advise if any intermittent missed prescribed wound care visits had any meaningful impact on his healing or worsening of the wound. It also cannot account for Mr. McCray's personal management outside of dressing changes and education received. If he did not comply with recommended weight bearing and leg elevation then responsibility for how he progressed is just as much if not more his own fault (refusing wound care, walking around).

### ACJ Denied McCray Standard Pain Medication

Mr. McCray was managed with routine non-narcotic pain medication in addition to multiple courses of opiate pain medication when suspected to be clinically indicated by medical staff. Mr. McCray has a medical history of opiate abuse as documented in his medical records (AC_CM_000869) as well as cheeking medication (MCCRAY_000134) and it would be prudent to avoid long-term use of such medications. In correctional settings there is significant risk of diversion and/or abuse of controlled substances, even with short term application. Alternative and non-narcotic pain management is commonly considered and applied in correctional settings. Pain management is completely unrelated to wound healing. The records reflect that McCray did not routinely complain of pain. Nevertheless, the records reflect that pain medications were repeatedly ordered for McCray by the medical care providers. McCray himself testified at deposition that he was on gabapentin the entire time he was in the ACJ.

### ACJ Failed to Provide McCray Adequate Nutrition

Upon my review of the available records, Mr. McCray did not display evidence of malnourishment. He was provided with the standard diet of a pre-trial detainee in addition to boost, a supplemental nutritional drink/shake. There were some intermittent dates where the boost was not ordered, and there are multiple instances of his documented refusal of this. It is my opinion based on my education, training, and experience that missing a few shakes did not impair his wound healing.

### ACJ Denied McCray Housing Accommodations

Mr. McCray was repeatedly educated by ACJ medical providers to limit weight bearing on his foot and to elevate his leg (AC_CM_000520). He was prescribed assistive devices to aid with this. A patient does not have to be in medical housing to be 100% non-weight bearing – they can use

10

023

a walker or crutches on any pod (unless corrections take those assistive devices away). Per Dr. Stechschulte, Mr. McCray would continue to bear weight on his foot even when told to be 100% non-weight bearing.

ACJ medical providers ordered Mr. McCray to be moved into medical housing when they determined it necessary and appropriate (AC_CM_001508). Per Dr. Park's testimony this was performed to help facilitate non-weight bearing, improve access to wound care, and to have closer monitoring on Mr. McCray's wound. Shortly after this move Mr. McCray was moved from medical housing to disciplinary housing. It is out of the control of the medical staff when patients are moved into disciplinary housing. Furthermore, it has become clear through depositions of ACJ personnel that ACJ administration has the final say regarding where an inmate is housed. Dr. Ashley Brinkman testified that even if a provider approved placement on MHU, the request may not be accommodated – the Warden has the final say on housing. Sgt. Randy Justice testified that ACJ administration has the final say on housing decisions and whether an inmate was permitted to retain a medical device (such as an AFO).

### ACJ Denied McCray Standard Antibiotic Treatment
There is no standard of care for osteomyelitis or for cellulitis. Every single instance is managed on a case-by-case basis. The duration of treatment for any infection is individualized. There are exceptions and examples of dosing adjustments (allergies, renal dosing, available therapeutics/formulary).

There are multiple instances where ACJ medical staff prescribed antibiotic courses that were discontinued early due to the patient not being able to tolerate the medication. I have outlined these above.

Once the diagnosis of osteomyelitis was confirmed oral antibiotic therapy was not going to prevent surgery from being curative. This diagnosis was suspected clinically in May of 2020 and confirmed on 7/1/20. This was highlighted by the patient not being prescribed antibiotics by wound care specialist Dr. Taffe on 6/3/20 (AC_CM_000524), 6/16/20 (AC_CM_000083), 7/2/20 (AC_CM_000537), by orthopedic surgery on 8/1/20 (AC_CM_000115) and 9/4/20 (AC_CM_000144), or by vascular surgery on 8/27/20 (AC_CM_000132).

### ACJ Delayed Specialists from Timely Diagnosing & Treating McCray
I did not discover at any point an instance where the patient was denied access to outside specialty care. Delays are common in the correctional setting, especially in the timeframe of the early COVID-19 pandemic. This is frequently not the fault of the correctional facility/providers, and in this case specifically it is not the fault of the providers. Podiatry had recommended specialty wound care consultation on 2/24/20, and this referral was ordered by Dr. Stechschulte on 2/25/20 (AC_CH_000511). It is not clear from the records why this referral took so long but the referral was resubmitted by Dr. Park on 5/4/20 (AC_CM_000517) and the patient was scheduled for one month later. When the concern for osteomyelitis was present Dr. Stechschulte was able to obtain an earlier consultation with Dr. Taffe of AGH wound care via telemedicine.

11

Phone and video conferencing allow this gap to be bridged and is an appropriate avenue for specialty consultation in place of or while awaiting in-person consultation. Access to specialty care can also be limited (which is not strictly an issue in the correctional setting), and unfortunately the quickest way to access this type of care may be going through the emergency department. This was attempted when there were worsening clinical concerns on 8/1/20, though the plan was ultimately not changed by this intervention. Wound cultures of the foot <u>do not</u> indicate patients are septic (First Amended Complaint, para. 144).

The complaint stated that Augmentin is contraindicated due to his "kidney condition and his blood test results, which indicated that he was experiencing problems with his kidneys and/or pancreas" (line 145 from First Amended Complaint). This statement is inaccurate. Augmentin was prescribed on multiple occasions during this incarceration by multiple providers including orthopedic surgery, as outlined above, and is a very good choice for cellulitis or to limit any soft tissue involvement, but not to cure osteomyelitis. I have found no blood tests indicating that his kidney function had been abnormal during this incarceration, nor any reason to believe this medication was contraindicated for Mr. McCray. There is also no mention of any pancreatic concerns or related labs in the medical records I reviewed for Mr. McCray.

***McCray's Spreading, Life-threatening Osteomyelitis Necessitated Amputating His Right Leg***
Mr. McCray wound was managed by ACJ medical staff, podiatry, and a wound care specialist but on 7/1/20 an XR showed evidence of osteomyelitis. After this point oral antibiotics are very unlikely to change the need for surgery. Due to the anatomical complexity of where this infection was, amputation was likely the best course for him as outlined in his consultations with orthopedic surgery. Any antibiotics advised at this time may have been for a collateral soft tissue infection or cellulitis, and likely just precautionary prior to a definitive surgery. At no point during this incarceration did Mr. McCray show clinical evidence of a life-threatening spreading infection that required immediate/emergent hospitalization or intervention. This infection was managed appropriately as an outpatient.

2. Rebuttal of Dr. Lee Ruotsi's Expert Report:

**I disagree with Dr. Lee Ruotsi on many aspects of his opinions. The following is a rebuke of his claims of deviations from the standard of care:**

"Several months later in May 2019, Mr. McCray's foot became infected, and he was transferred to University of Pennsylvania Medical Center ("UPMC") Presbyterian where he received IV antibiotics. MCCRAY_000013-63, MCCRAY_000034. Diagnostic testing showed Mr. McCray showed no evidence of osteomyelitis at that time. MCCRAY_000013-63, MCCRAY_000034 ("imaging of the foot did not reveal any osteo")." (Page 3).
*I disagree that Mr. McCray did not have osteomyelitis at this time. In my review of the available medical records advanced imaging (a CT or MRI) was not completed during this hospitalization. After x-rays did not reveal osteomyelitis of the foot attention was shifted towards treating life-threatening sepsis. Serial monitoring of inflammatory marker labs was not performed during or after this*

12

025

*hospitalization. Without this workup/monitoring, it was not possible to confirm/refute the presence of osteomyelitis at this time.*

"He was then transferred to SCI-Mercer and was allowed to continue outpatient wound treatment at UPMC Presbyterian. While at SCI-Mercer, Mr. McCray received proper wound care, was housed in a handicap accessible cell, and was allowed to use his cane, orthotic shoe and AFO brace. He then returned to SCI-Fayette for a few months, where he again received adequate care in accordance with medical standards." (Page 3).
*Dr. Ruotsi does not define what "adequate care in accordance with medical standards" is here. This is a generic general unsupported and unsourced statement. There are no standards of care for wound care.*

"It is my opinion that the healthcare providers, who treated Mr. McCray and corrections officials and administrators who obstructed his receipt of care, deviated from the standard of care in many respects as outlined below.
- On admission to ACJ, Mr. McCray's assistive devices were confiscated, and during his time at ACJ he was only allowed to use them intermittently. Deposition of McCray 65:19-66:19, 76:24-79:24, 107.
- Mr. McCray's ACJ Medical Records show he was prescribed to be housed on a lower bunk and tier and housed in the Medical Housing Unit (MHU) due to his chronic care and chronic pain needs." (Page 4).

*Dr. Ruotsi does not appear to have any experience in a correctional setting, thus likely has limited knowledge on how this affects certain aspects of his medical care. Upon intake into a correctional facility, medical personnel evaluate the patients and make their recommendations on housing and what durable medical equipment the patient may require at that time. It is then the responsibility of custody to provide this, which can also be affected at any time by the disciplinary status of the individual. Dr. Ruotsi is also basing some of his opinions about what happened upon the deposition of Mr. McCray, which is not a credible source of fact. Dr. Ruotsi is also not identifying which healthcare providers deviated from "the standard of care."*

"Based on my review, the County and individual defendants were aware of Mr. McCray's medical needs yet failed to comply with the medical orders of the podiatrist and wound care specialist concerning the frequency of Mr. McCray's wound care and keeping him on 100% non-weight bearing status." (page 6).
*Mr. McCray was ordered and educated to be non-weight bearing status after his podiatry appointment on 6/3/20 by Dr. Park (AC_CM_000524). Dr. Park ordered a wheelchair while in disciplinary and crutches when out of disciplinary, and the weight bearing status was repeatedly discussed with him and documented by providers (example- "100% nonWB status is encouraged to him and he will do the best he can in the present circumstance") (AC_CM_000527). Of note patient was observed by staff walking despite education to be 100% non-weight bearing (AC_CM_000551).*

"Dr. Stechschulte testifies in his deposition that every effort was made to accommodate an inmate's medical care regardless of where the inmate was housed but claimed that this was not always possible due to various circumstances within the prison, such as jail lockdowns and understaffing.

13

026

He did not explain why Mr. McCray could not have been housed in the MHU at ACJ consistent with the orders of his specialist" (page 7).
*Correctional facility medical staff can prescribe housing and durable medical equipment for their patients, but it is then the responsibility of custody to fulfill these orders.*

"While in solitary confinement, Mr. McCray did not have access to a clean or sterile environment where he could clean his wound. Several times, Mr. McCray was forced to administer his own treatment; he had to dress his wound, even if he wasn't provided with essential wound care supplies, was denied the opportunity to rinse his wound in the shower first and lacked sufficient education to apply the bandages properly to protect his wound. McCray Grievances, AC_CM_002187, AC_CM_002185. "
*These allegations are based on grievances and not known facts. To accurately support these claims a site visit would be necessary. Furthermore, wound care is not routinely a sterile procedure. If Mr. McCray was not incarcerated it is likely he would be completing a significant amount of wound care on his own or by family members in his own residence, which is also not a sterile facility.*

"On July 1, 2020, an X-Ray of Mr. McCray's right foot was interpreted as plantar ulceration with sinus tract and acute osteomyelitis of the plantar calcaneous. MCCRAY_003120, AC_CM_000236. It is at this point in time that arrangements should have been made for urgent workup and treatment of this problem. The appropriate approach at this time would have been hospitalization, MRI, surgical consultation and aggressive debridement of the soft-tissue and bony infection. Had this been carried out as I have suggested, it is quite likely that worsening of the infection and osteomyelitis leading to the below knee amputation (BKA) could have been avoided. Indeed, by the time the MRI was performed on August 17, 2020, the osteomyelitis had involved most of the calcaneous as well as part of the talus. The calcaneous is the "heel bone" and the talus is one of the large supporting mid-foot bones. Amputation of these 2 structures will leave an individual with a non-functional foot, so at this point BKA is the only viable and practical solution" (page 10).
*It is my opinion based on my education, training, and experience that Mr. McCray had osteomyelitis of this foot at least since May of 2020, if not much earlier. As detailed above, McCray may have had underlying undiagnosed chronic osteomyelitis since May 2019 as the tests performed at the time did not effectively rule out osteomyelitis. It is probable that by May 2020, based on the anatomical location of the already chronic osteomyelitis in his heel, as well as presence of hardware and the decreased function of his ankle and foot, a below the knee amputation was already indicated. This is outlined by the discussions by the orthopedic surgery team as mentioned previously in this report (AC_CM_000147).*

"On July 17, Mr. McCray was examined by Orthopedic Surgeon Dr. Stephen Martinkovich. He ordered Mr. McCray to have an MRI and ultrasound of the foot as soon as possible. He recommended wound packing twice daily and recommended evaluation for appropriate footwear. He additionally explained to Mr. McCray that he would likely require surgery to remove infected bone. AC_CM_000100-107" (page 11).
*This documents Mr. McCray was evaluated by orthopedic surgery on 7/17/20, not recommended to start on antibiotics, and advised to obtain imaging as an outpatient (not emergently).*

14

"On September 4, 2020, Orthopedic Surgery recommended a below knee amputation (BKA) due to osteomyelitis of the calcaneous, and osteomyelitis was again confirmed by another physician who recommended that Mr. McCray proceed with a below the knee amputation (BKA) to prevent further spread of the osteomyelitis as well as possible sepsis and death. AC_CM_000144-47. Once again, had there not been a 6-week delay from the initial diagnosis of osteomyelitis, Mr. McCray would likely have benefited from a much less catastrophic surgery and continue to have his leg and foot today" (page 11).
*It is unclear to me what this opinion is based on. Surgery was indicated once the diagnosis of osteomyelitis was confirmed, and the decision for BKA was made with the consideration of mobility and to decrease the need for future procedures (AC_CM_000147).*

"Had appropriate wound care, assistive devices, and accommodations been provided in the many months prior to June and July, the progression of this wound and ultimate below knee amputation likely would have been avoided" (page 13).
*This opinion is of speculation and not supported by facts, citations, or literature.*

"By July 1, 2020 the diagnosis of right calcaneal osteomyelitis was established and was further corroborated and documented throughout the months of July and August. AC_CM_000534-39, AC_CM_002687 AC_CM_002136-38, AC_CM_000540-41. An MRI was appropriately ordered on July 17 by an outside provider, however, this MRI would not be performed until a full month later on August 17. This MRI sadly revealed progression of the osteomyelitis to the point that below knee amputation became the only practical and viable option. AC_CM_000100-AC_CM_000107, MCCRAY_004775- 76, AC_CM_000127-130. Had the MRI been performed in a timely fashion it would have, at the very least, provided an opportunity to intervene much sooner for the infected wound with underlying osteomyelitis" (page 13).
*The diagnosis of osteomyelitis was suspected by ACJ providers in May of 2020. At that time, he likely already required an amputation, due the osteomyelitis AND the decreased function of his foot/ankle per the orthopedic surgeon's discussion in September (AC_CM_000147).*

"Had appropriate evaluative and interventional measures been put in place in early July it is highly likely that a partial calcanectomy (selective debridement of the affected/infected portion of the calcaneous) followed by a course of antibiotics and non-weight-bearing would have prevented the BKA. This protracted approach to acute osteomyelitis falls well below the standard of care" (page 13).
*The diagnosis of osteomyelitis was suspected by ACJ providers in May of 2020. At that time, he likely already required an amputation, due the osteomyelitis AND the decreased function of his foot/ankle per the orthopedic surgeon's discussion in September (AC_CM_000147).*

"Adequate nutrition is an important part of wound care recovery. There were several occasions on which Mr. McCray reported that he was not receiving his prescribed Boost nutritional supplement. Mr. McCray lost 20 pounds over the course of 6 months. AC_CM_000540-41. A lack of proper nutrition likely contributed to Mr. McCray's poor wound recovery."
*Nutrition is important, though Mr. McCray was provided 3 meals per day and ordered boost throughout the majority of this incarceration. His weight fluctuated but he booked in on 8/29/19 at*

15

*150lbs (AC_CM_000483) and had a normal BMI during this incarceration. There was a lower weight documented on 7/7/20 of 141lbs but this was up to 155lbs 10 days later, which may reflect a scale error. Weight loss cannot be attributed to a few missed doses of boost, other variables would also have to be considered.*

"Dr. Stechschulte and Dr. Park departed from the standard of care to devise and execute a physical therapy plan and effective exercises to enable Mr. McCray to walk safely with the least amount of pain" (page 16).
*Mr. McCray was referred to physical therapy (AC_CM_000514). It is the physical therapy staff's responsibility to devise and execute the physical therapy plan.*

"Each of the above instances reflect missed opportunities to develop a more aggressive timeline and plan of care which likely would have prevented the amputation in September. AC_CM_000518" (page 16).
*This is a statement of speculation and not supported by facts, citations, or literature.*

"There is no data to support the routine culturing of wounds, but rather, a deep culture should be obtained when there is clinical evidence of infection based on the provider's judgement. What is certain, however, is that the longer a wound remains open, the greater is the risk of wound infection and progression to osteomyelitis. Once again, the surveillance, treatment and testing for this wound was performed in such a protracted fashion as to greatly increase the risk of wound infection and osteomyelitis. It is certainly more likely than not, that if this situation would have been handled according to the accepted standard of care from the outset, the BKA would have been avoided. There is documentation of several cultures and the resulting reports including well understood wound pathogens including Streptococcal and Staphylococcal species" (page 16).
*It is unclear what the standard of care Dr. Ruotsi is referring to here. Every single wound is managed on a case-by-case basis. The duration of treatment for any infection is individualized. Cultures can help guide treatment, though superficial cultures are typically contaminated with bacteria that may not be causing the infection, especially with a chronic wound. A deep wound culture certainly would have been more helpful to guide treatment than a superficial wound culture. These are typically obtained by specialty care providers, which the patient was appropriately referred to on multiple occasions by ACJ providers.*

"As late as May 22, 2020, X-Rays of the right foot failed to show evidence of osteomyelitis. MCCRAY_003113-14. On or about May 30, 2020, Mr. McCray's wound culture was positive for Strep, Staph and diptheroids. AC_CM_002133-AC_CM_002135. Shortly thereafter, Mr. McCray was transferred to solitary confinement and then to a general population unit, and during that time did not receive proper and timely wound care, did not complete a full course of antibiotics, and out of necessity was forced to bear weight on his right foot with the infected wound" (page 17).
*The ACJ providers were concerned that osteomyelitis was present at this time (May 2020). An X-ray on 5/22/20 did not demonstrate radiographic evidence of acute osteomyelitis (AC_CM_000233) though it is possible to have osteomyelitis with normal X-rays. Radiographic changes such as bone erosions and periosteal reactions may not be evident with chronic osteomyelitis nor show up initially. It is my opinion that acute osteomyelitis was present at this time due to his clinical presentation and*

16

*subsequent demonstration of osteomyelitis on plain radiographs weeks later. It is my opinion that this may have marked a transition from chronic osteomyelitis to acute on chronic osteomyelitis. The reported bacteria present on Mr. McCray's reported wound culture may or may not be the cause of the infection (could possibly be colonizers or contaminants). The patient's reported side effects of the antibiotic medications that were started which led to their discontinuation are not discussed. It is not clear what Dr. Ruotsi is recommending would have been an acceptable treatment course here, though as I stated earlier if osteomyelitis was indeed present at this time oral antibiotics would not have resolved it.*

"Appropriate antibiotic agents, dosing and schedule should have been determined as soon as the definitive diagnosis of osteomyelitis was established – July 2. Acute osteomyelitis in a large weight bearing bone such as the calcaneous should be approached with a very real sense of urgency. A phone consultation between the ACJ physicians, Dr. Taffe, and an Infectious Disease consultant could have quite easily set Mr. McCray on a proper course. This obviously was not done, and failure to do so led to the loss of Mr. McCray's leg. There is no reason whatsoever to delay appropriate antibiotics until the time of surgery" (page 18).
*I do not agree with these statements for the reasons stated above. Starting antibiotics after the diagnosis of osteomyelitis was confirmed would not have prevented surgery, nor the extent of the surgery Mr. McCray underwent. The patient was seen on 8/1/20 and 9/4/20 by outside orthopedics and not started on antibiotics (AC_CM_000115 and AC_CM_000144). The type of surgery performed took into account the decreased function of his foot/ankle in addition to the infection per the orthopedic surgeon's discussion in September (AC_CM_000147).*

"Mr. McCray was allergic or sensitive to many antibiotics and medications, which he had an adverse reaction to or caused him pain. AC_CM_000541-44, AC_CM_000552-54, AC_CM_002630. ACJ medical personnel documented in his ACJ medical record that Mr. McCray had only one kidney and knew or should have known that Mr. McCray could have a significant adverse reaction to specific antibiotics, which happened on several occasions. *Id.*, AC CM 000479, AC CM 000505, AC CM 000527, AC_CM_000535, AC_CM_002187, AC_CM_002189. Mr. McCray told Dr. Stechschulte, Dr. Park and medical staff about his adverse reactions and persistent infection. *See* AC_CM_000522-580. McCray was given diapers because of persistent diarrhea from improper antibiotics. AC_CM_000523, AC_CM_000526-27" (page 18).
*The fact that Mr. McCray only had one kidney did not preclude him from taking specific antibiotics. He had a normal renal function documented during this incarceration (AC_CM_002126, 2140, 2153). Mr. McCray did suffer frequently from adverse effects of antibiotics which lead to their early discontinuation. This included diarrhea, which is a common adverse effect of many antibiotics.*


The above analysis is based upon the available information at this time. It is assumed that the information provided to me is correct. If more information becomes available at a later date, an additional report may be requested. Such information may or may not change the opinions rendered in this evaluation.

17

030

The examiner's opinions are based upon reasonable medical certainty and are impartial.

As discovery is ongoing and the available medical records appear incomplete, I reserve the right to amend this opinion letter in the event additional information is provided for my review.

Alexander Meagher, MD

*Alexander Meagher*

18

031